## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| JOHN DOE | : | |
| c/o Mincey Fitzpatrick Ross, LLC | : | |
| 1500 John F. Kennedy Boulevard, Suite 1525 | : | CIVIL NO. _____ |
| Philadelphia, Pennsylvania 19102 | : | |
| | : | |
| Plaintiff, | : | |
| vs. | : | JURY TRIAL DEMANDED |
| | : | |
| UNIVERSITY OF THE SCIENCES | : | |
| 600 S 43rd Street | : | |
| Philadelphia, Pennsylvania 19104 | : | |
| Defendant. | | |

---

## INTRODUCTION

1.      Plaintiff John Doe[1] ("John") brings this action for breach of contract, violation of Title

IX, and other related claims.

2.      This case arises out of the decision of the University of the Sciences (the "University" or

"USciences") to impose the disciplinary sanction of expulsion against John Doe in violation of

the Plaintiff's statutory and contractual rights.

## PARTIES

3.      Until January 18, 2019, John was a student at the University.

      a.   John currently resides in Philadelphia, Pennsylvania.

      b.   John had completed 3 ½ years of coursework at the University before being
wrongfully expelled.  He needs approximately 20 additional credits to obtain his

---

[1] The parties have agreed to the use of pseudonyms for the plaintiff, accusers and witnesses to protect their privacy.  Indeed, The disclosure of John Doe's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C.§1232g; 34 CFR Part 99.

undergraduate degree.

    c.  At the time of his expulsion, John was a Biomedical Science major with a Microbiology minor and a 3.29 cumulative GPA.

    d.  John Doe has paid a significant amount of money to the University in the expectation of receiving an education and a degree.

4.      The University of the Sciences is a private university.

    a.  The University was founded in 1821 as the first school of pharmacy in North America.  The University has a total undergraduate enrollment of approximately 1,200 students.

    b.  The University has a principal place of business at 600 South 44th Street, Philadelphia, Pennsylvania 19104.

5.      The University, at all times material hereto, acted by and through its agents, apparent agents, ostensible agents, servants, employees, workmen and/or representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of the University's business, mission and/or affairs, including, but not limited to Jessica Rickmond, Title IX Coordinator, for University, Joseph Kalin, Title IX Investigator for University, and Anne E. Kane, Esq., an attorney retained by University to investigate the alleged incident involving John Doe.

**JURISDICTION AND VENUE**

6.      This case arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all other claims in this case, as the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.

The University is located in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### Title IX Background

8.      On April 11, 2011, the Obama Era U.S. Education Department's Office of Civil Rights sent a "Dear Colleague Letter" to colleges and universities.

9.      The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and universities must have transparent and prompt procedures to investigate and resolve complaints of sexual misconduct and required schools to adopt a "more likely than not" burden of proof in cases involving sexual misconduct.

10.      Moreover, the Dear Colleague Letter states that schools should "minimize the burden on the complainant" and suggested that schools should focus more on victim advocacy.

11.      After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

12.      In response to pressure from Office of Civil Rights and the White House, educational institutions like the University limited procedural protections afforded to male students like John in sexual misconduct cases.

13.      In September 2017, the Education Department rescinded the Dear Colleague Letter of 2011 and issued new interim guidance on how to investigate and adjudicate allegations of campus sexual misconduct under federal law.

14.      Among other things, the interim guidance notes that schools should provide written notice to the responding party of the allegations, including sufficient details and adequate time to prepare a response before any initial interview.

15.    On November 16, 2018, the Education Department proposed further rules to address the lack of basic elements of due process and fundamental fairness.

16.    The proposed rules would require schools to operate with the presumption of innocence of the responding party throughout the grievance process.

17.    It would require written notice of allegations and an equal opportunity to review all evidence collected for both parties.

18.    It would require the right to cross-examination, subject to "rape shield" protections and a live hearing where cross-examination would be conducted through the parties' advisors.

19.    Notably, to promote impartial decisions, schools would not be allowed to use a "single investigator" or "investigator-only" model.

20.    Despite this new guidance, the University has continued use of a sexual misconduct policy with fundamentally flawed procedural protections, leaving responding parties such as John unreasonably vulnerable to unjust outcomes.

## THE DISCIPLINARY PROCEEDINGS AGAINST JOHN DOE

### John Doe and Jane Roe 1

21.    In the fall semester of 2017, John and Jane Roe 1 ("Jane 1") had known each other for over one year and maintained a nonsexual friendship.

22.    On or about November 3, 2017, John and Jane 1 had an exchange on Snapchat about Jane 1's "open relationship" with her then boyfriend.

23.    John and Jane 1 had been talking about Jane needing someone to provide physical affection in the absence of her boyfriend who attended another school.

24.     John asked if Jane 1's boyfriend would be okay with someone giving his girlfriend affection.  Jane 1 said he would be.  John volunteered to provide her with the wanted attention and invited her to his home.

25.     Jane 1 accepted and arrived at John's home between 11 pm and 12 am that night.

26.     Jane 1 would later recount that once she arrived, John took her up to his room and the two began kissing.  After 15-20 minutes, Jane 1 performed oral sex on John.  The two then engaged in foreplay and had intercourse.  John used a condom during intercourse.

27.     After having sex, the two fell asleep.  At the time, John had significant hip issues that prevented him from sleeping through the night.  The two woke, engaged in foreplay and had sex at least two more times.  Prior to the last encounter, John told Jane 1 that he had run out of condoms.

28.     The two remained in bed and engaged in foreplay.  As they had done before, at some point they began to have sex.  After about 1 or 2 minutes of penetration, Jane 1 said something like "that's not for you."  John then immediately stopped.

29.     John was confused and felt awkward.  The two made small talk but not about what Jane 1 had said.

30.     Jane 1 later recounted that she then went back to sleep and stayed in bed with John until she was awoken at 6 am by her alarm.  However, John recalled that after sex, he and Jane 1 made small talk before getting dressed and Jane 1 leaving.

31.     John walked Jane 1 to the door and Jane 1 walked to her dorm and immediately went to sleep.

32.     Neither John nor Jane 1 consumed any alcohol or drugs on that night.

33.     John and Jane 1 continued to interact after this night, with their interactions becoming less frequent over time.

34.     More than nine months later, Jane 1 and a sorority sister that the University labeled as W1 or Witness 1, made a report with the University that John had sexual intercourse with Jane 1 on November 3-4, 2017 without her consent.

35.     Specifically, Jane 1 alleged that the final sexual encounter that morning was not consensual because John did not have a condom and that he had forced himself inside of her by pinning her down with his legs.

36.     Despite policies and regulations prohibiting students from disclosing information about a report or complaint of sexual misconduct, Jane 1, W1 and others were permitted and encouraged by the University to disclose information about Jane 1's complaint to others in an effort to find other women willing to make a complaint against John.

37.     Through these efforts, Jane Roe 2 ("Jane 2") was convinced to file a complaint against John.

**John Doe and Jane Roe 2**

38.     As of January 14, 2018, John and Jane 2 had been maintaining a casual and consensual sexual relationship.  The previous semester, they had sex approximately 10 times.  John and Jane 2 would arrange via text or after having met up at parties to go to John's home to have sex.  Jane 2 later recounted that the relationship was not exclusive and they both were "seeing" other people.

39.     On January 14, 2018, John and his roommates were hosting a party to which he invited Jane 2 and her friends.

40.     When she arrived, John asked Jane 2 if she wanted to stay the night and she said yes.
Because John had hosting duties for the party, he and Jane 2 did not hang out together but he did
see her periodically during the party.

41.     Later that night, Jane 2 was injured on the dance floor when she was elbowed, fell down,
and came up with a bloody nose.  Jane 2 was upset and a friend, labeled by the University as W4,
took her to the second floor bathroom to help clean up her bloody nose.  John was near the
bathroom and left his hosting duties to help Jane 2.  John again asked Jane 2 if she wanted to stay
the night and she again responded yes.  John asked Jane 2 if she would like to go his room,
which was also on the second floor. Jane 2 accepted.

42.     John took Jane 2 to his room and they sat on the bed and talked.  Jane 2 was embarrassed
about her nose and John spent time trying to make her feel better about it.  John then left the
room briefly to make sure that someone had taken over his hosting duties.  When John returned,
he and Jane 2 began having sex on his bed.  John recalls Jane 2 being an active participant and
her being fully engage the entire time.  As on previous occasions that they had sex, Jane 2
occasionally got on top of and straddled John.

43.     After sex, John and Jane 2 went to sleep. Jane 2 then woke John and told him that she
wanted to leave.  The two got dressed and John walked Jane partially back to her dorm.  As they
left, around 2 am, the party was winding down and several of the partygoers, including W4,
walked behind John and Jane 2.

44.     Several people who interacted with Jane 2 that night, including W4, stated that Jane did
not appear intoxicated.

45.     On August 30, 2018, Jane 2 made a report to the University that she had passed out in
John's room the night of the January 14, 2018 party and woke up to John having sex with her.

Jane 2 made this report shortly after learning that her sorority sister Jane 1 had made a complaint against John.

**The University's Flawed Investigation**

46.    On August 30, 2018, the University Title IX coordinator, though investigator Joseph Kalin, notified John that a formal investigation was being initiated into allegations of non-consensual sexual intercourse with complainants Jane Roe 1 and Jane Roe 2, pursuant to the University's Sexual Misconduct Policy (the "policy").  A true and correct copy of the policy is attached hereto as Exhibit A.

47.    Specifically, John was given a Notice of Sexual Misconduct Investigation.  The Notice gave the names of the accusers and stated that John was being charged with "Sexual Assault I – Non-Consensual Sexual Intercourse."  However, the Notice did not provide John with any specifics about the allegations against him.

48.    When the University's investigation began in August 2018, John had spent the entire summer of 2018 studying to take the September 01, 2018 Medical College Admission Test ("MCAT") in anticipation of attending Medical School after graduation.  Upon learning of the investigation but having no idea what he was actually accused of doing, the stress John endured forced him to skip the exam and forfeit the $315 registration fee.

49.    That same day, the University issued a No Contact Order to John to stay away from Jane 1 and Jane 2.

50.    Under the policy, a formal investigation will be initiated if, after conducting the initial review of a formal complaint, the Title IX Coordinator determines that the allegation, if true, would constitute a violation of the policy.  Exh. A at 2.9.9.

51.     After Jane 1 and Jane 2 made their formal complaints against John on August 24, 2018 and August 30, 2018 respectively, Kalin determined that the allegations would constitute a violation of the policy and a formal investigation was initiated.

52.     Although the University asserted to John that they were acting according to the policy, they did anything but.

53.     The formal investigation did not comply with the policy or any of the University's procedures, as the University did not conduct separate investigations into the separate, unrelated claims against John.

54.     Instead, the University investigated both claims against John at the same time, allowing information obtained in relation to one claim to unfairly taint the other claim and vice versa.

55.     The University's policy utilizes the "single-investigator model" whereby a single investigator is given the power to interview accusers, the accused, and witnesses; make findings of fact; and determine whether a violation of the policy has occurred using a preponderance of the evidence (i.e., more likely than not) standard.  Exh. A at 2.10.2

56.     On September 5, 2018, the University retained attorney Kane of the law firm Schnader Harrison and Segal & Lewis LLP to be the sole investigator and issue a determination.

57.     According to the policy, the investigator will interview witnesses provided by both the complainant and respondent, those identified by other witnesses, and any other persons the investigator considers it proper to interview.  Exh. A at 2.10.7.

58.     The stated purpose of the interviews is to gather and assess information about the incidents at issue in the complaint, not to solicit general information about either party's character.  Exh. A at 2.10.5.

59.     However, Ms. Kane and the University used the witnesses in this matter in ways that eroded any sense of fairness, due process and equity.

60.     Ms. Kane and the University misused the witnesses and violated the University's own policy in the following ways:

  a)  Several witnesses, including Jane 1, were permitted and even encouraged to reveal the confidential nature of the complaints against John in order to gather information about John's character. The disclosure of information by someone involved in a complaint as a witness is a violation of Section 2.18 of Sexual Misconduct Policy. Exh. A at 2.18. Upon information and belief, no witness has been charged with violating the policy. Indeed, upon information and belief, Jane 1 and Jane 2 are currently violating this policy by revealing that John was expelled;

  b)   Several witnesses with information helpful to John's defense were not interviewed;

  c)  Witness statements were disregarded when they did not align with Ms. Kane's belief that John had sexually assaulted Jane 1 and Jane 2;

  d)  Discrepancies in the statements of witnesses favorable to Jane 1 and Jane 2 were not addressed or investigated;

  e)  Jane 1 and Jane 2 were each interviewed by the University on more occasions than John;

  f)  Ms. Kane failed to question Jane 1 and Jane 2 about discrepancies between their version of events and John's version but always cross-examined John on any discrepancy in his version of events and that of Jane 1 and/or Jane 2;

g) When John was initially confronted with a formal investigation without knowing anything about the charges against him, he was unable to explain what had happened months ago.  (After learning more about the charges against him, John was able to provide several witnesses to Ms. Kane.)

61.     Unfortunately for John, Ms. Kane and the University not only misused the witnesses, but the analysis of the evidence collected in each claim against John was intentionally skewed to ensure that John would be found to have sexually assaulted Jane 1 and Jane 2.

62.     In analyzing the evidence, Ms. Kane intentionally did the following to John's detriment:

a) Disregarded John's rebuttal of Jane 1's claim that John pinned her down with his legs by explaining that his chronic hip pain prohibited him from using his leg in that fashion;

b) Considered character evidence from female witnesses that John was pushy and would not take no for an answer but disregarded female witnesses that said John would never have sex with someone without their consent, including a witness who reported that John rebuffed her sexual advances because she was too intoxicated to give consent;

c) Ignored Jane 2's testimony that she became intoxicated soon after arriving at the party, and ignored several witnesses who stated that Jane 2 did not appear intoxicated and instead ruled that Jane 2 suddenly became intoxicated when she when into John's room and laid down;

d) Evaluated statements made by Jane 2 and John differently by accepting Jane 2's explanation that she contacted John the day after the party because she was embarrassed about her nose bleed but rejecting John's explanation that he agreed

11

with Jane 2 saying she was drunk because he was joking and did not mean it literally.

**Findings of the Investigator**

63.    Ms. Kane completed her investigative report on November 13, 2018.

64.    On November 14, 2018, Jessica Rickmond, the Title IX Coordinator informed John of the outcome of the investigation.

65.    Ms. Kane concluded that John Doe violated Section 1.6 of the Policy by engaging in sexual intercourse with Complainant 1 (Jane 1) "without affirmative consent," stating that Complainant 1(Jane 1) clearly voiced her unwillingness to engage in unprotected sex before the first time she and Respondent had intercourse and again after Respondent ran out of condoms.

66.    The investigator also concluded that John Doe violated Section 1.6 of the Policy by engaging in sexual intercourse with Complainant 2 (Jane 2) "without affirmative consent." According to Complainant 2 (Jane 2) was either passed out or semi-conscious when Respondent returned to his room and initiated sexual intercourse and Respondent knew or should have known that she was incapacitated.

67.    The report attempted to determine whether more likely than not there had been a violation of the policy regarding the events of November 3-4, 2017 with Jane 1.

68.    The evidence does not support the report's finding.

69.    The report attempted to determine whether more likely than not there had been a violation of the policy regarding the events of January 14, 2018 with Jane 2.

70.    The evidence does not support the report's finding.

71.    On December 7, 2018, Jessica Rickmond, the Title IX Coordinator informed John that an administrative panel had convened to determine sanctions two days before on December 5, 2018.

This panel does not have the power to overrule factual determinations and findings by the investigator.  *See* Exh A at 2.11.2.

72.     The administrative panel decided to sanction John with Expulsion, to be noted on his academic transcript, Campus Restriction and No Contact Order with Jane 1 and Jane 2.

73.     Per the University policy and instructions contained in the Sanctions, John submitted a written appeal to the University within 5 days of receiving notice of the Administrative Panel's decision.

74.     Per University policy, an administrative panel was formed to review his appeal.

75.      John's appeal was denied.  In denying the appeal, the panel ignored John's arguments that the investigation was flawed and incomplete.  The panel ignore the argument that several relevant witnesses should have been sought by Ms. Kane to provide information and that there should have been two separate investigations conducted by two separate investigators.

76.     Expulsion from the University will cause John to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career.

## COUNT I
## (Title IX)

77.     Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

78.     Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person .. . shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

79.     The University is an education program or activity operated by recipients of Federal financial assistance.

80.     Title IX bars the imposition of discipline against students where gender is a motivating factor in the decision to discipline.

81.     The decisions of the investigative process and the appeal process for John Doe were erroneous outcomes, which were the direct result of a flawed and biased proceeding.

82.     The University assumed that John Doe was guilty because he was a male accused of sexual assault rather than evaluating the case on its own merits.

83.     The University committed impermissible gender bias against John Doe in the investigation and adjudication of Jane Roe 1 and Jane Roe 2's accusations.

84.     The University violated their own policies and procedures and in doing so demonstrated the University's discriminatory bias against John based on his gender.

85.     Even assuming that the University had complied with its polices and procedures (which it did not), such rules afford varying rights to women and men as in virtually all cases of alleged sexual misconduct at the University, the accused student is a male and the accusing student is a female.

86.     There has been substantial criticism of universities, both in the student body and in the public media, accusing schools of not taking seriously complaints of female students alleging sexual assault by male students. On information and belief, the University's administration was cognizant of, and sensitive to, these criticisms. As a result, the University's decision-makers and its investigators were motivated to favor the accusing female over the accused male, so as to

protect themselves and the University from accusations that they had failed to protect female students from sexual assault.

87.    Upon information and belief, the University was motivated in this instance to accept the females' accusation of sexual assault so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students.

88.    The University has discriminated against John Doe because of his sex. This discrimination is intentional and is a substantial or motivating factor for the University's actions in this case. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Doe. These circumstances are described in detail above and show the following:

a.    The University, encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women.  For example, although the University was quick to initiate a formal investigation against John, it chose to ignore the policy violations committed by Jane 1, Jane 2 and several female witnesses when they revealed information about the investigation.

b.    The University has applied flawed or incorrect legal standards, and employed biased or negligent investigatory techniques.  For example, the single-investigator model is a proven flawed model that places the power to investigate, evaluate, prosecute and render judgment in the hands of one person.  Courts and the Government have criticized its use as an unfair model prone to unjust outcomes.

c.    The University officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct.

d.    The imposition of discipline on John is a result of a flawed and biased hearing

process. This resulted in a deprivation of access to educational opportunities at University.

89.     The circumstances of the investigatory process, the single investigator and the appeal process cast doubt on the accuracy of the outcome of the disciplinary proceeding. The Department of Education regulations and guidance state that Title IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct.

90.     The University assumed that Jane 1 and Jane 2, as female claimants, were truthful.  As a result of this gender bias, the University failed to adequately investigate and question the credibility of Jane 1 and Jane 2, limited questions to and commentary of investigatory findings to Jane 1 and Jane 2's emotional state and interactions with friends and family in the days and weeks after the alleged incident and failed to examine many of the conflicting statements of the parties in good faith.

91.     The Sexual Misconduct Policy ambiguously prohibits students from engaging in sexual intercourse with any other person that has consumed any amount of alcohol. However, in this instance, the University applied this prohibition in a gender discriminatory manner.

92.     Although both John and Jane 2 had been drinking, the University identified John as the initiator of sexual activity, notwithstanding the comparable intoxication of both participants.

93.     The University has discriminated against John Doe because of his sex. This discrimination is intentional and is a substantial or motivating factor for University's actions in this case. University officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct.

94.     John has been deprived of access to educational opportunities at the University.

95.     The University acted with deliberate indifference to these known acts of discrimination.

96.     As a direct and proximate result of the University's violations of John's rights under Title

IX, John has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

97.     The University is liable to John Doe for his damages.

98.     Pursuant to 42 U.S.C. §1988, John Doe is entitled to their attorney's fees incurred in bringing this action.

## Count II
## Breach of Contract

99.      Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

100.    By enrolling at the University, and paying his tuition and fees, and attending the school, John and the University had a relationship that may reasonably be construed as being contractual in nature.

101.    The terms of the contract between John Doe and the University are generally found in various Colleges policies and procedures, including those set forth in the Student Handbook.

102.    The contract between John and the University, as set forth in the Student Handbook, contains the following guarantee of essential fairness: "Procedures and rights in student conduct procedures are conducted with fairness to all." *See* Student Handbook at 49, the relevant portions of which are attached hereto as Exhibit B.

103.    The contract between John and the University, as set forth in the Student Handbook, also contains the following guarantee of essential due process "Due process, as defined within these procedures, assures written notice and the opportunity for a hearing before an objective decision-

maker." *Id*.

104.    The contract between John Doe and the University contains an implied covenant of good faith and fair dealing. This implied covenant prohibits the University from doing anything which will have the effect of destroying or injuring the right of John Doe to receive the fruits of the contract. The contract between John Doe and the University, as a result, impliedly included the requirement that the University provide John Doe with an investigatory and adjudicatory process that was fair.

105.    John paid the University tuition and fees.

106.    The University repeatedly and materially breached the explicit guarantee of fundamental fairness, as well as the implied covenant of good faith and fair dealing and other contractual provisions. These breaches include, but are not limited to, the following:

    1.    The University breached the explicit and implied obligation to provide John with adequate notice of the nature of the charges against him. Adequate notice was necessary to permit John to adequately defend himself through the entire disciplinary process, including the investigative stage.

    2.    The University breached the explicit and implied obligation to conduct a full and fair investigation of the claims against John Doe.

        i.    The investigator failed to conduct follow-up interviews, gather relevant physical evidence or information; and disregard character evidence.

        ii.    The investigator failed to consider statements by John, Jane 1 and Jane 2 that contradicted claims that John engaged in non-consensual sexual intercourse with his accusers.

        iii.    The failure to conduct a full and fair investigation was a breach of the

guarantee of a fair investigation and the implied covenant of good faith and fair dealing.

3.     The University breached its express and implied obligation when it limited John's access of the evidence against him.

    i.    John was not given copies of the evidence against him including witness statements.  Instead, John was forced to make an appointment to review the evidence, and even then he was only allowed to take notes of the evidence offered.

    ii.    These restrictions severely limited John's ability to defend himself as reviewing the evidence often took hours at a time.

    iii.    In this matter there were approximately 20 exhibits, including multiple page reports and interviews with 9 witness and multiple statements from each party. During at least one appointment, the evidence was incomplete as pages were missing from statements.

4.     The University breached its express and implied obligations when it found John Doe Responsible without sufficient evidence.

    i.    The Student Handbook includes the express statement that a student be found guilty by a preponderance of the evidence.

    ii.    There was no physical evidence or third party witnesses to support the allegations that John Doe was guilty.

    iii.    The only live witness presented against John Doe was Jane Roe 1 and Jane Roe 2, who were not a witnesses a reasonably prudent fact-finder would rely upon.  Indeed, Jane Roe's statements were aided by the

statements and memory of W1, who accompanied Jane 1 when she made her initial report.  W1 gave more than one statement to Ms. Kane and was encouraged to reveal information about the investigation to others in hopes of gathering more evidence against John.

    iv.    The failure to require that John Doe be found guilty only on the basis of sufficient evidence was a breach of the guarantees of fundamental fairness, conviction by a preponderance of the evidence, the presumption of innocence, and the implied covenant of good faith and fair dealing.

5.    The conduct of the entire process treated John Doe as if he was guilty from the start, thereby tainting the investigative process and violating the guarantees of fundamental fairness and fair and impartial hearing.

    i.    University administrators acted from the beginning as someone who believed the complainants without conducing any investigation.

    ii.    John Doe was prohibited from confronting his accusers.

    iii.    The bias of the entire process was so pervasive throughout the investigative processes that it destroyed any possibility of fairness and ensured that John would be found guilty. The finding was plainly a product of the presumption of guilt, as well as the atmosphere of bias and hysteria that permeated the entire disciplinary process.

    iv.    The failure to conduct an unbiased hearing was a breach of the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

107.    As a direct and foreseeable result of the University's failure to honor its express and

implied contractual promises and representations, John Doe has sustained, and will continue to

sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe

emotional distress; injury to reputation; past and future economic loss; deprivations of due

process; loss of educational opportunities; and loss of future career prospects.

WHEREFORE, Plaintiff John Doe, requests this Court to enter judgment against

University as follows:

- Judgment in favor of John Doe awarding damages in an amount to be determined at trial;

- An Injunction restoring John Doe as a student, remove marks from his school record indicating an expulsion and prohibiting further disciplinary proceedings in a manner that violates Title IX or the contract between the parties.

- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

## Count III
## Intentional Infliction of Emotional Distress

108.    Plaintiff incorporates each and every one of the other paragraphs of this Complaint as if fully set forth herein.

109.    The acts and omissions of the University at all times acting through its agents, servants, ostensible agents, employees and investigators (hereinafter collectively referred as to "investigators") were willful and intentional.

110.    The University knew or should have known that its investigators' systematically improper acts and omissions set forth above would cause John severe emotional distress.

111.    The University's conduct and that of its investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

112.    The University's conduct and that of its investigators was the direct and proximate cause

of John's severe emotional distress, which included symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, physical pain, and the inability to sleep through the night.

WHEREFORE, Plaintiff John Doe, requests this Court to enter judgment against University as follows:

      a.  Compensatory and consequential damages;

      b.  Award punitive damages;

      c.  Award prejudgment interest;

      d.  Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award; and

      e.  Grant such other and further relief that the Court deems just and proper.

## Count IV
## Negligent Infliction of Emotional Distress

113.  Plaintiff incorporates each and every one of the other paragraphs of this Complaint as if fully set forth herein.

114.  The University's disciplinary policies and procedures are not a product of negotiation, but ones of adhesion, unilaterally drafted and imposed upon its student body by the University and provided to University students after acceptance by the University.

115.  The University creates, interprets and implements its disciplinary policies unilaterally, exercising complete control over process which, if mishandled, would inevitably cause deep emotional harm so devastating that a reasonable person could not be expected to bear it.

116.  Throughout the course of its investigation, the University had a special relationship with John, which imposed on it a duty of care for John's emotional well-being, particularly throughout a disciplinary process.

22

117.   The University implicitly acknowledges the extreme emotional vulnerability of students involved in its disciplinary process by repeatedly and formally offering to afford those students, claimants and respondents, psychological and emotional care and support throughout the process.

118.   Yet, as the facts of this case illustrate, the University did mishandle its disciplinary procedures against John and that negligence has caused deep emotional harm to John, so devastating that a reasonable person could not be expected to bear it.

119.   The acts and omission of the University and its investigators were negligent.

120.   The University knew or should have known that the investigators' systematically improper acts and omissions set forth above would cause John severe emotional distress.

121.   The University's conduct and that of the investigator was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

122.   The University's conduct and that the investigators was the direct and proximate cause of John's severe emotional distress, which includes, but is not limited to symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night,

123.   As a direct, proximate, and foreseeable consequences of the aforementioned conduct, John Doe sustained significant damages, including but not limited to, severe emotional distress, damages to physical wellbeing, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

WHEREFORE, Plaintiff John Doe, requests this Court to enter judgment against University as follows:

      a.   Compensatory and consequential damages;

    b.  Award punitive damages;

    c.  Award prejudgment interest;

    d.  Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award; and

    e.  Grant such other and further relief that the Court deems just and proper.

## Count V
## Negligence

124.  Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

125. Having put in place a student disciplinary process, the University owed a duty of care to John Doe and others to conduct that process in a non-negligent manner and with due care. University officials who directed and implemented that process owed John Doe the same duty of care. The University is responsible for the conduct of those acting on its behalf under the theory of respondeat superior.

126. The obligation of University included the obligation to conduct an investigation and adjudicatory process in a non-negligent manner.

127. This duty is imposed by the contractual and/or quasi-contractual relationship between the parties.

128. This duty is further imposed by the role of the University in providing an education consistent with the liberal values of fairness and due process.

129. The conduct of University in investigating fell below the applicable standard of care for conducting investigations into, and adjudicating allegations of, sexual misconduct and amounted to breaches of the duty of due care. This negligent conduct included but was not limited to: the investigator was biased and assumed from the start of the investigation of John Doe was the

person who has assaulted Jane Roe 1 and Jane Roe 2.

130.  As a direct and proximate result of University's negligence, John Doe has suffered severe and substantial damages.

      a.   John Doe was denied the opportunity to complete his degree.

      b.   John Doe has lost the opportunity to obtain a valuable scholarship to graduate school.

      c.   John Doe's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

WHEREFORE, Plaintiff John Doe, requests this Court to enter judgment against University as follows:

      a.   Compensatory and consequential damages;

      b.   Award punitive damages;

      c.   Award prejudgment interest;

      d.   Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award; and

Grant such other and further relief that the Court deems just and proper.

## JURY DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as to each count.

Dated: January 24, 2019                  Respectfully submitted,

                             **MINCEY FITZPATRICK ROSS, LLC**

                             Riley H. Ross III, Esquire (PA 204676)
                             Zainab K. Ali, Esquire (PA 321181)
                             Two Penn Center
                             1500 JFK Blvd, Suite 1525
                             Philadelphia, PA 19102
                             ***Attorneys for Plaintiff***

## VERIFICATION

I, John Doe, hereby verify that I have read the foregoing Complaint and verify that all of the facts set forth therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  1-24-19

_____
John Doe

# EXHIBIT A

# Sexual Misconduct Policy Definitions, Process and Procedures | University of the Sciences

•

# Definitions and Title IX, Sexual Misconduct & Harassment Procedures and Process

# Definitions

**1.1**     The "Title IX Coordinator" is a designated individual recognized by the University, and is responsible for the oversight of this policy and any procedures related to it.  The Title IX Coordinator ("the Coordinator") is responsible for overseeing and resolving all Title IX reports and identifying and addressing any patterns or systemic concerns that arise during the review of such reports.

**1.1.1**     Responsibilities of the Coordinator include the following:

- Oversight of a prompt, fair, equitable investigation and resolution process for reports of prohibited conduct at the University.
- Evaluation of trends on campus by using information reported and data collected
- Development of recommendations for campus-wide training and education programs and other remedial actions designated to eliminate prohibited conduct, prevent its recurrence and address its effects.

**1.1.2**     The Coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or department/office, including any Deputy Coordinator.

**1.1.3**     The Title IX Coordinator may from time to time identify additional Deputy Coordinators within the University that serve in supporting and investigatory roles, and may have a specific area of expertise. Current Deputy Coordinators include:

- Title IX Deputy Coordinator for Students
- Title IX Deputy Coordinator for Faculty/Staff

**1.1.4**     The Title IX Coordinator is responsible for reporting any incidents brought to his/her attention that fall under the rubric of Clery-reportable offenses to the Clery Compliance Officer (or otherwise-named equivalent role) for inclusion in the Annual Security and Fire Safety Report.

**1.1.5**     The Title IX Coordinator is responsible for providing information regarding victim support and

other services to any individual reporting crimes that fall under the requirements of the Violence Against Women Reauthorization Act ("VAWA").

**1.2**      "Prohibited Conduct" includes the following specifically defined forms of behavior:  sexual assault, sexual exploitation, intimate partner violence, stalking, sexual or gender-based harassment and retaliation. Conduct under this policy is prohibited regardless of the sex, sexual orientation and/or gender identity/expression of the complainant or respondent.

**1.3**      "Complainant" is an individual who is eligible to file a complaint to report a violation of this policy.  It also includes any person who is reported to have experienced a violation of this policy in the case where another individual has made a report on that person's behalf.

**1.4**      "Respondent" is an individual responding to an allegation of violation of this policy.

**1.5**      "Complicity" is defined as being involved in illegal activity with others.

**1.6**      "Sexual Assault" consists of sexual contact and/or sexual intercourse that occurs without affirmative consent. Examples of behavior that may constitute sexual assault include, but are not limited to, the following:

- Engaging in sexual activity with an unconscious or semi-conscious person.
- Engaging in sexual activity with someone who is asleep or passed out.
- Engaging in sexual activity with someone who has said "no" or has otherwise expressed an unwillingness or refusal to engage in sexual activity.
- Engaging in sexual activity with someone who is vomiting, unable to stand without assistance, or has to be carried to bed.
- Allowing another person to engage in sexual activity with your partner without his or her consent.
- Requiring any person to perform any sexual activity as a condition of acceptance into a club, athletic program or any other organization affiliated with the University.
- Telling someone you will "out" them if they don't engage in sexual activity (e.g., threatening to disclose the person's sexual orientation without their consent).
- Telling someone you will fail them or give them a grade different from what they deserve if they don't agree to engage in sexual activity.
- Facilitating or assisting in a sexual assault including purchasing or providing alcohol or drugs to further a sexual assault.

**1.7**      "Sexual Contact" is any intentional sexual touching, however slight, with any object or body part (as described below), performed by a person upon another person.  It includes (a) intentional touching of the breasts, buttocks, groin, or genitals, whether clothed or unclothed, or intentionally touching another with any of these body parts; and (b) making another touch you or themselves with or on any of these body parts.

**1.8**　　　　"Sexual Intercourse" is any penetration, however slight, with any object or body part (as described below) and performed by a person upon another person. It includes (a) vaginal penetration by a penis, object, tongue, or finger; (b) anal penetration by a penis, object, tongue or finger; and (c) any contact, no matter how slight, between the mouth of one person and the genitalia of another person.

**1.9**　　　　"Affirmative Consent" is informed (knowing), voluntary and willing (freely-given), active and ongoing (not passive) permission, meaning that, through the demonstration of clear and coherent words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity.

1.9.1　　　Affirmative consent cannot be obtained by force.

1.9.2　　　Affirmative consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated.

1.9.3　　　Affirmative consent cannot be obtained or implied by silence or lack of resistance.

1.9.4　　　Consent may be withdrawn at any time.  An individual who seeks to withdraw consent must communicate, through words or actions, a decision to cease the sexual activity.  Once consent is withdrawn, the sexual activity must cease immediately.

**1.10**　　　　"Force" includes: (a) the use of physical violence, (b) threats, intimidation, and/or coercion.

**1.11**　　　　"Physical Violence" means that a person is exerting control over another person through the use of physical force.  Examples of physical violence include:  hitting, punching, slapping, kicking, restraining, choking, and brandishing or using any weapon.

**1.12**　　　　"Threats" are words or actions that would compel a reasonable person to engage in unwanted sexual activity.  Examples include:  threats to harm a person physically, to reveal private information to harm a person's reputation, or to cause a person academic or economic harm.

**1.13**　　　　"Intimidation" is an implied threat that menaces or causes reasonable fear in another person.  A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).

**1.14**　　　　"Incapacitation" means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity. A person who is incapacitated is unable, temporarily or permanently, to give consent because of mental or physical helplessness, sleep, unconsciousness or lack of awareness that sexual activity is taking place.  A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

**1.15**　　　　"Coercion" is the practice of forcing another party to act in an involuntary manner by use of

threats or force. Coercion is more than an effort to persuade, entice, or attract another person to act. When a person makes clear a decision not to participate in a particular form of sexual contact or sexual intercourse, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can constitute coercion.

1.16    "Sexual Exploitation" is an act or acts committed through non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, person benefit or advantage, or any other non-legitimate purpose.  Examples of Sexual Exploitation, include, but are not limited to, purposely or knowingly doing any of the following:

- Causing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give consent to sexual activity.
- Observing another individual's nudity or sexual activity or allowing another to observe consensual sexual activity without the knowledge and consent of all parties involved.
- Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images).
- Engaging in voyeurism (e.g., watching private sexual activity without the consent of the participants or viewing another person's intimate parts (including genitalia, groin, breasts or buttocks) in a place where that person would have a reasonable expectation of privacy).
- Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent.
- Exposing, disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent.
- Prostituting another person.
- Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

1.17    "Intimate Partner Violence"* ("IPV") includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship.  IPV may include any form of prohibited conduct under this Policy, including sexual assault, stalking, and physical assault. IPV includes the use or threat of physical force or restraint carried out with the intent of causing pain or injury to another.  Examples of behavior that may constitute IPV include the following:

- Taking away a person's cell phone during an argument so the person cannot call a friend or the police for help.
- Threatening to commit self-harm if another does not do what is asked.
- Threatening to physically assault someone the individual is dating if the person does not do what is asked.
- Hitting, punching, pinching, slapping, or choking someone with whom the person is intimately involved.
- Violating a protective order.
- Harming a person's animals or children while in an intimate relationship.

- Conduct directed at a specific person under circumstances that would cause a reasonable person to fear bodily injury or to experience substantial emotional distress.

* Intimate Partner Violence includes "dating violence" and "domestic violence, as defined by VAWA. Consistent with VAWA, the University will evaluate the existence of an intimate relationship based upon the Complainant's statement and taking into consideration the length of the relationship, the type of relationship, and the frequency of interaction between the person involved in the relationship.

**1.18**      "Physical Assault" is threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person.  Physical assault will be addressed under this Policy if it involves sexual or gender-based harassment, IPV, or is part of a course of conduct under the stalking definition.

**1.19**      "Stalking" (including Cyberstalking) occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear bodily injury or to experience substantial emotional distress.

1.19.1   "Course of conduct" in this circumstance means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.

1.19.2   "Substantial emotional distress" means significant mental suffering or anguish.

**1.20**      "Sexual Harassment" is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, suggestive, or otherwise.

1.20.1   For conduct to be deemed sexual harassment, both conditions below must be present:

- Submission to or reflection of such conduct is made, either explicitly or implicitly, as a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment).

- Such conduct creates a Hostile Environment

1.20.2   Examples of behavior that may constitute sexual harassment, if sufficiently severe, persistent or pervasive, include, but are not limited to, the following:

- Calling someone by a demeaning name.
- Giving someone unwanted gifts of a sexual nature.
- Displaying sexually-suggestive materials or sending notes, email, or jokes to a person that are sexually

explicit.
- Touching someone sexually without their consent.
- Massaging someone without permission.
- Brushing up against someone repeatedly.
- Continuing to ask out a person who already has said he or she is not interested.
- Exposing ones genitalia or breasts to another person.

**1.21**    "Gender-Based Harassment" includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when both conditions below are present:

- Submission to or reflection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment).
- Such conduct creates a Hostile Environment.

**1.22**    A "Hostile Environment" is defined as a situation where an individual's conduct is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from the University's education, employment, or co-curricular programs and/or activities.  Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective,

1.22.1    In evaluating whether a Hostile Environment exists, the University will consider the totality of known circumstances, including, but not limited to:

- The frequency, nature and severity of the conduct.
- Whether the conduct was physically threatening.
- The effect of the conduct on the Complainant's mental or emotional state (based upon a reasonably prudent person standard).
- Whether the conduct was directed at more than one person.
- Whether the conduct arose in the context of other discriminatory conduct.
- Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities.
- Whether the conduct implicates concerns related to academic freedom or protected speech.

1.22.2    A Hostile Environment can be created by persistent or pervasive conduct or by a single or isolated incident, if sufficiently severe.  The more severe the conduct, the less there is  a need to show a pattern or repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical.  A single incident of sexual assault, for example, may be sufficiently severe to constitute a hostile environment.  In

contrast, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment.

**1.23**     "Retaliation" means any adverse action taken against a person for making a good faith report of prohibited conduct or participating in any proceeding under this Policy.  Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy.  Retaliation may be present even where there is a finding of "no responsibility" on the allegations of prohibited conduct.  Retaliation does not include good faith actions lawfully pursued in response to a report of prohibited conduct.

1.23.1    The University prohibits any form of retaliation.

1.23.2    Retaliation is unlawful under Title IX.

1.23.3    Retaliation may include the following forms of behavior:

- Employment actions such as termination, refusal to hire, or denial of promotion.
- Other actions affecting a person's employment or academic or school-related activities such as threats, unjustified negative evaluations, unjustified negative references, or increased surveillance.
- Any other action such as an assault or unfounded civil or criminal charges that are likely to deter reasonable people from pursuing their rights.
- Sharing of information about an ongoing confidential investigation (including a Title IX or sexual misconduct investigation)

**1.24**     "Responsible Employee" is defined through Title IX as any employee who is required to share all reports of sexual misconduct with University administrative officials (i.e., Title IX Coordinator/Deputy Coordinator).

1.24.1    The University is deemed to have had notice if a responsible employee knew, or in the exercise of reasonable care should have known, about the misconduct.

1.24.2    Confidential employees are excluded from this requirement.

1.24.3    Every faculty member, staff, and volunteer on campus who works with students or minors, and every person identified as a Campus Security Authority (CSA) under the Clery Act must immediately report to the Title IX Coordinator any prohibited conduct reported to them or observed by then, including the name of the complainant and respondent, if known, and all known details as a "Responsible Employee".  All residence hall advisors and directors are also responsible employees.

**1.25**     "Confidential Employees" are those certain employees and volunteers whom the University has designated due to their specific role within the institution.

1.25.1    These individuals include professional, licensed counselors (and those who act in a counseling

role under the supervision of a licensed counselor) who are in an official role of providing mental health counseling to members of the campus community.

1.25.2    Confidential employees can talk to a victim without any requirement to reveal any personally identifying information about an incident to the University without the victim/patient's permission.  A person can seek assistance and support from these individuals without triggering a University investigation that could reveal the individual's identity or that the individual has disclosed the incident, thus providing some level of anonymity.  A list of current confidential employees can be found in a companion document to this policy.

1.25.3    Individuals who are trained as professional, licensed counselors, but who are not engaged in this role within the University are not deemed confidential employees, and continue to have an obligation to report.

1.25.4    Confidential Employees are, as Campus Security Authorities ("CSA") under the Clery Act, obligated to report the nature, date, time, and general location of an incident to the Title IX Coordinator while keeping confidential any information that would directly or indirectly identify the victim.  This limited report helps keep the Title IX Coordinator informed of the general extent and nature of prohibited conduct on and off campus so that the Title IX Coordinator can track patterns, evaluate the scope of the problem, and formulate appropriate campus-wide responses.

1.25.5    Before confidential support persons report any information to the Title IX Coordinator, they shall consult with the affected individual to ensure that no personally identifying details are shared with the Title IX Coordinator.

**1.26**      "Privacy" means that information related to a report of prohibited conduct will be shared with a limited circle of University employees who "need to know" in order to assist in the assessment, investigation and resolution of the report.  All employees who are involved in the University's response to reports of prohibited conduct receive specific training and guidance about sharing and safeguarding private information in accordance with state and federal laws.

1.26.1    The University will maintain as private, any accommodations or protective measures provided to the complainant to the extent that maintaining such confidentiality would not impair the University's ability to provide the accommodations or protective measures.

1.26.2    The privacy of student education records will be protected in accordance with the Family Educational Rights and Privacy Act ("FERPA").  All documentation related to a student's report, investigation, and resolution are protected by FERPA and will not be released, except as required by law.

1.26.3    Non-identifying information about a report may be shared with the Office of Public Safety or a designee to comply with the Clery Act.  A complainant's name will never be published in connection with the University's obligations under the Clery Act.  In addition, the University does not publish identifiable

information regarding victims in the University's Daily Crime log or online.

**1.27**        "Confidentiality" exists in the context of laws that protect certain relationships including with medical and clinical care providers and those who provide administrative services related to the provisions of medical and clinical care), mental health providers, counselors, and ordained clergy, all of whom may engage in confidential communications under Pennsylvania law.

1.27.1    It is critical for victims to understand that the above listed entities/persons are not permitted to disclose anything revealed to them in a professional setting to the University or anyone else without the explicit consent of the victim.

1.27.2    When information is shared by an individual with a confidential employee or a community professional with the same legal protections, the confidential employee (and/or such community professional) cannot reveal the information to any third party except when an applicable law or a court order requires or permits disclosure of such information.

1.27.3    For example, information may be disclosed when:

- The individual gives written consent for its disclosure;
- There is a concern that the individual will likely cause serious physical harm to self or others; or
- The information concerns conduct involving suspected abuse or neglect of a minor under the age of 18.

**1.28**        "Mediation" is defined as an intervention in a negotiation or conflict by an acceptable third party who has limited or no authoritative decision making power, who assists the involved parties to voluntarily reach a mutually acceptable settlement of the issues in dispute.

**1.29**        "Interim Measures" are supportive and protective measures offered to the reporting party, complainant, respondent, witnesses, and/or other members of the University community.

**1.30**        "Title IX Administrative Panel" is a 3-person panel chosen from a pool of University employees who are appropriately trained in Title IX matters.  The panel may include full-time benefits-eligible employees, faculty, or a mix thereof.  No students may serve on this panel.  This Panel will act as the body determining sanctions imposed on an individual found to be in violation of this policy.

**1.31**        The "Title IX Appeals Panel" is a 3-person panel chosen from a pool of University employees who are appropriately trained in Title IX matters.  The panel may include full-time benefits-eligible employees, faculty, or a mix thereof.  No students may serve on this panel.  In any individual incident, members of this panel shall be different than the individuals serving on the Title IX Administrative Panel for the incident/case.  This panel shall act as the body determining the outcome of an appeal under this policy.

# Title IX, Sexual Misconduct & Harassment Procedures and Process

**2.1          Consent**

2.1.1     A person who wants to engage in a specific sexual activity is responsible for obtaining consent for that activity.

2.1.2     Lack of protest does not constitute consent.  Lack of resistance does not constitute consent. Silence and/or passivity also do not constitute consent.  Relying solely on non-verbal communication before or during sexual activity can lead to misunderstanding and may result in a violation of this Policy.

2.1.3     It is important not to make assumptions about whether a potential partner is consenting.  In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity.  If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity.

2.1.4     Consent to one form of sexual activity does not, by itself, constitute consent to another form of sexual activity.  For example, one should not presume that consent to oral-genital contact constitutes consent to vaginal or anal penetration.  Consent to sexual activity on a prior occasion does not, by itself, constitute consent to future sexual activity.  In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of consent.

2.1.5     One should be cautious before engaging in sexual contact and/or sexual intercourse when either party has been drinking alcohol or using other drugs.  The introduction of alcohol or other drugs may create ambiguity for either party as to whether consent has been sought or given.  If one has doubt about either party's level of intoxication, foregoing all sexual activity is the most responsible practice.

2.1.6     Impairment by alcohol and/or other drugs is no defense to any violation of this Policy.

**2.2          Privacy and Confidentiality**

2.2.1     The University is committed to protecting the privacy of all individuals involved in the investigation and resolution of a report under this policy.  The University also is committed to providing assistance to help students, employees and third parties make informed choices.  With respect to any report under this policy, the University will make reasonable efforts to protect the privacy of participants, in accordance with applicable state and federal law, while balancing the need to gather information to assess the report and to take steps to eliminate prohibited conduct, prevent its recurrence, and remedy its effects.

2.2.2     Where the complainant requests anonymity, i.e., that their identity not be shared with the respondent, or that the University not pursue an investigation, the University must balance this request with the University's responsibility to provide a safe and non-discriminatory environment for all University members.  The University, through the Title IX Coordinator, will take all reasonable steps to investigate and respond to the report consistent with the request not to share identifying information or pursue an

investigation, but its ability to do so may be limited by the request.

2.2.3     Under a complainant request for anonymity, the request will be balanced against the following factors:

- The seriousness of the conduct;
- The respective ages and roles of the complainant and respondent;
- Whether there have been other reports of prohibited conduct under this policy involving the respondent;
- Whether the circumstances suggest there is a risk of the respondent committing additional acts of prohibited conduct;
- Whether the respondent has a history of arrests or records indicating a history of violence;
- Whether the report indicates the respondent threatened further sexual violence or other violence against the complainant and other individuals involved;
- Whether the reported conduct was committed by multiple individuals;
- Whether the circumstances suggest there is a risk of future acts of prohibited conduct under similar circumstances;
- Whether the reported conduct was perpetrated with a weapon;
- Whether the University possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence); and
- The respondent's right to receive information if such information is maintained in an "education record" under FERPA.

2.2.4     The University will take all reasonable steps to investigate and respond to the report consistent with the request not to share identifying information or pursue an investigation, but its ability to do so may be limited based on the nature of the request by the complainant.

2.2.5     Where the University is unable to take action consistent with the request of the complainant for anonymity, the Title IX Coordinator will inform the complainant about the chosen course of action, which may include the University seeking disciplinary action against a respondent.

2.2.6     Alternatively, the course of action may also include steps to eliminate the effects of the prohibited conduct and prevent its recurrence that do not involve formal disciplinary action against a respondent or revealing the identity of the complainant.

2.2.7     In such cases, the University will notify the complainant that it intends to move forward with an investigation, but in no event will the complainant be required to participate in any such actions undertaken by the University.

2.2.8     Title IX Coordinator is prohibited from answering any questions about the investigation or providing any information to the parent(s) of the complainant, respondent or any witnesses, except in the case of minor.  This prohibition applies even where the student has a signed FERPA waiver on file with the University. The Title IX Coordinator may provide information relating to the investigator process only.

**2.3**        **Reporting Allegations of Sexual Misconduct**

2.3.1        Making a report is the act of notifying the Title IX Coordinator or other Responsible Employee of an incident of Prohibited Conduct.  A report may be accompanied by a request for resources, no further action, informal resolution, and/or to initiate a formal complaint process by filing a complaint. The Title IX Coordinator will make an assessment of every report made, and determine, in conjunction with the complainant, how best to proceed.  Contact information for the Title IX Coordinator and Deputy Coordinators, including office locations, phone numbers, email addresses, is located in the Resources section of this document.

2.3.2        Any person who experiences prohibited conduct or who is aware of a member of the University community who has been subject to prohibited conduct is strongly encouraged to make a report.  All those designated as Responsible Employees  are required to report all information pertaining to instances of prohibited conduct, including information described as rumor or gossip that the responsible employee knows about.

2.3.3        An individual does not have to be a member of the University community to file a report under this policy. The University will take action to respond to allegations of prohibited conduct when the University knows or reasonably should know based on any available information that prohibited conduct has occurred.

2.3.4        Anonymous reports also are accepted and should be directed to the Title IX Coordinator or made via the confidential reporting line. The University will respond promptly and equitably to anonymous reports, but the response may be limited if the report does not include identifying information and/or a description of the facts and circumstances. Anonymous reports that provide enough information to constitute a criminal offense will be reported to the Office of Public Safety for purposes of inclusion in the University's Annual Security and Fire Safety Report.

2.3.5        The University encourages prompt reporting of prohibited conduct so that the University can respond promptly and equitably; however, the University does not limit the timeframe for reporting. If the respondent is no longer affiliated with the University at the time the report is made, the University will provide reasonably appropriate remedial measures, assist the complainant in identifying external reporting options, and take other reasonable steps to respond under Title IX. The University may continue to conduct an investigation for purposes of complying with Title IX and take steps to prevent the recurrence of such conduct and remedy the effects, if appropriate.

2.3.6        Complainants may simultaneously pursue criminal and University investigation. The University will support complainants in understanding and assessing their reporting options. Upon receipt of a report, the University will inform individuals of their right to file (or decline to file) criminal charges as well as the availability of medical, counseling and support services, and additional interim measures to prevent contact between a complainant and a respondent, such as housing, academic, transportation and working

accommodations, if reasonably available.  Making a report to the University does not require participation in any subsequent University proceedings, nor is a report required in order for a complainant to receive support or remedial measures.

2.3.7     Although the University strongly encourages all members of its community to report criminal violations of the law to law enforcement, it is the complainant's choice whether to make such a report and victims have the right to decline involvement with the police.[1] The University's Office of Public Safety will assist any victim with notifying local police if they so desire.

2.3.8     Public awareness events, protests, candlelight vigils, "survivor speak outs," or other forums in which students, staff, or faculty members disclose incidents of prohibited conduct, are not considered a report of Prohibited Conduct or notice to the University of prohibited conduct for purposes of triggering the University's obligation to investigate any particular incident(s).  Such events may, however, inform the need for campus-wide education and prevention efforts, and the University will provide information about Title IX and Clery rights at these events.

**2.4          Filing a Complaint**

2.4.1     Filing a complaint is making a request to initiate the University's formal disciplinary process. A report may become a formal complaint, either initiated by the complainant or the University, depending on the outcome of the initial inquiry and assessment of the report, coupled with the complainant's wishes.

**At the time a report is made, a complainant does not have to decide whether to file a complaint. The University recognizes that not every individual will be prepared to file a complaint with the University or to law enforcement, and individuals are not expected or required to pursue a specific course of action.**

**2.5          Initial Assessment**

2.5.1     Upon receipt of a report of prohibited conduct, the Title IX Coordinator will arrange to meet with the complainant in an intake meeting as soon as possible and within 5 days of receiving the report.

2.5.2     At this meeting, the Title IX Coordinator will discuss and explain:

- Title IX processes and procedures
- Counseling and medical support services available.
- Interim measures available and how to access them.
- Confidentiality versus privacy considerations.

2.5.3     At this meeting, the Title IX Coordinator will seek to determine how the complainant wishes to proceed, i.e., whether the complainant wishes to pursue an informal resolution, mediation, a formal complaint or does not wish to pursue further action. Title IX Coordinator will have discretion to determine whether or not informal resolution or mediation is appropriate under the circumstances.

2.5.4     Even in instances where the complainant does not wish any action to be taken, the Title IX Coordinator must assess and make a determination in order to ensure the safety and wellbeing of the complainant and the University community.

**2.6          Interim Measures**

2.6.1     The University may implement interim measures at any point during an investigation.

2.6.2     Measures may be both remedial (designed to address safety and well-being and continued access to educational opportunities) or protective (involving action against a respondent).

2.6.3     Interim measures are designed to eliminate the prohibited conduct, prevent its recurrence and remedy its effects.

2.6.4     Measures may include, but are not limited to:

- No contact orders
- Changes in housing assignment for one or both parties
- Academic accommodations
- Changes in supervisor or work location
- Removal from campus housing or grounds
- Social restrictions
- Changes in parking locations
- Increased security
- Emotional and other support
- Counseling

2.6.5     An interim suspension, i.e. suspension from classes, work and other privileges (e.g., participation in varsity athletics) or activities, or from the University, may also be instituted until resolution of a case.

2.6.6     Interim measures are available regardless of whether a complainant pursues a complaint or investigation under this policy.

2.6.7     The University will maintain the privacy of any interim and protective measures provided under this policy to the extent practicable and will promptly address any violation of the protective measures.

2.6.8     The Title IX Coordinator has the discretion to impose and/or modify any interim measure based on all available information, and is available to meet with a complainant or respondent to address any concerns about the provision of interim measures.  The Title IX Coordinator will work with the appropriate Title IX Deputy Coordinator (e.g., student, faculty) to identify and impose appropriate interim measures.

**2.7          Informal Resolution**

2.7.1    Recognizing that a wide spectrum of behaviors can constitute violations of the University's Sexual Misconduct and Harassment Policy, the Title IX Office may resolve reports informally and appropriately, based on the circumstances.

2.7.2    Informal resolutions generally are pursued when the complainant, having been fully informed of all available options, has explicitly made that choice. An informal resolution process is voluntary, and a complainant or respondent can ask to end the informal resolution process at any time before its completion.

2.7.3    If an informal resolution process is ended by request, any information obtained may be used in a subsequent formal resolution process.

2.7.4    Once a report has been resolved through an informal resolution process, the matter will be closed.

**2.8       Mediation**

2.8.1    If the complainant desires to pursue mediation to resolve his/her report, the Title IX Coordinator must agree that mediation is appropriate for resolution of the report at issue.  Mediation is never appropriate for resolution of cases involving alleged Sexual Assault or any form of violence.  To determine whether  mediation is appropriate, the Title IX Coordinator shall take the totality of circumstances into account, including but not limited to:

- The nature and severity of the conduct;
- The possibility of mediation resolving the matter;
- Whether mediation would satisfy the University's Title IX obligations in the case at hand.

2.8.2    If the Title IX Coordinator determines that mediation is appropriate, the Title IX Coordinator will promptly assign an appropriately trained mediator(s), notify the respondent, and implement mediation within five working days, absent any unusual circumstances.

2.8.3    Both parties must consent to mediation.

2.8.4    The Title IX Coordinator or any other appropriately trained employee may serve as the mediator.

2.8.5    A matter will be deemed satisfactorily resolved when both parties expressly agree in writing to an outcome that is also acceptable to the Title IX Coordinator.

2.8.6    At any stage during the mediation process, the complainant or respondent may terminate the mediation and elect to begin formal complaint procedures. Further, at any point during the mediation, if the mediator suspects that mediation is no longer appropriate, the mediator will confer with the Title IX Coordinator on this matter.  A finding of inappropriateness must be made, for example, in the event that the mediation exposes an occurrence of sexual assault with respect to the parties engaged in the mediation.

2.8.7      Because entry into mediation and into a mediation agreement is voluntary, neither party shall have the right to appeal the terms of a Mediation Agreement absent a showing of duress or undue influence caused by any person, even a person not involved in the mediation.  The Title IX Coordinator shall have sole discretion to determine whether a proper showing of duress or undue influence has been made.  If the Title IX Coordinator makes a finding of duress or undue influence, then formal procedures will be initiated.

**2.9          Formal Complaint**

2.9.1      Once a report of Prohibited Conduct has been made, a victim or a third-party may file a formal complaint alleging a violation of this policy. A complaint of prohibited conduct should be filed directly with the Title IX Coordinator. The University, when the Title IX Coordinator determines that it is necessary to protect the safety and well-being of the community, reserves the right to bring reports forward against a student or employee and to act as the complainant for purposes of this policy.

2.9.2      For Staff and Faculty, a formal complaint/statement must be submitted in writing.

2.9.3      It is strongly recommended that formal complaints be made in writing.

2.9.4      In order to institute a formal complaint, the following information is essential:

- The name of the accused (if known)
- A description with reasonable specificity the incident(s) of alleged misconduct, including the date and place of such incident(s)
- A list of any sources of potential information (e.g., witnesses, correspondence, records, etc.) that the victim or third-party believes may be relevant to the investigation.

2.9.5      A complaint should not be delayed if such sources of potential information are unknown or unavailable because such sources can be discovered in the formal investigation.

2.9.6      The Title IX Coordinator will review the complaint and determine whether the allegations, if true, would constitute a violation of this Policy. If necessary, the Title IX Coordinator will meet with the complainant or the third-party reporter to gather further information prior to making a determination. This initial review should occur within 5 days of receiving the formal complaint.

2.9.7      If, after conducting the initial review of a formal complaint, the Title IX Coordinator determines that the allegation, if true,  would not constitute a violation of this Policy, then the Title IX Coordinator will administratively close the case and notify the complainant (and the reporter, if there is one). If new information subsequently arises, the complainant or reporter of the incident may request reconsideration of the determination that no violation occurred.

2.9.8      In cases where the Title IX Coordinator concludes that the alleged conduct, while not a violation of this Policy, might implicate other University policies, the Title IX Coordinator may refer the matter to the

appropriate University officials.

2.9.9     If, after conducting the initial review of a formal complaint, the Title IX Coordinator determines that the allegation, if true,     would constitute a violation of this Policy, then a formal investigation will be initiated. The investigation will take the form of the single-investigator model recommended by the White House Task Force to Protect Students from Sexual Assault.

2.9.10   The Title IX Coordinator may enter an interim order, where warranted and/or requested by the complainant, directing that no contact shall occur between the complainant and the respondent, and may also institute any other interim measures necessary.

2.9.11   In the case where a law enforcement agency is in the process of gathering information, and at the request of law enforcement or University general counsel, the University will temporarily suspend the fact-finding aspect of the University investigation.  Investigation will proceed again upon notification of the Title IX Coordinator or Investigator by University general counsel.

## 2.10     Investigation

2.10.1   The Title IX Coordinator will meet with the respondent in order to provide written notification of the allegations, provide the respondent with a copy of the policy and its procedures, inform the respondent of his/her rights under this policy and answer any questions regarding the Policy, process and procedures that the respondent may have.

2.10.2   The Title IX Coordinator will assign an investigator to the complaint. The investigator will make findings of fact, applying a preponderance of the evidence standard (i.e., more likely than not), and determine based on those findings of fact whether a violation of this policy occurred.

2.10.3   The Respondent will have five (5) business days to submit a written response to the allegations to the Title IX Coordinator. The Respondent is not required to submit a written statement. The investigation will continue regardless of whether the respondent chooses to participate in the process.

2.10.4   The investigator will request individual interviews with the complainant, the respondent, and other witnesses as appropriate.  The initial interviews with the complainant and the respondent should be in person.

2.10.5   The purpose of the interviews is to gather and assess information about the incident(s) at issue in the complaint, not to solicit general information about either party's character.

2.10.6   This initial interview with the complainant should take place in person and within 5 business days after being assigned the case by the Title IX Coordinator.  The investigator may wait to hold the initial interview with the respondent until after first meeting with the complainant.

2.10.7   The investigator will interview witnesses provided by both the complainant and respondent.

Witnesses may also include those identified by a University representative, those identified by other witnesses, and any other persons the investigator considers it proper to interview.

2.10.8   After the collection of additional information is complete but prior to the conclusion of the investigation, the investigator may request individual follow-up interviews with the complainant and respondent to give each the opportunity to respond to the additional information.

2.10.9   Within one week after each party reviews the preliminary factual findings, the complainant and respondent may submit a written response to the investigator who will consider that response before finalizing the factual findings.

2.10.10   To the extent that the final report of the investigator concludes that a violation has occurred, the report will not contain any specific recommendation as to sanctions.

2.10.11   The investigator will return the final investigation report to the Title IX Coordinator.  The Title IX Coordinator will notify the complainant and respondent simultaneously in writing of the final findings of the investigator.

2.10.12   Such notification shall include the process, reasons for and deadline for appealing the investigator's finding.

**2.11        Student Sanctions**

2.11.1   This section shall apply when the respondent's primary role at the University is as a student.

2.11.2   If the final report determines that a violation has occurred and there is no appeal, or a finding that the investigator's decision is upheld, the Title IX Coordinator will appoint a 3-person panel of faculty and staff to a Title IX Administrative Panel, for determination of sanctions. Students are not eligible to serve on this panel.  This Panel may request clarification on the facts from the investigator, but does not have the authority to overrule the factual determinations of the investigator.

2.11.3   Concurrent to the appointment of the Title IX Administrative Panel, the Title IX Coordinator shall request a written confidential report from the Vice President of Student Affairs regarding the background of the student respondent, any prior incidents of misconduct in which the respondent has been involved, and a report of sanctions/remediation previously applied for offenses of a nature similar to the current case. Such report shall be completed within five (5) business days and returned to the Title IX Coordinator.

2.11.4   Concurrent to the appointment of the Title IX Administrative Panel, the Title IX Coordinator shall request a voluntary, written confidential impact statement from the complainant and respondent.

2.11.5   The Title IX Coordinator shall provide the Administrative Panel with 1) a full copy of the investigator's final report, including all exhibits, 2) the written confidential report from the Vice President of Student Affairs, and 3) any and all confidential impact statements received from the complainant and/or

respondent.

2.11.6   The Administrative Title IX Panel shall issue a letter detailing the sanctions to be imposed within 5 days of receiving the materials from the Title IX Coordinator. The letter shall be sent to the Title IX Coordinator who will then simultaneously relay it to the complainant and respondent, along with the procedures to appeal the decisions.

2.11.7   In an investigation conducted against a student who is the alleged perpetrator of any crime of violence or non-forcible sex offense (e.g., statutory rape, incest), the results of the sanctions proceeding will be provided to the victim and in the case of a deceased victim, to the next of kin.

**2.12**      **Employee Sanctions**

2.12.1   This section shall apply when the respondent's primary role at the University is as a non-faculty employee.

2.12.2   If the final report determines that a violation has occurred and there is no appeal, or a finding that the investigator's decision is upheld, the case shall be referred to the Director of Human Resources for disciplinary action per the Employee Standards of Conduct Policy and Corrective Action Procedures.

**2.13**      **Faculty Sanctions**

2.13.1   This section shall apply when the respondent's primary role at the University is as a faculty member.

2.13.2   For individuals holding dual and equal roles at the University as both faculty member and non-faculty employee, this section shall also apply.

2.13.3   If the final report determines that a violation has occurred and there is no appeal, or a finding that the investigator's decision is upheld, the case shall proceed  through the process for faculty sanctions (including termination) as outlined in the Faculty Service Information (FSI).

**2.14**      **Advisors**

2.14.1   The complainant and the respondent each have the opportunity to be advised by an advisor of their choice, including legal counsel, at their expense, at any stage of the process and to be accompanied by that advisor at any meeting or hearing in which the complainant or the respondent is required to be present.

2.14.2   An advisor may only consult and advise his or her advisee, but not speak for the advisee at any meeting nor may the advisor direct questions to any administrator, party or witness in the process.

2.14.3   Should the advisor become disruptive during any meeting, the Title IX Coordinator or investigator

may ask them to leave. No advisor (or party) will be given the opportunity to cross-examine or to directly question a complainant/respondent.

2.14.4   A parent may serve as an advisor to the complainant or respondent, and in such case, shall be treated as set forth above.

**2.15      Appeal**

2.15.1   An appeal may be made by either party based only on the following situations:

- A substantive violation of the procedures set forth in this policy has occurred which, in the context of the case, is likely to have the effect of changing the outcome; or
- The appellant has substantive and relevant new information that was not available at the time of the investigation that may change the outcome; or
- The appellant believes the decision regarding responsibility was in error; or
- The appellant believes the sanctions are not commensurate with the violation

2.15.2   An appeal must be made to the Title IX Coordinator in writing within five (5) business days of receiving notification of the Title IX Administrative Panel's decision from the Title IX Coordinator.

2.15.3   The Title IX Coordinator, having received the appeal, will convene a Title IX Appeals Panel, a 3-person panel of appropriately trained faculty and staff, for review of the appeal. Students are not eligible to serve on this panel.

2.15.4   The Title IX Coordinator will forward all materials reviewed by the Title IX Administrative Panel  to the Appeals Panel.

2.15.5   The Appeals Panel may request clarification on the facts from the investigator,.

2.15.6   The Appeals Panel will first make a determination of merit for the Appeal.  If no merit is found, the Appeals Panel will notify the Title IX Coordinator that the Appeal will not move forward.

2.15.7   If merit is found for the Appeal, the Appeals Panel will make a determination within five (5) business days of one of the following:

- Change in the finding of responsible/non-responsible for a violation of this policy; or
- Change in the sanctions imposed; or
- Refer the case back to the investigator to further review new information acquired; or
- Affirm the original findings and sanctions imposed

2.15.8   Upon determination by the Appeals Panel, the Title IX Coordinator will immediately be notified.

2.15.9   In the event there is a subsequent change in the result or when the result becomes final, both

parties will be sent written notification of such change within two (2) business days.

2.15.10   Any change in responsibility/non-responsibility and/or change in sanctions made by the Appeals Panel is final, and not subject to further appeal.  Findings and/or sanctions of this Policy cannot be grieved through the Student Grievance Policy.

**2.16      Request to Withdraw Complaint**

2.16.1   While every effort will be made to respect the complainant's wishes to withdraw a formal complaint, the University must be mindful of its overarching commitment to provide a non-discriminatory environment as set forth in this policy and pursuant to Title IX. Therefore, the Title IX Coordinator may determine that investigation is appropriate despite a complainant's request to withdraw the complaint.

**2.17      Request for Informal Resolution After a Complaint has Been Filed**

2.17.1   Once a complaint has been opened for investigation and before the final report has been provided to the parties, the complainant may request informal resolution or mediation as an alternative to formal resolution of the complaint.

2.17.2   Such informal resolution requires the agreement of the complainant and respondent and the approval of the Title IX Coordinator.

2.17.3   If such a request is approved, the timeframes will be stayed, and the investigators or a designee will take such steps as he or she deems appropriate to assist in reaching a resolution.

2.17.4   If an informal resolution cannot be reached in two weeks, then formal procedures will resume.

**2.18      Additional Confidentiality Considerations**

2.18.1   Once a complaint is filed, the complainant, third-party reporter, the respondent, personal advisors, and any witnesses will be notified of the potential for compromising the integrity of the investigation by disclosing information about the case and the importance of keeping confidential any information or documents that they receive or review.

2.18.2   If it is determined that anyone involved in a report or complaint either as a complainant, respondent or witness, colluded or shared information with another, sanctions may be imposed by USciences.  Such consequences may include suspension or dismissal from USciences, being barred from residing on campus, or being prohibited from participating in extracurricular activities, including varsity athletics.

**2.19      Multiple Charges**

2.19.1   If the report of a violation of the Sexual Misconduct and Harassment Policy also implicates other

potential violations of the University's Code of Student Conduct (in the case of students) or potential violations of other University policies, the Title IX Coordinator, in consultation with other appropriate University personnel, will evaluate all reported allegations to determine whether the allegations may be appropriately investigated together without unduly delaying resolution.

2.19.2    When the Title IX Coordinator determines that a single investigation is appropriate, the determination of responsibility for the violation of the Student Code of Conduct or violation of University policy will be evaluated under the applicable policy.

2.19.3    The investigation and adjudication will be done in accordance with the Sexual Misconduct and Harassment Policy.

2.19.4    If there is found to be no violation of the Sexual Misconduct and Harassment Policy, but violations of other University policies may have occurred, a referral to the appropriate hearing body (student conduct, human resources, faculty senate) may occur for further assessment and possible action, to be undertaken and/or imposed at the discretion of that body.

# 3.    Appendices

### 3.1        Appendix A – List of Confidential Employees

| Name | Role |
| --- | --- |
| Dr. Barb Siebert | Director, Student Health |
| Dr. Anna Patrone | Physician Assistant |
| Dr. Karen Levinson | Director, Student Counseling |
| Dr. Alissa Brown | Associate Director, Student Counseling |
| Dr. Gauri Saxena | Staff Psychologist |

*Note: List current as of 5/8/2018* **3.2        Appendix B – List of Potential Sanctions Student Sanctions**

All sanctions with detailed descriptions are available in the student handbook under the Student Conduct Policy.  Depending on the circumstances of the violation, alternative sanctions beyond the below list may be imposed.

- Written reprimand
- Completion of educational program(s)/workshop(s)
- Participation in psychological, physical, or substance abuse evaluations and/or counseling
- Conduct probation:  Loss of ability to participate in co-curricular activities

- Educational reflection paper
- Fines and restitution
- Housing Probation
- Housing Reassignment
- Housing Suspension (deferred)
- Housing Suspension
- Housing Termination
- Loss of Privileges
- Parental Notification
- Revocation of admission and/or degree
- Service requirement
- University Suspension (deferred)
- University Suspension (up to two years)
- Expulsion

- Verbal warning
- Written reprimand
- Required participation in non-credit educational programs or community service
- Required participation in psychological, physical, or substance abuse evaluations
- Required counseling
- Fines and restitution
- Administrative Leave
- Suspension
- Termination

**Faculty Sanctions**
- Verbal warning
- Written reprimand
- Required participation in non-credit educational programs or community service
- Required participation in psychological, physical, or substance abuse evaluations
- Required counseling
- Fines and restitution
- Administrative Leave
- Termination

# 4.    Companion Documents

**4.1**        Annual Security and Fire Safety Report

**4.2**        Student Handbook

**4.3**     Employee Handbook

**4.4**     Faculty Service Information

**4.5**     Mandatory Training Policy/Matrix

**4.6**     Title IX Intake Form

**4.7**     Notification of Respondent's Rights

**4.8**     Notification of Victim's Rights

For copies of these companion documents, please contact Jessica Rickmond at
j.rickmond@usciences.edu or 215-596-8844

- © **2019 University of the Sciences in Philadelphia**

  *600 South 43rd Street*
  *Philadelphia, PA 19104*

# EXHIBIT B



**University of the Sciences**

# 2018 – 2019

# STUDENT
# HANDBOOK

Property of: _____

Address: _____

Phone #: _____

E-mail: _____

In case of emergency, please notify:

_____     _____
            Name                                  Phone #

*The information in this book was the best available at press time.  Policies and procedures are subject to change.*

~ 2018-2019 STUDENT HANDBOOK ~

# TABLE OF CONTENTS

**GENERAL INFORMATION AND UNIVERSITY POLICIES**

General ...................................................................................................................... 4
University Policies ...................................................................................................... 8

**ACADEMICS**

Program Information .................................................................................................. 72
Academics .................................................................................................................. 76
Graduate Students ...................................................................................................... 76
Entry-Level Programs ................................................................................................ 76
Majors ........................................................................................................................ 77
Catalog Year for Degree Requirements .................................................................... 81
Registration and Student Records ............................................................................. 81
Grades ........................................................................................................................ 92
Academic Standards and Academic Progress ........................................................... 96
Requirements for Graduation .................................................................................... 102
Separation from the University .................................................................................. 103

**STUDENT SERVICES**

Guide to Campus Services ......................................................................................... 112
Services for Students .................................................................................................. 115

**CAMPUS LIFE**

Athletics ..................................................................................................................... 146
Civic Engagement ...................................................................................................... 148
Fraternity and Sorority Life ...................................................................................... 149
Leadership Programs .................................................................................................. 151
Off-Campus Housing ................................................................................................. 151
Residence Life ........................................................................................................... 152
Student Activities ...................................................................................................... 153
Student Government Association (SGA) ................................................................... 153
Student Organizations – General Information .......................................................... 156
Student Organizations ................................................................................................ 161

**DIRECTORIES** ...................................................................................................... 174

2018-2019 Board of Trustees ..................................................................................... 174
Administrative Staff ................................................................................................... 175
Full Time Faculty ...................................................................................................... 178
Important Telephone Numbers .................................................................................. 179

**APPENDIX A** – Academic Integrity ..................................................................... 183

**APPENDIX B** – Tuition, Fees, and Refunds (2018-2019) ................................... 187

**APPENDIX C** – Academic Calendars .................................................................. 191

**GLOSSARY** ........................................................................................................... 193

**INDEX** .................................................................................................................... 205

38. **Violation of University Policies.** Violating other published University policies or rules.

39. **Weapons.** Possession, use, or distribution of explosives (including fireworks and ammunition), guns (including air, BB, paintball, facsimile weapons and pellet guns), or other weapons or dangerous objects such as arrows, axes, machetes, nun chucks, throwing stars, or knives, including the storage of any item that falls within the category of a weapon in a vehicle parked on University property. (See Campus Weapons Policy for more information).

## OVERVIEW OF CONDUCT PROCESS

This overview provides a general idea of how the campus conduct proceedings work, however not all situations are of the same severity or complexity. Thus, these procedures are flexible, and are not exactly the same in every situation, though consistency in similar situations is a priority.

Students should be aware that the student conduct process is quite different from criminal and civil court proceedings. Procedures and rights in student conduct procedures are conducted with fairness to all, but do not include all of the same protections afforded by the courts. Due process, as defined within these procedures, assures written notice and the opportunity for a hearing before an objective decision-maker. No student will be found in violation of a University policy without information showing that it is more likely than not that, a policy violation occurred. Any sanctions will be proportionate to the severity of the violation and to the cumulative conduct history of the student.

The Office of Student Conduct may accommodate concerns for the personal safety, well-being, and/or fears of confrontation of the complainant, respondent, and/or other witnesses during the hearing by providing separate facilities, by using a visual screen, and/or by permitting participation by telephone, videophone, closed circuit television, video conferencing, videotape, audio tape, written statement, or other means where and as determined appropriate by the Director of Student Conduct (or designee).

### Filing of Complaints

Any member of the University community may file a complaint against a student or student organization for potential violations of the Student Conduct Policy. Complaints may be filed with the Office of Student Conduct. Faculty and staff can access the reporting forms on the University Blackboard page. Anyone else wishing to file a complaint should contact the office at (215) 596-7554.

While there is no time limit on filing complaints, it can become difficult to gather information regarding an incident and take action when there is a prolonged delay in filing a complaint. As such, every effort should be made to file a complaint as soon as possible after the event takes place or becomes known, preferably within five days.  Complaints filed more than 90 days after the event takes place or becomes known, will be addressed at the discretion of the Director of Student Conduct, in consultation with the Dean of Students (or designee).

The Director of Student Conduct (or designee) will review the complaint and will determine the initial course of action to be taken. If necessary, the Director of Student Conduct (or designee) may request