

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN DOE | : |
|         Plaintiff, | : |
| v. | : **Civil Action No.:** |
| | : **JURY TRIAL DEMADED** |
| UNIVERSITY OF THE SCIENCES | : |
|         Defendants. | : |

**ORDER**

AND NOW, on this _____ day of January 2019, upon consideration of Plaintiff John

Doe's Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiff's Verified

Complaint, and all documents submitted in support thereof and in opposition thereto, and after a

hearing in open court, it is ORDERED as follows:

1. Plaintiff's Motion for a Temporary Restraining Order is GRANTED;

2. Defendant and its officers, agents, servants, employees, and attorneys

    (collectively, "Defendant") are hereby RESTRAINED AND ENJOINED as

    follows:

    a) Defendant shall take all steps and actions necessary to reinstate Plaintiff as

        a student at University of the Sciences with the full credits and benefits

        that Plaintiff enjoyed prior to his expulsion;

    b) Defendant shall allow Plaintiff to resume his Spring 2019 class schedule

        and be given adequate time to submit a petition to graduate, conduct any

        tests, exams, quizzes, and/or projects that he missed or did not have the

        time to prepare for while expelled; and

    c) Defendant shall expunge any finding that Plaintiff violated the
    University's Sexual Misconduct Policy, including, but not limited to,
    notations on his records.

3. Defendant is ordered to SHOW CAUSE why Plaintiff's Motion for Preliminary
Injunction should not be granted at a hearing scheduled for

_____, 2019, at _____ a.m./p.m. in Courtroom _____, James

A. Bryne U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106.

4. Defendant is ORDERED to preserve and retain all documents and electronically
stored information potentially relevant to the claims in the Verified Complaint;

5. This Order shall remain in full force and effect until the hearing on Plaintiff's
Motion for Preliminary Injunction;

6. The Court FINDS that no compensable harm will result to Defendant as a result
of this Order, and, therefore, the Court declines to assess any surety bond; and

7. This Order shall become effective immediately.

**IT IS SO ORDERED.**

_____
U.S. DISTRICT COURT JUDGE

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JOHN DOE | : |
| Plaintiff, | : |
| v. | : |
| UNIVERSITY OF THE SCIENCES | : |
| Defendants. | : |

**19    358**

**Civil Action No.:**
**JURY TRIAL DEMADED**

### PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING
### ORDER AND PRELIMINARY INJUNCTION PURSUANT TO FED. R. CIV. P. 65

Plaintiff John Doe ("John"), by his undersigned attorneys, hereby moves this Honorable

Court pursuant to Federal Rule of Civil Procedure 65 for an Order temporarily restraining and

preliminarily enjoining Defendant University of the Sciences (the "University") from prohibiting

Plaintiff from attending his Spring 2019 classes and thereby graduating on time as well as from

continuing to impose an expulsion that was wrongfully initiated against Plaintiff. Specifically,

Plaintiff moves for an Order restraining and enjoining Defendant as follows:

a) Defendant shall take all steps and actions necessary to reinstate Plaintiff as a student at
   University of the Sciences with the full credits and benefits that Plaintiff enjoyed prior to
   his expulsion;

b) Defendant shall allow Plaintiff to resume his Spring 2019 class schedule and be given
   adequate time to submit a petition to graduate, conduct any tests, exams, quizzes, and/or
   projects that he missed or did not have the time to prepare for while expelled; and

c) Defendant shall expunge any finding that Plaintiff violated the University's Sexual
   Misconduct Policy, including, but not limited to, notations on his records.

Counsel for Plaintiff has notified Defendant of Plaintiff's intent to file this Motion and

has provided Defendant's counsel with a copy of the Verified Complaint, this Motion, and the

supporting Memorandum of Law today, January 24, 2019. In support of this Motion, Plaintiff

incorporates by reference his Verified Complaint and his Memorandum of Law filed herewith.

WHEREFORE, Plaintiff respectfully requests that the Court grant his Motion for a

Temporary Restraining Order and Preliminary Injunction as outlined in the attached proposed

Order, and for such other relief as the Court finds just and proper.[1]

Respectfully submitted,

**MINCEY FITZPATRICK ROSS, LLC**

Date: January 24, 2019     By:

Riley H. Ross III, PA I.D. #204676
Zainab K. Ali, PA I.D. #321181
Two Penn Center
1500 JFK Blvd. Suite 1525
Philadelphia, PA 19102
(215) 587-0006
riley@minceyfitzross.com

---

[1] Plaintiff respectfully asks that the hearing on this Motion be set on or before Tuesday January 29, 2019. Plaintiff's counsel will be away from January 30 – Feb 3 attending the Pennsylvania Bar Association's Mid-Year Meeting. This is a previously scheduled and non-refundable trip. Counsel will be appearing on a panel with the Chief Judge of the Eastern, Middle and Western District of Pennsylvania as well as Chief Judge Smith and Judge Fisher of the 3rd Circuit.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Civil Action No.:** |
| | : | **JURY TRIAL DEMANDED** |
| UNIVERSITY OF THE SCIENCES | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I. FACTUAL BACKGROUND

The facts of this case are set forth in detail in Plaintiff John Doe's ("John") Verified Complaint, which is incorporated herein. Here, John will set forth the specifics of some of the facts mentioned in the Complaint that support claims of a biased and flawed investigation and outcome by the University.

### A. Access to Information

From the moment that John was informed by the University that a formal investigation was being conducted, he was not provided with adequate information to represent himself. On August 30, 2018, John was given the Notice of Sexual Misconduct Investigation. *See* Notice attached hereto as Exhibit A. The Notice provided John with no information about the claims against him other than that he was being accused of Sexual Assault I – Non-Consensual Sexual Intercourse.[2]

---

[2] Jane 1 and Jane 2 were cc'd on the Notice. This is because the University chose to conduct a single investigation involving two separate claimants. Investigating two separate claims in one investigation and by one investigator led to information about one claim tainting the other claim and vice versa. For example, an interview of W1, a witness for Jane 1, led to an interview of W2 (Witness 2). W2 provided damaging character evidence about John's actions with Jane 2. The information was later specifically refuted by Jane 2, but the damage was already done. Had the

When evidence was gathered by the University, John was not given copies of statements. Instead, he was forced to make an appointment to review the documents and in doing so had to take notes on the evidence that he reviewed. John spent several hours at a time reviewing evidence and attempting to capture and keep straight statements made by others to aid his defense.

Lastly, given the single-investigator model used by the University, John was never afforded a hearing nor the opportunity to confront his accusers. Such failures hardly align with concepts of due process and fairness. *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016) ("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.") Indeed, there is a growing body of case law holding or suggesting that a live hearing subject to cross examination is critical to due process. *See, e.g., Doe v. Baum,* 903 F.3d 575, 581 (6th Cir 2018) ("[O]ur circuit has made two things clear: (1) if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension, and (2) when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination."). In this matter, credibility is definitely at issue as there are no third party witnesses and only Jane1 and jane2's words against John's. As such, the lack of a hearing and an opportunity to cross-examine prevents due process from being implemented.

## B. Witnesses

---

investigations been kept separate, W2 would not have been questioned about Jane 2 when offering information about Jane 1.

2

The University's Sexual Misconduct Policy (the "policy") states "[t]he purpose of the interviews is to gather and assess information about the incident(s) at issue in the complaint, not to solicit general information about either party's character." *See* Policy attached hereto as Exhibit B at 2.10.5. Despite this policy, Investigator Kane sought and welcomed negative character evidence against John. For example, in the *Findings and Analysis* section of Investigator Kane's Report of Investigation, Kane cites W2 and W3 as describing John as someone who is pushy and would not take no for an answer as support for her finding that John attempted to persuade Jane 1 to have unprotected sex after she said no. Kane goes on to cite a tale from W3 that she had to repeatedly tell John she was not interested in hooking up with him.

Ironically, Kane failed to include in her Report of Investigation favorable character evidence about John from female witnesses. Notably, W7 said that she trusted John and that he was a "good guy." W8 told Kane that during a sexual encounter with John, the condom either came off or broke. W8 stated that John immediately stopped when this happened and did not attempt to resume intercourse or pressure her to continue. W9 told Kane that once she was extremely drunk and threw herself at John and "did everything she could to get him to sleep with her." John did not take advantage of the situation but instead tucked W9 into bed. Investigator Kane did not include any of these statements in her Report of Investigation.

Investigator Kane showed a bias tendency to disregard witness statements that were favorable to John. For example, John produced witnesses that testified that Jane 2 did not appear intoxicated before *nor after* she and John had sex. These witnesses were not pro-John either. In fact, one witness, W4, was having a sexual relationship with Jane 2 at the time of the investigation. W4 stated that the alcohol-spiked punch Jane 2 drank that night (she consumed 4 cups maximum, none of which were full) was not strong. He knew because he made it. W4 also

3

testified that he could not state that Jane 2 was intoxicated. Kane disregarded this testimony and found that Jane 2 was intoxicated.

Ironically (there's that word again), Kane even disregarded Jane 2's own testimony in reaching her conclusion that Jane 2 was intoxicated and created an entirely new version of events that was specifically ruled out by Jane 2 *and* the other witnesses that Kane interviewed. Jane 2 claimed that she became very intoxicated shortly after arriving at the party in question. She did not suggest at any point that she became intoxicated in John's bedroom. However, as stated above, numerous witnesses told Kane that Jane 2 did not seem intoxicated. Therefore, in order to reconcile these obvious, fundamental discrepancies, Investigator Kane concluded that Jane 2 must have become incapacitated once she went in to John's room and laid down. According to Kane, the alcohol "caught up" with Jane 2 when she laid down. This finding of fact is completely unsupported by the evidence in this case. Jane 2 did not provide this version of events, and the witnesses specifically contradicted it. Kane reached this conclusion without consultation with any sort of medical professional that could explain if such a thing was even possible.

Notably, Kane also completely ignored Jane 2's statements about the effects she experienced after being elbowed, falling down and getting a bloody nose. Jane 2 stated that her memory was good until her fall but then it became episodic and disconnected. In a follow up interview, Jane 2 stated that immediately following her accident she was feeling disoriented and confused more than physically impaired. Investigator Kane never considered the possibility that Jane 2's accident is responsible for her inability to recall details from that night. Jane 2 may have suffered a concussion or some other injury that caused her to appear and act normal (as everyone but her observed), but to have no memory of many of the events from that night. Kane never considered this aspect of Jane 2's statements.

4

### C. Clear Bias for Jane 1 and Jane 2 and Against John

Investigator Kane showed clear bias for Jane 1 when she accepted whole-heartedly Jane 1's claim that John penned her down with his legs in order to achieve penetration. When he was asked if he penned Jane 1 down, John told Kane that he was physically incapable of doing so because of chronic hip problems. The hip problems prevented John from sleeping through the night. Indeed, John had hip surgery during the tail-end of this investigation. However, Kane never considered John's physical limitations but instead found that John penetrated Jane 1's body without her consent.

Kane showed a clear bias for Jane 2 and bias against John when evaluating the following text messages between Jane 2 and John after the sexual encounter at issue:

> Jane 2: Thanks for last night. I'm sorry about that. Also used to knocking back beers like it's nothing. Didn't think break would fuck over my tolerance as much as it did. (A laughing emoji was at the end.)
>
> John: Hey no prob. And yea you were pretty drunk. (A laughing emoji was at the end.)

Jane 2 explained that she was embarrassed about making a disturbance at the party because of her nose bled and she texted John to apologize for "being a mess." John explained to Kane that when he said Jane was drunk, he was just joking and didn't mean it literally. Kane decided to believe Jane 2's explanation for texting but not John's explanation. In fact Kane used John's text to support her conclusion that Jane 2 was incapacitated that night despite the fact that no witness observed her intoxicated before or after the incident. Moreover, later when Jane 2 texted John to say "I think it is best we don't hook up anymore. *Nothing personal against you*, just a personal decision I wanted to make you aware of" (emphasis added), Kane did not take Jane 2's words at face value as she did for John's words. This shows clear bias.

## II. ARGUMENT

5

Under Rule 65, the standards for granting a temporary restraining order ("TRO") are

the same as those for a preliminary injunction. A TRO can be granted "where the movant

has made reasonable efforts to provide notice and demonstrated the following four elements:

(1) a likelihood of success on the merits; (2) the probability of irreparable harm if the relief

is not granted; (3) that granting injunctive relief will not result in even greater harm to the

other party; and (4) that granting relief will be in the public interest." *Citibank N A. v. Kyle,*

No. I 5-cv-3298, 2015 U.S. Dist. LEXIS 77504, at \*6-7 (E.D. Pa. June 16, 2015) (Kelly, J.)

(granting TRO). The Third Circuit recently provided comprehensive guidance for the award

of preliminary equitable relief:

[A] movant for preliminary equitable relief must meet the threshold for
the first two 'most critical' factors: it most demonstrate that it can win on
the merits (which requires a showing significantly better than negligible
but *not necessarily more likely than not*) and that it is more likely than not
to suffer irreparable harm in the absence of preliminary relief. If these
gateway factors are met, a court then considers the remaining two factors
and determines in its sound discretion if all four factors, taken together,
balance in favor of granting the requested preliminary relief. In assessing
these factors, Judge Easterbrook's observation bears repeating: "how
strong a claim on the merits is enough depends on the balance of the
harms: the more net harm an injunction can prevent, the weaker the
plaintiff s claim on the merits can be while still supporting some
preliminary relief."

*Reilly v. City of Harrisburg,* 858 F.3d 173, 179; 2017 U.S. App. Lexis 9105 (3rd Cir. 2017),

quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins.* Co., 582 F.3d

721, 725 (7th Cir. 2009) (emphasis added). The Court further noted that "[w]e do not require

at the preliminary stage a more-likely-than-not showing of success on the merits because a

'likelihood' [of success on the merits] does not mean more likely than not." *Reilly*, 858 F.3d

at 178, n.3 (citations omitted).

The Court should grant John's Motion, issue a temporary restraining order, and set a

hearing to consider granting preliminary injunctive relief. As set forth in more detail below,

6

John will likely succeed on his breach of contract and Title IX claims. John has suffered, and will continue to suffer, irreparable harm, including the threatened expulsion, inability to earn a college degree, denied or impaired career and graduate school opportunities, and the lifelong stigma of being labeled a sex offender. The harm to John is far greater than any harm to the University that could result from granting the requested relief. The public has an undeniable interest in ensuring the University's wrongful, unfair, and discriminatory conduct is enjoined. As other courts have recognized in cases involving issues similar to those here, this case cries out for immediate injunctive relief. *See, e.g., Ritter v. Oklahoma,* 2016 U.S. Dist. LEXIS 60193, at *6-7 (W.D. Okla. May 6, 2016) (granting TRO to student expelled due to alleged violation of university's sexual misconduct policy; "[w]hen the penalty is as severe as that imposed in this case, with its potentially devastating consequences, the accused is entitled to more process than plaintiff was afforded"); *Doe v. Univ. of Notre Dame,* 2017 Dist LEXIS 69645 (N.D. In. 2017) (granting TRO to permit student to complete final exams after being found responsible for sexual misconduct); *Doe v. Middlebury College,* No. 1:15-CV-192-JGM, 2015 U.S. Dist. LEXIS 124540, 2015 WO 5488109, at *3 (D. Vt. Sept. 16, 2015) (granting preliminary injunction to student expelled for purported sexual misconduct); *King v. DePauw Univ.,* 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014) (granting preliminary injunction to student suspended for purported sexual misconduct).

## A. Doe is Likely to Succeed on His Breach of Contract and Title IX Claims[3]

### 1. John is Likely to Succeed on His Breach of Contract Claim

"[T]he relationship between a private educational institution and an enrolled student

---

[3] A plaintiff satisfies this element if he shows likelihood of success on even one of his claims. *See Miller v. Mitchell*, 598 F.3d 139, 148 (3d Cir. 2010) (upholding a preliminary injunction based on a finding of likelihood of success on the merits on two of three claims).

is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Swartley v. Hoffa.er,* 734 A.2d 915, 919 (Pa. Super. 1999). Pennsylvania courts "review the agreement between the parties concerning disciplinary procedures contained within a portion of the student handbook as we would any other agreement between two private parties." *Reardon v. Allegheny College,* 926 A.2d 477, 480 (Pa. Super. 2007). "The general rule has been that where a private university or college establishes procedures for the suspension or expulsion of its students, substantial compliance with those established procedures must be had before a student can be suspended or expelled." *Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.,* 392 Pa. Super. 502, 510, 573 A.2d 575, 579 (1990).

For a breach of contract claim to succeed, a plaintiff must establish (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Davis* v. *Wells Fargo,* 824 F.3d 333, 351 (3d Cir. 2016); *McShea v. City of Phi/a.,* 606 Pa. 88,995 A.2d 334, 340 (2010). Where the plaintiffs have successfully plead the elements of a breach of contract claim, courts in Pennsylvania and elsewhere have not hesitated to grant injunctive relief. *See Ritter v. Oklahoma,* supra; *Doe v. Univ. of Notre Dame,* supra; *Doe v. Middlebury College,* supra; *King v. DePauw Univ.,* supra; *see also Gjeka* v. *Del. County Cmty. College,* 2013 U.S. Dist. LEXIS 73054, \*40 (E.D. Pa. May 23, 2013) (denying motion to dismiss claim based on allegation that college breached contractual provisions in its Harassment Policy "by not providing a learning environment free from discrimination and not encouraging faculty or students to bring questions about sexual harassment or discrimination to the attention of [defendant].").

8

By enrolling at the University, and paying his tuition and fees, and attending the school, John Doe and the University had a relationship that may reasonably be construed as being contractual in nature. The terms of the contract between John Doe and the University are generally found in various University policies and procedures, including those set forth in the Student Handbook. *See* Student Handbook at 49, the relevant portions of which are attached hereto as Exhibit C. The contract between John Doe and the University contains the following guarantee of essential fairness: "Procedures and rights in student conduct procedures are conducted with fairness to all." *Id.* The contract between John Doe and the University, also contains the following guarantee of essential due process: "due process, as defined within these procedures, assures written notice and the opportunity for a hearing before an objective decision-maker. No student will be found in violation of a University policy without information showing that it is more likely than not that, a policy violation occurred." *Id.* As argued above, due process cannot not occur in a single-investigator system. *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016) ("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.")

The contract between John Doe and the University contains an implied covenant of good faith and fair dealing. This implied covenant prohibits the University from doing anything which will have the effect of destroying or injuring the right of John Doe to receive the fruits of the contract. The contract between John Doe and the University, as a result, impliedly includes the requirement that the University provide John Doe with an investigatory and adjudicatory process that was fair and with due process.

The University repeatedly and materially breached the explicit guarantee of fundamental

9

fairness and due process, as well as the implied covenant of good faith and fair dealing and other contractual provisions.

The University breached the explicit and implied obligation to provide John Doe with adequate notice of the nature of the charges against him. Adequate notice was necessary to permit John Doe to adequately defend himself through the entire disciplinary process, including the investigative stage. Contrary to the interim guidelines of the Department of Education, the University failed to give John notice of the allegations, including sufficient details and adequate time to prepare a response before any initial interview. Accordingly, at his interviews with the investigator, who would ultimately make the determination of culpability, John had no way of knowing what exactly Jane 1 and Jane 2 alleged and therefore, no way to know if he addressed all of the relevant details in answering her questions and referring her to other witnesses. Specifically, in his initial interview, John does not mention any information about condom use with Jane 1. When it is brought up by the investigator *after* he has given his version of events, he now has a reason to suspect that the use of a condom relates to Jane 1's claim and he is caught off guard. Accordingly, he had not reflected on the related conversation, was unable to immediately recall useful information or witnesses he could suggest to support his version of events. It is not until a follow up meeting that John is given the opportunity to suggest more relevant information, which he does. This one instance is characteristic of the entire investigation because John does not know the specifics of the allegations against him and is forced to guess what information and which witnesses are relevant to his case, thus preventing him from responding in a meaningful way.

The University breached the explicit and implied obligation to conduct a full and fair investigation of the claims against John Doe. The investigator failed to conduct follow-up interviews or gather relevant physical evidence or information. The investigator failed to

10

determine what, if any, benefits or accommodations Jane 1 and Jane 2 received as a result of their claim to be a victim of sexual assault. This information was relevant and essential to the assessment of their credibility. The failure to conduct a full and fair investigation was a breach of the guarantee of an investigation and the implied covenant of good faith and fair dealing.

The University breached its express and implied obligation when it limited John's access of the evidence against him. In this matter there were approximately 20 exhibits, including multiple page reports and interviews with 9 witness and multiple statements and from each party. There were missing pages at at least one appointment to view the file.

The University breached its express and implied obligations when it found John Doe Responsible without sufficient evidence. The Student Handbook as well as the University Sexual Misconduct Policy includes the express statement that a student be found guilty by a preponderance of the evidence. There was no physical evidence or third party witness to support the allegations that John was guilty. The failure to require that John be found guilty only on the basis of sufficient evidence was a breach of the guarantees of fundamental fairness, conviction by a preponderance of the evidence, the presumption of innocence, and the implied covenant of good faith and fair dealing.

The conduct of the entire process treated John as if he was guilty from the start, thereby tainting the investigative hearing process and violating the guarantees of fundamental fairness and fair and impartial hearing. The University administrators acted from the beginning as someone who believed the complainants without conducing any investigation. John was prohibited from confronting his accuser. The bias of the entire process was so pervasive throughout the investigative processes that it destroyed any possibility of fairness and ensured that John would be found guilty. The finding was plainly a product of the presumption of guilt, as well as the atmosphere of bias and hysteria that permeated the entire disciplinary process. The

11

failure to conduct an unbiased hearing was a breach of the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing. Moreover, the conclusions of the investigation and the appeal process for John were erroneous outcomes, which were the direct result of flawed and biased proceedings

As a direct and foreseeable result of the University's failure to honor its express and implied contractual promises and representations, John has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

### 2. John is Likely to Succeed on His Title IX Claim

Title IX guarantees that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX "'bar[s] the imposition of university discipline where gender is a motivating factor,'" and is enforceable through a private right of action for damages as well as for injunctive relief. *Doe v. Columbia Univ.*, 2016 U.S. App. LEXIS 13773 (2d Cir. 2016) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714-15 (2d Cir. 1994)). The University receives federal funds, and so may be held liable under Title IX. *Fitzgerald v. Barnstable Sch Comm.*, 555 U.S. 246, 257 (2009).

The University committed impermissible gender bias against John Doe in the investigation and adjudication of Jane 1 and Jane 2's accusations. The University has discriminated against John Doe because of his sex. The University assumed that John Doe was guilty because he was a male accused of sexual assault rather than evaluating the case on its own merits.

12

The circumstances of the investigatory process, the single investigator and the appeal process cast doubt on the accuracy of the outcome of the disciplinary proceeding. "The Department of Education regulations and guidance state that Title IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct. The University assumed that Jane 1 and Jane 2, as female claimants, were truthful. As a result of this gender bias, he University failed to adequately investigate and question the accusers' credibility, limited questions to and commentary of investigatory findings to the accusers' emotional state and interactions with friends and family in the days and weeks after the alleged incident and failed to examine many of the conflicting statements of the parties in good faith. The Sexual Misconduct Policy ambiguously prohibits students from engaging in sexual intercourse with any other person that has consumed any amount of alcohol. However, in this instance, the University applied this prohibition in a gender discriminatory manner.

The University has discriminated against John Doe because of his sex. This discrimination is intentional and is a substantial or motivating factor for the University' actions in this case. The University officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. John Doe has been deprived of access to educational opportunities at the University.

**B. Without Judicial Intervention Now, Doe Will Suffer Irreparable Harm**

"The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). That requirement is satisfied here in many ways.

First, when analyzing a college disciplinary matter and resulting sanctions, a plaintiff's inability to continue or complete his education has been regularly found to cause irreparable

13

injury. *See, e.g., Gati v. Univ. of Pittsburgh,* 91 A.3d 723, 729 n.10 (Pa. Super. 2014) (court "would have no trouble" finding irreparable harm when university dismissed student for dishonesty shortly before his graduation and defendant's "argument to the contrary is entirely unpersuasive");[4] *see also Jones v. Board of Governors of the University of North Carolina,* 557 F. Supp. 263, 266 (W.D.N.C. 1983), *aff'd* 704 F.2d 713 (4th Cir. 1983) (finding irreparable harm because student could not be adequately compensated for delay in obtaining a degree caused by suspension and granting injunction); *Ritter,* 2016 U.S. Dist. LEXIS 60193, at *8 ("loss of educational and career opportunities" is irreparable harm which "is not readily compensable in money damages"); *Tully v. Orr,* 608 F. Supp. 1222, 1225 (E.D.N.Y. 1985) (finding irreparable harm from expulsion for cheating and plagiarism, noting "indelible stigma of having once been disenrolled," and granting injunction).

Next, being labeled as someone who committed "sexual assault" irreparably harms John, his reputation, and his future educational, professional, and social prospects. John will be forced to disclose this finding whenever he is asked if he has been the subject of a disciplinary proceeding or been found responsible for a violation as such questions are common in applications for graduate or professional school, professional licensure, and in employment.[5]

---

[4] It should be noted that in *Gali,* the Superior Court found clear irreparable harm, but it also reversed the trial court's order enjoining the university from dismissing the plaintiff and requiring it to issue him a diploma. This was in part because the Superior Court held the plaintiff was not likely to succeed on his breach of contract claim. However, the facts of this case are quite different than those in the *Gali* given that in *Gali* the university dismissed a student for his admitted dishonesty, following a "host of other violations": the basis for dismissal was specified in the student handbook ; the university "followed its written procedure in arriving at its dismissal decision," and the university gave plaintiff appropriate notice and an opportunity to be heard. 91 A.3d at 734-35

[5] In fact, some states, such as New York and Virginia, are enacting legislation to require colleges to include a notation on a student's transcript if he has been found responsible for sexual misconduct. *See* Tovia Smith, "Push Grows for a 'Scarlet Letter' on Transcripts of Campus Sexual Offenders," NPR (May 11, 2016), *available at https://www.npr.org/2016/05/11/477656378/push-grows-for-a-scarlet-letter-on-*

14

"Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (reversing district court order and directing court to issue an injunction). Although that case was decided in a commercial context, the basis for the finding of irreparable harm – loss of reputation and loss of opportunities – easily translates to the harm to John here. As the district court noted in *Doe v. Brandeis:*

> A finding of responsibility for sexual misconduct can also have significant consequences off-campus. Post-graduate educational and employment opportunities may require disclosure of disciplinary actions taken by a student's former educational institution .... [A] student who is found responsible for sexual misconduct will likely face substantial social and personal repercussions. It is true that the consequences of a university sanction are not as severe as the consequences of a criminal conviction. Nevertheless, they bear some similarities, particularly in terms of reputational injury. Certainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings.

2016 U.S. LEXIS 43499, at *92. Other courts have also emphasized the stigma of a sexual misconduct finding on post-collegiate life. *See, e.g., Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8 (noting loss of educational and career opportunities); *King v. DePauw University*, 2014 U.S. Dist. LEXIS 117075, at *39-40 (S.D. Ind. Aug. 22, 2014) (noting impact on future employers and graduate school admissions committees). That stigma remains even if John were eventually reinstated, which is why this harm is irreparable. *See Tully*, 608 F. Supp. at 1225. Indeed, John intended to apply to medical school after graduation. Such as already been put on hold because he could not take the MCAT due to stress caused by the initiation of this investigation. There is no doubt that a stigma will follow John to medical school should the expulsion remain.

---

*transcripts-of-campus-sexual-offenders?utm_medium=RSS&utm_campaign=news*

15

Third, John will be irreparably harmed by the gap in his education that will result if the University's expulsion stands. Even if justice prevails and John is reinstated at a later date, or even if he could continue at another college in the future, courts have frequently held that *any* gap in a college education constitutes irreparable harm. As the court explained in *King v. DePauw University:*

> If [plaintiff] is not permitted to complete this upcoming semester at DePauw – even if, as DePauw asserts, he could choose to attend another university and ultimately graduate on time – he will forever have a gap or a senior-year transfer on his record. The Court finds it inevitable that he would be asked to explain another situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct at DePauw. ***Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding.***

2014 U.S. Dist. LEXIS 117075, at \*39-40 (emphasis added); see also *Doe v. Univ. of Notre Dame*, 2017 U.S. LEXIS 69645 (N.D. Ind. 2017) (citing several other courts to support its holding that an interruption in a student's education is not compensable by money damages); *Doe v. Middlebury College*, No. 1:15-CV-192-JGM, 2015 U.S. Dist. LEXIS 124540, 2015 WO 5488109, at \*3 (D. Vt. Sept. 16, 2015) ("[w]hile Plaintiff may recover damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class . . . [and] Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap.").

Lastly, if John is not permitted to complete his final semester and graduate with his classmates, he will be irreparably harmed because he will have been denied the most fundamental and important benefits of his bargain with the University: full participation in a perspective-shaping, mind-opening, one-of-a-kind college experience.

16

Courts, including the Supreme Court of the United States, have recognized this kind of harm as appropriate for injunctive relief. *See Reynolds Int'l Amateur Athletic Fed'n,* 12 S. Ct. 2512, 2513 (1992) (entering an injunction to allow an Olympic hopeful to participate in U.S. Olympic trials over objection of defendants, who alleged athlete should not be eligible to compete; finding irreparable harm based on loss of intangible benefits); *Palo v. Iowa Board of Regents,* No. CVCV08520 (Iowa D.C. Story Cty. Jan. 16, 2014) (sanction that prevented college student from playing on college's basketball team caused irreparable harm; even if student prevailed on merits, he would never get back the opportunity to play basketball as a senior), attached hereto as Exhibit D.

Depriving John of the right and ability to complete his final semester and to graduate with his classmates causes harm that cannot be replaced. It causes harm that cannot be adequately compensated with money damages. The harm is irreparable and should not be allowed.

## C. The Harm to John Outweighs Any Potential Harm to the University

The third element overwhelmingly tilts in John's favor. Here, the Court must balance the relative harm to the parties, i.e., the potential harm to John if an injunction is not issued versus the potential harm to the University if it is. *See, e.g., MarbleLIfe, Inc. v. Stone Res., Inc.,* 759 F. Supp.2d 552, 563 (E.D. Pa. 2010). The harm John will suffer if he is not allowed to complete his final semester of college and graduate with his peers is greater than any potential harm to the University. The University will not be harmed if John is allowed to resume classes. Indeed, John continued to take classes throughout the flawed investigation and the imposition of the expulsion in the fall semester of 2018 and throughout his appeal in the beginning of the spring semester of 2019. As such, there were no safety concerns with John being on campus and the University will not be harmed if he is to continue taking classes until this matter is resolved. As

17

such, the balance of harms clearly favors John. *See, e.g., Ritter*, 2016 U.S. Dist. LEXIS 60193, at *5 (noting balance favors granting injunction because any harm to college is "inconsiderable" compared to harm to student if he was wrongfully expelled); *Middlebury College*, 2015 U.S. Dist. LEXIS 124540, at *3 (finding balance weighs in favor of student); *King*, 2014 U.S. Dist. LEXIS 117075, at *40-42 (finding balance of equities "firmly" in student's favor: "the, unavoidable consequences" he would suffer absent an injunction, even if he ultimately won the case, outweighed any harm to university); *see also MarbleLife, Inc.*, 759 F. Supp.2d at 563 (granting preliminary injunction in trademark infringement case and finding that any harm to defendant was at least partly self-inflicted due to its failure to abide by its contractual obligations).

## D. The Public Has an Interest in the Enforcement of Contracts and the Fair and Non-Discriminatory Treatment of College Students

The public interest element also weighs in favor of granting the restraint and injunction. As the Third Circuit has stated, where, as here, a plaintiff has already demonstrated likely success on the merits and irreparable harm, "it almost always will be the case that the public interest will favor the plaintiff." *AT&T Co. v. Winback & Conserve Program,* 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). In addition, The Verified Complaint alleges fundamental breaches of contract, and "the public interest favors enforcing valid contracts and making parties live up to their agreements." *MarbleLife,* 759 F. Supp.2d at 563 (granting injunction). John has been treated unfairly by the University, and "it is always in the public's interest that a student be treated fairly before being disciplined." *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8; *see also King,* 2014 U.S. Dist. LEXIS 117075, at *42-43 (public interest in applying policies fairly in disciplinary matters). It is also in the public interest to remedy and eradicate discrimination. *See, e.g., Dole v. Local 427*, 894 F.2d 607, 616 (3d Cir. 1990) (noting that anti-discrimination statutes serve the public interest in curtailing discrimination).

18

In addition to the general public interest, the University of the Sciences community has a specific interest in seeing that the University's Title IX, Sexual Misconduct & Harassment Procedures and Process for sexual assault complaints are applied fairly and without discrimination.

## III.    CONCLUSION

John respectfully submits that this Court should enter a temporary restraining order and order the University to show cause why a preliminary injunction should not issue. Specifically, John asks this Court to order the University to reinstate Plaintiff as a student with the full credits and benefits that Plaintiff enjoyed prior to his expulsion; to allow Plaintiff to resume his Spring 2019 class schedule and be given adequate time to conduct any tests, exams, quizzes, and/or projects that he missed or did not have the time to prepare for while expelled; and to expunge any finding that Plaintiff violated the University's Sexual Misconduct Policy, including, but not limited to, notations on his records.

Respectfully submitted,

**MINCEY FITZPATRICK ROSS, LLC**

Date: January 24, 2019          By:

Riley H. Ross III, PA I.D. #204676
Zainab K. Ali, PA I.D. #321181
Two Penn Center
1500 JFK Blvd. Suite 1525
Philadelphia, PA 19102
(215) 587-0006
riley@minceyfitzross.com

## CERTIFICATE OF SERVICE

I, Riley H. Ross III, hereby certify that a true copy of the foregoing Motion and

Memorandum of Law in Support Thereof was served upon the University of the Sciences

through its attorney Leslie Greenspan on January 24, 2019.

Riley H. Ross III

# EXHIBIT A


**USciences**
**University of the Sciences**

600 South 43rd Street Philadelphia PA 19104
215 596 8800 | usciences edu

## NOTICE OF SEXUAL MISCONDUCT INVESTIGATION

**DATE:** 8/30/18

**TO:**

**CC:**

**FROM:** **Michael Stitley, Title IX Coordinator**

The University of the Sciences is conducting an investigation into allegations made by COMPLAINANT against the RESPONDENT of sexual misconduct that occurred on or about

____Nov. 3 / 4 2017; Jan. 2018____ at ____Respondent's Apartment____.

The allegations include the following prohibited conduct as defined by the *University of the Sciences Sexual Misconduct Policy* (see attached):

- X  Sexual Assault I – Non-Consensual Sexual Intercourse
- ☐  Sexual Assault II – Non-Consensual Sexual Contact
- ☐  Sexual Exploitation
-     Sexual Harassment/Gender Based Harassment
- ☐  Unwelcome Conduct
- ☐  Hostile Environment
- ☐  Stalking
- ☐  Intimate Partner Violence (Dating/Domestic Violence)
- ☐  Retaliation

Additional conduct prohibited by the Policy that is discovered during the investigation may also be investigated; you will be informed if the allegations under investigation are expanded.

Joseph Kalin, j.kalin@usciences.edu  has been assigned to investigate this complaint.

|  | **δ - 30 - δ** |
|---|---|
| Respondent Printed Name | Date |

____Signature____

**TELL YOUR PARENTS**

Because a finding of a violation of the Policy can have serious consequences for your education, it is strongly recommended that you immediately notify and consult with your parents or guardian.

## LEGAL COUNSEL

When the allegations, if true, might constitute criminal conduct, the party against whom they are brought is hereby advised to seek legal counsel before making any written or oral statements. Those facing allegations may wish to obtain legal advice about how this process could affect any criminal case in which they are or may become involved.

## POTENTIAL SANCTIONS

Students found in violation of the Sexual Misconduct Policy are subject to discipline based on the circumstances and nature of the violation. The forms of sanctions/remediation may include expulsion, suspension for a determinate or indeterminate length of time, restrictions on contact; course-schedule or work-schedule alteration; changes in housing; leaves of absence; required counselling and or treatment, and restitution. Expulsion precludes re-enrollment or re-admission to the University.

## ROLE OF SUPPORT PERSON AND ADVISOR

You may arrange for a Support Person and/or Advisor to accompany you to any investigative interview or related meeting. The Investigator will communicate directly with you and not with your Advisor.

## REMINDER

The Advisor may not speak for you but may advise you in private. All attendees are required to review the Sexual Misconduct Policy to understand the scope of their role in the administrative process.

## TIME FRAME

University of the Sciences strives to conclude its investigation within six weeks from issuance of this *Notice of Investigation*. The time frame may be extend for good cause, e.g., to ensure the integrity and completeness of the investigation, to comply with a request by external law enforcement, to accommodate the availability of witnesses, to accommodate reasonable requests for delay by the parties, account for breaks or holidays, and to account for complexities in the case or for other legitimate reasons.

## RETALIATION

The University prohibits any form of retaliation and will take steps to prevent retaliation and take strong responsive actions if retaliation occurs. No faculty, administrator or staff, applicant for employment, student, or member of the public may be subject to restraint, interference, coercion or any other form of retaliation for, in good faith, seeking advice concerning a sexual misconduct matter, filing a sexual misconduct complaint, or serving as a witness in the investigation of a sexual misconduct complaint.


**University of the Sciences**

600 South 43rd Street, Philadelphia, PA 19104
215 596 8800 | usciences.edu

[illegible text block, right side]

### RESPONDENT

#### NOTICE OF RIGHTS AND RESPONSIBILITIES

The purpose of this form is to ensure that when a complaint of sexual misconduct is filed, the accused person is aware of their rights and responsibilities. Please review the statements listed below carefully and be sure that you understand each of them.

___ I understand a complaint of sexual misconduct has been filed against me and have received the Notice of Sexual Misconduct Investigation.

___ I understand the University is required to investigate complaints of sexual misconduct.

___ I understand the University's investigation is independent and separate from any criminal or civil legal action.

___ I understand that complaints of sexual misconduct will be reviewed in accordance with the University's Sexual Misconduct Policy and any relevant grievance procedures.

___ Both the Complainant and Respondent (Parties) are entitled to have a Support Person present during any investigative or adjudicative proceeding or related meeting.

___ Parties are entitled to have a Non-Attorney Advocate or Attorney present during any investigative or adjudicative proceeding or related meeting, at their own expense.

___ I understand that at all times the University will communicate with me directly, and will not engage with my Advisor; I understand that my Advisor may not speak for me but may advise me privately; it is my responsibility to share information and communication received from the University with my Advisor.

___ Retaliation is prohibited and if any person retaliates against anyone who participates in a sexual misconduct investigation, they will be subject to disciplinary action; and that I should report any incidents of retaliation to the Title IX Coordinator (Michael Stitley 215-895-1116 or m.stitley@usciences.edu)

___ Conduct may violate the University's Sexual Misconduct Policy even if it does not violate the law.

___ Persons who commit sexual misconduct in violation of federal, state or local laws may also be subject to criminal charges

___ I have been informed of available services on campus and in the community for counseling, health, mental health, and legal assistance.

___ Parties will be informed of their appeal rights under the University's investigation and complaint resolution process.

___ Parties will be informed separately and simultaneously of the outcome of any disciplinary action resulting from the University's investigation and complaint resolution process.

__Y__ I have received a copy of the University's Sexual Misconduct Policy and had an opportunity to ask questions and have them answered.

<div style="background:black"> </div>

Respondent Name (*Printed*)                                    Student ID#

<div style="background:black"> </div>

Signature                                                      Date

__I__ Michael Stitley                       Interim Title IX Coordinator
Title IX Coordinator or Designated Representative        Title

Signature                                               9-30-18
                                                         Date

# EXHIBIT B

# Sexual Misconduct Policy Definitions, Process and Procedures I University of the Sciences

•

## Definitions and Title IX, Sexual Misconduct & Harassment Procedures and Process

## Definitions

**1.1** The "Title IX Coordinator" is a designated individual recognized by the University, and is responsible for the oversight of this policy and any procedures related to it. The Title IX Coordinator ("the Coordinator") is responsible for overseeing and resolving all Title IX reports and identifying and addressing any patterns or systemic concerns that arise during the review of such reports.

1.1.1 Responsibilities of the Coordinator include the following:

- Oversight of a prompt, fair, equitable investigation and resolution process for reports of prohibited conduct at the University.
- Evaluation of trends on campus by using information reported and data collected
- Development of recommendations for campus-wide training and education programs and other remedial actions designated to eliminate prohibited conduct, prevent its recurrence and address its effects.

1.1.2 The Coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or department/office, including any Deputy Coordinator.

1.1.3 The Title IX Coordinator may from time to time identify additional Deputy Coordinators within the University that serve in supporting and investigatory roles, and may have a specific area of expertise. Current Deputy Coordinators include:

- Title IX Deputy Coordinator for Students
- Title IX Deputy Coordinator for Faculty/Staff

1.1.4 The Title IX Coordinator is responsible for reporting any incidents brought to his/her attention that fall under the rubric of Clery-reportable offenses to the Clery Compliance Officer (or otherwise-named equivalent role) for inclusion in the Annual Security and Fire Safety Report.

1.1.5 The Title IX Coordinator is responsible for providing information regarding victim support and

other services to any individual reporting crimes that fall under the requirements of the Violence Against Women Reauthorization Act ("VAWA").

**1.2**     "Prohibited Conduct" includes the following specifically defined forms of behavior:  sexual assault, sexual exploitation, intimate partner violence, stalking, sexual or gender-based harassment and retaliation. Conduct under this policy is prohibited regardless of the sex, sexual orientation and/or gender identity/expression of the complainant or respondent.

**1.3**     "Complainant" is an individual who is eligible to file a complaint to report a violation of this policy.  It also includes any person who is reported to have experienced a violation of this policy in the case where another individual has made a report on that person's behalf.

**1.4**     "Respondent" is an individual responding to an allegation of violation of this policy.

**1.5**     "Complicity" is defined as being involved in illegal activity with others.

**1.6**     "Sexual Assault" consists of sexual contact and/or sexual intercourse that occurs without affirmative consent. Examples of behavior that may constitute sexual assault include, but are not limited to, the following:

- Engaging in sexual activity with an unconscious or semi-conscious person.
- Engaging in sexual activity with someone who is asleep or passed out.
- Engaging in sexual activity with someone who has said "no" or has otherwise expressed an unwillingness or refusal to engage in sexual activity.
- Engaging in sexual activity with someone who is vomiting, unable to stand without assistance, or has to be carried to bed.
- Allowing another person to engage in sexual activity with your partner without his or her consent.
- Requiring any person to perform any sexual activity as a condition of acceptance into a club, athletic program or any other organization affiliated with the University.
- Telling someone you will "out" them if they don't engage in sexual activity (e.g., threatening to disclose the person's sexual orientation without their consent).
- Telling someone you will fail them or give them a grade different from what they deserve if they don't agree to engage in sexual activity.
- Facilitating or assisting in a sexual assault including purchasing or providing alcohol or drugs to further a sexual assault.

**1.7**     "Sexual Contact" is any intentional sexual touching, however slight, with any object or body part (as described below), performed by a person upon another person.  It includes (a) intentional touching of the breasts, buttocks, groin, or genitals, whether clothed or unclothed, or intentionally touching another with any of these body parts; and (b) making another touch you or themselves with or on any of these body parts.

**1.8**      "Sexual Intercourse" is any penetration, however slight, with any object or body part (as described below) and performed by a person upon another person. It includes (a) vaginal penetration by a penis, object, tongue, or finger; (b) anal penetration by a penis, object, tongue or finger; and (c) any contact, no matter how slight, between the mouth of one person and the genitalia of another person.

**1.9**      "Affirmative Consent" is informed (knowing), voluntary and willing (freely-given), active and ongoing (not passive) permission, meaning that, through the demonstration of clear and coherent words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity.

1.9.1     Affirmative consent cannot be obtained by force.

1.9.2     Affirmative consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated.

1.9.3     Affirmative consent cannot be obtained or implied by silence or lack of resistance.

1.9.4     Consent may be withdrawn at any time.  An individual who seeks to withdraw consent must communicate, through words or actions, a decision to cease the sexual activity.  Once consent is withdrawn, the sexual activity must cease immediately.

**1.10**      "Force" includes: (a) the use of physical violence, (b) threats, intimidation, and/or coercion.

**1.11**      "Physical Violence" means that a person is exerting control over another person through the use of physical force.  Examples of physical violence include:  hitting, punching, slapping, kicking, restraining, choking, and brandishing or using any weapon.

**1.12**      "Threats" are words or actions that would compel a reasonable person to engage in unwanted sexual activity.  Examples include:  threats to harm a person physically, to reveal private information to harm a person's reputation, or to cause a person academic or economic harm.

**1.13**      "Intimidation" is an implied threat that menaces or causes reasonable fear in another person.  A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).

**1.14**      "Incapacitation" means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity. A person who is incapacitated is unable, temporarily or permanently, to give consent because of mental or physical helplessness, sleep, unconsciousness or lack of awareness that sexual activity is taking place.  A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

**1.15**      "Coercion" is the practice of forcing another party to act in an involuntary manner by use of

threats or force. Coercion is more than an effort to persuade, entice, or attract another person to act. When a person makes clear a decision not to participate in a particular form of sexual contact or sexual intercourse, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can constitute coercion.

**1.16**    "Sexual Exploitation" is an act or acts committed through non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, person benefit or advantage, or any other non-legitimate purpose.  Examples of Sexual Exploitation, include, but are not limited to, purposely or knowingly doing any of the following:

- Causing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give consent to sexual activity.
- Observing another individual's nudity or sexual activity or allowing another to observe consensual sexual activity without the knowledge and consent of all parties involved.
- Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images).
- Engaging in voyeurism (e.g., watching private sexual activity without the consent of the participants or viewing another person's intimate parts (including genitalia, groin, breasts or buttocks) in a place where that person would have a reasonable expectation of privacy).
- Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent.
- Exposing, disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent.
- Prostituting another person.
- Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

**1.17**    "Intimate Partner Violence"* ("IPV") includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship.  IPV may include any form of prohibited conduct under this Policy, including sexual assault, stalking, and physical assault. IPV includes the use or threat of physical force or restraint carried out with the intent of causing pain or injury to another.  Examples of behavior that may constitute IPV include the following:

- Taking away a person's cell phone during an argument so the person cannot call a friend or the police for help.
- Threatening to commit self-harm if another does not do what is asked.
- Threatening to physically assault someone the individual is dating if the person does not do what is asked.
- Hitting, punching, pinching, slapping, or choking someone with whom the person is intimately involved.
- Violating a protective order.
- Harming a person's animals or children while in an intimate relationship.

- Conduct directed at a specific person under circumstances that would cause a reasonable person to fear bodily injury or to experience substantial emotional distress.

\* Intimate Partner Violence includes "dating violence" and "domestic violence, as defined by VAWA. Consistent with VAWA, the University will evaluate the existence of an intimate relationship based upon the Complainant's statement and taking into consideration the length of the relationship, the type of relationship, and the frequency of interaction between the person involved in the relationship.

**1.18**    "Physical Assault" is threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person.  Physical assault will be addressed under this Policy if it involves sexual or gender-based harassment, IPV, or is part of a course of conduct under the stalking definition.

**1.19**    "Stalking" (including Cyberstalking) occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear bodily injury or to experience substantial emotional distress.

1.19.1   "Course of conduct" in this circumstance means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.

1.19.2   "Substantial emotional distress" means significant mental suffering or anguish.

**1.20**    "Sexual Harassment" is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, suggestive, or otherwise.

1.20.1   For conduct to be deemed sexual harassment, both conditions below must be present:

- Submission to or reflection of such conduct is made, either explicitly or implicitly, as a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment).
- Such conduct creates a Hostile Environment

1.20.2   Examples of behavior that may constitute sexual harassment, if sufficiently severe, persistent or pervasive, include, but are not limited to, the following:

- Calling someone by a demeaning name.
- Giving someone unwanted gifts of a sexual nature.
- Displaying sexually-suggestive materials or sending notes, email, or jokes to a person that are sexually

explicit.

- Touching someone sexually without their consent.
- Massaging someone without permission.
- Brushing up against someone repeatedly.
- Continuing to ask out a person who already has said he or she is not interested.
- Exposing ones genitalia or breasts to another person.

**1.21** "Gender-Based Harassment" includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when both conditions below are present:

- Submission to or reflection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment).
- Such conduct creates a Hostile Environment.

**1.22** A "Hostile Environment" is defined as a situation where an individual's conduct is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from the University's education, employment, or co-curricular programs and/or activities. Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective,

1.22.1 In evaluating whether a Hostile Environment exists, the University will consider the totality of known circumstances, including, but not limited to:

- The frequency, nature and severity of the conduct.
- Whether the conduct was physically threatening.
- The effect of the conduct on the Complainant's mental or emotional state (based upon a reasonably prudent person standard).
- Whether the conduct was directed at more than one person.
- Whether the conduct arose in the context of other discriminatory conduct.
- Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities.
- Whether the conduct implicates concerns related to academic freedom or protected speech.

1.22.2 A Hostile Environment can be created by persistent or pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less there is a need to show a pattern or repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. A single incident of sexual assault, for example, may be sufficiently severe to constitute a hostile environment. In

contrast, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment.

**1.23** "Retaliation" means any adverse action taken against a person for making a good faith report of prohibited conduct or participating in any proceeding under this Policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of prohibited conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of prohibited conduct.

1.23.1 The University prohibits any form of retaliation.

1.23.2 Retaliation is unlawful under Title IX.

1.23.3 Retaliation may include the following forms of behavior:

- Employment actions such as termination, refusal to hire, or denial of promotion.
- Other actions affecting a person's employment or academic or school-related activities such as threats, unjustified negative evaluations, unjustified negative references, or increased surveillance.
- Any other action such as an assault or unfounded civil or criminal charges that are likely to deter reasonable people from pursuing their rights.
- Sharing of information about an ongoing confidential investigation (including a Title IX or sexual misconduct investigation)

**1.24** "Responsible Employee" is defined through Title IX as any employee who is required to share all reports of sexual misconduct with University administrative officials (i.e., Title IX Coordinator/Deputy Coordinator).

1.24.1 The University is deemed to have had notice if a responsible employee knew, or in the exercise of reasonable care should have known, about the misconduct.

1.24.2 Confidential employees are excluded from this requirement.

1.24.3 Every faculty member, staff, and volunteer on campus who works with students or minors, and every person identified as a Campus Security Authority (CSA) under the Clery Act must immediately report to the Title IX Coordinator any prohibited conduct reported to them or observed by then, including the name of the complainant and respondent, if known, and all known details as a "Responsible Employee". All residence hall advisors and directors are also responsible employees.

**1.25** "Confidential Employees" are those certain employees and volunteers whom the University has designated due to their specific role within the institution.

1.25.1 These individuals include professional, licensed counselors (and those who act in a counseling

role under the supervision of a licensed counselor) who are in an official role of providing mental health counseling to members of the campus community.

1.25.2   Confidential employees can talk to a victim without any requirement to reveal any personally identifying information about an incident to the University without the victim/patient's permission. A person can seek assistance and support from these individuals without triggering a University investigation that could reveal the individual's identity or that the individual has disclosed the incident, thus providing some level of anonymity. A list of current confidential employees can be found in a companion document to this policy.

1.25.3   Individuals who are trained as professional, licensed counselors, but who are not engaged in this role within the University are not deemed confidential employees, and continue to have an obligation to report.

1.25.4   Confidential Employees are, as Campus Security Authorities ("CSA") under the Clery Act, obligated to report the nature, date, time, and general location of an incident to the Title IX Coordinator while keeping confidential any information that would directly or indirectly identify the victim. This limited report helps keep the Title IX Coordinator informed of the general extent and nature of prohibited conduct on and off campus so that the Title IX Coordinator can track patterns, evaluate the scope of the problem, and formulate appropriate campus-wide responses.

1.25.5   Before confidential support persons report any information to the Title IX Coordinator, they shall consult with the affected individual to ensure that no personally identifying details are shared with the Title IX Coordinator.

**1.26**   "Privacy" means that information related to a report of prohibited conduct will be shared with a limited circle of University employees who "need to know" in order to assist in the assessment, investigation and resolution of the report. All employees who are involved in the University's response to reports of prohibited conduct receive specific training and guidance about sharing and safeguarding private information in accordance with state and federal laws.

1.26.1   The University will maintain as private, any accommodations or protective measures provided to the complainant to the extent that maintaining such confidentiality would not impair the University's ability to provide the accommodations or protective measures.

1.26.2   The privacy of student education records will be protected in accordance with the Family Educational Rights and Privacy Act ("FERPA"). All documentation related to a student's report, investigation, and resolution are protected by FERPA and will not be released, except as required by law.

1.26.3   Non-identifying information about a report may be shared with the Office of Public Safety or a designee to comply with the Clery Act. A complainant's name will never be published in connection with the University's obligations under the Clery Act. In addition, the University does not publish identifiable

information regarding victims in the University's Daily Crime log or online.

**1.27** "Confidentiality" exists in the context of laws that protect certain relationships including with medical and clinical care providers and those who provide administrative services related to the provisions of medical and clinical care), mental health providers, counselors, and ordained clergy, all of whom may engage in confidential communications under Pennsylvania law.

1.27.1 It is critical for victims to understand that the above listed entities/persons are not permitted to disclose anything revealed to them in a professional setting to the University or anyone else without the explicit consent of the victim.

1.27.2 When information is shared by an individual with a confidential employee or a community professional with the same legal protections, the confidential employee (and/or such community professional) cannot reveal the information to any third party except when an applicable law or a court order requires or permits disclosure of such information.

1.27.3 For example, information may be disclosed when:

- The individual gives written consent for its disclosure;
- There is a concern that the individual will likely cause serious physical harm to self or others; or
- The information concerns conduct involving suspected abuse or neglect of a minor under the age of 18.

**1.28** "Mediation" is defined as an intervention in a negotiation or conflict by an acceptable third party who has limited or no authoritative decision making power, who assists the involved parties to voluntarily reach a mutually acceptable settlement of the issues in dispute.

**1.29** "Interim Measures" are supportive and protective measures offered to the reporting party, complainant, respondent, witnesses, and/or other members of the University community.

**1.30** "Title IX Administrative Panel" is a 3-person panel chosen from a pool of University employees who are appropriately trained in Title IX matters. The panel may include full-time benefits-eligible employees, faculty, or a mix thereof. No students may serve on this panel. This Panel will act as the body determining sanctions imposed on an individual found to be in violation of this policy.

**1.31** The "Title IX Appeals Panel" is a 3-person panel chosen from a pool of University employees who are appropriately trained in Title IX matters. The panel may include full-time benefits-eligible employees, faculty, or a mix thereof. No students may serve on this panel. In any individual incident, members of this panel shall be different than the individuals serving on the Title IX Administrative Panel for the incident/case. This panel shall act as the body determining the outcome of an appeal under this policy.

# Title IX, Sexual Misconduct & Harassment Procedures and Process

**2.1   Consent**

2.1.1      A person who wants to engage in a specific sexual activity is responsible for obtaining consent for that activity.

2.1.2      Lack of protest does not constitute consent.  Lack of resistance does not constitute consent. Silence and/or passivity also do not constitute consent.  Relying solely on non-verbal communication before or during sexual activity can lead to misunderstanding and may result in a violation of this Policy.

2.1.3      It is important not to make assumptions about whether a potential partner is consenting.  In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity.  If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity.

2.1.4      Consent to one form of sexual activity does not, by itself, constitute consent to another form of sexual activity.  For example, one should not presume that consent to oral-genital contact constitutes consent to vaginal or anal penetration.  Consent to sexual activity on a prior occasion does not, by itself, constitute consent to future sexual activity.  In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of consent.

2.1.5      One should be cautious before engaging in sexual contact and/or sexual intercourse when either party has been drinking alcohol or using other drugs.  The introduction of alcohol or other drugs may create ambiguity for either party as to whether consent has been sought or given.  If one has doubt about either party's level of intoxication, foregoing all sexual activity is the most responsible practice.

2.1.6      Impairment by alcohol and/or other drugs is no defense to any violation of this Policy.

**2.2   Privacy and Confidentiality**

2.2.1       The University is committed to protecting the privacy of all individuals involved in the investigation and resolution of a report under this policy.  The University also is committed to providing assistance to help students, employees and third parties make informed choices.  With respect to any report under this policy, the University will make reasonable efforts to protect the privacy of participants, in accordance with applicable state and federal law, while balancing the need to gather information to assess the report and to take steps to eliminate prohibited conduct, prevent its recurrence, and remedy its effects.

2.2.2       Where the complainant requests anonymity, i.e., that their identity not be shared with the respondent, or that the University not pursue an investigation, the University must balance this request with the University's responsibility to provide a safe and non-discriminatory environment for all University members. The University, through the Title IX Coordinator, will take all reasonable steps to investigate and respond to the report consistent with the request not to share identifying information or pursue an

investigation, but its ability to do so may be limited by the request.

2.2.3     Under a complainant request for anonymity, the request will be balanced against the following factors:

- The seriousness of the conduct;
- The respective ages and roles of the complainant and respondent;
- Whether there have been other reports of prohibited conduct under this policy involving the respondent;
- Whether the circumstances suggest there is a risk of the respondent committing additional acts of prohibited conduct;
- Whether the respondent has a history of arrests or records indicating a history of violence;
- Whether the report indicates the respondent threatened further sexual violence or other violence against the complainant and other individuals involved;
- Whether the reported conduct was committed by multiple individuals;
- Whether the circumstances suggest there is a risk of future acts of prohibited conduct under similar circumstances;
- Whether the reported conduct was perpetrated with a weapon;
- Whether the University possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence); and
- The respondent's right to receive information if such information is maintained in an "education record" under FERPA.

2.2.4     The University will take all reasonable steps to investigate and respond to the report consistent with the request not to share identifying information or pursue an investigation, but its ability to do so may be limited based on the nature of the request by the complainant.

2.2.5     Where the University is unable to take action consistent with the request of the complainant for anonymity, the Title IX Coordinator will inform the complainant about the chosen course of action, which may include the University seeking disciplinary action against a respondent.

2.2.6     Alternatively, the course of action may also include steps to eliminate the effects of the prohibited conduct and prevent its recurrence that do not involve formal disciplinary action against a respondent or revealing the identity of the complainant.

2.2.7     In such cases, the University will notify the complainant that it intends to move forward with an investigation, but in no event will the complainant be required to participate in any such actions undertaken by the University.

2.2.8     Title IX Coordinator is prohibited from answering any questions about the investigation or providing any information to the parent(s) of the complainant, respondent or any witnesses, except in the case of minor. This prohibition applies even where the student has a signed FERPA waiver on file with the University. The Title IX Coordinator may provide information relating to the investigator process only.

**2.3     Reporting Allegations of Sexual Misconduct**

2.3.1     Making a report is the act of notifying the Title IX Coordinator or other Responsible Employee of an incident of Prohibited Conduct. A report may be accompanied by a request for resources, no further action, informal resolution, and/or to initiate a formal complaint process by filing a complaint. The Title IX Coordinator will make an assessment of every report made, and determine, in conjunction with the complainant, how best to proceed. Contact information for the Title IX Coordinator and Deputy Coordinators, including office locations, phone numbers, email addresses, is located in the Resources section of this document.

2.3.2     Any person who experiences prohibited conduct or who is aware of a member of the University community who has been subject to prohibited conduct is strongly encouraged to make a report. All those designated as Responsible Employees  are required to report all information pertaining to instances of prohibited conduct, including information described as rumor or gossip that the responsible employee knows about.

2.3.3     An individual does not have to be a member of the University community to file a report under this policy. The University will take action to respond to allegations of prohibited conduct when the University knows or reasonably should know based on any available information that prohibited conduct has occurred.

2.3.4     Anonymous reports also are accepted and should be directed to the Title IX Coordinator or made via the confidential reporting line. The University will respond promptly and equitably to anonymous reports, but the response may be limited if the report does not include identifying information and/or a description of the facts and circumstances. Anonymous reports that provide enough information to constitute a criminal offense will be reported to the Office of Public Safety for purposes of inclusion in the University's Annual Security and Fire Safety Report.

2.3.5     The University encourages prompt reporting of prohibited conduct so that the University can respond promptly and equitably; however, the University does not limit the timeframe for reporting. If the respondent is no longer affiliated with the University at the time the report is made, the University will provide reasonably appropriate remedial measures, assist the complainant in identifying external reporting options, and take other reasonable steps to respond under Title IX. The University may continue to conduct an investigation for purposes of complying with Title IX and take steps to prevent the recurrence of such conduct and remedy the effects, if appropriate.

2.3.6     Complainants may simultaneously pursue criminal and University investigation. The University will support complainants in understanding and assessing their reporting options. Upon receipt of a report, the University will inform individuals of their right to file (or decline to file) criminal charges as well as the availability of medical, counseling and support services, and additional interim measures to prevent contact between a complainant and a respondent, such as housing, academic, transportation and working

accommodations, if reasonably available. Making a report to the University does not require participation in any subsequent University proceedings, nor is a report required in order for a complainant to receive support or remedial measures.

2.3.7    Although the University strongly encourages all members of its community to report criminal violations of the law to law enforcement, it is the complainant's choice whether to make such a report and victims have the right to decline involvement with the police.[1] The University's Office of Public Safety will assist any victim with notifying local police if they so desire.

2.3.8    Public awareness events, protests, candlelight vigils, "survivor speak outs," or other forums in which students, staff, or faculty members disclose incidents of prohibited conduct, are not considered a report of Prohibited Conduct or notice to the University of prohibited conduct for purposes of triggering the University's obligation to investigate any particular incident(s).  Such events may, however, inform the need for campus-wide education and prevention efforts, and the University will provide information about Title IX and Clery rights at these events.

## 2.4    Filing a Complaint

2.4.1    Filing a complaint is making a request to initiate the University's formal disciplinary process. A report may become a formal complaint, either initiated by the complainant or the University, depending on the outcome of the initial inquiry and assessment of the report, coupled with the complainant's wishes.

**At the time a report is made, a complainant does not have to decide whether to file a complaint. The University recognizes that not every individual will be prepared to file a complaint with the University or to law enforcement, and individuals are not expected or required to pursue a specific course of action.**

## 2.5    Initial Assessment

2.5.1    Upon receipt of a report of prohibited conduct, the Title IX Coordinator will arrange to meet with the complainant in an intake meeting as soon as possible and within 5 days of receiving the report.

2.5.2    At this meeting, the Title IX Coordinator will discuss and explain:

- Title IX processes and procedures
- Counseling and medical support services available.
- Interim measures available and how to access them.
- Confidentiality versus privacy considerations.

2.5.3    At this meeting, the Title IX Coordinator will seek to determine how the complainant wishes to proceed, i.e., whether the complainant wishes to pursue an informal resolution, mediation, a formal complaint or does not wish to pursue further action. Title IX Coordinator will have discretion to determine whether or not informal resolution or mediation is appropriate under the circumstances.

2.5.4     Even in instances where the complainant does not wish any action to be taken, the Title IX Coordinator must assess and make a determination in order to ensure the safety and wellbeing of the complainant and the University community.

## 2.6       Interim Measures

2.6.1     The University may implement interim measures at any point during an investigation.

2.6.2     Measures may be both remedial (designed to address safety and well-being and continued access to educational opportunities) or protective (involving action against a respondent).

2.6.3     Interim measures are designed to eliminate the prohibited conduct, prevent its recurrence and remedy its effects.

2.6.4     Measures may include, but are not limited to:

- No contact orders
- Changes in housing assignment for one or both parties
- Academic accommodations
- Changes in supervisor or work location
- Removal from campus housing or grounds
- Social restrictions
- Changes in parking locations
- Increased security
- Emotional and other support
- Counseling

2.6.5     An interim suspension, i.e. suspension from classes, work and other privileges (e.g., participation in varsity athletics) or activities, or from the University, may also be instituted until resolution of a case.

2.6.6     Interim measures are available regardless of whether a complainant pursues a complaint or investigation under this policy.

2.6.7     The University will maintain the privacy of any interim and protective measures provided under this policy to the extent practicable and will promptly address any violation of the protective measures.

2.6.8     The Title IX Coordinator has the discretion to impose and/or modify any interim measure based on all available information, and is available to meet with a complainant or respondent to address any concerns about the provision of interim measures.  The Title IX Coordinator will work with the appropriate Title IX Deputy Coordinator (e.g., student, faculty) to identify and impose appropriate interim measures.

## 2.7       Informal Resolution

2.7.1    Recognizing that a wide spectrum of behaviors can constitute violations of the University's Sexual Misconduct and Harassment Policy, the Title IX Office may resolve reports informally and appropriately, based on the circumstances.

2.7.2    Informal resolutions generally are pursued when the complainant, having been fully informed of all available options, has explicitly made that choice. An informal resolution process is voluntary, and a complainant or respondent can ask to end the informal resolution process at any time before its completion.

2.7.3    If an informal resolution process is ended by request, any information obtained may be used in a subsequent formal resolution process.

2.7.4    Once a report has been resolved through an informal resolution process, the matter will be closed.

### 2.8    Mediation

2.8.1    If the complainant desires to pursue mediation to resolve his/her report, the Title IX Coordinator must agree that mediation is appropriate for resolution of the report at issue.  Mediation is never appropriate for resolution of cases involving alleged Sexual Assault or any form of violence.  To determine whether mediation is appropriate, the Title IX Coordinator shall take the totality of circumstances into account, including but not limited to:

- The nature and severity of the conduct;
- The possibility of mediation resolving the matter;
- Whether mediation would satisfy the University's Title IX obligations in the case at hand.

2.8.2    If the Title IX Coordinator determines that mediation is appropriate, the Title IX Coordinator will promptly assign an appropriately trained mediator(s), notify the respondent, and implement mediation within five working days, absent any unusual circumstances.

2.8.3    Both parties must consent to mediation.

2.8.4    The Title IX Coordinator or any other appropriately trained employee may serve as the mediator.

2.8.5    A matter will be deemed satisfactorily resolved when both parties expressly agree in writing to an outcome that is also acceptable to the Title IX Coordinator.

2.8.6    At any stage during the mediation process, the complainant or respondent may terminate the mediation and elect to begin formal complaint procedures. Further, at any point during the mediation, if the mediator suspects that mediation is no longer appropriate, the mediator will confer with the Title IX Coordinator on this matter.  A finding of inappropriateness must be made, for example, in the event that the mediation exposes an occurrence of sexual assault with respect to the parties engaged in the mediation.

2.8.7     Because entry into mediation and into a mediation agreement is voluntary, neither party shall have the right to appeal the terms of a Mediation Agreement absent a showing of duress or undue influence caused by any person, even a person not involved in the mediation.  The Title IX Coordinator shall have sole discretion to determine whether a proper showing of duress or undue influence has been made.  If the Title IX Coordinator makes a finding of duress or undue influence, then formal procedures will be initiated.

## 2.9     Formal Complaint

2.9.1     Once a report of Prohibited Conduct has been made, a victim or a third-party may file a formal complaint alleging a violation of this policy. A complaint of prohibited conduct should be filed directly with the Title IX Coordinator. The University, when the Title IX Coordinator determines that it is necessary to protect the safety and well-being of the community, reserves the right to bring reports forward against a student or employee and to act as the complainant for purposes of this policy.

2.9.2     For Staff and Faculty, a formal complaint/statement must be submitted in writing.

2.9.3     It is strongly recommended that formal complaints be made in writing.

2.9.4     In order to institute a formal complaint, the following information is essential:

- The name of the accused (if known)
- A description with reasonable specificity the incident(s) of alleged misconduct, including the date and place of such incident(s)
- A list of any sources of potential information (e.g., witnesses, correspondence, records, etc.) that the victim or third-party believes may be relevant to the investigation.

2.9.5     A complaint should not be delayed if such sources of potential information are unknown or unavailable because such sources can be discovered in the formal investigation.

2.9.6     The Title IX Coordinator will review the complaint and determine whether the allegations, if true, would constitute a violation of this Policy. If necessary, the Title IX Coordinator will meet with the complainant or the third-party reporter to gather further information prior to making a determination. This initial review should occur within 5 days of receiving the formal complaint.

2.9.7     If, after conducting the initial review of a formal complaint, the Title IX Coordinator determines that the allegation, if true,  would not constitute a violation of this Policy, then the Title IX Coordinator will administratively close the case and notify the complainant (and the reporter, if there is one). If new information subsequently arises, the complainant or reporter of the incident may request reconsideration of the determination that no violation occurred.

2.9.8     In cases where the Title IX Coordinator concludes that the alleged conduct, while not a violation of this Policy, might implicate other University policies, the Title IX Coordinator may refer the matter to the

appropriate University officials.

2.9.9    If, after conducting the initial review of a formal complaint, the Title IX Coordinator determines that the allegation, if true,    would constitute a violation of this Policy, then a formal investigation will be initiated. The investigation will take the form of the single-investigator model recommended by the White House Task Force to Protect Students from Sexual Assault.

2.9.10   The Title IX Coordinator may enter an interim order, where warranted and/or requested by the complainant, directing that no contact shall occur between the complainant and the respondent, and may also institute any other interim measures necessary.

2.9.11   In the case where a law enforcement agency is in the process of gathering information, and at the request of law enforcement or University general counsel, the University will temporarily suspend the fact-finding aspect of the University investigation.  Investigation will proceed again upon notification of the Title IX Coordinator or Investigator by University general counsel.

## 2.10    Investigation

2.10.1   The Title IX Coordinator will meet with the respondent in order to provide written notification of the allegations, provide the respondent with a copy of the policy and its procedures, inform the respondent of his/her rights under this policy and answer any questions regarding the Policy, process and procedures that the respondent may have.

2.10.2   The Title IX Coordinator will assign an investigator to the complaint. The investigator will make findings of fact, applying a preponderance of the evidence standard (i.e., more likely than not), and determine based on those findings of fact whether a violation of this policy occurred.

2.10.3   The Respondent will have five (5) business days to submit a written response to the allegations to the Title IX Coordinator. The Respondent is not required to submit a written statement. The investigation will continue regardless of whether the respondent chooses to participate in the process.

2.10.4   The investigator will request individual interviews with the complainant, the respondent, and other witnesses as appropriate.  The initial interviews with the complainant and the respondent should be in person.

2.10.5   The purpose of the interviews is to gather and assess information about the incident(s) at issue in the complaint, not to solicit general information about either party's character.

2.10.6   This initial interview with the complainant should take place in person and within 5 business days after being assigned the case by the Title IX Coordinator.  The investigator may wait to hold the initial interview with the respondent until after first meeting with the complainant.

2.10.7   The investigator will interview witnesses provided by both the complainant and respondent.

Witnesses may also include those identified by a University representative, those identified by other witnesses, and any other persons the investigator considers it proper to interview.

2.10.8   After the collection of additional information is complete but prior to the conclusion of the investigation, the investigator may request individual follow-up interviews with the complainant and respondent to give each the opportunity to respond to the additional information.

2.10.9   Within one week after each party reviews the preliminary factual findings, the complainant and respondent may submit a written response to the investigator who will consider that response before finalizing the factual findings.

2.10.10   To the extent that the final report of the investigator concludes that a violation has occurred, the report will not contain any specific recommendation as to sanctions.

2.10.11   The investigator will return the final investigation report to the Title IX Coordinator.  The Title IX Coordinator will notify the complainant and respondent simultaneously in writing of the final findings of the investigator.

2.10.12   Such notification shall include the process, reasons for and deadline for appealing the investigator's finding.

**2.11      Student Sanctions**

2.11.1   This section shall apply when the respondent's primary role at the University is as a student.

2.11.2   If the final report determines that a violation has occurred and there is no appeal, or a finding that the investigator's decision is upheld, the Title IX Coordinator will appoint a 3-person panel of faculty and staff to a Title IX Administrative Panel, for determination of sanctions. Students are not eligible to serve on this panel.  This Panel may request clarification on the facts from the investigator, but does not have the authority to overrule the factual determinations of the investigator.

2.11.3   Concurrent to the appointment of the Title IX Administrative Panel, the Title IX Coordinator shall request a written confidential report from the Vice President of Student Affairs regarding the background of the student respondent, any prior incidents of misconduct in which the respondent has been involved, and a report of sanctions/remediation previously applied for offenses of a nature similar to the current case. Such report shall be completed within five (5) business days and returned to the Title IX Coordinator.

2.11.4   Concurrent to the appointment of the Title IX Administrative Panel, the Title IX Coordinator shall request a voluntary, written confidential impact statement from the complainant and respondent.

2.11.5   The Title IX Coordinator shall provide the Administrative Panel with 1) a full copy of the investigator's final report, including all exhibits, 2) the written confidential report from the Vice President of Student Affairs, and 3) any and all confidential impact statements received from the complainant and/or

respondent.

2.11.6   The Administrative Title IX Panel shall issue a letter detailing the sanctions to be imposed within 5 days of receiving the materials from the Title IX Coordinator. The letter shall be sent to the Title IX Coordinator who will then simultaneously relay it to the complainant and respondent, along with the procedures to appeal the decisions.

2.11.7   In an investigation conducted against a student who is the alleged perpetrator of any crime of violence or non-forcible sex offense (e.g., statutory rape, incest), the results of the sanctions proceeding will be provided to the victim and in the case of a deceased victim, to the next of kin.

## 2.12   Employee Sanctions

2.12.1   This section shall apply when the respondent's primary role at the University is as a non-faculty employee.

2.12.2   If the final report determines that a violation has occurred and there is no appeal, or a finding that the investigator's decision is upheld, the case shall be referred to the Director of Human Resources for disciplinary action per the Employee Standards of Conduct Policy and Corrective Action Procedures.

## 2.13   Faculty Sanctions

2.13.1   This section shall apply when the respondent's primary role at the University is as a faculty member.

2.13.2   For individuals holding dual and equal roles at the University as both faculty member and non-faculty employee, this section shall also apply.

2.13.3   If the final report determines that a violation has occurred and there is no appeal, or a finding that the investigator's decision is upheld, the case shall proceed  through the process for faculty sanctions (including termination) as outlined in the Faculty Service Information (FSI).

## 2.14   Advisors

2.14.1   The complainant and the respondent each have the opportunity to be advised by an advisor of their choice, including legal counsel, at their expense, at any stage of the process and to be accompanied by that advisor at any meeting or hearing in which the complainant or the respondent is required to be present.

2.14.2   An advisor may only consult and advise his or her advisee, but not speak for the advisee at any meeting nor may the advisor direct questions to any administrator, party or witness in the process.

2.14.3   Should the advisor become disruptive during any meeting, the Title IX Coordinator or investigator

may ask them to leave. No advisor (or party) will be given the opportunity to cross-examine or to directly question a complainant/respondent.

2.14.4   A parent may serve as an advisor to the complainant or respondent, and in such case, shall be treated as set forth above.

## 2.15   Appeal

2.15.1   An appeal may be made by either party based only on the following situations:

- A substantive violation of the procedures set forth in this policy has occurred which, in the context of the case, is likely to have the effect of changing the outcome; or
- The appellant has substantive and relevant new information that was not available at the time of the investigation that may change the outcome; or
- The appellant believes the decision regarding responsibility was in error; or
- The appellant believes the sanctions are not commensurate with the violation

2.15.2   An appeal must be made to the Title IX Coordinator in writing within five (5) business days of receiving notification of the Title IX Administrative Panel's decision from the Title IX Coordinator.

2.15.3   The Title IX Coordinator, having received the appeal, will convene a Title IX Appeals Panel, a 3-person panel of appropriately trained faculty and staff, for review of the appeal. Students are not eligible to serve on this panel.

2.15.4   The Title IX Coordinator will forward all materials reviewed by the Title IX Administrative Panel  to the Appeals Panel.

2.15.5   The Appeals Panel may request clarification on the facts from the investigator,.

2.15.6   The Appeals Panel will first make a determination of merit for the Appeal.  If no merit is found, the Appeals Panel will notify the Title IX Coordinator that the Appeal will not move forward.

2.15.7   If merit is found for the Appeal, the Appeals Panel will make a determination within five (5) business days of one of the following:

- Change in the finding of responsible/non-responsible for a violation of this policy;
- Change in the sanctions imposed;
- Refer the case back to the investigator to further review new information acquired; or
- Affirm the original findings and sanctions imposed

2.15.8   Upon determination by the Appeals Panel, the Title IX Coordinator will immediately be notified.

2.15.9   In the event there is a subsequent change in the result or when the result becomes final, both

parties will be sent written notification of such change within two (2) business days.

2.15.10   Any change in responsibility/non-responsibility and/or change in sanctions made by the Appeals Panel is final, and not subject to further appeal.  Findings and/or sanctions of this Policy cannot be grieved through the Student Grievance Policy.

## 2.16     Request to Withdraw Complaint

2.16.1    While every effort will be made to respect the complainant's wishes to withdraw a formal complaint, the University must be mindful of its overarching commitment to provide a non-discriminatory environment as set forth in this policy and pursuant to Title IX. Therefore, the Title IX Coordinator may determine that investigation is appropriate despite a complainant's request to withdraw the complaint.

## 2.17     Request for Informal Resolution After a Complaint has Been Filed

2.17.1    Once a complaint has been opened for investigation and before the final report has been provided to the parties, the complainant may request informal resolution or mediation as an alternative to formal resolution of the complaint.

2.17.2   Such informal resolution requires the agreement of the complainant and respondent and the approval of the Title IX Coordinator.

2.17.3   If such a request is approved, the timeframes will be stayed, and the investigators or a designee will take such steps as he or she deems appropriate to assist in reaching a resolution.

2.17.4   If an informal resolution cannot be reached in two weeks, then formal procedures will resume.

## 2.18     Additional Confidentiality Considerations

2.18.1    Once a complaint is filed, the complainant, third-party reporter, the respondent, personal advisors, and any witnesses will be notified of the potential for compromising the integrity of the investigation by disclosing information about the case and the importance of keeping confidential any information or documents that they receive or review.

2.18.2    If it is determined that anyone involved in a report or complaint either as a complainant, respondent or witness, colluded or shared information with another, sanctions may be imposed by USciences.  Such consequences may include suspension or dismissal from USciences, being barred from residing on campus, or being prohibited from participating in extracurricular activities, including varsity athletics.

## 2.19     Multiple Charges

2.19.1    If the report of a violation of the Sexual Misconduct and Harassment Policy also implicates other

potential violations of the University's Code of Student Conduct (in the case of students) or potential violations of other University policies, the Title IX Coordinator, in consultation with other appropriate University personnel, will evaluate all reported allegations to determine whether the allegations may be appropriately investigated together without unduly delaying resolution.

2.19.2    When the Title IX Coordinator determines that a single investigation is appropriate, the determination of responsibility for the violation of the Student Code of Conduct or violation of University policy will be evaluated under the applicable policy.

2.19.3    The investigation and adjudication will be done in accordance with the Sexual Misconduct and Harassment Policy.

2.19.4    If there is found to be no violation of the Sexual Misconduct and Harassment Policy, but violations of other University policies may have occurred, a referral to the appropriate hearing body (student conduct, human resources, faculty senate) may occur for further assessment and possible action, to be undertaken and/or imposed at the discretion of that body.

# 3.    Appendices

## 3.1    Appendix A – List of Confidential Employees

| Name | Role |
| --- | --- |
| Dr. Barb Siebert | Director, Student Health |
| Dr. Anna Patrone | Physician Assistant |
| Dr. Karen Levinson | Director, Student Counseling |
| Dr. Alissa Brown | Associate Director, Student Counseling |
| Dr. Gauri Saxena | Staff Psychologist |

*Note: List current as of 5/8/2018***3.2    Appendix B – List of Potential Sanctions****Student Sanctions**

All sanctions with detailed descriptions are available in the student handbook under the Student Conduct Policy.  Depending on the circumstances of the violation, alternative sanctions beyond the below list may be imposed.

- Written reprimand
- Completion of educational program(s)/workshop(s)
- Participation in psychological, physical, or substance abuse evaluations and/or counseling
- Conduct probation:  Loss of ability to participate in co-curricular activities

- Educational reflection paper
- Fines and restitution
- Housing Probation
- Housing Reassignment
- Housing Suspension (deferred)
- Housing Suspension
- Housing Termination
- Loss of Privileges
- Parental Notification
- Revocation of admission and/or degree
- Service requirement
- University Suspension (deferred)
- University Suspension (up to two years)
- Expulsion

- Verbal warning
- Written reprimand
- Required participation in non-credit educational programs or community service
- Required participation in psychological, physical, or substance abuse evaluations
- Required counseling
- Fines and restitution
- Administrative Leave
- Suspension
- Termination

**Faculty Sanctions**
- Verbal warning
- Written reprimand
- Required participation in non-credit educational programs or community service
- Required participation in psychological, physical, or substance abuse evaluations
- Required counseling
- Fines and restitution
- Administrative Leave
- Termination

# 4.    Companion Documents

**4.1**      Annual Security and Fire Safety Report

**4.2**      Student Handbook

**4.3**    Employee Handbook

**4.4**    Faculty Service Information

**4.5**    Mandatory Training Policy/Matrix

**4.6**    Title IX Intake Form

**4.7**    Notification of Respondent's Rights

**4.8**    Notification of Victim's Rights

For copies of these companion documents, please contact Jessica Rickmond at
j.rickmond@usciences.edu or 215-596-8844

- © 2019 University of the Sciences in Philadelphia

*600 South 43rd Street*
*Philadelphia, PA 19104*

# EXHIBIT C



# University of the Sciences

## 2018 – 2019

# STUDENT HANDBOOK

Property of: _____

Address: _____

Phone #: _____

E-mail: _____

In case of emergency, please notify:

_____        _____
          Name                                Phone #

*The information in this book was the best available at press time. Policies and procedures are subject to change.*

~ 2018-2019 STUDENT HANDBOOK ~

# TABLE OF CONTENTS

**GENERAL INFORMATION AND UNIVERSITY POLICIES**

General ........................................................................................................................................... 4
University Policies .......................................................................................................................... 8

**ACADEMICS**

Program Information ...................................................................................................................... 72
Academics ...................................................................................................................................... 76
Graduate Students .......................................................................................................................... 76
Entry-Level Programs .................................................................................................................... 76
Majors ............................................................................................................................................ 77
Catalog Year for Degree Requirements ......................................................................................... 81
Registration and Student Records .................................................................................................. 81
Grades ............................................................................................................................................ 92
Academic Standards and Academic Progress ................................................................................ 96
Requirements for Graduation ......................................................................................................... 102
Separation from the University ...................................................................................................... 103

**STUDENT SERVICES**

Guide to Campus Services ............................................................................................................. 112
Services for Students ...................................................................................................................... 115

**CAMPUS LIFE**

Athletics ......................................................................................................................................... 146
Civic Engagement .......................................................................................................................... 148
Fraternity and Sorority Life ........................................................................................................... 149
Leadership Programs ...................................................................................................................... 151
Off-Campus Housing ..................................................................................................................... 151
Residence Life ............................................................................................................................... 152
Student Activities .......................................................................................................................... 153
Student Government Association (SGA) ........................................................................................ 153
Student Organizations – General Information ............................................................................... 156
Student Organizations .................................................................................................................... 161

**DIRECTORIES** ............................................................................................................................ 174

2018-2019 Board of Trustees ........................................................................................................ 174
Administrative Staff ....................................................................................................................... 175
Full Time Faculty ........................................................................................................................... 178
Important Telephone Numbers ....................................................................................................... 179

**APPENDIX A** – Academic Integrity ........................................................................................... 183

**APPENDIX B** – Tuition, Fees, and Refunds (2018-2019) ........................................................ 187

**APPENDIX C** – Academic Calendars ......................................................................................... 191

**GLOSSARY** .................................................................................................................................. 193

**INDEX** ........................................................................................................................................... 205

~ 2018-2019 STUDENT HANDBOOK ~

38. **Violation of University Policies.** Violating other published University policies or rules.

39. **Weapons.** Possession, use, or distribution of explosives (including fireworks and ammunition), guns (including air, BB, paintball, facsimile weapons and pellet guns), or other weapons or dangerous objects such as arrows, axes, machetes, nun chucks, throwing stars, or knives, including the storage of any item that falls within the category of a weapon in a vehicle parked on University property. (See Campus Weapons Policy for more information).

## OVERVIEW OF CONDUCT PROCESS

This overview provides a general idea of how the campus conduct proceedings work, however not all situations are of the same severity or complexity. Thus, these procedures are flexible, and are not exactly the same in every situation, though consistency in similar situations is a priority.

Students should be aware that the student conduct process is quite different from criminal and civil court proceedings. Procedures and rights in student conduct procedures are conducted with fairness to all, but do not include all of the same protections afforded by the courts. Due process, as defined within these procedures, assures written notice and the opportunity for a hearing before an objective decision-maker. No student will be found in violation of a University policy without information showing that it is more likely than not that, a policy violation occurred. Any sanctions will be proportionate to the severity of the violation and to the cumulative conduct history of the student.

The Office of Student Conduct may accommodate concerns for the personal safety, well-being, and/or fears of confrontation of the complainant, respondent, and/or other witnesses during the hearing by providing separate facilities, by using a visual screen, and/or by permitting participation by telephone, videophone, closed circuit television, video conferencing, videotape, audio tape, written statement, or other means where and as determined appropriate by the Director of Student Conduct (or designee).

### Filing of Complaints

Any member of the University community may file a complaint against a student or student organization for potential violations of the Student Conduct Policy. Complaints may be filed with the Office of Student Conduct. Faculty and staff can access the reporting forms on the University Blackboard page. Anyone else wishing to file a complaint should contact the office at (215) 596-7554.

While there is no time limit on filing complaints, it can become difficult to gather information regarding an incident and take action when there is a prolonged delay in filing a complaint. As such, every effort should be made to file a complaint as soon as possible after the event takes place or becomes known, preferably within five days. Complaints filed more than 90 days after the event takes place or becomes known, will be addressed at the discretion of the Director of Student Conduct, in consultation with the Dean of Students (or designee).

The Director of Student Conduct (or designee) will review the complaint and will determine the initial course of action to be taken. If necessary, the Director of Student Conduct (or designee) may request

# EXHIBIT D

IN THE IOWA DISTRICT COURT FOR STORY COUNTY

|                          |   |                |
|--------------------------|---|----------------|
| YEMPABOU PALO,           | ) |                |
|                          | ) |                |
|          Petitioner,     | ) | No. CVCV048520 |
|                          | ) |                |
|     vs.                  | ) |                |
|                          | ) |                |
| IOWA BOARD OF REGENTS,   | ) | **RULING**     |
|                          | ) |                |
|          Respondent.     | ) |                |
|                          | ) |                |

On the 10th day of January, 2014, Petitioner's
Interlocutory Motion for Review of Administrative Agency Denial
of Stay, Petitioner's Motion to Disqualify Counsel and
Respondent's Motion for Additional Time to File Record came
before the Court for hearing. Petitioner, Yempabou Palo,
appeared personally with his counsel, Matthew Boles and Adam
Witosky; Diane Stahle, Special Assistant Iowa Attorney General,
appeared for the Iowa Board of Regents.

Record was made concerning the Motion to Disqualify
the attorney for the Iowa Board of Regents. Petitioner, on the
record, waived his objection and the hearing proceeded without
the Court ruling on the request to disqualify Ms. Stahle from
further participation in the case. Record was also made
concerning the Motion for Additional Time. Ms. Stahle requested
additional time to file the full administrative record with this
Court. Opposing counsel consented and the Court grants the
request. The full administrative record shall be filed by

Case 2:19-cv-00358-JS  Document 2  Filed 01/24/19  Page 62 of 69
Case 2:16-cv-05088-JP  Document 2-1  Filed 09/23/16  Page 24 of 31

E-FILED 2014 JAN 16 9:22 AM STORY - CLERK OF DISTRICT COURT

January 31, 2014. Counsel for both parties agreed that the full record was not necessary for the Court to rule on Petitioner's Interlocutory Motion.

The Court then proceeded to hear arguments and testimony on the Interlocutory Motion.

## BACKGROUND

Mr. Palo was a member of the Iowa State University (ISU) basketball team. However, on September 18, 2012, he was formally charged by the Story County Attorney with Sexual Abuse in the Second Degree as a result of an alleged incident that occurred in May 2012.

The charges against Mr. Palo were dropped by the Story County Attorney in January 2013. Mr. Palo had been suspended from the ISU basketball team during this interim period while formal criminal charges were pending. However, after the formal criminal charges were dropped, Mr. Palo was reinstated on the basketball team and he played in 17 games thereafter to finish out the 2012-13 season.

In September 2012, the Office of Judicial Affairs of ISU charged Mr. Palo with violating the University's Code of Conduct relating to sexual misconduct. That matter proceeded to hearing before an Administrative Law Judge (ALJ) from the Iowa Department of Inspections and Appeals, who ruled that the accusations were "not founded." Both the University and the

2

Case 2:19-cv-00358-JS   Document 2   Filed 01/24/19   Page 63 of 69
Case 2:16-cv-05088-JP   Document 2-1   Filed 09/23/16   Page 25 of 31
E-FILED 2014 JAN 16 9:22 AM STORY - CLERK OF DISTRICT COURT

Complainant each filed an administrative appeal of the ALJ's ruling. As mandated by appropriate protocol, the appeal was heard by the President of ISU, Dr. Steven Leath. President Leath ruled that the Student Code of Conduct had been violated by Mr. Palo and that as a result, he would be precluded from participating in intercollegiate athletics as a member of the ISU basketball team. Mr. Palo then appealed that Ruling to the Iowa Board of Regents, who affirmed President Leath's decision. Pursuant to the Iowa Administrative Procedures Act, Iowa Code Chapter 17A, Mr. Palo has requested the matter now come before this Court for judicial review.

The issue presented is whether, on a temporary basis pending disposition of the case on the full merits, this Court should stay the provision prohibiting Mr. Palo from rejoining the ISU basketball team as ruled on by President Leath, and subsequently affirmed by the Iowa Board of Regents.

## SIGNIFICANT FACTS

There are several significant facts that this Court finds most troubling in attempting to reconcile the formal decisions of ISU President Leath and the Board of Regents with the decision to suspend Mr. Palo from the ISU basketball team, particularly on the basis of a stay awaiting a full hearing on the merits. The Court FINDS the troubling facts are as follows:

3

Case 2:19-cv-00358-JS Document 2 Filed 01/24/19 Page 64 of 69
Case 2:16-cv-05088-JP Document 2-1 Filed 09/23/16 Page 26 of 31
E-FILED 2014 JAN 16 9:22 AM STORY - CLERK OF DISTRICT COURT

1.    The ALJ from the Department of Inspections and Appeals who
      initially heard the facts of this case determined that "the
      University has not established by a preponderance of the
      evidence that Mr. Palo committed a violation of the Iowa
      State University Code of Conduct." The ALJ then ruled that
      the University's complaint against Mr. Palo was "not
      founded."

2.    The ALJ was the initial finder of fact during the
      administrative proceedings against Mr. Palo, observed the
      witnesses and determined credibility. President Leath and
      the Board of Regents merely relied on the ALJ's ruling and
      the record before the ALJ to render their decisions.

3.    The underlying criminal case filed against Mr. Palo by the
      Story County Attorney was dismissed on January 14, 2013.

4.    The ALJ's findings and the dismissal of criminal charges by
      the Story County Attorney place the Complainant's
      credibility at issue.

5.    After the Story County Attorney dropped the formal criminal
      charges, Mr. Palo was reinstated to the ISU basketball team
      and allowed to participate in 17 games during the 2012-13
      season. During this period the University's disciplinary
      charges against Mr. Palo were still pending.

6.    In June 2013, after taking into account Mr. Palo's
      situation and compliance with the Student Code of Conduct,

4

Case 2:19-cv-00358-JS  Document 2  Filed 01/24/19  Page 65 of 69
Case 2:16-cv-05088-JP  Document 2-1  Filed 09/23/16  Page 27 of 31
E-FILED  2014 JAN 16 9:22 AM STORY - CLERK OF DISTRICT COURT

the University reviewed his athletic scholarship and the
same was renewed.  Mr. Palo currently remains on athletic
scholarship from ISU, notwithstanding that his status could
have been revoked as a scholarship athlete for violation of
the Student Code of Conduct.

7.    Though Mr. Palo faced potential restrictions and possible
suspension or even expulsion from the University as a
result of the University's complaint against him, he is
currently a student in "good standing" at ISU.  Further,
his academic performance is exceptional, having previously
been named twice an academic Big XII performer.

8.    As a student in good standing, Mr. Palo has all the same
rights and privileges of all other students, with the
exception of the restrictions concerning his participation
in intercollegiate athletics as a member of the ISU
basketball team.

9.    If Mr. Palo had been suspended from the University and
failed to graduate, it could potentially affect the number
of athletic scholarships available to the University.

10.   President Leath issued his decision concerning Mr. Palo
five days after the deadline that would have allowed Mr.
Palo to transfer to another school and still take advantage
of his remaining athletic eligibility.  President Leath

5

Case 2:19-cv-00358-JS  Document 2  Filed 01/24/19  Page 66 of 69
Case 2:16-cv-05088-JP  Document 2-1  Filed 09/23/16  Page 28 of 31
E-FILED 2014 JAN 16 9:22 AM STORY - CLERK OF DISTRICT COURT

issued his decision on August 30, 2013, despite the fact
that the matter was appealed to him in early June 2013.

11. The decision of the Iowa Board of Regents of December 5,
2013, is, at best, short and contains neither discussion
nor analysis of the underlying facts of the case. On first
blush, the decision appears to simply be a "rubber stamp"
of President Leath's decision, even though it took three
months to render said Ruling.

12. Mr. Palo is a fifth-year senior who has used his "red
shirt" year. His eligibility to play intercollegiate
athletics as a basketball player expires at the end of the
current basketball season. "Irreparable injury" will occur
to Mr. Palo if not allowed to return to the team as his
time is short and there is no "next season" concerning his
eligibility.

13. The Iowa Board of Regents alleges that granting a stay
would interfere with the University's ability to protect
the Complainant. The Court FINDS that this position is not
sustainable in that the Complainant is no longer a student
at ISU and no longer resides in the state of Iowa.
Further, neither Complainant nor her counsel appeared nor
participated in the hearing conducted on January 10, 2014.

14. The Iowa Board of Regents also alleges that having Mr. Palo
on the ISU basketball team tarnishes the University's

6

reputation and image and presents a threat to other students. If this is true, then why renew Mr. Palo's scholarship, allow him to remain a student in "good standing," and have full and unrestricted privileges as an ISU student, other than participating in basketball? Further, if these claims are truly believed, then why was he reinstated to the basketball team during the 2012-13 season and allowed to participate in 17 games?

Given the factual record, the Court FINDS that these claims are without merit.

## LAW OF THE CASE

During the pendency of the judicial review, a party may file an interlocutory motion in the reviewing court seeking review of the agency's action on an application for stay or other temporary remedies. *See* Iowa Code section 17A.19(5)(b).

Further, the Court may grant relief but only after a consideration and balancing of factors, as provided in Iowa Code section 17A.19(5)(c):

(1)  The extent to which the applicant is likely to prevail when the court finally disposes of the matter.

(2)  The extent to which the applicant will suffer irreparable injury if relief is not granted.

(3)  The extent to which the grant of relief to the applicant will substantially harm other parties to the proceedings.

7

(4) The extent to which the public interest relied on
by the agency is sufficient to justify the
agency's action in the circumstances.

Iowa Code Section 17A.19(5)(c).

The Court may issue an Order granting the stay on
appropriate terms. *See* Iowa Code Section 17A.19(5)(d). A stay
of an agency decision pending appeal can be granted where the
likelihood of success is not high but the balance of hardships
favors the Applicant. *See Grinnell College v. Osborn*, 751
N.W.2d 396 (Iowa 2008).

**ORDER**

IT IS ORDERED as follows:

1. The provision of the Order of the Board of Regents
dated December 5, 2013, disallowing Palo from participating as a
member of the ISU basketball team is hereby STAYED on a
temporary basis only.

2. Respondent shall have until January 31, 2014, to
file the full administrative record.


Clerk to furnish copies to:

Matthew Boles
Diane Stahle

8

E-FILED  2014 JAN 16 9:22 AM STORY - CLERK OF DISTRICT COURT



State of Iowa Courts

**Type:**          OTHER ORDER

**Case Number**    **Case Title**
CVCV048520         YEMPABOU PALO VS IOWA BOARD OF REGENTS

So Ordered

*TJBice*

Thomas J. Bice, District Court Judge,
Second Judicial District of Iowa

Electronically signed on 2014-01-16 09:22:57    page 9 of 9