**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| John Doe, | : |
| | : |
| Plaintiff, | : |
| v. | : **No. 19-cv-358-JS** |
| | : |
| University of the Sciences, | : |
| | : |
| Defendant. | : |

_____ :

## <u>ORDER</u>

AND NOW, this ___ day of _____, 2019, upon consideration of the Motion of Plaintiff, John Doe, for Preliminary Injunction (doc. 2), the Memorandum of Law of Defendant, USciences, in Opposition to Plaintiff's Motion (doc. 5), the evidence presented at the hearings before this Court on January 28 and 29, 2019, and the parties' submission of proposed findings of fact and conclusions of law, it is hereby **ORDERED** that Plaintiff's motion is **DENIED**.


_____
The Hon. Juan R. Sanchez

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
John Doe,                                    :
                                           :
                        Plaintiff,      :
       v.                             : **No. 19-cv-358-JS**
                                           :
University of the Sciences,         :
                                         :
                       Defendant.    :
_____ :

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF DEFENDANT,**
**UNIVERSITY OF THE SCIENCES, IN OPPOSITION TO**
**<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

**I.**     **<u>INTRODUCTION</u>**

      Plaintiff, John Doe ("Plaintiff"), was expelled from the University of the Sciences ("USciences" or the "University") after being investigated and found responsible for having sex with two victims without their consent. One victim was awake but non-consenting, while the other was passed out or semi-conscious and awoke to find Plaintiff on top of her, engaging in sexual intercourse. This Court should not grant Plaintiff's motion for preliminary injunction that would allow Plaintiff to immediately return to USciences, where both victims are still students. Plaintiff has failed to meet his heavy burden to prove that he is entitled to the extraordinary relief of a preliminary injunction. The University's investigation and process was full, fair, and in compliance with the University's policy against sexual misconduct, and its decision to expel Plaintiff should not be cast aside, especially not at this early phase of the litigation. Plaintiff's Motion for Preliminary Injunction should be denied.

## II.    **PROPOSED FINDINGS OF FACTS**

### A. **Background Information**

1.      USciences has a student population of approximately 2,200 students. (N.T. 1/28/19 at 88:25-89:2.)

2.      Located in West Philadelphia, the USciences campus is approximately two to three city blocks long.  (N.T. 1/28/19 at 89:3-6.)

3.      USciences has a written policy prohibiting sexual misconduct (the "Policy").  (P-5.)

4.      The Policy outlines – step-by-step – how the University reviews and investigates allegations of sexual misconduct.  (P-5; D-3; N.T. 1/28/19 at 91:1-10.)

5.      Since implementing the Policy in the Summer of 2018, USciences does not use conduct boards in connection with sexual assault allegations.  Rather, USciences utilizes its Policy against sexual misconduct.  (N.T. 1/28/19 at 136:4-10, 137:10-14.)

6.       As set forth in more detail below, the University complied with its Policy, including with respect to the intake of the two Complainants' allegations of sexual misconduct, the investigation of the allegations, the sanctions imposed on Plaintiff, and the appeal process.  (P-5; D-3; N.T. 1/28/19 at 92:16-18, 93:9-11, 93:15-17, 95:5-24, 96:17-97:3, 101:24-102:7, 102:15-18, 105:3-4.)

### B. **The Complainants**

7.      At the time of the investigation and at the present time, the Complainants were and are second- and third-year students at USciences who currently attend USciences.  (N.T. 1/28/19 at 89:9-17; P-2 at 1.)

8.      Complainant 1 alleged that Plaintiff penetrated her body without her consent and that she did not want to engage in unprotected sex.  (P-2 at 5-8.)

9.      Complainant 2 alleged that Plaintiff had sexual intercourse with her without her consent while she was incapacitated.  She awoke in Plaintiff's room to find Plaintiff on top of her and penetrating her.  (P-2 at 14.)

### C. Plaintiff, John Doe

10.      Plaintiff began attending USciences in the Fall of 2015.  (N.T. 1/28/19 at 10:24-25.)

11.      Plaintiff was formally expelled from USciences as of January 18, 2019, when his appeal was denied, based on a finding of responsibility for two separate acts of sexual misconduct with two different victims.  (Id. at 21:18-20; P-2.)

12.      Plaintiff has never taken the MCAT, an exam required prior to acceptance into medical school.  (N.T. 1/28/19 at 16:15-16 ("I decided to not sit through the exam"), 66:6-10.)

13.      Plaintiff has never applied to any medical schools.  (Id. at 66:1-3.)

14.      Plaintiff has never attempted to transfer schools.  (Id. at 66:21-24.)

15.      Plaintiff is not aware of whether there is a notation on his transcript related to his being found responsible for two violations of USciences' policy against sexual assault.  (Id. at 66:25-67:1.)

### D. The Investigation of Complainants' Allegations of Sexual Assault

16.      On August 30, 2018, Plaintiff was officially notified that he was being investigated by USciences for sexual misconduct.  (N.T. 1/28/19 at 12:10-12, 26:17-23; P-1.)

3

17.     Prior to August 30, 2018, Plaintiff had learned information about a complaint of sexual misconduct being made about him.  (N.T. 1/28/19 at 68:8-69:4.)

18.     Specifically, one of Plaintiff's fraternity brother told him that a female student said "one of your fraternity brothers raped one of my sorority sisters."  (Id. at 22:7-13, 23:1-3, 23:20-23.)

19.     On August 30, 3018, Plaintiff had a meeting with the Dean of Students and the then-Title IX Coordinator on campus and was given a Notice of Sexual Misconduct Investigation.  (Id. at 27:21-28:5; P-1.)

20.     The Notice of Sexual Misconduct Investigation informed Plaintiff of the names of both Complainants.  (P-1; N.T. 1/28/19 at 29:23-30:1, 30:7, 67:17-18.)

21.     The Notice of Sexual Misconduct Investigation informed Plaintiff of the dates of the alleged misconduct – November 3-4, 2017 and January 2018.  (P-1; N.T. 1/28/19 at 69:5-17.)

22.     The Notice of Sexual Misconduct Investigation informed Plaintiff of the location of the alleged misconduct – his apartment.  (P-1; N.T. 1/28/19 at 69:18-20.  See also N.T. 1/28/19 at 69:21-4 ("Q: So you understood not only who made the allegations, but you understood also, that they were of a sexual nature, correct? A: Correct. Q: You knew the dates on which they were accusing you of some misconduct? A: Yes. Q: And you knew where they occurred, correct? A: Yes.")

23.     The Notice of Sexual Misconduct Investigation informed Plaintiff that the nature of the allegations was sexual misconduct.  (P-1; N.T. 1/28/19 at 68:1-2.)

24.     The Notice of Sexual Misconduct Investigation informed Plaintiff of the policy provisions he was being accused of violating.  (P-1; N.T. 1/28/19 at 70:5-7.)

25.    As of the time of his meeting with the Dean of Students and the then-Title IX Coordinator and his receipt of the Notice of Sexual Misconduct Investigation, Plaintiff knew who made the allegations against him, the dates of the incidents, the locations of the incidents, that the allegations were of a sexual nature, and which policy provisions he was accused of violating.  (P-1; N.T. 1/28/19 at 69:21-70:7.)

26.    Plaintiff also understood at that time that the University would be investigating the Complainants' allegations.  (N.T. 1/28/19 at 72:8-11.)

27.    There is no requirement under the Policy that the University disclose to a Respondent the written allegations of Complainants.  (P-5 at § 2.9.4 and 2.10.1.  See also N.T. 1/28/19 at 122:21-123:19.)

28.    Approximately one month went by after the August 30, 2018 meeting before Plaintiff was contacted by the University about the investigation.  (N.T. 1/28/19 at 31:11-14.)

29.    In an effort to avoid bias, a committee at the University decided to hire an outside investigator to investigate the allegations of sexual misconduct.  (N.T. 1/28/19 at 93:25-94:20, 116:13-16.)

30.    The outside investigator who was retained was Anne Kane, a lawyer and a partner at the law firm of Schnader Harrison.  (N.T. 1/28/19 at 32:22-33:2, 93:15-24.)

31.    The University decided to use a single investigator for the allegations against Plaintiff, in part, because there were multiple Complainants, a similar time frame, and similar policy violations (sexual assault), and the University wanted to understand the totality of the circumstances.  (N.T. 1/28/19 at 100:6-17, 116:13-16.  See also id. at 118:21-119:13.)

32.     All parties (the two Complainants and Respondent/Plaintiff) had the opportunity to suggest potential witnesses to interview, and they did so.  (N.T. 1/28/19 at 95:5-11.)

33.     All parties (the two Complainants and Respondent/Plaintiff) were interviewed by the outside investigator two times.  (N.T. 1/28/19 at 95:12-21.)

34.     The outside investigator interviewed approximately 10 witnesses, and the Title IX Coordinator, Jessica Rickmond, coordinated those interviews.  (N.T. 1/28/19 at 95:22-96:8; P-2 at 2-4 (identifying the witnesses interviewed).)

35.     Plaintiff met with the outside investigator two times – on October 2 and again on October 25, 2018.  (P-2 at 4; N.T. 1/28/19 at 72:22-73:4.)

36.     Plaintiff had the opportunity to choose an advisor, including legal counsel, to advise him throughout the process, and Plaintiff availed himself of that opportunity. (N.T. 1/28/19 at 102:8-18; P-5 at § 2.14.)

37.     Plaintiff's advisor/lawyer was present during both of Plaintiff's meetings with the outside investigator.  (N.T. 1/28/19 at 33:8-9, 75:12-16.)

38.     Plaintiff retained his lawyer, Zak Goldstein, within one week of receiving the Notice of Sexual Misconduct Investigation.  (N.T. 1/28/19 at 70:17-19.)

39.     During his first meeting with the outside investigator, Plaintiff explained his perspective on the nights in question and was then asked more specific questions about those nights.  (N.T. 1/28/19 at 34:16-19, 35:15-17.)

40.     At the time of his first meeting with the outside investigator, Plaintiff provided the name of one individual who Plaintiff believed had relevant information. (N.T. 1/28/19 at 35:18-23.)

6

41.     Between his first and second meetings with the outside investigator (and his lawyer/advisor), Plaintiff had time to compile his thoughts and reflect on the incidents in question.  (N.T. 1/28/19 at 38:10-15.)

42.     Between his first and second meetings with the outside investigator (and his lawyer/advisor), and after compiling his thoughts on the incidents in question, Plaintiff provided the names and contact information for seven additional witnesses who Plaintiff believed had relevant information.  (N.T. 1/28/19 at 38:4-7, 73:5-74:4.)

43.     Plaintiff also provided a description of the relevant information he believed each witness had.  (N.T. 1/28/19 at 74:2-4.)

44.     Six of the seven additional witnesses identified by Plaintiff were interviewed by the outside investigator.  (N.T. 1/28/19 at 73:19-20.)

45.     The one witness identified by Plaintiff but not interviewed only had character evidence about Plaintiff and no actual information relevant to the incidents in question.  (N.T. 1/28/19 at 45:1-7, 74:8.)

46.     During Plaintiff's second meeting with the outside investigator, he was given a written statement of what he said during the initial meeting and was given the opportunity to review it and make any necessary corrections.  (N.T. 1/28/19 at 39:21-25.)

47.     Plaintiff reviewed his statements from the first meeting with the outside investigator, made corrections, explained some of the details, and confirmed what he had said during his initial meeting with the outside investigator.  (N.T. 1/28/19 at 40:10-13.)

48.    During his second meeting with the outside investigator (and his lawyer/advisor), Plaintiff was shown pictures of text messages from Complainant 2 and was asked to interpret them.  (N.T. 1/28/19 at 40:18-20.)

49.    On November 1, 2018, Plaintiff received an email from the Title IX Coordinator stating that the investigator was nearing her conclusion and that he was entitled to review the preliminary investigative report.  (D-1; N.T. 1/28/19 at 42:24-43:2, 14-24.)

50.    At that point, Plaintiff understood that he was permitted to submit a written response to the outside investigator's preliminary investigative report and that the response could include additional questions he believed should be asked of other parties or witnesses, new evidence that he believed was relevant, and the impact of the situation on him.  (D-1; N.T. 1/28/19 at 79:1-15.)

51.    Plaintiff made an appointment to review the preliminary investigative report with his lawyer/advisor.  (N.T. 1/28/19 at 43:3-5.)

52.    The Title IX Coordinator provided Plaintiff and the two Complainants with the same opportunity to review the report and the same binder of information (to review at different times), which included the preliminary investigative report and all of its attachments.  (N.T. 1/28/19 at 97:13-24, 98:17-99:25.)

53.    The preliminary investigative report did not contain a conclusion of responsibility but did contain all of the statements from every witness.  (N.T. 1/28/19 at 43:11-14, 74:10-20, 96:11-16.)

54.    Multiple attachments to the preliminary investigative report contained positive character evidence about Plaintiff.  (N.T. 1/28/19 at 74:21-75:4.)

55.    Plaintiff and his lawyer/advisor reviewed the preliminary investigative report multiple times.  (N.T. 1/28/19 at 44:6, 75:5-9.)

56.    Plaintiff spent hours reviewing the preliminary investigative report with his lawyer/advisor.  (N.T. 1/28/19 at 49:4-12.)

57.    Plaintiff subsequently availed himself of the opportunity to submit a written response to the preliminary investigative report and submitted a three-page response on November 12, 2018 explaining why he disagreed with the investigator's preliminary investigative report.  (D-2; N.T. 1/28/19 at 80:5-14, 81:24-81:8.  See also N.T. 1/28/19 at 80:5-6 ("There were a lot of different responses I wrote."); id. at 96:17-97:3.)

58.    Later in November 2018, when the investigative report was finalized, Plaintiff was informed of the outcome of the investigation and was told that the final investigative report was available to review.  (N.T. 1/28/19 at 46:14-16.)

**E.  The Investigation Outcome, Sanctions, and Appeal Process**

59.    In November 2018, when the investigative report was finalized, Plaintiff learned that he was found responsible for sexually assaulting the two Complainants. (N.T. 1/28/19 at 53:19-54:2.  See also P-2.)

60.     The Title IX Coordinator provided Plaintiff and the two Complainants with the same opportunity to review the report and the same binder of information (to review at different times), which included the final investigative report and all of its attachments. (N.T. 1/28/19 at 97:25-98:8.)

61.    When reviewing the final investigative report, Plaintiff had access to the entire report and all of its attachments.  (N.T. 1/28/19 at 81:20-25.)

62.    Plaintiff reviewed the final investigative report three times and spent approximately 6 to 8 hours reviewing it, some of which time included his lawyer/advisor. (N.T. 1/28/19 at 48:2-11, 49:4-6, 75:9-11, 81:9-11, 82:2-4.)

63.    Plaintiff spent more than 10 to 11 hours reviewing both the preliminary investigative report and the final report.  (N.T. 1/28/19 at 49:9-12, 82:5-7.)

64.    This time included Plaintiff's attempted dictation of the final investigative report and all of its attachments verbatim.  (N.T. 1/28/19 at 48:15-22, 52:10-12.)

65.    The final investigative report concluded:

> **Complainant 1's Allegations**: I conclude that Respondent [Plaintiff] violated Section 1.6 of the Policy by engaging in sexual intercourse with Complaint 1 "without affirmative consent."  Complainant 1 clearly voiced her unwillingness to engage in unprotected sex before the first time she and Respondent had intercourse and again after Respondent ran out of condoms.  Affirmative consent to unprotected sex cannot be implied from the earlier sexual encounters where they used a condom or from pre-intercourse sexual contact during the last encounter.

> **Complainant 2's Allegations**: I conclude that Respondent [Plaintiff] violated Section 1.6 of the Policy by engaging in sexual intercourse with Complaint 2 "without affirmative consent."  Complainant 2 was either passed out or semi-conscious when Respondent returned to his room and initiated sexual intercourse and Respondent knew or should have known that she was incapacitated.  A person who is passed out or semi-conscious cannot give affirmative consent to sexual intercourse.

(P-2 at 14.)

66.    After the decision from the final investigative report was provided to all parties, a Sanctions Board was established to determine Plaintiff's sanctions for his violations of the Policy.  (P-5 at § 2.11; N.T. 1/28/19 at 100:23-24.)

67.     The Sanctions Board was comprised of three members of the USciences faculty or staff.  (N.T. 1/28/19 at 101:10-12; P-5 at § 2.11.2.)

68.     The Sanctions Board had access to the same information provided in the single binder to the parties.  (N.T. 1/28/19 at 100:21-23.)

69.     Plaintiff submitted a written Impact Statement to the Sanctions Board prior to it rendering a decision as to Plaintiff's sanctions for violating the Policy and advocated not to be expelled from school.  (N.T. 1/28/19 at 82:8-21, 100:25-101:7; P-5 at § 2.11.4.)

70.     On December 7, 2018, Plaintiff learned that the sanction for his conduct was expulsion.  (N.T. 1/28/19 at 82:22-83:2.)

71.     Plaintiff also understood at that time that he had a right to appeal the Sanctions Board's decision – another process of which he availed himself.  (N.T. 1/28/19 at 83:2-5.)

72.     Plaintiff requested an extension of the deadline to submit his appeal because the deadline was around the time of final exams for the semester, and Plaintiff was granted that extension of time by the University.  (N.T. 1/28/19 at 83:14-23.)

73.     Plaintiff submitted a six-page appeal letter.  (N.T. 1/28/19 at 84:1-3.)

74.     In his appeal letter, Plaintiff had the opportunity to outline any problems he had with the investigation of his conduct, and he did so.  (N.T. 1/28/19 at 84:4-8, 101:24-102:7.)

75.     In his appeal letter, Plaintiff raised issues about a single investigator conducting the investigation, additional witnesses that should have been interviewed, the wrong outcome being reached by the investigator, and that expulsion was too harsh

of a punishment – all of which are the same issues Plaintiff raises in this litigation.  (N.T. 1/28/19 at 84:12-85:10.)

76.    The Appeal Board was comprised of three members of the USciences faculty or staff.  (N.T. 1/28/19 at 101:10-12; P-5 at § 2.15.3.)

77.    There was no overlap between the members of the Sanctions Board and the Appeal Board.  (N.T. 1/28/19 at 132:4-11.)

78.    The Appeal Board was provided the same binder of information that Plaintiff and the two Complainants had been provided, including the entire investigative report and all of its attachments.  (N.T. 1/28/19 at 100:21-23.)

79.    The Appeal Board can request additional information or clarification from the investigator in connection with an appeal.  (N.T. 1/28/19 at 101:19-22; P-5 at § 2.15.5.)

80.    On January 18, 2019, despite the ability to change the finding of responsibility, change the sanctions, or refer the case back to the investigator for further review of new information acquired, the Appeal Board affirmed and upheld the decision to expel Plaintiff for his conduct.  (N.T. 1/28/19 at 131:5-13; P-5 at § 2.15.7.)

81.    Prior to the appeal process being final, Plaintiff attended a class with one of the Complainants.  (N.T. 1/28/19 at 59:17-19.)

82.    The Complainant who attended a class with Plaintiff went to see the Title IX Coordinator and was "very concerned, very upset," "crying," "appeared very anxious, jittery, almost as if she was close to hyperventilating; very worried and concerned about how to go to class" a second time that week with Plaintiff.  (N.T. 1/28/19 at 103:11-13, 20-104:1.)

12

83.    Plaintiff sent an email to Ms. Rickmond on January 22, 2019 – after the investigation had concluded – about a potential policy violation by one of the Complainants.  (N.T. 1/28/19 at 63:13-14, 63:24-64:8 (speculating that it "probably" would confirm to unidentified others that he had "lost the case"), 104:16-17, 105:23, 109:1-2.)

84.    By the time Plaintiff emailed Ms. Rickmond on January 22, 2019, he already had retained counsel (Mr. Ross) and, knowing that litigation was imminent, counsel for USciences advised her not to respond to Plaintiff's email or further investigate the issue at that time.  (N.T. 1/28/19 at 104:16-24, 106:20-23.)

85.    This litigation was commenced on January 24, 2019 (doc. 1).

III.    **PROPOSED CONCLUSIONS OF LAW**

1.    This phase of the case is not intended to be a full-blown hearing or decision on the merits.  St. Thomas-St. John Hotel & tourism Ass'n v. Virgin Islands, 357 F.3d 297, 301 (3d Cir. 2004).

2.    Rather, a temporary restraining order is an "extraordinary form of relief, designed to temporarily maintain the status quo (generally for 14 days, and on rare occasions for longer) while the parties prepare to litigate the issues on a motion for a preliminary injunction."  Citibank N.A. v. Kyle, No. 15-3298, 2015 U.S. Dist. LEXIS 77504, *6 (E.D. Pa. June 16, 2015), quoting Pileggi v. Aichele, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012).

3.    A preliminary injunction, too, is an "extraordinary remedy" and "should be granted only in limited circumstances."  Id., quoting Kos Pharms., Inc. v. Andrix Corp., 369 F.3d 700, 708 (3d Cir. 2004).

4.     To obtain a preliminary injunction, the moving party must prove: (1) "a reasonable probability of eventual success in the litigation," (2) a probability of immediate irreparable injury if the injunction is not granted, (3) that granting an injunction will not cause even greater harm to the other party, and (4) that granting the injunction is in the public interest.  Doe v. Princeton Univ., No. 18-16539, 2019 U.S. Dist. Ct. LEXIS 4449 (D.N.J. Jan. 9, 2019), citing Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017).

**A.  <u>Plaintiff Has Failed to Show Probable Success on the Merits.</u>**

5.     To prove probable success on the merits, a plaintiff must make a showing "significantly better than negligible."  Reilly, 858 F.3d at 179.

6.     Plaintiff has failed to prove a substantial likelihood of success on the merits on his Title IX claim or his breach of contract claim.[1]

**B.  <u>Plaintiff has Failed to Prove Probable Success on his Title IX Claim.</u>**

7.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

8.     In short, Title IX prohibits universities from discriminating against a student because of sex.  Saravanan v. Drexel Univ., No. 17-3409, 2017 U.S. Dist. LEXIS 166940, *8 (E.D. Pa. Oct. 10, 2017) ("Saravan I").

---

[1] Plaintiff only argues the likelihood of success on the merits with respect to his Title IX and breach of contract claims.  (Plaintiff's Motion (doc. 2) at 7-13.)  Therefore, USciences will address only those two causes of action.

9.      A plaintiff alleging a selective enforcement theory under Title IX[2] must show that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate to proceeding was affected by the student's gender." Saravan I, 2017 U.S. Dist. LEXIS 166940, at *12, citing Yusuf v. Vassar Coll., 35 F.3d 709,715 (2d Cir. 1994).

10.     A male plaintiff alleging a selective enforcement theory under Title IX must show that a female in sufficiently similar circumstances was treated more favorably by the university.  Saravan I, 2017 U.S. Dist. LEXIS 166940, at *12.

11.     A student is "similarly situated" when the individuals have engaged in the same conduct.  Saravan v. Drexel, No. 17-3409, 2017 U.S. Dist. LEXIS 193925, *15 (E.D. Pa. Nov. 24, 2017) ("Saravan II") ("To consider a student similarly situated, the individuals with whom a plaintiff seeks to be compared *must have engaged in the same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it") (emphasis in original; internal citations omitted).

12.     Gender bias must be shown to be the motivation for inconsistent treatment by the university.  Saravan I, 2017 U.S. Dist. LEXIS 166940, at *12.

13.     Plaintiff has not shown that a female involved in this case was similarly situated to him or that any such female was more favorably treated.

14.     While he complains that the Complainants generally were treated more favorably during the investigation and after the investigation, he has not proven that

---

[2] Plaintiff's counsel identified his Title IX theories as selective enforcement and erroneous outcome.  (N.T. 1/29/18 at 26:8-10.)

either of the Complainants was "similarly situated," as neither Complainant was accused of sexual misconduct.  See Saravan II, 2017 U.S. Dist. LEXIS 193925, at *15.

15.     Nor has Plaintiff shown an inconsistency that warrants further inquiry. See, e.g., Yusuf, 35 F.3d at 716.

16.     Plaintiff also takes issue with various provisions of the Policy but fails to demonstrate that gender was a motivating basis for implementing or enforcing those provisions.

17.     For instance, Plaintiff posits that because the Policy requires that Complainants be interviewed within five days of making a report but does not have a similar time constraint on interviewing a Respondent (who is, according to Plaintiff's counsel, almost always male (N.T. 1/29/19 at 7:7-8)), then gender must have motivated those requirements.

18.     There is no evidence supporting this contention.

19.     In addition, even if Plaintiff's allegations on this point are assumed to be true (which they are not), they "do no more than indicate a pro-victim – not an anti-male – bias." Doe v. Pa. State Univ., No. 4:17-cv-01315, 2018 U.S. Dist. LEXIS 3184, *14 (M.D. Pa. Jan. 8, 2018) (citing cases for the proposition that a pro-victim policy is not equivalent to showing bias against males).

20.     Plaintiff also complains that there was negative character evidence about him in the final investigative report but not positive character evidence.

21.     This, too, is a non-starter, as even Plaintiff admits that the attachments to the preliminary and final investigative report contained multiple references to positive character evidence about Plaintiff.  (N.T. 1/28/19 at 74:21-75:4.)

16

22.    Lastly, Plaintiff complains that the Policy requirement of confidentiality during the investigation was not enforced against one of the Complainants who posted about the outcome on social media.

23.    That situation, however, was not yet brought to a conclusion or further investigated because of the pendency of this litigation.

24.    Plaintiff, a male, and the two female Complainants were treated the same during the University's process, including but not limited to their number of meetings with and access to the outside investigator, the ability to suggest witnesses to interview, the opportunity to review the preliminary and final investigative report (using the same binder of information), and the opportunity to submit written responses to the preliminary and final investigative reports.

25.    Accordingly, Plaintiff has not proven selective enforcement under Title IX.

26.    An erroneous outcome theory under Title IX requires that a plaintiff allege "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." Doe v. Trs. of the Univ. of Pa., 270 F. Supp. 3d 799, 823 (E.D. Pa. 2017).

27.    Allegations of a procedural or other flaw in the university's proceeding that led to an erroneous or adverse outcome and conclusory allegations of gender discrimination are insufficient to state a claim for erroneous outcome. Id. at 822.

28.    Statements by university officials or patterns of decision-making that tend to show gender bias may support a claim for erroneous outcome. Id. at 823.

29.    In this case, there is no evidence of any statements by university officials or patterns of decision-making to support such a claim.

30.    Moreover, Plaintiff's unhappiness with the result of the investigation is not a basis to find an erroneous outcome.

31.    For the same reason as set forth above in connection with the selective enforcement theory, there is no evidence of record of gender bias.

### C. Plaintiff has Failed to Prove Probable Success on his Breach of Contract Claim.

32.    Plaintiff has not shown a substantial likelihood of success on his breach of contract claim.

33.    Plaintiff challenges the provision in the USciences Student Handbook that "procedures and rights in student conduct procedures are conducted with fairness to all" and that "due process… assures written notice and the opportunity for a hearing before an objective decision-maker."  (P-4 at 49.)

86.    As explained by Ms. Rickmond at the hearing, since implementing the Policy in the Summer of 2018, USciences does not use conduct boards in connection with sexual assault allegations.  Rather, USciences utilizes its Policy against sexual misconduct.  (N.T. 1/28/19 at 136:4-10, 137:10-14.)  Therefore, this provision of the Student Handbook is not even applicable to the case at hand.

34.    To the extent this Court determines that this Student Handbook provision is applicable (which it is not), USciences complied with all requirements of fairness and due process, even without a "hearing."

35.    A "private university's disciplinary process does not give rise to 'fairness' obligations that are independent of, and separate from, the obligations imposed by the more specific provisions' in the parties' contract."  Powell v. St. Joseph's Univ., No. 17-

18

4438, 2018 U.S. Dist. LEXIS 27145, *15 (E.D. Pa. Feb. 20, 2018), citing <u>Doe v. Trs. of</u> <u>the Univ. of Pa.</u>, 270 F. Supp. 3d at 812.

36.    In other words, the procedures contained in the Policy define what is "fair." <u>Id.</u>

37.    Moreover, notice and an opportunity to be heard are basic requirements of fundamental fairness.  <u>Doe v. Trs. of the Univ. of Pa.</u>, 270 F. Supp. 3d at 813.

38.    In this case, Plaintiff had more than ample notice and an opportunity to be heard.

39.    With respect to notice, Plaintiff admits that as of his first meeting about this case on August 30, 2018, he knew who made the allegations against him, the dates of the incidents, the locations of the incidents, that the allegations were of a sexual nature, and which policy provisions he was accused of violating.  (P-1; N.T. 1/28/19 at 69:21-70:7.)

40.    He was not substantively questions about the allegations until approximately one month later.  (N.T. 1/28/19 at 31:11-14.)

41.    There was no requirement that Plaintiff be provided a detailed summary of the Complainants' allegations or a copy of the Complainants' written complaints.  <u>See</u> P-5 at § 2.9.4 and 2.10.1.  <u>See also</u> <u>Doe v. Trs. of the Univ. of Pa.</u>, 270 F. Supp. 3d at 816 (finding no breach of the notice provisions in the university's policy because "the notice procedures in the Disciplinary Procedures did not require Defendant to provide a copy of the complaint to Plaintiff, nor did they require Defendant to provide Plaintiff with the level of factual detail that the Complaint alleges was lacking").

42.    Separate from the fact that Plaintiff had all of the notice he was entitled to before being substantively questioned by the outside investigator in early October 2018, Plaintiff had a plethora of opportunities to be heard throughout the entire process, including but not limited to the following opportunities:

a.    participation in the investigation, including meeting two separate times with the outside investigator and his advisor/lawyer;

b.    identification of additional witnesses to be interviewed;

c.    interviews of seven out of eight witnesses identified by Plaintiff, the eighth of which pertained only to Plaintiff's character;

d.    review during his second meeting with the outside investigator of his own statement from his first meeting with the outside investigator and the ability to correct, clarify, and confirm those statements;

e.    review of the investigator's preliminary and final findings and reports on multiple occasions and for more than eleven hours in total;

f.    submission of a written Impact Statement prior to a sanction being imposed; and

g.    submission of an appeal after being notified of his expulsion.

43.    Plaintiff also had an advisor/lawyer working with him every step of the way.

44.    The University followed its Policy at every step, thereby assuring that all parties were treated fairly.

45.    Accordingly, Plaintiff has failed to show a substantial likelihood of success on the merits of his breach of contract claim.

### D. Plaintiff Has Failed to Make a Clear Showing of Immediate Irreparable Harm.

46.     The plaintiff must make a "clear showing of immediate irreparable harm" in the absence of a preliminary injunction.  Reilly, 858 F.3d at 179; Doe v. Princeton, 2019 U.S. Dist. LEXIS 4449, at **14-15.

47.     Plaintiff has failed to make a "clear showing" of "immediate irreparable harm."

48.     While Plaintiff speculates that medical schools or other schools will not accept him with a disciplinary history of sexual assault (N.T. 1/28/19 at 20:3-10), the fact is that Plaintiff made the decision not to take the MCAT in September 2018 or any time after that, despite the exam being offered more than 10 times.  (N.T. 1/28/19 at 16:15-16 ("I decided not to sit through the Exam"), 66:9-16 (Plaintiff has never taken the MCAT; the MCAT is offered "more than 10 times a year").)

49.     In addition to his election not to take the MCAT – an exam required to apply to medical school – Plaintiff has never even applied to medical school.  (N.T. 1/28/19 at 1-11.)

50.     While Plaintiff speculates that he is unable to transfer schools because of a notation on his transcript about sexual misconduct, Plaintiff has made no efforts to transfer schools and is not even aware of what the notation on his record is, if any. (N.T. 1/28/19 at 18:15-19:1, 20:3-21:9, 66:17-67:1 ("Q: Have you made any efforts to transfer? A: No. Q: Have you applied to any schools to transfer? A: No. Q: Do you even [sic] know what your record says, if anything, about your expulsion? A: No.").)

51.    To the extent Plaintiff complains that a gap in his resume would cause him irreparable harm, that gap is due to his own decisions not to take the MCAT and not to apply to medical school.

52.    Granting a preliminary injunction at this point in time will not eliminate the gap on Plaintiff's resume.

53.    Therefore, by definition, Plaintiff cannot make a clear showing that he will suffer immediate irreparable harm in the absence of a preliminary injunction.  See Reilly, 858 F.3d at 176, 179.

54.    The harm Plaintiff believes he will suffer if the injunction is not granted is speculative in nature.  (N.T. 1/28/19 at 18:15-19:1, 20:3-21:8.)

**E.  Plaintiff Has Failed to Show that the Balancing of the Harms or the Public Interest Weigh in his Favor.**

55.    Furthermore, even if Plaintiff does satisfy his burden of (i) proving a substantial likelihood of success on the merits and (ii) making a clear showing of irreparable harm (which he has not), this Court's analysis must continue to the next two factors: (iii) balancing the harms, and (iv) the pubic interest.

56.    The third factor of balancing the harms weighs in favor of USciences.

57.    The USciences campus is small – only two to three city blocks long.  (N.T. 1/28/19 at 89:3-6.)

87.    The USciences student population is small – only approximately 2,200 students.  (N.T. 1/28/19 at 88:25-89:2.)

58.    Plaintiff already saw one of the Complainants in a class during the first week of the Spring 2019 semester, before his appeal was final.  (N.T. 1/28/19 at 59:17-19.)

59.    When that Complainant saw Plaintiff in class, she went to see Ms.

Rickmond and was visibly upset, crying, worried, jittery, and appeared as if she may

hyperventilate.  (N.T. 1/28/19 at 103:11-13, 20-104:1.)

60.    This Court need not speculate as to how the Complainants will react to

seeing Plaintiff on campus; the evidence already presented of how one Complainant

reacted to seeing Plaintiff in class confirms that such contact in close proximity is

detrimental and traumatic to at least one of Plaintiff's victims.

61.    The Complainants are entitled to pursue their education in an environment

free from sexual assault and free from the trauma, stress, anxiety, and re-victimization

of seeing their abuser on campus.  See, e.g., Marshall v. Ohio Univ., No. 2:15-cv-775,

2015 U.S. Dist. LEXIS 31272, **25-26 (S.D. Ohio Mar. 13, 2015) (denying the motion

for preliminary injunction and holding that the balance of the harms weighed in favor of

denying the injunction when the victim and the plaintiff would be placed in close

proximity and the victim "can rightfully expect to pursue her education in an environment

free from the harassing behavior of a fellow student").

62.    The Complainants should not be forced to see Plaintiff on campus.  To do

so would cause them significant harm and interfere with their educations.

63.    In addition to the harm to the victims/Complainants, the University would

suffer harm (reputational and otherwise) if forced to allow Plaintiff to return to campus

after a thorough investigation found him responsible for two separate acts of sexual

assault.

64.    The public interest is also served by protecting victims of sexual assault

from being revictimized every time they see their abuser on campus, allowing victims of

sexual assault to pursue their education free of such revictimization and trauma, and by allowing universities like USciences to enforce its policies against sexual assault.  See Marshall, 2015 U.S. Dist. LEXIS 31272, at **26-27.

### F.    Miscellaneous Proposed Conclusions of Law

65.    The law in the Third Circuit does not require a live hearing or the right of cross-examination in the Title IX arena.  See Doe v. Princeton, 2019 U.S. Dist. LEXIS 4449, at **19-20 ("Plaintiff cites no authority showing that the Third Circuit or this Court has adopted the same reasoning [requiring cross-examination] and the Court cannot identify any precedent showing the same.").

66.    This Court is not bound by the law of another circuit.  See, e.g., United States v. Rhines, 640 F.3d 69, 72 (3d Cir. 2011) (noting that a Tenth Circuit decision was not binding upon the court and had no bearing on the standard in this Circuit); Walker v. Williamson, 235 Fed. Appx. 888, 889 (3d Cir. 2007) (stating that a Fifth Circuit decision is not binding on the Third Circuit); Steelworkers Pension Trust v. Renco Group, Inc., No. 16-190, 2016 U.S. Dist. LEXIS 112382, *25 (M.D. Pa. Aug. 22, 2016) (a decision from the Seventh Circuit is not binding on the court); Brown v. Burnett, No. 15-284, 2016 U.S. Dist. LEXIS 1671, *13 (W.D. Pa. Jan. 7, 2016) (a decision from the Ninth Circuit is not binding on the court); Pearson v. Ebbert, No. 3:14-cv-1975, 2015 U.S. Dist. LEXIS 16068, *12 (M.D. Pa. Feb. 10, 2015) (the district court is not bound by a decision issued by the Eleventh Circuit); Loukhton v. Chertoff, No. 07-663, 2007 U.S. Dist. LEXIS 59271, *7 n.1 (D.N.J. Aug. 13, 2007) (finding that the court was not bound by a decision from another Circuit and stating: "A Third Circuit federal district court is bound only by the pronouncements of the Third Circuit Court of Appeals").

67.    Therefore, the Sixth Circuit's pronouncement in <u>Doe v. Baum</u>, 903 F.3d 575, 581 (6th Cir. 2018) that "our circuit" requires a hearing and opportunity for cross-examination in the university sexual assault arena has no binding effect on this Court.

68.    The law in the Third Circuit does not prohibit a single-investigator model for Title IX investigations.

69.    The Department of Education's ("DOE") proposed regulations relating to Title IX investigations are not law and have no binding effect on this Court.  <u>Doe v. Princeton</u>, 2019 U.S. Dist. LEXIS 4449, at *15 ("proposed regulations… have no legal effect"), *24 ("the Proposed Regulations are merely proposals and do not have the force of law").  <u>See also</u> N.T. 1/28/19 at 142:15-143:9 (Court sustained Defendant's objections to Plaintiff's use of and reliance upon the DOE's proposed regulations).

70.    Universities are entitled to deference in their decisions related to academic and disciplinary matters.  <u>Sweezy v. New Hampshire</u>, 354 U.S. 234, 250 (1957) (recognizing the "essentiality of freedom in the community of American universities"); <u>Board of Curators of University of Missouri v. Horowitz</u>, 435 U.S. 78 (1978); <u>Regents of University of Michigan v. Ewing</u>, 474 U.S. 214 (1985).  <u>See also</u> <u>Schulman v. Franklin & Marshall College</u>, 538 A.2d 49, 52 (Pa. Super. Ct. 1988) (where a college student was suspended for misconduct, the court stated: "The courts have been very reluctant to interfere with college proceedings concerning internal discipline.  A college is a unique institution which, to the degree possible, must be self-governing…")

71.     For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction should be denied.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Date: February 8, 2019          /s/ Leslie M. Greenspan
Leslie M. Greenspan, Esquire
Attorney ID No. 91639
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
Attorneys for Defendant,
University of the Sciences

## **CERTIFICATE OF SERVICE**

I, Leslie M. Greenspan, Esquire certify that on this date, I caused a copy of the

foregoing document to be electronically filed through the Court's ECF System and that a

notice of electronic filing will be generated to the following counsel of record, thereby

constituting service of the document:

Riley H. Ross, III, Esquire
Two Penn Center
1500 JFK Boulevard, Suite 1525
Philadelphia, PA 19102
Attorney for Plaintiff, John Doe


**TUCKER LAW GROUP, LLC**

Date:  February 8, 2019          /s/ Leslie M. Greenspan_____
                                 Leslie M. Greenspan, Esquire