# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : **No.: 2:19-cv-00358-JS** |
| | : **JURY TRIAL DEMANDED** |
| | : |
| UNIVERSITY OF THE SCIENCES, | : |
| | : |
| Defendant. | : |
| | : |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    PROPOSED FINDINGS OF FACT

1.    This case was brought by, John Doe ("John"), an undergraduate student who seeks an Order preliminarily enjoining Defendant University of the Sciences (the "University") from imposing the disciplinary sanction of expulsion against John Doe in violation of the Plaintiff's statutory and contractual rights.

2.    Until January 18, 2019, John was a student at the University. (Transcript of Day 1 Evidentiary Hearing, January 28, 2019 (hereinafter "T. Day 1") at 21:12-20)

**John Doe and Jane Roe 1**

3.    In the fall semester of 2017, John and Jane Roe 1 ("Jane 1") had known each other for over one year and maintained a nonsexual friendship. (Report of Investigation, hereinafter "Report" (Plaintiff's Exhibit 2) at 5)

4.    On or about November 3, 2017, John and Jane 1 had an exchange on Snapchat about Jane 1's "open relationship" with her then boyfriend. (Report (Plaintiff's Exhibit 2) at 5)

5.    John and Jane 1 had been talking about Jane needing someone to provide physical affection in the absence of her boyfriend who attended another school. John asked if Jane 1's

boyfriend would be okay with someone giving his girlfriend affection.  Jane 1 said he would be.

John volunteered to provide her with the wanted attention and invited her to his home. (Report

(Plaintiff's Exhibit 2) at 5)

6.      Jane 1 accepted and arrived at John's home between 11 pm and 12 am that night. (Report

(Plaintiff's Exhibit 2) at 5)

7.      Jane 1 would later recount that once she arrived, John took her up to his room and the

two began kissing.  After 15-20 minutes, Jane 1 performed oral sex on John.  The two then

engaged in foreplay and had intercourse.  John used a condom during intercourse. (Report

(Plaintiff's Exhibit 2) at 5)

8.      After having sex, the two fell asleep.  At the time, John had significant hip issues that

prevented him from sleeping through the night.  The two woke, engaged in foreplay and had sex

at least two more times.  Prior to the last encounter, John told Jane 1 that he had run out of

condoms.  (Report (Plaintiff's Exhibit 2) at 6)

9.      The two remained in bed and engaged in foreplay.  As they had done before, at some

point they began to have sex.  After about 1 or 2 minutes of penetration, Jane 1 said something

like "that's not for you." John then immediately stopped. ((Plaintiff's Exhibit 2) Report at 6)

10.     John was confused and felt awkward.  The two made small talk but not about what Jane 1

had said. (Report (Plaintiff's Exhibit 2) at 6)

11.     Jane 1 later recounted that she then went back to sleep and stayed in bed with John until

she was awoken at 6 am by her alarm.  However, John recalled that after sex, he and Jane 1 made

small talk before getting dressed and Jane 1 leaving. (Report (Plaintiff's Exhibit 2) at 5)

12.     John walked Jane 1 to the door and Jane 1 walked to her dorm and immediately went to

sleep. (Report (Plaintiff's Exhibit 2) at 5)

13.     Neither John nor Jane 1 consumed any alcohol or drugs on that night. (Report (Plaintiff's Exhibit 2) at 5)

14.     On August 24, 2018, Jane 1 and a sorority sister that the University labeled as W1 or Witness 1, made a report with the University that John had sexual intercourse with Jane 1 on November 3-4, 2017 without her consent. (Report (Plaintiff's Exhibit 2) at 1)

15.     Specifically, Jane 1 alleged that the final sexual encounter that morning was not consensual because John did not have a condom and that he had forced himself inside of her by pinning her down with his legs. (Report (Plaintiff's Exhibit 2)  at 5)

**John Doe and Jane Roe 2**

16.     As of January 14, 2018, John and Jane 2 had been maintaining a casual and consensual sexual relationship.  The previous semester, they had sex approximately 10 times.  John and Jane 2 would arrange via text or after having met up at parties to go to John's home to have sex.  Jane 2 later recounted that the relationship was not exclusive and they both were "seeing" other people. (Report (Plaintiff's Exhibit 2) at 8)

17.     On January 14, 2018, John and his roommates were hosting a party to which he invited Jane 2 and her friends. (Report (Plaintiff's Exhibit 2) at 8)

18.     When she arrived, John asked Jane 2 if she wanted to stay the night and she said yes. Because John had hosting duties for the party, he and Jane 2 did not hang out together but he did see her periodically during the party.  (Report (Plaintiff's Exhibit 2) at 11)

19.     Later that night, Jane 2 was injured on the dance floor when she was elbowed, fell down, and came up with a bloody nose.  Jane 2 was upset and a friend, labeled by the University as W4, took her to the second floor bathroom to help clean up her bloody nose.  John was near the bathroom and left his hosting duties to help Jane 2.  John again asked Jane 2 if she wanted to stay

the night and she again responded yes. John asked Jane 2 if she would like to go his room, which was also on the second floor. Jane 2 accepted. (Report (Plaintiff's Exhibit 2) at 9)

20.     John took Jane 2 to his room and they sat on the bed and talked. Jane 2 was embarrassed about her nose and John spent time trying to make her feel better about it. John then left the room briefly to make sure that someone had taken over his hosting duties. When John returned, he and Jane 2 began having sex on his bed. John recalls Jane 2 being an active participant and her being fully engage the entire time. As on previous occasions that they had sex, Jane 2 occasionally got on top of and straddled John. (Report (Plaintiff's Exhibit 2) at 9)

21.     After sex, John and Jane 2 went to sleep. Jane 2 then woke John and told him that she wanted to leave. The two got dressed and John walked Jane partially back to her dorm. As they left, around 2 am, the party was winding down and several of the partygoers, including W4, walked behind John and Jane 2. (Report (Plaintiff's Exhibit 2) at 9,12)

22.     Several people who interacted with Jane 2 that night, including W4, stated that Jane did not appear intoxicated. (Report (Plaintiff's Exhibit 2) at 12)

23.     Despite policies and regulations prohibiting students from disclosing information about a report or complaint of sexual misconduct, Jane 1, W1 and others were permitted and encouraged by the University to disclose information about Jane 1's complaint to others in an effort to find other women willing to make a complaint against John. (Report (Plaintiff's Exhibit 2) at 2-3)

24.     Through these efforts, Jane Roe 2 ("Jane 2") was convinced to file a complaint against John. (Report (Plaintiff's Exhibit 2) at 11)

25.     On August 30, 2018, Jane 2 made a report to the University that she had passed out in John's room the night of the January 14, 2018 party and woke up to John having sex with her.

Jane 2 made this report shortly after learning that her sorority sister Jane 1 had made a complaint against John. (T. Day 1 at 112:24-113:4)

26.     The University never investigated whether the Jane 1, Jane 2 or any of the witnesses coordinated their statements or were influenced to make any statements regarding the investigation, although it was known that individuals were talking to each other is what led to the complaints. (T. Day 1 at 113:5-18)

**The University's Flawed Investigation**

27.     On August 30, 2018, the University Title IX coordinator notified John that a formal investigation was being initiated into allegations of non-consensual sexual intercourse with complainants Jane Roe 1 and Jane Roe 2, pursuant to the University's Sexual Misconduct Policy (the "policy"). (Report (Plaintiff's Exhibit 2 at 1)

28.     Specifically, John was given a Notice of Sexual Misconduct Investigation.  The Notice gave the names of the accusers and stated that John was being charged with "Sexual Assault I – Non-Consensual Sexual Intercourse."  However, the Notice did not provide John with any specifics about the allegations against him. (T. Day 1 at 28:13-22)

29.     When the University's investigation began in August 2018, John had spent the entire summer of 2018 studying to take the September 1, 2018 Medical College Admission Test ("MCAT") in anticipation of attending Medical School after graduation.  (T. Day 1 at 16: 4-11, 18: 1-5)

30.     Upon learning of the investigation but having no idea what he was actually accused of doing, the stress John endured forced him to skip the exam and forfeit the $315 registration fee. (T. Day 1 at 16: 17-23)

31.    The stress of not knowing the parameters of the investigation resulted in John voluntarily withdrawing from his usual activities, including conducting in undergraduate laboratory research, participating in his fraternity, and continuing any activity other than his academic classes. (T. Day 1 at 14:3-15:22)

32.    That same day, the University issued a "No Contact Order" to John to stay away from Jane 1 and Jane 2. (T. Day 1 at 92: 9-24)

33.    John was given no information about the investigation after being noticed of the existence of the Jane 1's and Jane's 2's accusation until after his interview, more than a month later. (T. Day 1 at 30:25-32:3)

34.    Under the policy, a formal investigation will be initiated if, after conducting the initial review of a formal complaint, the Title IX Coordinator determines that the allegation, if true, would constitute a violation of the policy.  (Policy (Plaintiff's Exhibit 5) at 2.9.9.)

35.    The formal investigation did not comply with the policy or any of the University's procedures, as the University did not conduct separate investigations into the separate, unrelated claims against John.  Instead, the University investigated both claims against John at the same time, allowing information obtained in relation to one claim to unfairly taint the other claim and vice versa. (T. Day 1 at 32:11-15)

36.    The University's policy utilizes the "single-investigator model" whereby a single investigator is given the power to interview accusers, the accused, and witnesses; make findings of fact; and determine whether a violation of the policy has occurred using a preponderance of the evidence (i.e., more likely than not) standard.  (Policy (Plaintiff's Exhibit 5) at 2.10.2 )

37.    According to the policy, the investigator will interview witnesses provided by both the complainant and respondent, those identified by other witnesses, and any other persons the investigator considers it proper to interview.  (Policy (Plaintiff's Exhibit 5) at 2.10.7 )

38.    The stated purpose of the interviews is to gather and assess information about the incidents at issue in the complaint, not to solicit general information about either party's character.  (Policy (Plaintiff's Exhibit 5) at 2.10.5)

**Findings of the Investigator**

39.    Anne Kane was an attorney hired by the University to be the sole-investigator for Jane 1's and Jane 2's allegations against John. (T. Day 1 at 33:21-33-4)

40.    While John was permitted to have an advisor present at his meetings with the investigator, the advisor was not permitted to speak on John's behalf at any meetings. (T. Day 1 at 33:5-25)

41.    Following John's second interview, John received and email from the Title IX coordinator stating the investigator was nearing her conclusion and a preliminary report was available for review. (T. Day 1 at 42:24-43:2).

42.    The preliminary report is a summary of interviews, and information that has been collected over the course of the investigation by the investigator (T. Day 1 at 96: 9-16)

43.    John was not given a copy of the preliminary report nor was he permitted to make any direct copies of the report. He was only permitted to view the document by appointment. (T. Day 1 at 43:6-10)

44.    The report, containing statements from every witness and the complainants was voluminous, requiring hours to read in its entirety. (T. Day 1 at 43:11-18)

45.    John made appointments and reviewed the report several times with his Advisor and alone. (T. Day 1 at 44:2-8)

46.    Upon viewing the preliminary report, John learned that not all his witnesses were interviewed. He was told it was because they would provide character evidence for John. (T. Day 1 at 44:24-45:7)

47.    However, John recalled from his initial interview, that he was questioned about negative character statements witnesses had made about him, and questioned about situations with women other than Jane 1 and Jane 2. (T. Day 1 at 45:8-45:9)

48.    Ms. Kane completed her investigative report on November 13, 2018. (Report (Plaintiff's Exhibit 2) at 14)

49.    John was given notice of the outcome, but again, not given the report itself and told that it was available for review. (T. Day 1 at 46:10-16, 47:13-16)

50.    John, again, made multiple appointments to view the report, both with and without his advisor. (T. Day 1 at 48:2-11)

51.    John estimates that he spent in excess of 11 hours attempting to review and take notes of the preliminary and final report. (T. Day 1 at 49:9-12)

52.    While there were positive character statements made by witnesses, the investigator only included the negative character statements in her report. (T. Day 1 at 52:21- 53:18)

53.    John appealed the decision because the investigation had reached the wrong conclusion because it was incomplete, flawed, and biased. (T. Day 1 at 54:3-12)

54.    John, in his appeal, pointed out witnesses who were not questioned, including a sorority sister of Jane 1 who Jane 1 had discussed the matter with previously when Jane 1 had decided not to make a complaint initially and a witness who had a direct view into the room where John

and Jane 2 were, when according to the investigator, Jane 2 was incapacitated. (T. Day 1 at 55:16- 56:8)

55.    On November 14, 2018, Jessica Rickmond, the Title IX Coordinator informed John of the outcome of the investigation. (Email- J. Doe to Title IX Coordinator  (Defendant's Exhibit 1))

56.    Ms. Kane concluded that John Doe violated Section 1.6 of the Policy by engaging in sexual intercourse with Complainant 1 (Jane 1) "without affirmative consent," stating that Complainant 1(Jane 1) clearly voiced her unwillingness to engage in unprotected sex before the first time she and Respondent had intercourse and again after Respondent ran out of condoms. (Report (Plaintiff's Exhibit 2 at 14)

57.    The investigator also concluded that John Doe violated Section 1.6 of the Policy by engaging in sexual intercourse with Complainant 2 (Jane 2) "without affirmative consent." According to Complainant 2 (Jane 2) was either passed out or semi-conscious when Respondent returned to his room and initiated sexual intercourse and Respondent knew or should have known that she was incapacitated. (Report (Plaintiff's Exhibit 2) at 14)

58.    On December 7, 2018, Jessica Rickmond, the Title IX Coordinator informed John that an administrative panel had convened to determine sanctions two days before on December 5, 2018. (Email- J. Doe to Title IX  (Defendant's Exhibit 2))

59.     This panel does not have the power to overrule factual determinations and findings by the investigator.  (T. Day 1 at 128:23-129-12)

60.    The administrative panel decided to sanction John with Expulsion, to be noted on his academic transcript, Campus Restriction and No Contact Order with Jane 1 and Jane 2. (T. Day 1 at 11:1-3, 18:15-23, 92:16-25)

**Doe is Likely to Succeed on His Breach of Contract and Title IX Claims**

**Breach of Contract**

61.     The policy promises the student that the University is committed to "[e]ngaging in investigative inquiry and resolution of reports that are adequate, reliable, impartial, prompt, fair and equitable."  (Plaintiff's Exhibit 4 at 37)

62.     The policy promises the student that the University is committed to "[s]upporting complainants and respondents equally."  (Plaintiff's Exhibit 4 at 37)

63.     The University's Student Handbook allows for disciplinary hearings, known as Conduct Board Hearings that are conducted by groups made up of students, administration, and staff. (T. Day 1 at 133:12-16;, 134:24-9)

64.     The University allows for Conduct Hearings for very serious offenses such as assault, battery, harassment, discrimination and weapons offenses.  (Plaintiff's Exhibit 4 at 45-49)

65.     Witnesses are allowed to be presented at Conduct Board Hearings. (T. Day 1 at 144:4-14)

66.     The Student Handbook provides that in reference to sexual misconduct cases, the Conduct Board will not include a student representative, although according to the Title IX coordinator, the Handbook is not followed as written in that regard. (T. Day 1 at 135:22-136:6)

67.     The Appeal Boards for the Conduct Hearing Board contains students. (T. Day 1 at 144:22-25)

68.     From the moment that John was informed by the University that a formal investigation was being conducted, he was neither treated fairly nor provided with adequate information to defend himself.  (T. Day 1 at 10:8 – 65:13)

69.    On August 30, 2018, John was given the Notice of Sexual Misconduct Investigation..  (T. Day 1 at 12:8-12)

70.    The Notice provided John with no information about the claims against him other than that he was being accused of Sexual Assault I – Non-Consensual Sexual Intercourse. (T. Day 1 at 28:13-22)

71.    Jane 1 and Jane 2 were cc'd on the Notice.  (Notice of Sexual Misconduct Investigation (Plaintiff's Exhibit 1))

72.     At his initial interview, the Investigator asked John for his perspective on Jane 1, but was not told what Jane 1's specific allegations were. (T. Day 1 at 34:2-14)

73.    The investigator only brought up condom use or asked any specific questions at all *after* John  has already given recollection of events. (T. Day 1 at 34; 16-23)

74.    The investigator repeated this same method in here questioning of John about Jane 2 (T. Day 1 at 35:9-17)

75.     Only by deducting relevance by the Investigator's line of questioning in real time, and without his advisor being permitted to interject, was John able suspect that the use of a condom relates to Jane 1's claim. (T. Day 1 at 36:4-15)

76.    John was question about a conversation that Jane 1 alleged that they had. Which John denied. (T. Day 1 at 36:16-37:6)

77.    John was never given anything in writing that stated what the allegations against him were, neither pertaining to Jane 1 nor to Jane 2. (T. Day 1 at 37:7-22)

78.     Accordingly, John did not know in advance what information would be relevant and was unable to immediately recall useful information or witnesses he could suggest to support his version of events with Jane 1, although he was able to think of one witness on the fly regarding

Jane 2. (T. Day 1 at 35:18-23)

79.    After the completion of the first interview with the investigator, John was able to reflect on what he assumed were the allegations and recommends more witnesses for the investigator to speak with. (T. Day 1 at 38:2-19)

80.    However, at the second interview, John was not told about any witnesses who were interviewed nor given the opportunity to review any statements by any witness or Jane 1 or Jane 2. (T. Day 1 at 40:1-7)

81.    John was only permitted to review and correct is own statement from the investigator's first interview of him. (T. Day 1 at 39:21-25)

82.    The investigator failed to conduct follow-up interviews or gather relevant physical evidence or information.  . (Report (Plaintiff's Exhibit 2))

83.    The investigator failed to determine what, if any, benefits or accommodations Jane 1 and Jane 2 received as a result of their claim to be a victim of sexual assault. Several witnesses with information helpful to John's defense were not interviewed. (T. Day 1 at 44:24-45:7)

84.    Witness statements were disregarded when they did not align with Ms. Kane's belief that John had sexually assaulted Jane 1 and Jane 2.  (Report (Plaintiff's Exhibit 2))

85.    Discrepancies in the statements of witnesses favorable to Jane 1 and Jane 2 were not addressed or investigated.  (Report (Plaintiff's Exhibit 2))

86.    Jane 1 and Jane 2 were each interviewed by the University on more occasions than John. Ms. Kane failed to question Jane 1 and Jane 2 about discrepancies between their version of events and John's version but always cross-examined John on any discrepancy in his version of events and that of Jane 1 and/or Jane 2.  (Report (Plaintiff's Exhibit 2))

87.     The disclosure of information by someone involved in a complaint as a witness is a

violation of Section 2.18 of Sexual Misconduct Policy.  (Policy at 2.18)

88.      No witness has been charged with violating the policy. However, Jane 1 and Jane 2 are

currently violating this policy by revealing that John was expelled.  (Policy at 2.18)

**Title IX Claim**

89.     In September 2017, the Education Department rescinded the Dear Colleague Letter of

2011 and issued new interim guidance on how to investigate and adjudicate allegations of

campus sexual misconduct under federal law. (Plaintiff's Exhibit 6)

90.     Among other things, the interim guidance notes that schools should provide written

notice to the responding party of the allegations, including sufficient details and adequate time to

prepare a response before any initial interview. (Plaintiff's Exhibit 6)

91.     The University was aware of Department of Education guidance being rescinded in 2017.

(T. Day 1 at 138:17-139:4)

92.     These Department of Education changes occurred prior to the University revising their

sexual misconduct police in 2018. (T. Day 1 at 139:2-7)

93.     The Education Department's new proposed regulation requires individuals charged with

sexual misconduct be given a live hearing. (T. Day 1 at 141:16-19)

94.      The Education Department's new proposed regulation requires individuals charged with

sexual misconduct be permitted to have counsel present at that live hearing. (T. Day 1 at 141:20-

21)

95.     The Education Department new proposed regulation requires individuals charged with

sexual misconduct be permitted to cross-examine their accusers at the hearing. (Dept. of Ed.

Proposed Regulation (Plaintiff's Exhibit 7)

96.     The proposed rules would require schools to operate with the presumption of innocence of the responding party throughout the grievance process. (Plaintiff's Exhibit 7)

97.     It would require written notice of allegations and an equal opportunity to review all evidence collected for both parties. (Plaintiff's Exhibit 7)

98.     It would require the right to cross-examination, subject to "rape shield" protections and a live hearing where cross-examination would be conducted through the parties' advisors. (Plaintiff's Exhibit 7)

99.     Notably, to promote impartial decisions, schools would not be allowed to use a "single investigator" or "investigator-only" model. (Plaintiff's Exhibit 7)

100.    Investigator Kane showed clear bias for Jane 1 when she accepted whole-heartedly Jane 1's claim that John pinned her down with his legs in order to achieve penetration.

101.    When he was asked during the initial interview if he pinned Jane 1 down, John told Kane that he had not. (T. Day 1 at 57:20-58:3)

102.    After John found out the details of what Jane 1 alleged about John forcefully pinning her down by reading the preliminary report, he informed the investigator that what Jane 1 was not possible. John had severe problems with his hip and he was due for a total hip replacement. (T. Day 1 at 58:16-21)

103.    Due to his hip condition, John experienced severe pain, especially during intercourse that prevented him from forcefully pinning Jane 1, who was taller and weighed more than John, down. (T. Day 1 at 58:22-59:2)

104.    Indeed, John underwent a total hip replacement on December 26, 2018 and now has a metal and ceramic hip implant. (T. Day 1 at 59:3-9)

14

105.    The hip problems prevented John from sleeping through the night.  Indeed, John had hip

surgery during the tail end of this investigation.  (T. Day 1 at 58:18 – 59:9)

106.    The investigator presented John with text messages between John and Jane 2 and asked

John to interpret their meaning. (T. Day 1 at 40:15-22)

107.    Kane showed a clear bias for Jane 2 and bias against John when evaluating the following

text messages between Jane 2 and John after the sexual encounter at issue:

Jane 2: Thanks for last night.  I'm sorry about that.  Also used to knocking back beers like it's

nothing.  Didn't think break would fuck over my tolerance as much as it did.  (A laughing emoji

was at the end.)

John:  Hey no prob.  And yea you were pretty drunk.  (A laughing emoji was at the end.)

(Report (Plaintiff's Exhibit 2) at 9-14)

108.    Jane 2 explained that she was embarrassed about making a disturbance at the party

because of her nose bled and she texted John to apologize for being a causing a scene.  (Report

(Plaintiff's Exhibit 2) at 13)

109.    John explained to Kane that when he said Jane was drunk, he was just joking and didn't

mean it literally. (Report (Plaintiff's Exhibit 2) at 13)

110.    Kane decided to believe Jane 2's explanation for texting but not John's explanation.

(Report (Plaintiff's Exhibit 2) at 13-14)

111.    In fact Kane used John's text to support her conclusion that Jane 2 was incapacitated that

night despite the fact that no witness observed her intoxicated before or after the incident.

(Report (Plaintiff's Exhibit 2) at 13)

112.    Moreover, later when Jane 2 texted John to say "I think it is best we don't hook up

anymore.  ***Nothing personal against you***, just a personal decision I wanted to make you aware

of" (emphasis added), Kane did not take Jane 2's words at face value as she did for John's words. (Report (Plaintiff's Exhibit 2) at 13-14)

113.    The investigator ignored Jane 2's testimony that she became intoxicated soon after arriving at the party, and ignored several witnesses who stated that Jane 2 did not appear intoxicated and instead ruled that Jane 2 suddenly became intoxicated when she when into John's room and laid down. (Report (Plaintiff's Exhibit 2 at 12)

114.    The investigator evaluated statements made by Jane 2 and John differently by accepting Jane 2's explanation that she contacted John the day after the party because she was embarrassed about her nose bleed but rejecting John's explanation that he agreed with Jane 2 saying she was drunk because he was joking and did not mean it literally. (Report (Plaintiff's Exhibit 2 at 13-14)

115.    The policy requires that all parties not disclose information related to the investigation. (T. Day 1 at 105:17-23)

116.    All parties, including the Jane 1 and Jane 2 were given copies of and instructed on the policy, including confidentiality considerations. (T. Day 1 at 107:9-13)

117.    Jane 1 made a public social media post about the outcome of the investigation stating that she had won her case. (T. Day 1 at 104:5-15)

118.    Anyone who knew about the investigation would therefore now know that John was expelled. (T. Day 1 at 106:10-17)

119.    The violations of the policy by the female students were not investigated by the University (T. Day 1 at 106:18-21).

120.    Investigator Kane showed a bias tendency to disregard witness statements that were favorable to John.

121.    For example, John produced witnesses that testified that Jane 2 did not appear intoxicated before *nor after* she and John had sex.  These witnesses were not pro-John either.(Report (Plaintiff's Exhibit 2) at 12)

122.    In fact, one witness, W4, was having a sexual relationship with Jane 2 at the time of the investigation.  (Report (Plaintiff's Exhibit 2) at 4)

123.    Kane disregarded this testimony and found that Jane 2 was intoxicated.  .  (Report (Plaintiff's Exhibit 2))

124.    Kane even disregarded Jane 2's own testimony in reaching her conclusion that Jane 2 was intoxicated and created an entirely new version of events that was specifically ruled out by Jane 2 *and* the other witnesses that Kane interviewed. (Report (Plaintiff's Exhibit 2) at 10)

125.    Jane 2 claimed that she became very intoxicated shortly after arriving at the party in question. (Report (Plaintiff's Exhibit 2) at 10)

126.    She did not suggest at any point that she became intoxicated in John's bedroom. (Report (Plaintiff's Exhibit 2) at 10)

127.    However, as stated above, numerous witnesses told Kane that Jane 2 did not seem intoxicated.  (Report (Plaintiff's Exhibit 2) at 12)

128.    Therefore, in order to reconcile these obvious, fundamental discrepancies, Investigator Kane concluded that Jane 2 must have become incapacitated once she went in to John's room and laid down.  .  (Report (Plaintiff's Exhibit 2))

129.    According to Kane, the alcohol "caught up" with Jane 2 when she laid down.  (Report (Plaintiff's Exhibit 2) at 13)

130.    This finding of fact is completely unsupported by the evidence in this case.

131.    Jane 2 did not provide this version of events, and the witnesses specifically contradicted it.  .  (Report (Plaintiff's Exhibit 2))

132.    Kane reached this conclusion without consultation with any sort of medical professional that could explain if such a thing was even possible. Notably, Kane also completely ignored Jane 2's statements about the effects she experienced after being elbowed, falling down and getting a bloody nose.  .  (Report (Plaintiff's Exhibit 2))

133.    Jane 2 stated that her memory was good until her fall but then it became episodic and disconnected.  (Report (Plaintiff's Exhibit 2) at 10)

134.    Investigator Kane never considered the possibility that Jane 2's accident is responsible for her inability to recall details from that night.  .  (Report (Plaintiff's Exhibit 2))

135.    Jane 2 may have suffered a concussion or some other injury that caused her to appear and act normal (as everyone but her observed), but to have no memory of many of the events from that night.  Kane never considered this aspect of Jane 2's statements.

136.    In here report, Kane also cites a tale from W3 that she had to repeatedly tell John she was not interested in hooking up with him.  (Report (Plaintiff's Exhibit 2) at 8)

137.    Ironically, Kane failed to include in her Report of Investigation favorable character evidence about John from female witnesses.  .  (Report (Plaintiff's Exhibit 2))

138.    W8 told Kane that during a sexual encounter with John, the condom either came off or broke. (Report (Plaintiff's Exhibit 2) at Exhibit P; Transcript of Day 2 Evidentiary Hearing, January 29, 2019 (hereinafter "T. Day 2") at 10:4-14)

139.    W8 stated that John immediately stopped when this happened and did not attempt to resume intercourse or pressure her to continue.  (Report (Plaintiff's Exhibit 2) at Exhibit P; T. Day 2 at 10:15-21)

140.    W9 told Kane that once she was extremely drunk and threw herself at John and "did everything she could to get him to sleep with her." (Report (Plaintiff's Exhibit 2) at Exhibit Q; T. Day 2 at 10:15-25)

141.    John did not take advantage of the situation but instead tucked W9 into bed. (Report (Plaintiff's Exhibit 2) at Exhibit Q; T. Day 2 at 10:15-25)

142.    Investigator Kane did not include any of these statements in her Report of Investigation. (Report (Plaintiff's Exhibit 2))

**Without Judicial Intervention Now, Doe Will Suffer Irreparable Harm**

143.    John will be forced to disclose this finding whenever he is asked if he has been the subject of a disciplinary proceeding or been found responsible for a violation as such questions are common in applications for graduate or professional school, professional licensure, and in employment.

144.    During the investigation, John was in his final year at the University was planning to graduate at the conclusion of the Spring Semester. (T. Day 1 at 11:14-21).

145.    The allegations and investigation has already detrimentally impacted John's academic and professional career by upending his plans to apply to medical school. (T. Day 1 at 15:19-16-7)

146.    John intended to apply to medical school after graduation. Such as already been put on hold because he could not take the MCAT due to stress caused by the initiation of this investigation. (T. Day 1 at 16:9-16)

147.    There is no doubt that a stigma will follow John to medical school should the expulsion remain. ( T. Day 1 at 18: 11-19:1)

148.    Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap . John will be irreparably harmed by the gap in his education that will result if the University's expulsion stands. (T. Day 1 at 20: 11-19)

149.    Even if John were to transfer and be accepted by another institution, he would be likely to have to complete two more semesters in order to qualify to graduate at the new institutions (T. Day 1 at 20: 20-21:8)

150.    John is not permitted to complete his final semester and graduate with his classmates he will have been denied the most fundamental and important benefits of his bargain with the University: full participation in, one-of-a-kind college experience geared toward a career in the sciences. (T. Day 1 at 19:4-20:2)

**The Harm to John Outweighs Any Potential Harm to the University**

151.    The harm John will suffer if he is not allowed to complete his final semester of college and graduate with his peers is greater than any potential harm to the University.

152.    The University will not be harmed if John is allowed to resume classes.

153.    The University's Sexual Misconduct Policy allows for the interim suspension of a student accused of sexual misconduct.  (Plaintiff's Exhibit 5 at 2.6.4)

154.    The University did not issue an interim suspension to John Doe.

155.    Indeed, John continued to take classes throughout the flawed investigation and the imposition of the expulsion in the fall semester of 2018 and throughout his appeal in the beginning of the spring semester of 2019.  (T. Day 1 at 12: 23-13:1)

156.    During the course of the appeal in the spring semester, John was permitted to continue classes, including one with Jane 1. (T. Day 1 at 59:15-21)

157.    When brought to the Title Coordinator's attention, rather than have either student removed from the class, the professor was told that the two should not be made to communicate with each other. (T. Day 1 at 103: 3-19)

158.    As such, there were no safety concerns with John being on campus and the University will not be harmed if he is to continue taking classes until this matter is resolved.

**The Public Has an Interest in the Enforcement of Contracts and the Fair and Non-Discriminatory Treatment of College Students**

159.    The verified Complaint alleges fundamental breaches of contract. See Plaintiff's Complaint

160.    The public interest favors enforcing valid contracts and making parties live up to their agreements." *MarbleLife,* 759 F. Supp.2d at 563 (granting injunction).

161.    " It is always in the public's interest that a student be treated fairly before being disciplined." *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8; *see also King,* 2014 U.S. Dist. LEXIS 117075, at *42-43 (public interest in applying policies fairly in disciplinary matters).

## II.    PROPOSED CONCLUSIONS OF LAW

**Preliminary Injunction Standard**

1.    Under Fed. R. Civ. P. 65, this Court must weigh four factors when deciding whether to grant a motion for preliminary injunction: (1) has the movant shown a reasonable probability of success on the merits; (2) will the movant be irreparably harmed by denial of the relief; (3) will granting preliminary relief result in even greater harm to the non-moving party; and (4) is granting preliminary relief in the public interest. *American Civil Liberties Union v. Reno*, 217 F.3d 162, 172 (3d Cir. 2000) (citations omitted). This Court finds that Plaintiffs have fully supported each of these factors and that a preliminary injunction should issue.

2.    A movant for preliminary equitable relief must meet the threshold for the first two

'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but *not necessarily more likely than not*) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. *Reilly v. City of Harrisburg,* 858 F.3d 173, 179; 2017 U.S. App. Lexis 9105 (3rd Cir. 2017), quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins.* Co., 582 F.3d 721, 725 (7th Cir. 2009) (emphasis added).

3.      Courts "do not require at the preliminary stage a more-likely-than-not showing of success on the merits because a 'likelihood' [of success on the merits] does not mean more likely than not." *Reilly*, 858 F.3d at 178, n.3.

4.      A plaintiff satisfies this element if he shows likelihood of success on even one of his claims. *See Miller v. Mitchell*, 598 F.3d 139, 148 (3d Cir. 2010) (upholding a preliminary injunction based on a finding of likelihood of success on the merits on two of three claims). Plaintiff has also alleged other claims against the University but does not seek preliminary relief on the basis of those claims.

5.      Cases involving student disciplines are fitting for immediate injunctive relief. *See, e.g., Ritter v. Oklahoma,* 2016 U.S. Dist. LEXIS 60193, at *6-7 (W.D. Okla. May 6, 2016) (granting TRO to student expelled due to alleged violation of university's sexual misconduct policy; "[w]hen the penalty is as severe as that imposed in this case, with its potentially devastating consequences, the accused is entitled to more process than plaintiff was afforded"); *Doe v. Univ. of Notre Dame,* 2017 Dist LEXIS 69645 (N.D. In. 2017) (granting TRO to permit student to complete final exams after being found responsible for sexual misconduct); *Doe v. Middlebury College,* No. 1:15-CV-192-JGM, 2015 U.S. Dist. LEXIS 124540, 2015 WO 5488109, at *3 (D. Vt. Sept. 16, 2015) (granting preliminary

injunction to student expelled for purported sexual misconduct); *King v. DePauw Univ.,* 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014) (granting preliminary injunction to student suspended for purported sexual misconduct).

**Doe is Likely to Succeed on His Breach of Contract and Title IX Claims**

**Breach of Contract**

6.       For a breach of contract claim to succeed, a plaintiff must establish (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Davis* v. *Wells Fargo,* 824 F.3d 333, 351 (3d Cir. 2016); *McShea v. City of Phi/a.,* 606 Pa. 88,995 A.2d 334, 340 (2010).

7.       The relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Swartley v. Hoffa.er,* 734 A.2d 915, 919 (Pa. Super. 1999).

8.       Pennsylvania courts "review the agreement between the parties concerning disciplinary procedures contained within a portion of the student handbook as we would any other agreement between two private parties." *Reardon v. Allegheny College,* 926 A.2d 477, 480 (Pa. Super. 2007).

9.       Where a private university or college establishes procedures for the suspension or expulsion of its students, substantial compliance with those established procedures must be had before a student can be suspended or expelled. *Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.,* 392 Pa. Super. 502, 510, 573 A.2d 575, 579 (1990).

10.    By enrolling at the University, and paying his tuition and fees, and attending the school, John Doe and the University had a relationship that may reasonably be construed as being contractual in nature.

11.    The terms of the contract between John Doe and the University are generally found in various University policies and procedures, including those set forth in the Student Handbook. *See* Student Handbook at 49, the relevant portions of which are attached hereto as Exhibit C.

12.    The contract between John Doe and the University contains an implied covenant of good faith and fair dealing. This implied covenant prohibits the University from doing anything which will have the effect of destroying or injuring the right of John Doe to receive the fruits of the contract.

13.    The contract between John Doe and the University, as a result, impliedly includes the requirement that the University provide John Doe with an investigatory and adjudicatory process that was fair and with due process.

14.    The contract between John Doe and the University required the University to provide written notice and an opportunity for a hearing before an objective decision-maker.  (Plaintiff's Exhibit 4 at 49)

15.    The University did not provide John Doe with written notice of the allegations against him.

16.    The University did not provide John Doe with an opportunity for a hearing before an objective decision-maker.

17.    The contract between John Doe and the University required the University to treat complainants and respondents equally.  (Plaintiff's Exhibit 4 at 37)

18.    The University did not treat John Doe equally when compared to how it treated Jane Roe 1 and Jane Roe 2.

19.    The University treated John Doe like a suspect instead of a student

20.    The single-investigator model used by the University does not align with concepts of due process and fairness. *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016) ("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.")

21.    The lack of a hearing and an opportunity to cross-examine prevents due process from being implemented.

22.    A live hearing subject to cross-examination is critical to due process. *See, e.g., Doe v. Baum,* 903 F.3d 575, 581 (6th Cir 2018) ("[O]ur circuit has made two things clear: (1) if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension, and (2) when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination.").

23.    To date, the Third Circuit has not considered whether a live hearing subject to cross-examination is critical to due process in the school disciplinary setting. *Doe v. Princeton Univ.*, No. 18-16539, 2019 U.S. Dist. Ct. LEXIS 4449 at *20 (D.N.J. Jan. 9, 2019).

24.    The investigator's failure to conduct follow-up interviews or gather relevant physical evidence or information was relevant and essential to the assessment of their credibility.

25.    The investigator's failure to determine what, if any, benefits or accommodations Jane 1 and Jane 2 received as a result of their claim to be a victim of sexual assault was relevant and essential to the assessment of their credibility.

26.    The University repeatedly and materially breached the explicit guarantee of fundamental fairness and due process, as well as the implied covenant of good faith and fair dealing and other contractual provisions.

27.    The University breached the explicit and implied obligation to provide John Doe with adequate notice of the nature of the charges against him.

28.    The University breached the explicit and implied obligation to conduct a full and fair investigation of the claims against John Doe.

29.    The University breached its express and implied obligation when it limited John's access of the evidence against him.

30.    The University breached its express and implied obligations when it found John Doe Responsible without sufficient evidence.

31.    The failure to require that John be found responsible only on the basis of sufficient evidence was a breach of the guarantees of fundamental fairness, conviction by a preponderance of the evidence, the presumption of innocence, and the implied covenant of good faith and fair dealing.

32.    As a direct and foreseeable result of the University's failure to honor its express and implied contractual promises and representations, John has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**Title IX Claim**

33.     Title IX guarantees that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

34.     Title IX "'bar[s] the imposition of university discipline where gender is a motivating factor,'" and is enforceable through a private right of action for damages as well as for injunctive relief. *Doe v. Columbia Univ.,* 2016 U.S. App. LEXIS 13773 (2d Cir. 2016) (quoting *Yusuf v. Vassar Coll.,* 35 F.3d 709, 714-15 (2d Cir. 1994)). The University receives federal funds, and so may be held liable under Title IX. *Fitzgerald v. Barnstable Sch Comm.,* 555 U.S. 246, 257 (2009).

35.     The University committed impermissible gender bias by discriminating against John Doe on the basis of his sex in the investigation and adjudication of Jane 1 and Jane 2's accusations.

36.     The circumstances of the investigatory process, the single investigator and the appeal process cast serious doubt on the accuracy of the outcome of the sexual misconduct proceeding.

37.     The Department of Education regulations and guidance state that Title IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct.

38.     The University officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the discriminatory conduct.

39.      John Doe has been deprived of access to educational opportunities at the University.

40.     The University failed to adequately investigate and question the accusers' credibility, limited questions to and commentary of investigatory findings to the accusers' emotional state and interactions with friends and family in the days and weeks after the alleged incident and

failed to examine many of the conflicting statements of the parties in good faith.

41.    The conduct of the entire process treated John as if he was guilty from the start, thereby tainting the investigative hearing process and violating the guarantees of fundamental fairness and fair and impartial hearing.

42.    The bias of the entire process was so pervasive throughout the investigative processes that it destroyed any possibility of fairness and ensured that John would be found guilty.

43.    The finding was plainly a product of the presumption of guilt, as well as the atmosphere of bias and hysteria that permeated the entire disciplinary process.

**Without Judicial Intervention Now, Doe Will Suffer Irreparable Harm**

44.    "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). *see also Jones v. Board of Governors of the University of North Carolina,* 557 F. Supp. 263, 266 (W.D.N.C. 1983), *aff'd* 704 F.2d 713 (4th Cir. 1983) (finding irreparable harm because student could not be adequately compensated for delay in obtaining a degree caused by suspension and granting injunction); *Ritter,* 2016 U.S. Dist. LEXIS 60193, at *8 ("loss of educational and career opportunities" is irreparable harm which "is not readily compensable in money damages"); *Tully v. Orr,* 608 F. Supp. 1222, 1225 (E.D.N.Y. 1985) (finding irreparable harm from expulsion for cheating and plagiarism, noting "indelible stigma of having once been disenrolled," and granting injunction).

45.    Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will.  *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d

187, 195 (3d Cir. 1990) (reversing district court order and directing court to issue an injunction).

46.     A sexual misconduct finding has a negative stigma on post-collegiate life. *See, e.g., Ritter,* 2016 U.S. Dist. LEXIS 60193, at *8 (noting loss of educational and career opportunities); *King v. DePauw University,* 2014 U.S. Dist. LEXIS 117075, at *39-40 (S.D. Ind. Aug. 22, 2014) (noting impact on future employers and graduate school admissions committees).

47.     John's inability to continue or complete his education would cause irreparable injury. *See, e.g., Gati v. Univ. of Pittsburgh,* 91 A.3d 723, 729 n.10 (Pa. Super. 2014) (court "would have no trouble" finding irreparable harm when university dismissed student for dishonesty shortly before his graduation and defendant's "argument to the contrary is entirely unpersuasive"); *see also Jones v. Board of Governors of the University of North Carolina,* 557 F. Supp. 263, 266 (W.D.N.C. 1983), *aff'd* 704 F.2d 713 (4th Cir. 1983) (finding irreparable harm because student could not be adequately compensated for delay in obtaining a degree caused by suspension and granting injunction); *Ritter,* 2016 U.S. Dist. LEXIS 60193, at *8 ("loss of educational and career opportunities" is irreparable harm which "is not readily compensable in money damages"); *Tully v. Orr,* 608 F. Supp. 1222, 1225 (E.D.N.Y. 1985) (finding irreparable harm from expulsion for cheating and plagiarism, noting "indelible stigma of having once been disenrolled," and granting injunction).

48.     Being labeled as someone who committed "sexual assault" irreparably harms John, his reputation, and his future educational, professional, and social prospects.

*49.*     John will be irreparably harmed by the gap in his education that will result if the University's expulsion stands. *King v. DePauw University* 2014 U.S. Dist. LEXIS 117075

(S.D. Ind. Aug. 22, 2014) (granting preliminary injunction to student suspended for purported sexual misconduct).*:*

50.     If John is not permitted to complete his final semester and graduate with his classmates, he will be irreparably harmed because he will have been denied the most fundamental and important benefits of his bargain with the University: full participation in a perspective-shaping, mind-opening, one-of-a-kind college experience.

51.     The harm to John cannot be adequately compensated with money damages.

**The Harm to John Outweighs Any Potential Harm to the University**

52.     The Court must balance the relative harm to the parties, i.e., the potential harm to John if an injunction is not issued versus the potential harm to the University if it is. *See, e.g., MarbleLIfe, Inc. v. Stone Res., Inc.,* 759 F. Supp.2d 552, 563 (E.D. Pa. 2010).

53.     The harm John will suffer if he is not allowed to complete his final semester of college and graduate with his peers is greater than any potential harm to the University.

54.     The University will not be harmed if John is allowed to resume classes. *See, e.g., Ritter*, 2016 U.S. Dist. LEXIS 60193, at *5 (noting balance favors granting injunction because any harm to college is "inconsiderable" compared to harm to student if he was wrongfully expelled); *Middlebury College*, 2015 U.S. Dist. LEXIS 124540, at *3 (finding balance weighs in favor of student); *King*, 2014 U.S. Dist. LEXIS 117075, at *40-42 (finding balance of equities "firmly" in student's favor: "the, unavoidable consequences" he would suffer absent an injunction, even if he ultimately won the case, outweighed any harm to university); *see also MarbleLife, Inc.*, 759 F. Supp.2d at 563 (granting preliminary injunction in trademark infringement case and finding that any harm to defendant was at least partly self-inflicted due to its failure to abide by its contractual obligations).

**The Public Has an Interest in the Enforcement of Contracts and the Fair and Non-Discriminatory Treatment of College Students**

55.    The Court must weigh the effect on the expulsion of John and John's return to school activities pending the outcome of the litigation.

56.    Where a plaintiff has already demonstrated likely success on the merits and irreparable harm, "it almost always will be the case that the public interest will favor the plaintiff." *AT&T Co. v. Winback & Conserve Program,* 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

57.    The public interest favors enforcing valid contracts and making parties live up to their agreements. *MarbleLife,* 759 F. Supp.2d at 563 (granting injunction).

58.    The University has treated John unfairly, and "it is always in the public's interest that a student be treated fairly before being disciplined." *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8; *see also King,* 2014 U.S. Dist. LEXIS 117075, at *42-43 (public interest in applying policies fairly in disciplinary matters).

59.    It is also in the public interest to remedy and eradicate discrimination. *See, e.g., Dole v. Local 427*, 894 F.2d 607, 616 (3d Cir. 1990) (noting that anti-discrimination statutes serve the public interest in curtailing discrimination).

60.    In addition to the general public interest, the University of the Sciences community has a specific interest in seeing that the University's Title IX, Sexual Misconduct & Harassment Procedures and Process for sexual assault complaints are applied fairly and without discrimination.

Respectfully submitted,

**MINCEY FITZPATRICK ROSS, LLC**

Date:  February 8, 2019          By:    /s/ Riley H. Ross III
                                        Riley H. Ross III, PA I.D. #204676
                                        Zainab K. Ali, PA I.D. #321181
                                        Two Penn Center
                                        1500 JFK Blvd. Suite 1525
                                        Philadelphia, PA 19102
                                        (215) 587-0006
                                        riley@minceyfitzross.com

## **CERTIFICATION OF SERVICE**

I, Riley H. Ross III, hereby certify that a true copy of the foregoing to be served electronically

upon all counsel through the Court's Electronic Filing system.


Date:  February 8, 2019            /s/ Riley H. Ross III
                                   Riley H. Ross III