IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE | : | CIVIL ACTION |
| | : | |
| v. | : | No. 19-358 |
| | : | |
| UNIVERSITY OF THE SCIENCES | : | |

## <u>MEMORANDUM</u>

**Juan R. Sánchez, C.J.**                                                                **July 29, 2019**

Plaintiff John Doe was accused by two women of sexual assault just before the beginning of his senior year at Defendant University of the Sciences (the University).[1] After an outside investigator concluded it was more likely than not Doe was responsible for having sex with his accusers without their affirmative consent, the University expelled him. Doe appealed his expulsion through the University's internal processes. His appeal was denied, and, in mid-January, 2019, Doe's expulsion became effective. After an unsuccessful attempt to obtain injunctive relief which would have allowed him to complete his senior year and graduate, Doe filed the Amended Complaint. The University then moved to dismiss pursuant to Rule 12(b)(6). The Court will grant the University's motion and dismiss the Amended Complaint in its entirety because Doe has failed

---

[1] This litigation involves the intersection of highly-sensitive issues of sex, consent, and alcohol consumption. Understandably, at the hearing on Doe's request for emergency injunctive relief, the parties agreed—with the Court's permission—that those sensitivities justified concealing the identities of Doe and his accusers. Once the exigency of the emergency proceeding passed, however, the issue of confidentiality and Rule 10(a) was not raised again until the July 10, 2019, oral argument. *See Doe v. Megless*, 654 F.3d 404, 408 ("Rule 10(a) requires parties to a lawsuit to identify themselves in their respective pleadings.").

The Court appreciates the stakes of privacy in a matter as sensitive as this one and the parties' good intentions in maintaining that privacy thus far. Nevertheless, the matter of anonymity should have been put before the Court for the analysis required by *Doe v. Megless*, which requires a plaintiff to show "both (1) fear of severe harm, and (2) that the fear of severe harm is reasonable" as a precondition to rebutting the presumption of openness attached to judicial proceedings. *Id.* (quoting *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 596 F.3d 1036, 1043 (9th Cir. 2010)).

to plead (1) facts suggesting gender-motivated bias in his disciplinary proceedings; (2) the existence of specific contract provisions the University may have violated during his disciplinary proceedings; (3) conduct sufficiently outrageous to support a claim for the intentional infliction of emotional distress; and (4) facts distinguishing his contract claim from his claim for negligent infliction of emotional distress.  Because Doe has already had at least one chance to adequately plead his case and has again failed to do so, dismissal will be with prejudice.

## FACTS[2]

Plaintiff John Doe is a resident of North Carolina who, until January, 2019, was a student at Defendant University of the Sciences, a private university located in Philadelphia, Pennsylvania which receives federal funding. The relationship between Doe and the University was governed by the Sexual Misconduct Policy, *see* Am. Compl. Ex. A, and the Student Handbook (Handbook), *see* Am. Compl. Exs. B & C.

The events giving rise to this litigation stem from separate sexual encounters between Doe and two female students, identified as Jane Roe 1 (Roe 1) and Jane Roe 2 (Roe 2), in November, 2017, and January, 2018.[3] Both women claimed their respective sexual encounters with Doe were not consensual. Roe 1 reported her alleged assault to the University on August 24, 2018. She then

---

[2] The following facts are taken from the Amended Complaint and exhibits thereto, as well as the "Notice of Sexual Misconduct Investigation" and the "Report of Investigation," which are attached as Exhibits 1 and 2 to the Defendant's Motion. Even though Exhibits 1 and 2 are not attached to the Amended Complaint, the Court may nevertheless consider these documents because they are "integral to and relied upon" in the Amended Complaint and Doe does not challenge their authenticity. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

[3] The Amended Complaint details the specific allegations as to each of these encounters. However, the Court finds it unnecessary to repeat them here in any great detail because they are largely irrelevant to the issues before the Court—the fairness of the disciplinary process afforded to Doe after these allegations were brought to the University's attention.

prompted her sorority sister, Roe 2, to report her alleged assault, which Roe 2 did on August 30, 2018.

Having received the reports from Roes 1 & 2, the University then proceeded to investigate both claims simultaneously. On August 30, 2018, the University's Title IX Coordinator notified Doe that a formal investigation was being initiated to determine whether he had violated the University's Sexual Misconduct Policy. On that date, the University provided Doe a "Notice of Sexual Misconduct Investigation," which identified Roes 1 & 2, provided the dates and locations of the alleged assaults, described the sexual nature of the allegations, and listed the specific provisions of the University's Sexual Misconduct Policy Doe allegedly violated. *See* Mot. to Dismiss Ex. 1 at 1. On September 5, 2018, the University hired outside counsel to investigate Roes' allegations.

On November 13, 2018, the investigator tendered her Report of Investigation (Report),[4] concluding a preponderance of the evidence established Doe violated Section 1.6 of the Sexual Misconduct Policy by engaging in sexual intercourse with Roe 1 and Roe 2 without securing their affirmative consent. The Report also reflects that, in the course of the investigation, the investigator met with Roe 1 on September 11, 2018, and October 23, 2018; Roe 2 on September 13, 2018, and October 23, 2018; and Doe on October 2, 2018, and October 25, 2018. *See* Mot. to Dismiss Ex. 2 at 3-4. The Report also indicates the investigator interviewed ten separate witnesses—three female students identified by Roes 1 & 2, one male student identified by both Roe 2 and Doe as having relevant information, and three male and three female students suggested exclusively by Doe. *Id.* She also appears to have reviewed text messages provided to her, and the University's internal

---

[4] The University moved to seal the Report at the same time it moved to dismiss. *See* Mot. to Seal, ECF No. 24, Apr. 30, 2019. The Motion to Seal will be addressed separately.

investigation file (which consisted of notes of interviews of Roe 1, a witness, and Roe 2, which were conducted by the University's Title IX investigator on August 24, 28, and 30, 2018). *Id.* at 2.

On November 14, 2018, one day after the investigator completed the Report, the University's Title IX Coordinator informed Doe of the result. On December 7, 2018, the Coordinator informed Doe that, two days earlier, on December 5, 2018, an administrative panel had convened to determine the sanctions. This panel determined the appropriate sanction was expulsion, with a notation on his academic transcript, a campus restriction, and no contact order with respect to Roes 1 & 2. Doe then submitted a written appeal, which was subsequently denied after review by a separate administrative panel.

On January 24, 2019, Doe commenced the instant action by filing a Complaint and Motion for a Temporary Restraining Order and Preliminary Injunction. After holding a two-day hearing and receiving proposed findings of fact and conclusions of law, the Court denied the Motion and issued a Memorandum discussing its reasons for doing so. *See* Order, Feb. 14, 2019, ECF No. 14. The University then moved to dismiss the action. Doe filed the Amended Complaint on April 15, 2019, and the University moved to dismiss again. The Court held oral argument on July 10, 2019. The Motion to Dismiss is now ripe for decision.

**DISCUSSION**

The Amended Complaint contains claims for gender-discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*., for which the Court exercises jurisdiction pursuant to 28 U.S.C. § 1331, and state law claims for breach of contract and intentional and negligent infliction of emotional distress, for which the Court possesses jurisdiction

pursuant to 28 U.S.C. § 1367(a).[5] The University moves to dismiss each of these claims for failure

to state a claim upon which relief could be granted. *See* Fed. R. Civ. 12(b)(6). The Court will first

---

[5] The University challenges the Court's subject matter jurisdiction to hear the state claims. It argues that there is no jurisdiction pursuant to 28 U.S.C. § 1332 because the University is a citizen of Pennsylvania and Doe pled in his original complaint that he was a citizen of Pennsylvania and may not, as he now seeks to do, claim North Carolina citizenship. In response, Doe claims that the original pleading was made in error and that at all times he was a citizen of North Carolina, and not Pennsylvania.

The Court has diversity jurisdiction to address Doe's state claims. The Court agrees with the University that citizenship is assessed as of the time the action is filed. *See Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972) ("It is the citizenship of the parties at the time the action is commenced which is controlling."). Nevertheless, there is a general presumption that a college student who attends school outside of his home state is domiciled in his home state. *Bradley v. Zissimos*, 721 F. Supp. 738, 739 (E.D. Pa. 1989) ("It is generally presumed that a student who attends a university in a state other than the student's 'home' state intends to return 'home' upon completion of studies.") (citing *Lyons v. Salve Regina Coll.*, 422 F. Supp. 1354, 1357 (D.R.I. 1976), *rev'd on other grounds*, 565 F.3d 200 (1st Cir. 1977)).

Here, Doe pled in the original complaint that he was a college student (prior to his expulsion), Compl. ¶ 3(b), and that he "currently resides in Philadelphia, Pennsylvania," *id.* ¶ 3(a). He did not plead that he was a "citizen" of Pennsylvania. In the Amended Complaint, Doe avers (1) he was a student at the University until January 18, 2019; (2) he "is a citizen of and domiciled in the state of North Carolina"; and, (3) he left North Carolina "only to attend college at the University". Am. Compl, ¶ 3(a-c). The two pleadings are not inconsistent. In the Amended Complaint, Doe merely avers in greater detail what the original pleading leaves to inference: Doe is a college student whose domicile is another state (North Carolina). Moreover, the University has done nothing to rebut the presumption that Doe, although residing in Philadelphia to attend school, was domiciled at the time in North Carolina. Accordingly, the Court finds that Doe was a citizen of North Carolina at the time the Complaint was filed, and thus there is complete diversity between the parties such that the Court has jurisdiction pursuant to 28 U.S.C. § 1332.

In the alternative, the Court finds that it possesses supplemental jurisdiction to hear Doe's state claims because they so overlap with his cause of action under Title IX that all of his claims— federal and state—form part of the same case or controversy. *See* 28 U.S.C. § 1367(a). Furthermore, the Court would not dismiss the state claims because it will dismiss the Title IX claim, *see* 28 U.S.C. § 1367(c)(3), because "considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification" for retaining supplemental jurisdiction. *Sarpolis v. Tereshko*, 625 F. App'x 594, 599 (3d Cir. 2016) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)). Dismissing Doe's state claims for lack of subject matter jurisdiction would defang this Court's decision by removing any preclusive effect vis-à-vis the intertwined state claims. *See Tucker v. Secretary of Health and Human Services*, 588 F. App'x 110, 114 (3d Cir. 2014) ("A judgment dismissing an action for lack of jurisdiction ordinarily has no preclusive effect on the cause of action originally raised."); *see also* Fed. R. Civ. P. 41(b) ("Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule—*except one for lack of jurisdiction* . . . operates as an adjudication on the merits.")

address the University's motion as it applies to the Title IX claim (Count I), and then the claims

for breach of contract (Count II), intentional infliction of emotional distress (Count III), and

negligent infliction of emotional distress (Count IV).[6]

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim

is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Id.* When evaluating a pleading under Rule

12(b)(6), the Court "must accept all of the complaint's well-pleaded facts as true," and then

"determine whether the facts alleged in the complaint are sufficient to show that plaintiff has a

'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

The Court begins with Doe's claim for relief under Title IX, which prohibits discrimination

on the basis of sex by educational institutions receiving federal funding. *See* 20 U.S.C. § 1681(a)

("No person in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance.").[7] "Because Title IX prohibits (under covered

---

(emphasis added)). This would be a waste of resources, inconvenient and/or unfair because it
would essentially allow Doe to refile his breach of contract and intentional and negligent infliction
of emotional distress claims—which have been litigated through a preliminary injunction
proceeding and an amendment in this Court—in state court, thus requiring the University to expend
resources to defend the same claims in a different forum. As a result, even if the Court does not
possess diversity jurisdiction, it would exercise supplemental jurisdiction to decide the pendent
state claims on their merits.

[6] Doe withdrew Count V of the Amended Complaint, which contained a claim for negligence. *See*
Opp'n at 6.

[7] The Court declines Doe's invitation to graft the burden-shifting analysis required in Title VII
cases by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), onto this Title IX claim.
Although the Second Circuit in *Doe v. Columbia*, 831 F.3d 46, 55-56 (2nd Cir. 2016), suggested

circumstances) subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Doe*, 831 F.3d at 53 (internal quotation marks omitted). Plaintiffs alleging discrimination in violation of Title IX generally invoke one or more of three possible theories, known commonly as erroneous outcome, selective enforcement, and deliberate indifference. *Doe v. Trs. Of Univ. of Pa.*, 270 F. Supp. 3d 799, 822 (E.D.Pa. 2017) (citation omitted). Doe's Amended Complaint invokes all three, and so the Court addresses each in turn.

The Court described erroneous outcome claims in its Memorandum concerning Doe's request for injunctive relief. As noted therein, in an erroneous outcome claim, the plaintiff alleges he or she is actually innocent of the charged conduct and was wrongly found responsible for the violation for which he or she is punished. *See* Memo. 8, Feb. 14, 2019, ECF No. 13. To be successful, a plaintiff must "allege particular facts sufficient to cast some articulable doubt on the accuracy of the discipline" and "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *see also Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018); *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 822-23. The Amended Complaint fails to adequately allege either aspect of the claim.

First, the Amended Complaint does not allege facts sufficient to cast any articulable doubt on the accuracy of Doe's discipline. As the Report reflects, the investigator interviewed Doe, Roe 1, and Roe 2, on two separate occasions each (for a total of six separate interviews) and considered statements provided by ten separate witnesses, both male and female, and identified by Roes 1 & 2 and Doe. Despite the expansive process which resulted in his expulsion, Doe claims that it was

---

this was appropriate, the Third Circuit has not yet addressed this issue and Doe has offered no compelling rationale for this Court to do so in the absence of further guidance.

tainted by five procedural flaws. He describes these as the use of (1) a single investigator to investigate multiple claims of misconduct; (2) special rules for claims involving sexual misconduct; (3) procedures denying the accused the ability to confront and cross-examine his accuser; (4) an inadequate appeals process; and, (5) policies that have been rescinded or questioned by the United States Department of Education.

None of Doe's five conclusory allegations suffices to cast doubt upon the outcome of the disciplinary process. It is not obvious—and Doe has not adequately explained—why either the University's use of a single investigator or the Department of Education's decision to rescind non-binding guidance (after a change in administrations) could create an articulable doubt as to the outcome of the University's investigation. Doe similarly fails to explain why the University's appeals process, the special procedures applicable to sexual assault allegations, and his inability to cross-examine Roes 1 & 2—despite his having been interviewed twice by the investigator and suggesting seven separate witnesses in his defense—possibly tainted the outcome of the process here.[8] At most, Doe has compiled a list of generalized complaints about the University's disciplinary process unmoored from any actual impact on the accuracy of *his* specific process. The

---

[8] In other parts of his Opposition, Doe invokes the Sixth Circuit's decision in *Doe v. Baum*, which held a university's denial of the right to confront witnesses could cast an articulable doubt on the accuracy of the disciplinary proceeding. 903 F.3d at 585-86 ("[B]ecause Doe alleged that the university did not provide an opportunity for cross-examination even though credibility was at stake in his case, he has pled facts sufficient to cast some articulable doubt on the accuracy of the disciplinary proceedings."). In its Memorandum addressing Doe's request for injunctive relief, the Court declined to address whether this aspect of *Baum*'s holding was applicable, instead finding Doe was unlikely to succeed on the merits because he failed to produce evidence connecting the erroneous outcome to gender bias (thus obviating any need to determine whether Doe alleged facts which would cast doubt upon the accuracy of his disciplinary hearing). Memo. at 8 n.6. For the same reason—Doe's failure to connect his discipline to gender bias—the Court will, again, decline to address this aspect of *Baum*'s holding.

Court thus finds that he has failed to adequately allege particular facts casting some articulable doubt on the University's finding of his responsibility.

Second, even if the Court were satisfied that one or more of the five alleged flaws in the discipline process created some doubt about its accuracy, the Court would nevertheless grant the motion to dismiss because Doe has failed to adequately allege facts suggesting that gender bias motivated the allegedly erroneous outcome. The types of allegations that would raise the requisite inference include: statements from administrators or patterns of decision-making suggesting bias, *Yusuf*, 35 F.3d at 715, a combination of external pressure and a disciplinary board's decision to credit all female testimony and reject all male testimony, *Baum*, 903 F.3d at 586, and the combination of external pressure, a process allegedly designed to favor female complainants, public statements from university officials, and training materials used by the university which encouraged its employees to believe the accuser and presume the guilt of the accused, *Trustees*, 270 F. Supp. 3d at 823-24. Here, Doe has alleged no facts similar to those considered sufficient in *Yusuf*, *Baum*, or *Trustees*, and thus the Court finds that he has failed to bridge the gap between the allegedly flawed outcome and gender bias. *See Yusuf*, 35 F.3d at 315. Instead, Doe relies on generalities, *see, e.g.*, Am. Compl. ¶ 94,[9] which fail to raise his right to relief from speculative to plausible. *See Iqbal*, 556 U.S. at 678.

In his Opposition, Doe cites the Second Circuit's decision in *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016). The comparison is not helpful. In that matter, the plaintiff supported his allegation that the university had been motivated to discipline him by public pressure by

---

[9] In full, this averment states: "Upon information and belief, the University was motivated in this instance to accept the females' accusation of sexual assault so as to show the student body and the public that the University is serious about protecting female students by male students." Am. Compl. ¶ 94.

referencing several, specific examples. *See Columbia*, 831 F.3d at 50-51. These included complaints by various student organizations that were publicized by the New York Post, efforts by the Columbia University Democrats to ensure the university was not giving "light punishments" to male students, a January 23, 2014, article in the student-run newspaper criticizing the university's handling of sexual assault cases, and twenty-three student complaints filed with the Department of Education alleging the university mishandled incidents of sexual assault. *Id.* Here, Doe vaguely avers that "there has been substantial criticism *of universities*" and that "on information and belief, the University's administration was cognizant of, and sensitive to, *these criticisms*." Am. Compl. ¶ 93 (emphasis added). This averment is deficient because, unlike the public pressure discussed in *Columbia*, it identifies no specific criticisms of the University, or actions the University may have taken in response to those criticisms *at all*, let alone those that would suggest that his discipline was motivated by gender bias.

At oral argument, the parties discussed the Seventh Circuit's June 28, 2019, decision in *Doe v. Purdue University*, --- F.3d ---, 2019 WL 2707502 (7th Cir. 2019), which reversed and remanded a district court's decision dismissing due process and Title IX claims stemming from university disciplinary processes. The comparison to that decision is as unhelpful to Doe as the comparisons to *Columbia*, *Yusuf*, *Baum*, and *Trustees*. As an initial matter, the Seventh Circuit stated that the "Dear Colleague Letter"—which forms a key component of Doe's claim—is "standing alone . . . obviously not enough to get [plaintiff] over the plausibility line." 2019 WL 2707502, at *12 (citing *Baum*, 903 F.3d 586). Moreover, the allegations upon which the *Purdue* plaintiff relied in that matter were far more specific than those presented by Doe. For example, the *Purdue* plaintiff alleged that the Title IX coordinator credited the testimony of the complainant over his testimony without having met with the complainant and without providing more than a

"cursory statement" as to why she did so. *Id.* Doe makes no such allegation here, nor could he because the Report makes clear he met with the University's investigator multiple times prior to the issuance of her report.

The plaintiff in *Purdue* also alleged the board responsible for recommending a punishment to the Title IX coordinator was biased against him because its members made up their minds before speaking to plaintiff and refused to hear from his witnesses. 2019 WL 2707502, at *12. Again, there is no such allegation here. Doe alleges that he timely appealed to the analogous board at the University by submitting a written statement to it, Am. Compl. ¶ 76, and the Report also makes clear that the investigator heard from him and the seven witnesses he identified. As further evidence of gender-motivated bias, the *Purdue* plaintiff also cited a Facebook post by the university's "Center for Advocacy, Response, and Education," entitled "Alcohol isn't the cause of campus sexual assault. Men are." 2019 WL 2707502, at *12. As described above, Doe offers no similar statements by University administrators or personnel.[10] For these reasons, *Purdue* is unavailing.

As the foregoing comparisons to *Purdue*, *Columbia*, *Yusuf*, *Baum*, and *Trustees*, make clear, Doe's Amended Complaint fails to allege facts that raise the inference of gender bias, and, his Title IX claim will be dismissed to the extent it relies on the erroneous outcome theory.

---

[10] At oral argument, Doe's counsel offered what appeared to be a print out reflecting the University's involvement in the "Its On Us" campaign, which is a "national campaign and cultural movement aimed at fundamentally shifting the way we think about sexual assault, by encouraging everyone to see it as their responsibility to do something to prevent it." The documents offered were not attached to Doe's Amended Complaint and thus the Court does not consider them as presently part of the record. Nevertheless, even if the Court could consider the late additions to the record, there is nothing about these documents—which reference both women and men as victims of sexual assault—that supports an inference that Doe's punishment was motivated by gender bias.

Doe next relies on the "selective enforcement" theory of Title IX liability, which requires a showing that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. Success on such a claim requires that a male plaintiff "allege a female was in circumstances sufficiently similar to his own and was treated more favorably by the university." *Saravanan v. Drexel Univ.*, No. 17-3409, 2017 WL 5659821, at *6 (E.D. Pa. Nov. 24, 2017) (citation and internal quotation marks omitted). In order to make an appropriate comparison, the two students "must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it." *Id.* (quoting *Ke v. Drexel Univ.*, No. 11-6708, 2015 WL 5316492, at *19 (E.D. Pa. Sept. 4, 2015)). The plaintiff must establish the selective enforcement was motivated by gender. *Doe v. Rider Univ.*, No. 16-4882, 2018 WL 466225, at *9 (D.N.J. Jan. 17, 2018).

Here, Doe alleges that the University engaged in gender-motivated selective enforcement by punishing him, but not Roe 2, despite the fact that both he and Roe 2 had consumed alcohol prior to their sexual encounter. In other words, Doe now claims that, at the same time he allegedly violated the Sexual Misconduct Policy by having sex with Roe 2 without her affirmative consent, Roe 2 was allegedly violating the Sexual Misconduct Policy during the same encounter by having sex with *him* without *his* affirmative consent, and, that, because the University punished him, but not her, it should be liable under Title IX's selective enforcement theory.

Doe's argument is meritless. Roe 2 and Doe are not valid comparators. As the University points out, Doe never accused Roe 2 of sexual misconduct, and the Amended Complaint makes clear Doe's position that the encounter was consensual. *See* Am. Compl. ¶ 44 ("When John returned, he and Jane 2 began having sex on his bed. *John recalls Jane 2 being an active*

*participant and her being fully engaged the entire time*. As on previous occasions that they had

sex, Jane 2 occasionally got on top of and straddled John." (emphasis added)); *see also id.* ¶ 73

("The evidence does not support the report's finding [that Doe violated the sexual misconduct

policy by having sex with Jane 2 without securing her affirmative consent]."). The Court thus finds

that Doe and Roe 2 did not engage "in the same conduct without such differentiating or mitigating

circumstances that would distinguish their conduct or the [school's treatment] of them for it."

*Saravanan*, 2017 WL 5659821, at *6.[11] Because of his failure to identify a valid comparator, Doe's

Title IX claim will be dismissed to the extent it relies upon a selective enforcement theory.

　　Finally, Doe alleges the "deliberate indifference" theory of Title IX liability. This theory

applies "where a plaintiff seeks to hold an institution liable for sexual harassment and requires the

---

[11] The Court is also skeptical of Doe's selective enforcement theory because it appears to flow from a faulty premise—namely, the consumption of *any* alcohol renders a person unable to give affirmative consent under the Sexual Misconduct Policy. *See* Am. Compl. ¶ 98 ("The Sexual Misconduct Policy ambiguously prohibits students from engaging in sexual intercourse with any other person that has consumed any amount of alcohol."). The Court agrees with Doe that the Sexual Misconduct Policy could be clearer, but not, as Doe claims, that the Sexual Misconduct Policy is violated by engaging in sexual activity with someone who has consumed "any amount of alcohol." Section 1.6 of the Sexual Misconduct Policy defines "sexual assault" as "sexual contact . . . that occurs without affirmative consent," and identifies engaging in sexual activity "with an unconscious or semi-conscious person" and "someone who is asleep or passed out" as two of nine enumerated, but not exhaustive, examples of violative conduct. Am. Compl. Ex. A at § 1.6. The definition does not specifically reference the consumption of alcohol, nor do the provisions describing consent state affirmative consent is impossible where a participant has consumed "any amount of alcohol," Doe's suggestion to the contrary notwithstanding. *See id.* at §§ 1.9 (defining "affirmative consent" as "informed (knowing), voluntary and willing (freely-given), active and ongoing (not passive) permission, meaning that, through the demonstration of clear and coherent words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity"); 2.1.5 ("One should be cautious before engaging in sexual contact and/or sexual intercourse when either party has been drinking alcohol."). The plain language of the Sexual Misconduct Policy suggests there is at least some daylight between a single drink and the point of inebriation at which giving informed consent becomes impossible. Thus, just because Doe may have consumed some quantity of alcohol prior to the sexual encounter with Roe 2 does not mean, ipso facto, Roe 2 violated the Sexual Misconduct Policy. For this reason, the Court would also dismiss the selective enforcement claim.

plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 825 (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003)). This theory also requires the plaintiff to establish that the "the official's response to the alleged gender bias must be clearly unreasonable in light of the known circumstances." *Id.* (quoting *Doe v Brown Univ.*, 166 F. Supp. 3d 177, 190-191 (D.R.I. 2016)).

The parties dispute whether this theory reaches disciplinary proceedings. *See* Mot. to Dismiss at 7 n.5; Opp'n at 5. There is substantial and persuasive authority supporting the University's position that the theory does not. *See Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 825 (citing *Doe v. Baum*, 227 F. Supp. 3d 784, 820 (E.D. Mich. 2017), *rev'd on other grounds*, 903 F.3d 575 (6th Cir. 2018); *Brown Univ.*, 166 F. Supp. 3d at 191; *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757-58 (E.D. Tenn. 2009)). Moreover, the Court finds Doe's citation to *Wells v. Xavier University*, 7 F. Supp. 3d 746 (W.D. Ohio 2014), in which the district court denied a motion to dismiss a deliberate indifference claim stemming from university discipline, is unavailing. The district court's decision in *Wells* is not binding on this Court, nor is it persuasive, given that it provides only a cursory justification for its decision to apply the deliberate indifference theory outside its more frequent confines, *Wells*, 7 F. Supp. 3d at 751-52, and in light of the more recent decision in *Doe v. Baum*, in which the Sixth Circuit (of which the Western District of Ohio is a part) rejected the application of deliberate indifference to challenges to university disciplinary proceedings, *Baum*, 903 F.3d at 588.

Notwithstanding the Court's doubts, the Court need not decide whether deliberate indifference is ever viable to challenge university disciplinary proceedings because, even assuming it is, Doe's claim is deficient. In *Trustees*, this Court rejected the notion that a cognizable claim of

deliberate indifference could be "based solely on an assertion that [p]laintiff advanced arguments of gender bias and other procedural flaws in the adversarial disciplinary proceeding and [d]efendant rejected them." 270 F. Supp. 3d at 826. Yet, that appears to be what Doe alleges here. *See* Am. Compl. ¶ 78 ("John's appeal was denied. In denying the appeal, the panel ignored John's arguments that the investigation was flawed and incomplete."). Moreover, as discussed in greater detail with respect to Doe's erroneous outcome claim, Doe has failed to adequately allege misconduct by the University. Although he complains of many facets of the disciplinary process, he has failed to describe how they qualify as "misconduct" or allege facts which would support the inference that the University's response was "unreasonable in light of the known circumstances." *Tr. of the Univ. of Pa.*, 270 F. Supp. 3d at 825. Accordingly, even if the Court did find that deliberate indifference reached challenges to the University's discipline, the Court would still dismiss this aspect of the claim.

Because Doe has failed to adequately allege a Title IX violation by means of any of the three theories he advances—erroneous outcome, selective enforcement, or deliberate indifference—the Court will grant the University's Motion to Dismiss as to Count I of the Amended Complaint in its entirety.

Having dismissed Doe's single claim arising under federal law, the Court considers Doe's remaining claims—breach of contract (Count II), intentional infliction of emotional distress (Count III), and negligent infliction of emotional distress (Count IV)—in turn. The Court will dismiss the breach of contract and intentional infliction of emotional distress claims because Doe has failed to state these claims on their merits. The negligent infliction of emotional distress claim will be dismissed because it is foreclosed by the gist of the action doctrine.

The Court first considers Doe's breach of contract claim. There are three elements to such a claim under Pennsylvania law: (1) a contract; (2) a breach of a duty imposed by that contract; and (3) resulting damages. *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 182 (3d Cir. 2015) (quoting *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)). Pennsylvania law permits a student to bring a suit for breach of contract where "the institution ignores or violates portions of the written contract." *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999) (citations omitted). "The contract between an educational institution and a student includes any agreement between the parties concerning disciplinary procedures, contained within a portion of the student handbook." *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 810 (quoting *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007)).

The University's Handbook, *see* Am. Comp. Exs. B & C, and the Sexual Misconduct Policy, *see id.* Ex. A, form the basis of Doe's claim.[12] Doe relies upon the specific following language from the Handbook:

> **Procedures and rights in student conduct procedures are conducted with fairness to all**, but do not include all of the same protections afforded by the courts. Due process, as defined within these procedures, **assures written notice and the opportunity for a hearing with an objective decision-maker.** No student will be found in violation of a University policy without information showing that it is more likely than not that, a policy violation occurred.

Am. Compl. Ex. B at 49 (emphasis added). He also relies upon a policy statement attached to the Handbook, which states that the University is committed to "engaging in investigative inquiry and resolution of reports that are adequate, reliable, impartial, prompt, fair and equitable." *Id.* at 37. Doe's Amended Complaint—which is largely coextensive with his request for injunctive relief,

---

[12] Doe also claims violation of the covenant of good faith and fair dealing. However, this is an "interpretative tool" used in conjunction with the substantive provisions of the agreement, and not an independent contractual obligation. *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 815 n.8. The Court will not, therefore, address the duty separately from the substantive policies at issue.

which the Court denied in its entirety—alleges a number of different breaches of contract. The parties' briefing coalesces around three specific allegations: (1) inadequate notice, (2) use of a single-investigator model (i.e., the use of one investigator to investigate more than one allegation against the same person), and (3) the failure to conduct a full and fair investigation. The Court will consider each in turn.

First, Doe alleges that the University breached its obligation to provide him notice of the allegations against him. Am. Compl. ¶ 116(1). The Court will dismiss this aspect of the Amended Complaint for two reasons. Initially, this conclusory allegation is undermined by the "Notice of Sexual Misconduct Investigation," which Doe was provided on August 30, 2018, and identified Roes 1 & 2, the dates and locations of the alleged assaults, the sexual nature of the allegations, and the specific provisions of the University's Sexual Misconduct Policy he was alleged to have violated. *See* Mot. to Dismiss Ex. 1. Moreover, even more problematically, Doe cites no provision of either the Handbook or the Sexual Misconduct Policy that obligates the University to do more than provide him the notice it did. As the Court noted in its earlier Memorandum rejecting this assertion as a basis for injunctive relief, the University *could* have provided greater detail about the allegations to Doe, but no provision of the contract between it and Doe *required* it to do so. The Amended Complaint adds no further detail than the insufficient allegations already assessed by the Court, and therefore, Doe has failed to state a claim with respect to the alleged inadequacy of his notice. *See See Trs. of the Univ. of Pa.,* 270 F. Supp. 3d at 816 (granting a motion to dismiss a breach of contract claim where the notice procedures "did not require [the university] to provide a copy of the complaint to [the accused], nor did they require [the university] to provide [the accused] with the level of factual detail that the [accused] alleges was lacking").

Second, Doe alleges that the University breached its contract with him by employing a single-investigator model. Am. Compl. ¶¶ 56-58. This aspect of Doe's claim is self-defeating. In the Amended Complaint, Doe avers that it is the University's policy to use a single-investigator model. *See id.* ¶ 58 (citing Sexual Misconduct Policy § 2.10.2 ("The Title IX Coordinator will assign an investigator to the complaint.")). In the following paragraph, he avers that that is exactly what the University did. *See id.* ¶ 59 ("On September 5, 2018, the University retained attorney Kane of the law firm Schnader Harrison Segal & Lewis LLP to be the sole investigator and issue a determination."). The University's decision to follow a provision of its contract with Doe cannot be considered evidence the University breached that contract.

Moreover, to the extent that Doe argues that the use of the single-investigator model is somehow in tension with the University's purported obligation to provide "fairness to all," the Court is not persuaded. A university's obligation to provide "fundamental fairness" as a matter of Pennsylvania contract law only requires a university to provide "notice of the charges and some opportunity for hearing." *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 812 (quoting *Ruane v. Shippensburg Univ.*, 871 A.2d 859, 862 (Pa. Commw. Ct. 2005)).[13] Doe has not alleged facts which suggest that the single-investigator model—through which he received notice of the charges and multiple opportunities to speak directly to the investigator and identify seven individuals with testimony he believed would be favorable—violated that contractual right. The Court finds that Doe has failed to state a claim with respect to the University's alleged breach of contract by using a single investigator.

---

[13] Students attending private universities, such as the University, are not ordinarily entitled to the same due process right to fairness as students at public institutions. *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 812 n.6 (citing *Reardon*, 926 A.2d at 480 n.2). However, the Court finds the University voluntarily contracted to provide "fundamental fairness" based on pages 49 and 37 of the Handbook. *Id.*

Third, Doe alleges that the University failed to conduct a full and fair investigation. As noted, under Pennsylvania law, "fundamental fairness" in the context of student disciplinary proceedings requires a student be given "notice of the charges and some opportunity for a hearing." *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 812 (quoting *Ruane v. Shippensburg Univ.*, 871 A.2d 859, 862 (Pa. Commw. Ct. 2005)). More specifically, Pennsylvania courts have found a student is entitled to a "statement of the specific charges and grounds which...would justify [discipline]," and should be provided "the names of the witnesses against him," "an oral or written report on the facts to which each witness testifies," and an "opportunity to present . . . his own defense against the charges and to produce either oral testimony or written affidavits of witnesses on his behalf." *Id.* (quoting *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 573 A.2d 575, 578-79 (Pa. Super. Ct. 1990)). Nevertheless, an educational institution need not provide "a full-dress judicial hearing, with the right to cross-examine witnesses." *Boehm*, 573 A.2d at 579.

The Court makes express that to which it could only gesture in its Memorandum disposing of Doe's motion for injunctive relief. Doe has failed to state a claim that the University breached its agreement with him by depriving him of fundamental fairness. Even accepting all the allegations of the Amended Complaint as true and drawing all inferences in Doe's favor, the motion to dismiss record shows Doe was provided with (1) the time, date, sexual nature, and locations of the alleged incidents, as well as the identities of his accusers, Mot. to Dismiss Ex. 1 at 1; (2) more than one opportunity to review the witness statements attached to the Report, Am. Compl. ¶ 116(3)(iii); (3) more than one opportunity to defend himself before the investigator, including the opportunity to provide *an additional statement* to her after reviewing the investigator's preliminary report, Mot. Dismiss Ex. 2 at 4; (4) the benefit of an administrative panel, distinct from the investigator, to determine his punishment, Am. Compl. ¶¶ 74-75, and yet

another administrative panel to review his appeal of the initial panel's determination, *id.* ¶¶ 76-78; and (5) the opportunity to identify witnesses in his defense—a right which he exercised with such alacrity that seven of the ten total witnesses (excluding Roes 1 & 2) were people *Doe identified*, Mot. to Dismiss Ex. 2 at 3-4. These circumstances make it impossible for the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, and the Amended Complaint will be dismissed to the extent it alleges that the University breached its contract with Doe by depriving him of "fundamental fairness."

In addition to the three allegations discussed above, Doe's Amended Complaint also alleges that the University breached its contract with him by (1) limiting his access to the evidence against him, (2) finding him responsible without sufficient evidence, and (3) treating him "as if he was guilty from the start." Am. Compl. ¶ 116(3-5). None of these allegations is sufficient to state a claim. Initially, he has not identified a provision of either the Handbook or the Sexual Misconduct Policy that obligates the University to provide copies of the witness statements for him to keep.[14] Notwithstanding this fatal failure, although Doe pleads that reviewing the evidence against him "often took hours at time," he has not pled that the University prevented him from taking the "hours" he needed to review the documents. The Court thus finds that he has failed to state a claim for breach of contract based on the University's requirement that he schedule appointments to view the Report and its exhibits.

Doe's claim that the University breached its contract by misapplying the preponderance of the evidence standard also fails. In support, Doe avers that there was no physical evidence to

---

[14] Although the Court cannot and does not consider Doe's testimony at the preliminary injunction hearing, he did testify he was able to cure whatever prejudice the University's decision to allow Doe to review—but not retain—a copy of the Report may have caused by transcribing it on his laptop using voice-to-text software. He also testified that when pages were missing from the Report during one of the appointments he made to review it, they were provided to him within minutes.

support Roes' complaints. Am. Compl. ¶ 116(4)(ii). Doe raised the absence of physical evidence in connection with Doe's request for injunctive relief. The Court found that he was unlikely to succeed on the merits of such a claim because he did not identify any provision of the contract requiring such evidence. He still has not done so. In further support of his conclusion that the University did not employ a preponderance standard, he avers Roe 1's statements were aided by a witness, who gave more than one statement to the investigator and accompanied Roe 1 when Roe 1 made her complaint to the University. *Id.* ¶ 116(4)(iii). The Sexual Misconduct Policy grants the investigator the authority to consider witness statements and make findings of fact. Am. Compl. Ex. A at § 2.10.2. That the investigator made a finding of fact as to the credibility of the complainant with which Doe disagrees does not mean the investigator failed to apply the correct standard of review. In light of the foregoing, the Court finds Doe has failed to adequately allege the University breached its contract with him by misapplying the preponderance of the evidence standard.[15]

Finally, the Amended Complaint avers the University violated its contract with Doe by "treat[ing] John Doe as if he was guilty from the start, thereby tainting the investigative process and violating the guarantees of fundamental fairness and fair and impartial hearing." Am. Compl. ¶ 116(5). In support of this conclusion, he avers "University administrators acted from the beginning as someone who believed the complainants without conduc[t]ing any investigation." *Id.* ¶ 116(5)(i). However, he cites no specific examples of such conduct and this conclusory averment is insufficient to support a claim. *See Fowler*, 578 F.3d at 210. He also avers the he was prohibited

---

[15] Paragraph 116(4)(iv) alleges "the failure to require that John Doe be found guilty only on the basis of sufficient evidence was a breach of the guarantees of fundamental fairness, conviction by a preponderance of the evidence, the presumption of innocence, and the implied covenant of good faith and fair dealing." This is a legal conclusion the Court need not credit. *See Fowler*, 578 F.3d at 210.

from confronting his accuser and denied the right to a hearing before a panel. *Id.* ¶ 116(ii-iii). However, the University's guarantee of "fundamental fairness" does not, as a general matter, entitle him to such trial rights and he has cited no specific provision of the Handbook or Sexual Misconduct Policy granting him such rights. Doe was entitled to no more or less than a "statement of the specific charges and grounds which . . . would justify [discipline]," "the names of the witnesses against him," "an oral or written report on the facts to which each witness testifies," and an "opportunity to present . . . his own defense against the charges and to produce either oral testimony or written affidavits of witnesses on his behalf." *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 812. He was not entitled to a judicial hearing, *Boehm*, 573 A.2d at 579, and thus the Court finds he has failed to state a claim for breach of contract based on the University's purported mistreatment.

The Court will grant the University's motion to dismiss as it pertains to Count II and dismiss the breach of contract claim in its entirety because none of his allegations are sufficient to survive scrutiny under Rule 12(b)(6).

In Count III, which the Court will also dismiss, Doe alleges the University intentionally inflicted emotional distress in the course of investigating and disciplining him. In order to state a claim for intentional infliction of emotional distress under Pennsylvania law, a plaintiff must allege "(1) the defendant's conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress is severe." *Chuy v. Phila. Eagles Football Club*, 565 F.2d 1265, 1273 (3d Cir. 1979). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998). "It is for the Court to determine in the first instance whether the conduct is

extreme and outrageous, such that recovery may be permitted." *Cheney v. Daily News L.P.*, 654 F. App'x 578, 583 (3d Cir. 2016) (citing *Small v. Juniata College*, 682 A.2d 350, 355 (Pa. Super. Ct. 1996)).

The Court will dismiss this claim. Even accepting as true what few facts (as distinct from conclusions) Doe has averred, the Court cannot say the alleged misconduct is "extreme and outrageous" enough to proceed. In *Hoy*, the Supreme Court of Pennsylvania noted "only the most egregious conduct" is actionable as the intentional infliction of emotional distress. 720 A.2d at 754. As evidence, it cited actionable conduct in *Banyas v. Lower Bucks Hospital*, 437 A.2d 1236 (Pa. Super. Ct. 1981), in which the defendant intentionally fabricated records to suggest the plaintiff murdered a third party resulting in his indictment for homicide, *Papieves v. Lawrence,* 437 A.2d 118 (Pa. 1970), in which the defendant killed the plaintiff's son with an automobile, and then buried him in a field where he was discovered months later, and *Chuy*, in which the defendant knowingly released false information that the plaintiff was suffering from a fatal disease, 595 F.2d at 1265.[16] Here, at best, Doe has alleged intentional gender-based discrimination, which courts in this district have found insufficient to meet the stringent standards applicable to intentional infliction of emotional distress claims. *See Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 827 (quoting *Harris v. Saint Joseph's Univ.*, Case No. 13-3937, 2014 WL 1910242, at *11 (E.D. Pa. May 13,

---

[16] In more recent examples, courts have found sufficiently outrageous conduct where defendants were alleged to have left "a man charged with murder, attempted murder, aggravated assault, robbery, and resisting arrest, unrestrained in a public hospital," *Martin-McFarlane v. City of Phila.*, 299 F. Supp. 3d 658, 671 (E.D. Pa. 2017), and where police, during a stand-off, were alleged to have disconnected a plaintiff's electricity, threatened to arrest him on felony charges if he failed to cooperate, fired hundreds of canisters of pepper spray into his home, and played loud music and other screeching noises, all of which culminated in the plaintiff's suicide, *see Heckensweiler v. McLaughlin*, 517 F. Supp. 2d 707, 720 (E.D. Pa. 2007).

2014)). The Court will therefore grant the University's motion as it pertains to Count III and dismiss Doe's claim for the intentional infliction of emotional distress.

Finally, in Count IV, Doe brings a claim for negligent infliction of emotional distress, which will be dismissed based on the gist of the action doctrine. In order to state a claim, a plaintiff must plead the elements of an ordinary negligence claim, *see Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 198 (Pa. Super. Ct. 2008), in addition to one of four scenarios: "(1) that the [defendant] had a contractual or fiduciary duty toward him; (2) that [plaintiff] suffered a physical impact; (3) that [plaintiff] was in a 'zone of danger' and at risk of an immediate physical injury; (4) that [plaintiff] had a contemporaneous perception of tortious injury to a close relative," *Doe v. Phila. Cmty. Health Alternatives AIDS Task Force*, 745 A.2d 25, 27 (Pa. Super. Ct. 2000). A plaintiff must also allege to have suffered "immediate and substantial physical harm," a standard met by pleading "symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and on-going mental, physical and emotional harm." *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 282 (internal alterations and quotations omitted).

The University argues Doe's negligent infliction of emotional distress claim is barred by the gist of the doctrine action, which prohibits a plaintiff from "re-casting" a claim sounding in breach of contract to one sounding in tort. *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (noting "the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims"). "Although claims for breach of contract and negligence derive from a common origin, tort actions stem from breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus." *Powell v. Saint Joseph's Univ.*, Case No. 17-4438, 2018 WL 994478, at *7 (E.D. Pa. Feb. 20, 2018) (quoting *Bash v. Bell Tel. Co.*, 601 A.3d 825, 829 (Pa. Super. Ct. 2002)).

24

This doctrine bars a tort claim "(1) arising solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim." *Reardon*, 926 A.2d at 486. The University contends each of these elements is met here, and Doe's negligent infliction of emotional distress claim must, therefore, be dismissed as duplicative of his breach of contract claim. Doe only obliquely responds, arguing the University and Doe had a special relationship sufficient to state a cause of action for negligence (and thus, presumably, for negligent infliction of emotional distress).

The Court finds the Superior Court's decision in *Reardon* to be persuasive, and will, on this basis, dismiss Count IV. In *Reardon*, a student was accused of plagiarizing sections of a biology paper in violation of the college's handbook, known as "The Compass." 926 A.2d at 479. Her professor notified the school, which triggered an investigation by the college's Honors Committee and a hearing before the school's College Judicial Board, both of which found against the student.[17] *Id.* The student then appealed to the college's president, who affirmed the findings and disposition of the Board. *Id.* The student then sued, alleging, inter alia, negligence in the conduct of the investigation. *Id.* The trial court dismissed the negligence claim on gist of the action grounds and the student appealed. *Id.*

The Superior Court affirmed the trial court's decision. *Id.* at 487. In so doing, the Superior Court noted the student's claims were "premised on the concept that [the defendants] owed appellant, as a member of the college community, duties that are in addition to and apart from any

---

[17] The Court notes that the plaintiff in *Reardon* was permitted to confront adverse witnesses, 926 A.2d at 479, but that fact was not referenced in the Superior Court's discussion of the gist of the action doctrine, and so the Court considers this factual distinction to be immaterial.

contractual obligation raised." *Id.* (internal quotation marks omitted). The panel rejected this argument:

> The problem with this concept is that appellant fails to plead from where this duty arises or what this duty entails. The only duties owed by [the defendants] we can discern are rooted in *The Compass*—not some external and undefined general duty of care. *See McCandless*, *supra* at 903–904; *see also*, *Hart*, *supra* at 340. Indeed, *The Compass* represents the sole basis for the relationship between the parties— appellant promises to adhere to the Honor Code in exchange for an education at Allegheny, while [the defendants], promise[] to adhere to the terms of *The Compass* in giving this education in exchange for monetary compensation. If this context were stripped away, there would be no relationship between the parties. Any potential liability [the defendants] could incur, therefore, would arise out of their breach of the terms set forth in *The Compass*. Furthermore, if appellant is unable to demonstrate *The Compass* was breached, it is impossible to discern any other source from which liability could flow. *See*, *supra* at 340.

*Id.* at 487.

The gist of the action doctrine forecloses Doe's negligent infliction of emotional distress claim for the reasons it foreclosed the appellant's cause of action in *Reardon*. Doe alleges the University owes him "a duty of care for [his] emotional well-being." Am. Compl. ¶ 127. In support of the existence of this alleged duty, he avers the University's disciplinary policies and procedures are the "product of . . . adhesion," *id.* ¶ 125, and the University "creates, interprets and implements its disciplinary policies unilaterally," *id.* ¶ 126. Even accepting these allegations as true, Doe has offered no authority to support his position such conditions support the finding of a duty of care separate and apart from the Handbook and/or Sexual Misconduct Policy. The Court is not persuaded Doe's hypothetical duty is different from the "external and undefined general duty of care" the Superior Court flatly rejected in *Reardon*. Much like the relationship at issue there, in the absence of the Handbook and Sexual Misconduct Policy, there would be no relationship between Doe and the University, and thus, any liability the University could incur with respect to the disciplinary process necessarily arises from its contract with Doe. Moreover, like the Superior

Court also noted in *Reardon*, the Court does not perceive—and Doe has not explained—how the University could be liable to him if he were unable to demonstrate a breach of the Handbook or Sexual Misconduct Policy. Therefore, the Court finds Doe's negligent infliction claim is barred by the gist of the action doctrine. *See Powell*, 2018 WL 994478, at *7 (dismissing negligence claim on gist of the action grounds where the "allegations aver only breaches of duties imposed by the parties' contractual agreement").[18] Count IV will be dismissed.

The final issue the Court must address is whether Doe will be granted leave to file a second amended complaint. Ordinarily, leave to amend must be "freely" given "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court need not do so, however, where amendment would be "inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). The Court finds that dismissal with prejudice is appropriate here. Doe's Amended Complaint was filed with the benefit of this Court's decision on his request for injunctive relief (which raised nearly identical issues to those discussed here) as well as the University's motion to dismiss his original complaint. If Doe were able to develop additional support for his claims, he surely could and would have done so. He has not, and thus the Court finds that additional leave to amend would be futile.

**CONCLUSION**

In light of the foregoing, the Court will grant the University's Motion to Dismiss Doe's Amended Complaint for failure to state a claim upon which relief might be granted and dismiss each of the four counts contained therein with prejudice.

---

[18] The Court recognizes both *Reardon* and *Powell* concerned the application of the gist of the action doctrine in the context of pure negligence claims, but finds the distinction immaterial. Doe did not challenge the University's reference to these cases on this basis (or any basis), and a negligent infliction of emotional distress claim incorporates a pure negligence claim (i.e., the failure to plead negligence is fatal to a negligent infliction of emotional distress claim). *Toney*, 961 A.2d at 198.

An appropriate order follows.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.