## REPORT OF INVESTIGATION

This report addresses allegations of violations of the Sexual Misconduct Policy of the University of the Sciences (the "University").  This report will determine whether it is more likely than not that there has been a violation of the Policy.  Anne E. Kane, an attorney with the law firm Schnader Harrison Segal & Lewis LLP ("Schnader") conducted the investigation and prepared this report.

## I.      INVOLVED PARTIES

- **Complainant 1** is third-year female undergraduate student currently living off campus.  At the time of the allegations, she was a sophomore and lived in Osol Hall.

- **Complainant 2** is a second-year female undergraduate student currently living in Osol Hall.  At the time of the allegations, she was a freshman and lived in Goodman Hall.

- **Respondent** is a fourth-year male undergraduate student currently living off campus in a house he shares with four other students.  At the time of the allegations, Respondent was a junior and living in the same off-campus house.

## II.     REPORTED CONDUCT

On August 24, 2018, Complainant 1 reported to the University that Respondent had sexual intercourse with her without her consent at Respondent's off-campus residence on or about November 3-4, 2017.  On August 30, 2018, Complainant 2 reported to the University that Respondent had sexual intercourse with her without her consent during a party at Respondent's off-campus residence in January 2018.

On August 30, 2018, the University's Title IX Coordinator provided Respondent with a Notice of Investigation ("NOI").  The NOI informed Respondent that an investigation was being conducted into the Complainants' allegations of non-consensual sexual intercourse pursuant to the University's Sexual Misconduct Policy (the "Policy").

The Policy defines sexual assault as "sexual contact and/or sexual intercourse that occurs without affirmative consent."  A copy of the Policy is attached as Exhibit A.  Section 1.6 of the Policy lists examples of conduct that may constitute sexual assault, including:

- Engaging in sexual activity with an unconscious or semi-conscious person.

- Engaging in sexual activity with someone who is asleep or passed out.

- Engaging in sexual activity with someone who has said "no" or has otherwise expressed an unwillingness or refusal to engage in sexual activity.

Section 1.9 defines "affirmative consent" as "informed (knowing), voluntary and willing (freely-given), active and ongoing (not passive) permission, meaning that, through the demonstration of clear and coherent words or actions, a person has indicated permission to engage in mutually-agreed upon sexual activity."  It further specifies:

> 1.9.1  Affirmative consent cannot be obtained by force.
>
> 1.9.2  Affirmative consent cannot be gained by taking advantage of the incapacitation of another where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated.
>
> 1.9.3  Affirmative consent cannot be obtained or implied by silence or lack of resistance.
>
> 1.9.4  Consent may be withdrawn at any time.  An individual who seeks to withdraw consent must communicate, through words or actions, a decision to cease the sexual activity.  Once consent is withdrawn, the sexual activity must cease immediately.

On August 30, 2018, the University issued Orders Of No Contact to Respondent and both Complainants.

## III.    INVESTIGATION

On September 5, 2018, the University retained me to conduct the investigation and provided me with a copy of the existing investigation file (attached as Exhibit B).[1]  The file included the following intake reports from Joseph Kalen, the University's Title IX Investigator:

- August 24, 2018 interview with Complainant 1.

- August 24, 2018 interview with Witness 1 (who stated that Complainant 1 told Witness 1 about the allegations involving Respondent the day after the conduct allegedly occurred. Witness 1 also supported Complainant 1 when she made her report).

- August 28, 2018 interview with Witness 2 (who stated that Complainant 1 told Witness 2 about the allegations involving the Respondent the night before Complainant 1 made her report to the University.  Witness 2 also stated that she was aware of an incident involving Complainant 2 and Respondent).

---

[1]    All names have been redacted and replaced with a unique identifier as space permits (e.g., "Respondent" or "R", "Complainant 1" or "C1", "Complainant 2" or "C2", "Witness 1" or "W1", etc.).  A list is provided at the beginning of the document.

D_00002

- August 30, 2018 interview with Complainant 2.

In the course of the investigation, I interviewed the following witnesses:

- On September 11, 2018, I interviewed Complainant 1.  I had a follow up meeting with Complainant 1 on October 23, 2018.  A copy of the Complainant 1 interview notes are attached as Exhibit C.   After reviewing the preliminary report, Complainant 1 provided an additional statement, which is attached as Exhibit S (names removed).

- On September 13, 2018, I interviewed Complainant 2.  I had a follow up meeting with Complainant 2 on October 23, 2018.  A copy of the Complainant 2 interview notes are attached as Exhibit D.  Complainant 2 also provided screenshots of text messages exchanged with Respondent.  These text messages are attached as Exhibit E.[2]  After reviewing the preliminary report, Complainant 2 provided an additional statement, which is attached as Exhibit T (names removed).

- On September 20, 2018, I interviewed Witness 1, a third-year female undergraduate student living off campus.  As noted above, Complainant 1 told Witness 1 about the allegations involving Respondent the day after the conduct allegedly occurred. Witness 1 also supported Complainant 1 when she made her report.   A copy of the Witness 1 interview notes are attached as Exhibit F.  Witness 1 also provided a screenshot of an August 26, 2018 text message exchange between Complainant 1 and Respondent.  This text message exchange is attached as Exhibit G.

- On September 20, 2018, I interviewed Witness 2, a third-year female undergraduate student living off campus.  As noted above, Complainant 1 told Witness 2 about the allegations involving the Respondent the night before Complainant 1 made her report to the University.  Witness 2 also stated that she was aware of an incident involving Complainant 2 and Respondent.  A copy of the Witness 2 interview notes are attached as Exhibit H.

- On September 25, 2018, I interviewed Witness 3, a former University of the Sciences female undergraduate student who transferred to another school after her freshman year (the 2016-2017 academic year).  Complainant 1 identified Witness 3 as someone who had had a similar problem with Respondent.  A copy of the Witness 3 interview notes are attached as Exhibit I.  Witness 3 also provided screenshots of a text message exchange between her and Respondent.  This text message exchange is attached as Exhibit J.[3]

---

[2]    As noted above, names have been redacted and replaced with a unique identifier.

[3]    As noted above, names have been redacted and replaced with a unique identifier.

D_00003

- On October 2, 2018, I interviewed Respondent.  I had a follow up meeting with Respondent on October 25, 2018.  A copy of the Respondent interview notes are attached as Exhibit K.  After reviewing the preliminary report, Respondent provided an additional statement, which is attached as Exhibit U (names removed).

- On October 9, 2018, I interviewed Witness 4, a fourth-year male undergraduate student who is friends with both Respondent and Complainant 2.  Both Respondent and Complainant 2 identified Witness 4 as someone with knowledge of events at the January 2018 party.  A copy of the Witness 4 interview notes are attached as Exhibit L.

- On October 12, 2018, I interviewed Witness 5, a fourth-year P2 male student who is one of the Respondent's roommates. Respondent identified Witness 5 as someone with knowledge of events at the January 2018 party and an earlier September 2017 card party.  A copy of the Witness 4 interview notes are attached as Exhibit M.

- On October 12, 2018, I interviewed Witness 6, a fourth-year P2 male student who is one of the Respondent's roommates. Respondent identified Witness 6 as someone with knowledge of events at the January 2018 party.  A copy of the Witness 4 interview notes are attached as Exhibit N.

- On October 12, 2018, I interviewed Witness 7, a fourth-year P2 female student who is the girlfriend of one of the Respondent's roommates. Respondent identified Witness 7 as someone with knowledge of events at the January 2018 party and an earlier September 2017 card party.  A copy of the Witness 7 interview notes are attached as Exhibit O.

- On October 12, 2018, I interviewed Witness 8, a fourth-year female undergraduate student.  Respondent identified Witness 8 as someone with knowledge of events at the January 2018 party and an earlier September 2017 card party.  A copy of the Witness 7 interview notes are attached as Exhibit P.

- On October 17, 2018, I interviewed Witness 9, a fourth-year female undergraduate student who is friend of the Respondent and attended the January 2018 party.  Respondent identified Witness 9 as someone with knowledge of events at the January 2018 party and an earlier September 2017 card party.  A copy of the Witness 9 interview notes are attached as Exhibit Q.

- On October 17, 2018, I interviewed Witness 10, a fourth-year male undergraduate student who is one of Respondent's roommates and attended the January 2018 party.  Respondent identified Witness 10 as someone with knowledge of events at the party.  A copy of the Witness 10 interview notes are attached as Exhibit R.

D_00004

## IV.    JURISDICTION

The conduct reported by both Complainants occurred off campus at the Respondent's residence. The Policy applies to sexual or gender-based harassment that is committed by a member of the campus community off campus if "the conduct may have the effect of creating a hostile environment for a member of the University community." Both Complainants have reported feelings of discomfort and distress as a result of Respondent's conduct and his presence on campus. Accordingly, the Policy applies to the conduct reported.

## V.    PREPONDERANCE OF THE EVIDENCE STANDARD

Section 2.10.1 provides that the applicable standard of proof for findings of fact under the Policy is the preponderance of evidence standard, i.e., the evidence demonstrates that it is more likely than not that the conduct occurred. This standard is often referred to as "50% plus a feather."

## VI.    FINDINGS OF FACT AND ANALYSIS

This report addresses separately the allegations made by Complainant 1 and Complainant 2.

### A.    Complainant 1's Allegations

Complainant 1 alleges that Respondent engaged in sexual intercourse with her without her consent after she told him that she did not want to have sex without a condom. This incident allegedly occurred at Respondent's residence sometime in the night/early morning hours of November 4, 2017.

#### 1.    Undisputed Facts

Many of the facts and circumstances relating to the incident are undisputed. Both Complainant 1 and Respondent agree that:

- Respondent and Complainant 1 had a snapchat exchange the evening of November 3, 2017, in which Complainant 1 complained about "guy issues." Respondent invited Complainant 1 to his house to talk.

- Both Respondent and Complainant 1 understood that sex was a possibility if Complainant 1 accepted this invitation. Respondent and Complainant 1 had known each other for over a year and had a casual, non-sexual friendship.

- Neither Complainant 1 nor Respondent were under the influence of any alcohol or drugs.

- Complainant 1 arrived at Respondent's house between 11 pm and 12 am. Complaint 1 and Respondent went up to Respondent's room and, after talking for 15 minutes or so, began kissing, and then had consensual sexual contact and sexual intercourse. Complainant 1 stated that she wanted to use a condom prior to intercourse which they did.

5

- Complainant and Respondent fell asleep but woke again later and had consensual sexual intercourse at least one additional time during the night. Again they used a condom during intercourse.

- Respondent ran out of condoms prior to their last sexual encounter which took place during the early morning hours of November 4, 2013. The facts and circumstances regarding what happened during this last sexual encounter are disputed.

## 2. Disputed Facts

Complainant 1 and Respondent dispute the facts and circumstances of their last sexual encounter.

- Complainant 1's Statement

  According to Complainant 1, when Respondent initiated sexual contact the last time, Respondent told Complainant 1 that he had run out of condoms. Complainant 1 reports that she and Respondent then had the following exchange while she was lying down in bed and he was sitting up next to her:

  > Respondent: "I don't have a condom"

  > Complainant 1: "If you don't have a condom, let's not do this."

  > Respondent: "Okay."

  Complainant 1 states that she understood "okay" to mean that Respondent understood and acknowledged that she did not want to have sex without a condom. Complainant 1 then relates that Respondent then lay back down and continued to touch her sexually, including rubbing his penis against her vagina. According to Complainant 1, she did not want to push him off but attempted to move her body away to avoid this contact. She then relates that Respondent persisted, moved his body in such a way to prevent her from moving her legs, achieved penetration, and then engaged in intercourse for a short time before stopping. She recalls saying "Didn't I tell you not to fucking do that" and that Respondent responded "sorry." She states that after this exchange they both then fell back asleep until her alarm woke her up around 6 am. *See* Exhibit C, p. 3.

- Respondent's Statement

  According to Respondent, Complainant 1 said nothing during this last sexual encounter to suggest that Complainant 1 did not want to have sex without a condom. He reports that Complainant 1 actively participated in the sex until she said something shortly after he had achieved penetration, causing him to stop immediately. When first interviewed, Respondent did not remember what Complainant 1 had said but later recalled that she said: "That is not for you." According to Respondent, he did not ask Complainant 1 why she told him to stop because he felt "awkward" in the moment. When asked, he denied that it could

6

have had anything to do with not having a condom.  He reports that Complainant 1 got up and left immediately afterward.  *See* Exhibit K, pp. 2-3, 8.

- Other Evidence

  Complainant 1 reports that she told Witness 1 about the incident with Respondent the day after it occurred.  *See* Exhibit C, p. 4.  Witness 1 confirms that Complainant 1 told her that that Complainant 1 had hooked up with Respondent the night before, that Respondent had run out of condoms, that Complainant 1 told Respondent that she did not want to have sex without a condom but that Respondent proceeded with intercourse anyway.  *See* Exhibit F, p. 1.  According to both Complainant 1 and Witness 1, they discussed reporting the incident to the University at that time but decided not to report out of concern that Complainant 1 would not be believed.  *See* Exhibit C, p. 4; Exhibit F, p.1.  Complainant 1 decided to report the incident on August 23-24, 2018, after she learned that other members of her sorority had also had problems with Respondent.

### 3.    Findings and Analysis

Applying the preponderance of evidence standard, I make the following factual findings:

- ***Complainant 1 told Respondent that she did not want to have sex without a condom***.  Complaint 1 states that she told Respondent the following when he ran out of condoms: "If you don't have a condom, let's not do this."  Complainant 1's account is consistent with what she told Witness 1 the day after the incident.  Respondent's account is less credible.  He acknowledges that Complainant 1 told him before they had sex the first time that she wanted to use a condom but claims that she did not say anything or do anything that communicated to him that she was unwilling to have sex without a condom after he ran out.  I conclude that it is more likely than not that Complainant 1 told Respondent that she did not want to have unprotected sexual intercourse when Respondent ran out of condoms.

- ***Respondent penetrated Complainant 1's body without her consent***.
  Complainant 1 states that she said no to unprotected sex, that she did not push Respondent away because he had acknowledged her "no" by saying "okay," that she moved her body to avoid contact between his penis and her vagina, and that she then froze when he persisted and achieved penetration.   According to Respondent, Complainant 1 responded to his sexual overtures and fully participated in intercourse until Complainant 1 said something which caused him to stop abruptly mid-intercourse.  Again, Respondent's account is less credible.  That Complainant 1 did not push Respondent away did not make her "no" to unprotected sex less clear.  It is more likely than not that Respondent heard Complainant 1's "no" but thought that he might be able to persuade her to engage

in unprotected sex if he persisted.[4]  The fact that Respondent did not ask Complainant 1 what was wrong and/or why she wanted to stop at the time also suggests that Respondent knew what the problem was: that Complainant 1 did not want to engage in unprotected sex.  In light of all the above, I conclude that Respondent did not have Complainant 1's consent.

**B.      Complainant 2's Allegations**

Complainant 2 alleges that Respondent had sexual intercourse with her without her consent when she was incapacitated. This incident allegedly occurred in Respondent's room during a party at Respondent's residence on January 14, 2018.

**1.      Undisputed Facts**

A number of the facts and circumstances relating to the relationship between Complainant 2 and Respondent and the January 14, 2018 incident are undisputed:

- Complainant 2 and Respondent had a consensual and casual "friends with benefits" arrangement during the 2017 fall semester when Complainant 2 was a freshman and Respondent was a junior.  This relationship started at the end of August 2017.

- Respondent and Complainant 2 would typically arrange to meet by text.  Sometimes Complainant 2 would come over to Respondent's house and they would have sex.  Sometimes they would meet at parties and agree to hook up later at Respondent's house.

- Although Witness 2 believed that Complainant 2 was drunk at a September 2017 card party, Complainant 2 and Respondent both deny that Complainant 2 was incapacitated or that Respondent took advantage of her in any way at that party.

- Respondent invited Complainant 2 and her friends by text to a January 14, 2018 party at his residence.  Complainant 2 and her friends arrived at the party between 10 and 11 pm.

---

[4]      This is consistent with the accounts of two other female students interviewed (Witness 2 and Witness 3) who described Respondent as someone who was "pushy" and would not take no for an answer.  *See* Exhibit H (Witness 2) and Exhibit I (Witness 3).  For example, Witness 3 describes repeatedly telling Respondent that she was not interested in hooking up with him over the course of an evening and finally had to push him away before he accepted her "no."  (Respondent recalls his interaction with Witness 3 differently—that they were hooking up and kissing and that she was receptive to his advances until she asked him to stop which he immediately did).  I note, however, that there is sufficient evidence to support a finding that Respondent did not have Complainant 1's consent without the information provided by these two witnesses.

D_00008

- Sometime around 12:00 am, Complainant 2 was "elbowed" while dancing, was knocked to the floor, and got a bloody nose. Complainant 2 was upset, flustered and embarrassed by this accident. Witness 4 assisted Complainant 2 clean up and took her upstairs to the second floor bathroom. Respondent did not witness the accident but was with Complainant 2 on the second floor after she got cleaned up.

- Complainant 2 accepted Respondent's invitation to go to his room. The facts and circumstances surrounding this invitation and what happened next are disputed. Although both Respondent and Complainant 2 agree that sexual intercourse occurred, they disagree as to whether it was consensual.

- Sometime later, most likely after 1:30, Complainant 2 woke up in Respondent's room and wanted to leave. Complainant 2 and Respondent dispute the facts and circumstances surrounding her decision to return to her residence hall. However, it is undisputed that Respondent walked her back to her residence hall.

- The next day, on January 15, 2018, Complainant 2 and Respondent had the following text exchange:

    > Complainant 2: "Thanks for last night. I'm sorry about that. Also used to knocking back beers like it's nothing, didn't think break would fuck over my tolerance as much as it did."

    > Respondent: "Hey, no prob. And yea you were pretty drunk."

    > Complainant 2: "I know. Definitely fucked up in that department. Please tell [Witness 4] I said thanks and I'm sorry too. Also, we're going to pretend last night didn't happened and never speak of it again."

    > Respondent: "If you say so lol."

- Later that same day, Respondent texted Complainant 2 to tell her she had left some clothes in his room.

    > Respondent: "You want to come over again for a bit? I have some clothes that you left behind to give you lol."

    > Complainant 2: Right … I can't right now, I have a meeting with coaches in like, ten minute."

    > Respondent: "After that?"

    > Complainant 2: "Yeah, but I can't stay long."

- Two days later, on January 17, 2018, Complainant 2 broke off the "friends with benefits" arrangement with Respondent by text.

Complainant 2: "So I'm going to have to dip out for a while and break off this little agreement. Sorry."

Respondent: "Hey, I'm not really sure what you mean by our agreement. Would you be able to explain?"

Complainant 2: "I think it's best we don't hook up anymore. Nothing against you, just a personal decision I wanted to make you aware of."

Respondent: "Oh okay and yea I completely understand. I also agree that its for the best."

### 2.    Disputed Facts

Complainant 2 and Respondent dispute certain facts and circumstances relating to the party and what happened in Respondent's room, including: (1) whether Complainant 2 told Respondent that she intended spend the night and have sex; (2) the degree to which Complainant 2 was intoxicated; and (3) whether Complainant 2 consented to sexual intercourse.

- <u>Complainant 2's Statement</u>

  According to Complainant 2, she attended the January 14, 2018 party with a group of girls and intended to have a "girls night out." She states that she did not intend to hook up with Respondent that night but did not know whether Respondent was expecting her to stay over. She denies saying anything to Respondent that would indicate that she wanted to spend the night or have sex with Respondent. Exhibit D, p. 3.

  Complainant 2 reports that she drank beer and 3 or 4 cups of "juice" and became intoxicated. She described feeling disorientated and confused rather than physically impaired (although she believes her reactions were slowed because of the amount of alcohol she had consumed and that this may have contributed to her fall while dancing). Exhibit D, p. 3.

  Complainant 2 recalls getting bumped while dancing, falling to the floor and getting a bloody nose. She describes being very upset and embarrassed about her fall. She states that her accident increased her disorientation and her memory of the remaining night is limited. She recalls being helped by Witness 4 and later by Respondent. She recalls going upstairs to the second floor bathroom to get cleaned up. She recalls Respondent asking her if she wanted to lie down in his room and commenting that "she was in no condition to go home." She states that we agreed to lie down in Respondent's room because she wanted to collect herself. She recalls going to Respondent's room, taking off her shoes, lying down, and falling asleep after Respondent left the room. Exhibit D, pp. 3-4, 7.

  The next thing Complainant 2 recalls is waking up to find that Respondent was on top of her engaging in sexual intercourse. She describes herself as being too drunk and too exhausted to say anything, and does not recall him finishing or

having an orgasm.  She states that she did not say anything to Respondent or actively participate in the sex.  She next recalls waking up some time later disorientated.  Her pants and underwear were off but she was still in her tee shirt and bra.  Respondent was asleep beside her.  She got up and put on her pants and shoes in the dark.  Respondent then woke up and asked her: "What are you doing?"  She responded that she wanted to go home and Respondent asked: "Are you okay to go home?"  Complainant 2 understood him to be asking if she was sober enough.  Respondent got up and walked her most of the way back to her residence hall.  She does not recall any others leaving the house at the same time.  Exhibit D, pp. 4, 7.

The next day, Complainant 2 was still embarrassed about her fall and texted Respondent to apologize about making a disturbance at the party.  She was also confused and upset about what had happened with Respondent in his room but did not say anything to anyone.  When Complainant 2 went to Respondent's house to pick up the clothes she had left behind, she did not talk to Respondent about the party or what had happened with Respondent in his room.  Exhibit D, pp. 4-5.

Two days later, Complainant 2 decided she did not want to continue the "friends with benefits" arrangement with Respondent after what had happened and texted Respondent ending the arrangement.  Since that time, she has avoided contact with Respondent but still sees him around campus.  Exhibit D, p. 5.

Complainant 2 did not consider making a report regarding what had happened with Respondent at the party until she learned that one of her sorority sisters had had a problem with Respondent and was reporting him for assault.  Exhibit D, p. 5.

- <u>Respondent's Statement</u>

   According to Respondent, shortly after Complainant 2 arrived at the party, he asked her if she wanted to stay over and she said yes.  He further states that he saw her periodically during the evening but did not hang out with her because he had hosting responsibilities.  Exhibit K, p. 5.

   Respondent did not witness Complainant 2's accident but saw her on the second floor with Witness 4 getting cleaned up.  He states that he asked her again if she wanted to stay over and she said yes.  According to Respondent, he asked her again because he wanted to make sure that she hadn't changed her mind about staying after her accident.  Exhibit K, p. 5.

   Respondent states that they then went to his room, talked for a while and then had sex.  He states that he left the room briefly before they had sex to make sure someone was covering his hosting responsibilities but that Complainant 2 was awake when he returned and actively participated in sexual intercourse.  He denies that Complainant 2 was passed out or incapacitated in any way.  Exhibit K, pp. 5-6.

Respondent describes Complainant 2 as "buzzed" not drunk during the party and explains that "buzzed" means "more social and talkative." He further states that he had seen her much more drunk on other occasions. When asked about his text the following day ("yea you were pretty drunk"), he states that he meant this in a joking way and not literally. Exhibit K, pp. 6, 8.

- Other Evidence

  Other party attendees interviewed state that they did not observe Complainant 2 exhibit any obvious signs of incapacitation (e.g., stumbling; slurring words) but had only limited contact with her. Exhibit M (Witness 5); Exhibit O (Witness 7); Exhibit P (Witness 8). Witness 4, who helped Complainant 2 clean up and who is a friend of both Respondent and Complainant 2, states that Complainant 2 was able to walk up the stairs unassisted after her accident but that he could not tell how drunk she was. Exhibit L (Witness 4).

  The two witnesses who knocked on Respondent's bedroom during the time Respondent was in the bedroom with Complainant 2 could not see into the room and did not see or hear Complainant 2. Exhibit M (Witness 5); Exhibit O (Witness 7).

  As noted above, Complainant 2 and Respondent exchanged texts the day after the party, in one text Complainant 2 stated that she hadn't expected the Christmas break to "fuck up my tolerance" and Respondent responded "yea you were pretty drunk." Exhibit E. None of Complainant 2's texts to Respondent immediately following the party said anything about what had occurred in Respondent's room.

### 3.   Findings and Analysis

Applying the preponderance of evidence standard, I make the following factual findings:

- ***Respondent may have misunderstood Complainant 2's acceptance of Respondent's invitation to go to his room as an indication that she wanted to stay over and have sex***. Both Complainant 2 and Respondent state that they agreed to hook up after meeting at a party on multiple occasions during the prior semester. Although Complainant 2 states that she did not intend to do so at the January 14, 2018 party and that she did not say anything to Respondent to that effect at the January 14, 2018 party, she concedes that it is possible that Respondent could have understood her acceptance of his offer to lie down in his room as an indication that she intended to spend the night and have sex. Exhibit D, p. 7. Several witnesses state that Complainant 2 appeared upset immediately following the accident but also agree that she did not display any obvious signs of intoxication at that time. Although Complainant 2 recalls Respondent telling her that she was in no condition to go home when he invited her to his room (a statement Respondent does not recall making), it is possible that Respondent was talking about her being upset rather than drunk. Exhibit D, p. 4. Taking all this evidence into account, I conclude that it is possible that Respondent believed that

Complainant 2 was upset but not intoxicated, and that he believed that her acceptance of his invitation indicated that she was willing to hook up as they had in the past.

- ***Complainant 2 became incapacitated after she lay down in Respondent's room.*** Complainant 2 states she fell asleep/passed out immediately after Respondent left the room, and woke up only briefly to find Respondent on top of her engaging in sexual intercourse. Although other party attendees did not observe Complainant 2 display any obvious signs of intoxication either before or immediately following her accident, this is not inconsistent with the alcohol catching up with her once she lay down. Respondent's account—that Complainant 2 was "buzzed" not drunk—is contradicted by his text exchange with Complainant 2 the next day, in which he stated that Complainant 2 had been "pretty drunk" the night before. Respondent's explanation of this statement (that he was "joking" and/or trying to make her feel better about her accident) is not very credible in the context of this text exchange. It is more likely than not that Complainant 2 became incapacitated (passed out and/or semi-conscious) after she lay down in Respondent's room. I further note that Respondent's characterization of Complainant 2 as "pretty drunk" in his text likely describes Complainant 2's level of intoxication when she was in his room because Respondent had had only brief contacts with Complainant 2 at the party before then.

- ***Respondent knew or should have known when he returned to his room that Complainant 2 was incapacitated and unable to consent to sexual intercourse***. Complainant 2 states that she was unaware that Respondent returned to his room and that she woke up to find that Respondent was on top of her engaged in sexual intercourse. She further states that she was too drunk and exhausted to say or do anything and does not recall him finishing or having an orgasm. Although Respondent may have believed that Complainant 2 had agreed to stay over and have sex (based on their prior interactions and her acceptance of his invitation to his room), he should have realized that Complainant 2 was not able to consent to intercourse when he returned and found her passed out and/or semi-conscious.

- ***Complainant 2's statement that she did not consent to sexual intercourse is consistent with her desire to leave Respondent's residence as soon as she woke up later that night.*** Both Respondent and Complainant 2 agree that Complainant 2 woke up later that night and immediately wanted to return to her residence hall. In fact, Complainant 2 states that she dressed so quickly in the dark that she left clothes behind. Her desire to leave instead of spending the night corroborates her statement that she had not told Respondent earlier that she wanted to spend the night and have sex. It is also consistent with and supports her statement that the sex was nonconsensual.

- ***Complainant 2's statement that she did not consent to sexual intercourse is consistent with her decision to terminate her relationship with Respondent two days after the party***. On January 17, 2018, two days after the party, Complainant 2 sent Respondent a text terminating their "friends with benefits" arrangement.

13

Complainant 2 and Respondent have had little contact thereafter.  The timing of this decision is consistent with and supports Complainant 2's statement that she did not consent to sexual intercourse the night of the party.

## VII.   CONCLUSION

**Complainant 1's Allegations**:  I conclude that Respondent violated Section 1.6 of the Policy by engaging in sexual intercourse with Complainant 1 "without affirmative consent."  Complainant 1 clearly voiced her unwillingness to engage in unprotected sex before the first time she and Respondent had intercourse and again after Respondent ran out of condoms.  Affirmative consent to unprotected sex cannot be implied from the earlier sexual encounters where they used a condom or from pre-intercourse sexual contact during the last encounter.

**Complainant 2's Allegations**:  I conclude that Respondent violated Section 1.6 of the Policy by engaging in sexual intercourse with Complainant 2 "without affirmative consent."  Complainant 2 was either passed out or semi-conscious when Respondent returned to his room and initiated sexual intercourse and Respondent knew or should have known that she was incapacitated.  A person who is passed out or semi-conscious cannot give affirmative consent to sexual intercourse.

DATE: 11/13/2018                    By: _____
                                          Anne E. Kane

D_00014

# EXHIBIT A

D_00015

| Policy Name | | | |
|---|---|---|---|
| Sexual Misconduct Policy | | | |
| **Policy Number** | **Policy Type** | **Effective Date** | **Revision Date** |
| 8222018 | HR | 8/22/2018 | 8/22/2018 |
| **Policy Owner** | **Policy Reviewer** | **Review Schedule** | **Approval** |
| Office of Title IX | Clery Compliance Committee, Cabinet | Annual | 8/22/2018 |
| **Applicable To** | | | |
| University Community | | | |

## POLICY STATEMENT

The University of the Sciences (the "University") is committed to maintaining a safe and healthy educational and work environment in which no member of the University community is denied the benefits of, or discriminated against as it relates to, any University program or activity, on the basis of sex, sexual orientation, or gender identity. Gender-based and sexual harassment, including sexual violence, are forms of sex discrimination in that they deny or limit an individual's ability to participate in or benefit from University programs or activities.

This policy identifies how students and employees can report prohibited conduct to the University confidentially and what resources are available both on and off campus to aid them, including employees' and student' rights to notify local law enforcement and their right to also decline to notify such authorities. It identifies the University's Title IX Coordinator and Deputy Coordinators, describes the Coordinator's role in compliance with Title IX, the Clery Act and VAWA, and provides information about how reports of prohibited conduct are assessed, investigated and resolved.

Violations of this policy may result in the imposition of sanctions up to, and including, termination, dismissal, or expulsion, as determined by the appropriate officials at the University.

Retaliation against an individual for raising an allegation of sexual or gender-based harassment, for cooperating in an investigation of such a complaint, or for opposing discriminatory practices is prohibited. Submitting a complaint that is not in good faith or providing false or misleading information in any investigation of complaints is also prohibited.

Nothing in this policy shall be construed to abridge academic freedom and inquiry, principles of free speech, or the University's educational mission.

## POLICY PURPOSE

The University is devoted to fostering a climate of respect and security on campus as it relates to preventing, educating and responding to acts of prohibited conduct and adhering to Clery, Title IX, and VAWA regulations. This policy serves to demonstrate the University's commitment to:

- Disseminating clear policies, procedures, and processes for responding to prohibited conduct reported to the University;
- Delivering prevention, education and awareness programs, as well as ongoing training and public-service campaigns, so that students and employees may identify what behavior constitutes prohibited conduct; understand how to report such misconduct; recognize warning signs of potentially abusive behavior and ways to reduce risks; and learn about safe and positive options for bystander intervention that may be carried out by an individual to prevent harm or intervene when there is a risk of prohibited conduct against a person;
- Engaging in investigative inquiry and resolution of reports that are adequate, reliable, impartial, prompt, fair and equitable;
- Supporting complainants and respondents equally and holding persons accountable for established violations of this policy; and
- Providing a written explanation of the rights and options available to every student or employee, whether they be a complainant or respondent.

## JURISDICTION

This policy applies to sexual or gender-based harassment that is committed by sudents, faculty, staff, University appointees, or third parties, whenever the misconduct occurs:

- On University of the Sciences property; or
- Off University of the Sciences property, if:
  - the conduct was in connection with a University or University-recognized program or activity; or
  - the conduct may have the effect of creating a hostile environment for a member of the University community.

## MONITORING AND CONFIDENTIALITY

A number of resources are available at the University and in the area to assist those who have experienced gender-based or sexual harassment, including sexual violence.

Individuals considering making a disclosure to the University and/or individuals offering University resources should make sure they have informed expectations pertaining to privacy and confidentiality. The University is committed to providing as much assistance as possible and is committed to helping individuals make informed decisions with respect to disclosures.

It is important to understand that, while the University will treat information it has received with appropriate sensitivity, University personnel may nonetheless need to share certain information with those at the University responsible for stopping or preventing sexual or gender-based harassment. For example, University officers, other than those who are prohibited from reporting because of a legal confidentiality obligation or prohibition against reporting, must promptly notify the appropriate University entity about possible sexual or gender-based harassment, regardless of whether a complaint is filed. Such reporting is necessary for various reasons,

including to ensure that persons possibly subjected to such conduct receive appropriate services and information; that the University can track incidents and identify patterns; and that, where appropriate, the University can take steps to protect the University community. This reporting by University officers will not necessarily result in a complaint; rather, the University or Title IX Coordinator, in consultation with the the appropriate University department or entity, will assess the information and determine what action, if any, will be taken. Information will be disclosed in this manner only to those at the University who, in the judgment of the Title IX Coordinator, have a need to know.

Should individuals desire to discuss an incident or other information only with persons who are subject to a legal confidentiality obligation or prohibition against reporting, they should ask University officers for information about such resources, which are available both at the University and elsewhere. University officers are available to discuss these other resources and to assist individuals in making an informed decision.

## RESOURCES

**Title IX Team Contact Information**

| Role | Name | Phone | Email | Office location |
|------|------|-------|-------|-----------------|
| Title IX Coordinator | Michael Stitley | 215.596.1116<br><br>908.334.8608 (after hours) | m.stitley@usciences.edu | Alumni Hall |
| Deputy Title IX Coordinator – Students | Ross Radish, JD | 215.596.8950 | r.radish@usciences.edu | Whitecar Hall |
| Deputy Title IX Coordinator – Faculty/Staff | Michael Janes | 215.596.8697 | m.janes@usciences.edu | 4100 Chester Ave, 3rd Floor |
| Title IX Investigator | Joseph Kalin | 215.596.7041 | j.kalin@usciences.edu | Alumni Hall |

**Anonymous Reporting**

The University of the Sciences provides anonymous reporting for all students, faculty, and staff via Ethics Point®. This is a third-party managed compliance reporting system which provides a way for individuals to anonymously and confidentially report activities involving misconduct, violations of regulations or policies, or otherwise inappropriate, unethical, and/or illegal activities.

Reports may be filed online at
https://secure.ethicspoint.com/domain/media/en/gui/18902/index.html (link also available at the
bottom of the USciences.edu homepage labeled as "EthicsPoint").

For phone reporting, the toll-free reporting number for Ethics Point® is 888-266-0218.

**Additional Campus Resources**

| On-Campus Resources List | Off-Campus Resources List |
|---|---|
| | |
| Emergency Assistance (24/7/365) | Emergency (24/7/365)          **911** |
| Public Safety   215.596.7000 | |
| | 24-Hour Hotline/Organizations |
| Confidential Medical/Mental Health Assistance | Woman Organized Against Rape     215.985.3333 |
| Student Health215.596.8980 | Women Against Abuse        866.723.3014 |
| Counseling     215.596.8536 | Menergy       215.242.2235 |
| | Men's Resource Center      215.564.0488 |
| Student Support | |
| Dean of Students       215.596.8950 | Sexual Assault Medical Evaluation |
| Student Life   215.596.8756 | Philadelphia Sexual Assault   215.800.1589 |
| Office of Student Conduct     215.596.7473 | Response Center (PSARC) |
| | 300 E. Hunting Park Avenue |
| Employee Support | Philadelphia, PA 19124 |
| Human Resources | |
|   Michael Janes          215.596.7533 | *For emergencies call 215-425-1625 to reach the* |
|   Marcia Conrad    215.596.7533 | *on-call sexual assault nurse examiner* |
| | |
| | Philadelphia Police Special    215.685.3251 |
| | Victims Unit (SVU) |
| | |
| | EAP                        800.252.4555 |
| | https://www.theeap.com/higher-education-eap |

Additional links to off-campus support resources are available at the below link:

https://www.usciences.edu/student-life/student-health-and-counseling/related-links-resources.html

The Victims Compensation Assistance Program (VCAP) is available to help victims of sexual assault who may not be able to afford or do not want their insurance billed for the cost of a forensic rape examination.   Students who seek services at the Philadelphia Sexual Assault Response Center (PSARC) or a qualifying medical clinician for a forensic rape examination may make a claim to VCAP.


**Complete University Title IX, Sexual Misconduct & Harassment Policy and Procedures**


***Outside Agencies***:

U.S. Department of Education, Office for Civil Rights (OCR)

U.S. Equal Employment Opportunity Commission (EEOC)

Pennsylvania Human Relations Commission (PHRC)

## TITLE IX, SEXUAL MISCONDUCT & HARASSMENT PROCEDURES AND PROCESS

## DEFINITIONS

1.1 The "Title IX Coordinator" is a designated individual recognized by the University, and is responsible for the oversight of this policy and any procedures related to it. The Title IX Coordinator ("the Coordinator") is responsible for overseeing and resolving all Title IX reports and identifying and addressing any patterns or systemic concerns that arise during the review of such reports.

    1.1.1 Responsibilities of the Coordinator include the following:
- Oversight of a prompt, fair, equitable investigation and resolution process for reports of prohibited conduct at the University.
- Evaluation of trends on campus by using information reported and data collected
- Development of recommendations for campus-wide training and education programs and other remedial actions designated to eliminate prohibited conduct, prevent its recurrence and address its effects.

    1.1.2 The Coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or department/office, including any Deputy Coordinator.

    1.1.3 The Title IX Coordinator may from time to time identify additional Deputy Coordinators within the University that serve in supporting and investigatory roles, and may have a specific area of expertise. Current Deputy Coordinators include:
- Title IX Deputy Coordinator for Students
- Title IX Deputy Coordinator for Faculty/Staff

    1.1.4 The Title IX Coordinator is responsible for reporting any incidents brought to his/her attention that fall under the rubric of Clery-reportable offenses to the Clery Compliance Officer (or otherwise-named equivalent role) for inclusion in the Annual Security and Fire Safety Report.

    1.1.5 The Title IX Coordinator is responsible for providing information regarding victim support and other services to any individual reporting crimes that fall under the requirements of the Violence Against Women Reauthorization Act ("VAWA").

1.2 "Prohibited Conduct" includes the following specifically defined forms of behavior: sexual assault, sexual exploitation, intimate partner violence, stalking, sexual or gender-based harassment and retaliation. Conduct under this policy is prohibited regardless of the sex, sexual orientation and/or gender identity/expression of the complainant or respondent.

1.3 "Complainant" is an individual who is eligible to file a complaint to report a violation of this policy. It also includes any person who is reported to have experienced a violation of this policy in the case where another individual has made a report on that person's behalf.

1.4 "Respondent" is an individual responding to an allegation of violation of this policy.

1.5   "Complicity" is defined as being involved in illegal activity with others.

1.6   "Sexual Assault" consists of sexual contact and/or sexual intercourse that occurs without affirmative consent. Examples of behavior that may constitute sexual assault include, but are not limited to, the following:
- Engaging in sexual activity with an unconscious or semi-conscious person.
- Engaging in sexual activity with someone who is asleep or passed out.
- Engaging in sexual activity with someone who has said "no" or has otherwise expressed an unwillingness or refusal to engage in sexual activity.
- Engaging in sexual activity with someone who is vomiting, unable to stand without assistance, or has to be carried to bed.
- Allowing another person to engage in sexual activity with your partner without his or her consent.
- Requiring any person to perform any sexual activity as a condition of acceptance into a club, athletic program or any other organization affiliated with the University.
- Telling someone you will "out" them if they don't engage in sexual activity (e.g., threatening to disclose the person's sexual orientation without their consent).
- Telling someone you will fail them or give them a grade different from what they deserve if they don't agree to engage in sexual activity.
- Facilitating or assisting in a sexual assault including purchasing or providing alcohol or drugs to further a sexual assault.

1.7   "Sexual Contact" is any intentional sexual touching, however slight, with any object or body part (as described below), performed by a person upon another person.  It includes (a) intentional touching of the breasts, buttocks, groin, or genitals, whether clothed or unclothed, or intentionally touching another with any of these body parts; and (b) making another touch you or themselves with or on any of these body parts.

1.8   "Sexual Intercourse" is any penetration, however slight, with any object or body part (as described below) and performed by a person upon another person. It includes (a) vaginal penetration by a penis, object, tongue, or finger; (b) anal penetration by a penis, object, tongue or finger; and (c) any contact, no matter how slight, between the mouth of one person and the genitalia of another person.

1.9   "Affirmative Consent" is informed (knowing), voluntary and willing (freely-given), active and ongoing (not passive) permission, meaning that, through the demonstration of clear and coherent words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity.
   1.9.1   Affirmative consent cannot be obtained by force.
   1.9.2   Affirmative consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated.

1.9.3   Affirmative consent cannot be obtained or implied by silence or lack of resistance.

1.9.4   Consent may be withdrawn at any time.  An individual who seeks to withdraw consent must communicate, through words or actions, a decision to cease the sexual activity.  Once consent is withdrawn, the sexual activity must cease immediately.

**1.10**   "Force" includes: (a) the use of physical violence, (b) threats, intimidation, and/or coercion.

**1.11**   "Physical Violence" means that a person is exerting control over another person through the use of physical force.  Examples of physical violence include:  hitting, punching, slapping, kicking, restraining, choking, and brandishing or using any weapon.

**1.12**   "Threats" are words or actions that would compel a reasonable person to engage in unwanted sexual activity.  Examples include:  threats to harm a person physically, to reveal private information to harm a person's reputation, or to cause a person academic or economic harm.

**1.13**   "Intimidation" is an implied threat that menaces or causes reasonable fear in another person.  A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).

**1.14**   "Incapacitation" means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity. A person who is incapacitated is unable, temporarily or permanently, to give consent because of mental or physical helplessness, sleep, unconsciousness or lack of awareness that sexual activity is taking place.  A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

**1.15**   "Coercion" is the practice of forcing another party to act in an involuntary manner by use of threats or force. Coercion is more than an effort to persuade, entice, or attract another person to act.  When a person makes clear a decision not to participate in a particular form of sexual contact or sexual intercourse, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can constitute coercion.

**1.16**   "Sexual Exploitation" is an act or acts committed through non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, person benefit or advantage, or any other non-legitimate purpose.  Examples of Sexual Exploitation, include, but are not limited to, purposely or knowingly doing any of the following:

- Causing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give consent to sexual activity.
- Observing another individual's nudity or sexual activity or allowing another to observe consensual sexual activity without the knowledge and consent of all parties involved.
- Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images).
- Engaging in voyeurism (e.g., watching private sexual activity without the consent of the participants or viewing another person's intimate parts (including genitalia, groin, breasts or buttocks) in a place where that person would have a reasonable expectation of privacy).
- Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent.
- Exposing, disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent.
- Prostituting another person.
- Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

1.17   "Intimate Partner Violence"[1] ("IPV") includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship. IPV may include any form of prohibited conduct under this Policy, including sexual assault, stalking, and physical assault. IPV includes the use or threat of physical force or restraint carried out with the intent of causing pain or injury to another. Examples of behavior that may constitute IPV include the following:

- Taking away a person's cell phone during an argument so the person cannot call a friend or the police for help.
- Threatening to commit self-harm if another does not do what is asked.
- Threatening to physically assault someone the individual is dating if the person does not do what is asked.
- Hitting, punching, pinching, slapping, or choking someone with whom the person is intimately involved.
- Violating a protective order.
- Harming a person's animals or children while in an intimate relationship.
- Conduct directed at a specific person under circumstances that would cause a reasonable person to fear bodily injury or to experience substantial emotional distress.

---

[1] Intimate Partner Violence includes "dating violence" and "domestic violence, as defined by VAWA. Consistent with VAWA, the University will evaluate the existence of an intimate relationship based upon the Complainant's statement and taking into consideration the length of the relationship, the type of relationship, and the frequency of interaction between the person involved in the relationship.

1.18    "Physical Assault" is threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person.  Physical assault will be addressed under this Policy if it involves sexual or gender-based harassment, IPV, or is part of a course of conduct under the stalking definition.

1.19    "Stalking" (including Cyberstalking) occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear bodily injury or to experience substantial emotional distress.

    1.19.1  "Course of conduct" in this circumstance means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.

    1.19.2  "Substantial emotional distress" means significant mental suffering or anguish.

1.20    "Sexual Harassment" is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, suggestive, or otherwise.

    1.20.1  For conduct to be deemed sexual harassment, both conditions below must be present:
- Submission to or reflection of such conduct is made, either explicitly or implicitly, as a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment).
- Such conduct creates a Hostile Environment

    1.20.2  Examples of behavior that may constitute sexual harassment, if sufficiently severe, persistent or pervasive, include, but are not limited to, the following:
- Calling someone by a demeaning name.
- Giving someone unwanted gifts of a sexual nature.
- Displaying sexually-suggestive materials or sending notes, email, or jokes to a person that are sexually explicit.
- Touching someone sexually without their consent.
- Massaging someone without permission.
- Brushing up against someone repeatedly.
- Continuing to ask out a person who already has said he or she is not interested.
- Exposing ones genitalia or breasts to another person.

1.21    "Gender-Based Harassment" includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when both conditions below are present:
- Submission to or reflection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the

basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment).
- Such conduct creates a Hostile Environment.

**1.22**    A "Hostile Environment" is defined as a situation where an individual's conduct is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from the University's education, employment, or co-curricular programs and/or activities. Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective,

    1.22.1  In evaluating whether a Hostile Environment exists, the University will consider the totality of known circumstances, including, but not limited to:
- The frequency, nature and severity of the conduct.
- Whether the conduct was physically threatening.
- The effect of the conduct on the Complainant's mental or emotional state (based upon a reasonably prudent person standard).
- Whether the conduct was directed at more than one person.
- Whether the conduct arose in the context of other discriminatory conduct.
- Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities.
- Whether the conduct implicates concerns related to academic freedom or protected speech.

    1.22.2  A Hostile Environment can be created by persistent or pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less there is a need to show a pattern or repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. A single incident of sexual assault, for example, may be sufficiently severe to constitute a hostile environment. In contrast, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment.

**1.23**    "Retaliation" means any adverse action taken against a person for making a good faith report of prohibited conduct or participating in any proceeding under this Policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of prohibited conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of prohibited conduct.

    1.23.1  The University prohibits any form of retaliation.

    1.23.2  Retaliation is unlawful under Title IX.

    1.23.3  Retaliation may include the following forms of behavior:
- Employment actions such as termination, refusal to hire, or denial of promotion.
- Other actions affecting a person's employment or academic or school-related activities such as threats, unjustified negative evaluations, unjustified negative references, or increased surveillance.
- Any other action such as an assault or unfounded civil or criminal charges that are likely to deter reasonable people from pursuing their rights.

- Sharing of information about an ongoing confidential investigation (including a Title IX or sexual misconduct investigation)

1.24 "Responsible Employee" is defined through Title IX as any employee who is required to share all reports of sexual misconduct with University administrative officials (i.e., Title IX Coordinator/Deputy Coordinator).

1.24.1 The University is deemed to have had notice if a responsible employee knew, or in the exercise of reasonable care should have known, about the misconduct.

1.24.2 Confidential employees are excluded from this requirement.

1.24.3 Every faculty member, staff, and volunteer on campus who works with students or minors, and every person identified as a Campus Security Authority (CSA) under the Clery Act must immediately report to the Title IX Coordinator any prohibited conduct reported to them or observed by then, including the name of the complainant and respondent, if known, and all known details as a "Responsible Employee". All residence hall advisors and directors are also responsible employees.

1.25 "Confidential Employees" are those certain employees and volunteers whom the University has designated due to their specific role within the institution.

1.25.1 These individuals include professional, licensed counselors (and those who act in a counseling role under the supervision of a licensed counselor) who are in an official role of providing mental health counseling to members of the campus community.

1.25.2 Confidential employees can talk to a victim without any requirement to reveal any personally identifying information about an incident to the University without the victim/patient's permission. A person can seek assistance and support from these individuals without triggering a University investigation that could reveal the individual's identity or that the individual has disclosed the incident, thus providing some level of anonymity. A list of current confidential employees can be found in a companion document to this policy.

1.25.3 Individuals who are trained as professional, licensed counselors, but who are not engaged in this role within the University are not deemed confidential employees, and continue to have an obligation to report.

1.25.4 Confidential Employees are, as Campus Security Authorities ("CSA") under the Clery Act, obligated to report the nature, date, time, and general location of an incident to the Title IX Coordinator while keeping confidential any information that would directly or indirectly identify the victim. This limited report helps keep the Title IX Coordinator informed of the general extent and nature of prohibited conduct on and off campus so that the Title IX Coordinator can track patterns, evaluate the scope of the problem, and formulate appropriate campus-wide responses.

1.25.5 Before confidential support persons report any information to the Title IX Coordinator, they shall consult with the affected individual to ensure that no personally identifying details are shared with the Title IX Coordinator.

1.26 "Privacy" means that information related to a report of prohibited conduct will be shared with a limited circle of University employees who "need to know" in order to assist in the assessment, investigation and resolution of the report. All employees who are involved in the University's response to reports of prohibited

conduct receive specific training and guidance about sharing and safeguarding private information in accordance with state and federal laws.

1.26.1 The University will maintain as private, any accommodations or protective measures provided to the complainant to the extent that maintaining such confidentiality would not impair the University's ability to provide the accommodations or protective measures.

1.26.2 The privacy of student education records will be protected in accordance with the Family Educational Rights and Privacy Act ("FERPA"). All documentation related to a student's report, investigation, and resolution are protected by FERPA and will not be released, except as required by law.

1.26.3 Non-identifying information about a report may be shared with the Office of Public Safety or a designee to comply with the Clery Act. A complainant's name will never be published in connection with the University's obligations under the Clery Act. In addition, the University does not publish identifiable information regarding victims in the University's Daily Crime log or online.

1.27 "Confidentiality" exists in the context of laws that protect certain relationships including with medical and clinical care providers and those who provide administrative services related to the provisions of medical and clinical care), mental health providers, counselors, and ordained clergy, all of whom may engage in confidential communications under Pennsylvania law.

1.27.1 It is critical for victims to understand that the above listed entities/persons are not permitted to disclose anything revealed to them in a professional setting to the University or anyone else without the explicit consent of the victim.

1.27.2 When information is shared by an individual with a confidential employee or a community professional with the same legal protections, the confidential employee (and/or such community professional) cannot reveal the information to any third party except when an applicable law or a court order requires or permits disclosure of such information.

1.27.3 For example, information may be disclosed when:
- The individual gives written consent for its disclosure;
- There is a concern that the individual will likely cause serious physical harm to self or others; or
- The information concerns conduct involving suspected abuse or neglect of a minor under the age of 18.

1.28 "Mediation" is defined as an intervention in a negotiation or conflict by an acceptable third party who has limited or no authoritative decision making power, who assists the involved parties to voluntarily reach a mutually acceptable settlement of the issues in dispute.

1.29 "Interim Measures" are supportive and protective measures offered to the reporting party, complainant, respondent, witnesses, and/or other members of the University community.

1.30 "Title IX Administrative Panel" is a 3-person panel chosen from a pool of University employees who are appropriately trained in Title IX matters. The panel may include full-time benefits-eligible employees, faculty, or a mix thereof.

No students may serve on this panel.  This Panel will act as the body determining sanctions imposed on an individual found to be in violation of this policy.

1.31   The "Title IX Appeals Panel" is a 3-person panel chosen from a pool of University employees who are appropriately trained in Title IX matters.  The panel may include full-time benefits-eligible employees, faculty, or a mix thereof. No students may serve on this panel.  In any individual incident, members of this panel shall be different than the individuals serving on the Title IX Administrative Panel for the incident/case.  This panel shall act as the body determining the outcome of an appeal under this policy.

## 2.  PROCESS AND PROCEDURES

### 2.1    Consent

2.1.1   A person who wants to engage in a specific sexual activity is responsible for obtaining consent for that activity.

2.1.2   Lack of protest does not constitute consent.  Lack of resistance does not constitute consent.  Silence and/or passivity also do not constitute consent. Relying solely on non-verbal communication before or during sexual activity can lead to misunderstanding and may result in a violation of this Policy.

2.1.3   It is important not to make assumptions about whether a potential partner is consenting.   In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity.  If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity.

2.1.4   Consent to one form of sexual activity does not, by itself, constitute consent to another form of sexual activity.  For example, one should not presume that consent to oral-genital contact constitutes consent to vaginal or anal penetration.  Consent to sexual activity on a prior occasion does not, by itself, constitute consent to future sexual activity.  In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of consent.

2.1.5   One should be cautious before engaging in sexual contact and/or sexual intercourse when either party has been drinking alcohol or using other drugs. The introduction of alcohol or other drugs may create ambiguity for either party as to whether consent has been sought or given.  If one has doubt about either party's level of intoxication, foregoing all sexual activity is the most responsible practice.

2.1.6   Impairment by alcohol and/or other drugs is no defense to any violation of this Policy.

### 2.2    Privacy and Confidentiality

2.2.1   The University is committed to protecting the privacy of all individuals involved in the investigation and resolution of a report under this policy.  The University also is committed to providing assistance to help students, employees and third parties make informed choices.  With respect to any report under this policy, the University will make reasonable efforts to protect the privacy of participants, in accordance with applicable state and federal law, while balancing the need to gather information to assess the report and to

take steps to eliminate prohibited conduct, prevent its recurrence, and remedy its effects.

2.2.2   Where the complainant requests anonymity, i.e., that their identity not be shared with the respondent, or that the University not pursue an investigation, the University must balance this request with the University's responsibility to provide a safe and non-discriminatory environment for all University members. The University, through the Title IX Coordinator, will take all reasonable steps to investigate and respond to the report consistent with the request not to share identifying information or pursue an investigation, but its ability to do so may be limited by the request.

2.2.3   Under a complainant request for anonymity, the request will be balanced against the following factors:

- The seriousness of the conduct;
- The respective ages and roles of the complainant and respondent;
- Whether there have been other reports of prohibited conduct under this policy involving the respondent;
- Whether the circumstances suggest there is a risk of the respondent committing additional acts of prohibited conduct;
- Whether the respondent has a history of arrests or records indicating a history of violence;
- Whether the report indicates the respondent threatened further sexual violence or other violence against the complainant and other individuals involved;
- Whether the reported conduct was committed by multiple individuals;
- Whether the circumstances suggest there is a risk of future acts of prohibited conduct under similar circumstances;
- Whether the reported conduct was perpetrated with a weapon;
- Whether the University possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence); and
- The respondent's right to receive information if such information is maintained in an "education record" under FERPA.

2.2.4   The University will take all reasonable steps to investigate and respond to the report consistent with the request not to share identifying information or pursue an investigation, but its ability to do so may be limited based on the nature of the request by the complainant.

2.2.5   Where the University is unable to take action consistent with the request of the complainant for anonymity, the Title IX Coordinator will inform the complainant about the chosen course of action, which may include the University seeking disciplinary action against a respondent.

2.2.6   Alternatively, the course of action may also include steps to eliminate the effects of the prohibited conduct and prevent its recurrence that do not involve formal disciplinary action against a respondent or revealing the identity of the complainant.

2.2.7   In such cases, the University will notify the complainant that it intends to move forward with an investigation, but in no event will the complainant be required to participate in any such actions undertaken by the University.

2.2.8   Title IX Coordinator is prohibited from answering any questions about the investigation or providing any information to the parent(s) of the complainant, respondent or any witnesses, except in the case of minor. This prohibition

applies even where the student has a signed FERPA waiver on file with the University. The Title IX Coordinator may provide information relating to the investigator process only.

## 2.3    Reporting Allegations of Sexual Misconduct

2.3.1    Making a report is the act of notifying the Title IX Coordinator or other Responsible Employee of an incident of Prohibited Conduct.  A report may be accompanied by a request for resources, no further action, informal resolution, and/or to initiate a formal complaint process by filing a complaint. The Title IX Coordinator will make an assessment of every report made, and determine, in conjunction with the complainant, how best to proceed.    Contact information for the Title IX Coordinator and Deputy Coordinators, including office locations, phone numbers, email addresses, is located in the Resources section of this document.

2.3.2    Any person who experiences prohibited conduct or who is aware of a member of the University community who has been subject to prohibited conduct is strongly encouraged to make a report.  All those designated as Responsible Employees are required to report all information pertaining to instances of prohibited conduct, including information described as rumor or gossip that the responsible employee knows about.

2.3.3    An individual does not have to be a member of the University community to file a report under this policy. The University will take action to respond to allegations of prohibited conduct when the University knows or reasonably should know based on any available information that prohibited conduct has occurred.

2.3.4    Anonymous reports also are accepted and should be directed to the Title IX Coordinator or made via the confidential reporting line. The University will respond promptly and equitably to anonymous reports, but the response may be limited if the report does not include identifying information and/or a description of the facts and circumstances. Anonymous reports that provide enough information to constitute a criminal offense will be reported to the Office of Public Safety for purposes of inclusion in the University's Annual Security and Fire Safety Report.

2.3.5    The University encourages prompt reporting of prohibited conduct so that the University can respond promptly and equitably; however, the University does not limit the timeframe for reporting. If the respondent is no longer affiliated with the University at the time the report is made, the University will provide reasonably appropriate remedial measures, assist the complainant in identifying external reporting options, and take other reasonable steps to respond under Title IX. The University may continue to conduct an investigation for purposes of complying with Title IX and take steps to prevent the recurrence of such conduct and remedy the effects, if appropriate.

2.3.6    Complainants may simultaneously pursue criminal and University investigation. The University will support complainants in understanding and assessing their reporting options. Upon receipt of a report, the University will inform individuals of their right to file (or decline to file) criminal charges as well as the availability of medical, counseling and support services, and additional interim measures to prevent contact between a complainant and a respondent, such as housing, academic, transportation and working accommodations, if reasonably available.  Making a report to the University does not require participation in any subsequent University proceedings, nor is

a report required in order for a complainant to receive support or remedial measures.

2.3.7   Although the University strongly encourages all members of its community to report criminal violations of the law to law enforcement, it is the complainant's choice whether to make such a report and victims have the right to decline involvement with the police.[2] The University's Office of Public Safety will assist any victim with notifying local police if they so desire.

2.3.8   Public awareness events, protests, candlelight vigils, "survivor speak outs," or other forums in which students, staff, or faculty members disclose incidents of prohibited conduct, are not considered a report of Prohibited Conduct or notice to the University of prohibited conduct for purposes of triggering the University's obligation to investigate any particular incident(s). Such events may, however, inform the need for campus-wide education and prevention efforts, and the University will provide information about Title IX and Clery rights at these events.

## 2.4   Filing a Complaint

2.4.1   Filing a complaint is making a request to initiate the University's formal disciplinary process. A report may become a formal complaint, either initiated by the complainant or the University, depending on the outcome of the initial inquiry and assessment of the report, coupled with the complainant's wishes. **AT THE TIME A REPORT IS MADE, A COMPLAINANT DOES NOT HAVE TO DECIDE WHETHER TO FILE A COMPLAINT. THE UNIVERSITY RECOGNIZES THAT NOT EVERY INDIVIDUAL WILL BE PREPARED TO FILE A COMPLAINT WITH THE UNIVERSITY OR TO LAW ENFORCEMENT, AND INDIVIDUALS ARE NOT EXPECTED OR REQUIRED TO PURSUE A SPECIFIC COURSE OF ACTION.**

## 2.5   Initial Assessment

2.5.1   Upon receipt of a report of prohibited conduct, the Title IX Coordinator will arrange to meet with the complainant in an intake meeting as soon as possible and within 5 days of receiving the report.

2.5.2   At this meeting, the Title IX Coordinator will discuss and explain:

- Title IX processes and procedures
- Counseling and medical support services available.
- Interim measures available and how to access them.
- Confidentiality versus privacy considerations.

2.5.3   At this meeting, the Title IX Coordinator will seek to determine how the complainant wishes to proceed, i.e., whether the complainant wishes to pursue an informal resolution, mediation, a formal complaint or does not wish to pursue further action. Title IX Coordinator will have discretion to determine whether or not informal resolution or mediation is appropriate under the circumstances.

2.5.4   Even in instances where the complainant does not wish any action to be taken, the Title IX Coordinator must assess and make a determination in order to ensure the safety and wellbeing of the complainant and the University community.

---

[2] The Title IX Coordinator is a "Responsible Employee" under Title IX and also a "Campus Security Authority" under the Clery Act. Statistical information not including the individual's identifying information will be provided to the University official responsible for compiling the University's crime statistics for the annual security report, even if the victim chooses not to report the incident to campus public safety.

## 2.6   Interim Measures

2.6.1   The University may implement interim measures at any point during an investigation.

2.6.2   Measures may be both remedial (designed to address safety and well-being and continued access to educational opportunities) or protective (involving action against a respondent).

2.6.3   Interim measures are designed to eliminate the prohibited conduct, prevent its recurrence and remedy its effects.

2.6.4   Measures may include, but are not limited to:

- No contact orders
- Changes in housing assignment for one or both parties
- Academic accommodations
- Changes in supervisor or work location
- Removal from campus housing or grounds
- Social restrictions
- Changes in parking locations
- Increased security
- Emotional and other support
- Counseling

2.6.5   An interim suspension, i.e. suspension from classes, work and other privileges (e.g., participation in varsity athletics) or activities, or from the University, may also be instituted until resolution of a case.

2.6.6   Interim measures are available regardless of whether a complainant pursues a complaint or investigation under this policy.

2.6.7   The University will maintain the privacy of any interim and protective measures provided under this policy to the extent practicable and will promptly address any violation of the protective measures.

2.6.8   The Title IX Coordinator has the discretion to impose and/or modify any interim measure based on all available information, and is available to meet with a complainant or respondent to address any concerns about the provision of interim measures.  The Title IX Coordinator will work with the appropriate Title IX Deputy Coordinator (e.g., student, faculty) to identify and impose appropriate interim measures.

## 2.7   Informal Resolution

2.7.1   Recognizing that a wide spectrum of behaviors can constitute violations of the University's Sexual Misconduct and Harassment Policy, the Title IX Office may resolve reports informally and appropriately, based on the circumstances.

2.7.2   Informal resolutions generally are pursued when the complainant, having been fully informed of all available options, has explicitly made that choice. An informal resolution process is voluntary, and a complainant or respondent can ask to end the informal resolution process at any time before its completion.

2.7.3   If an informal resolution process is ended by request, any information obtained may be used in a subsequent formal resolution process.

2.7.4   Once a report has been resolved through an informal resolution process, the matter will be closed.

## 2.8   Mediation

2.8.1   If the complainant desires to pursue mediation to resolve his/her report, the Title IX Coordinator must agree that mediation is appropriate for resolution of the report at issue.  Mediation is never appropriate for resolution of cases involving alleged Sexual Assault or any form of violence.  To determine whether  mediation is appropriate, the Title IX Coordinator shall take the totality of circumstances into account, including but not limited to:

- The nature and severity of the conduct;
- The possibility of mediation resolving the matter;
- Whether mediation would satisfy the University's Title IX obligations in the case at hand.

2.8.2   If the Title IX Coordinator determines that mediation is appropriate, the Title IX Coordinator will promptly assign an appropriately trained mediator(s), notify the respondent, and implement mediation within five working days, absent any unusual circumstances.

2.8.3   Both parties must consent to mediation.

2.8.4   The Title IX Coordinator or any other appropriately trained employee may serve as the mediator.

2.8.5   A matter will be deemed satisfactorily resolved when both parties expressly agree in writing to an outcome that is also acceptable to the Title IX Coordinator.

2.8.6   At any stage during the mediation process, the complainant or respondent may terminate the mediation and elect to begin formal complaint procedures.  Further, at any point during the mediation, if the mediator suspects that mediation is no longer appropriate, the mediator will confer with the Title IX Coordinator on this matter.  A finding of inappropriateness must be made, for example, in the event that the mediation exposes an occurrence of sexual assault with respect to the parties engaged in the mediation.

2.8.7   Because entry into mediation and into a mediation agreement is voluntary, neither party shall have the right to appeal the terms of a Mediation Agreement absent a showing of duress or undue influence caused by any person, even a person not involved in the mediation.   The Title IX Coordinator shall have sole discretion to determine whether a proper showing of duress or undue influence has been made.  If the Title IX Coordinator makes a finding of duress or undue influence, then formal procedures will be initiated.


**2.9     Formal Complaint**

2.9.1   Once a report of Prohibited Conduct has been made, a victim or a third-party may file a formal complaint alleging a violation of this policy. A complaint of prohibited conduct should be filed directly with the Title IX Coordinator. The University, when the Title IX Coordinator determines that it is necessary to protect the safety and well-being of the community, reserves the right to bring reports forward against a student or employee and to act as the complainant for purposes of this policy.

2.9.2   For Staff and Faculty, a formal complaint/statement must be submitted in writing.

2.9.3   It is strongly recommended that formal complaints be made in writing.

2.9.4   In order to institute a formal complaint, the following information is essential:

- The name of the accused (if known)

- A description with reasonable specificity the incident(s) of alleged misconduct, including the date and place of such incident(s)
- A list of any sources of potential information (e.g., witnesses, correspondence, records, etc.) that the victim or third-party believes may be relevant to the investigation.

2.9.5   A complaint should not be delayed if such sources of potential information are unknown or unavailable because such sources can be discovered in the formal investigation.

2.9.6   The Title IX Coordinator will review the complaint and determine whether the allegations, if true, would constitute a violation of this Policy. If necessary, the Title IX Coordinator will meet with the complainant or the third-party reporter to gather further information prior to making a determination. This initial review should occur within 5 days of receiving the formal complaint.

2.9.7   If, after conducting the initial review of a formal complaint, the Title IX Coordinator determines that the allegation, if true, would not constitute a violation of this Policy, then the Title IX Coordinator will administratively close the case and notify the complainant (and the reporter, if there is one). If new information subsequently arises, the complainant or reporter of the incident may request reconsideration of the determination that no violation occurred.

2.9.8   In cases where the Title IX Coordinator concludes that the alleged conduct, while not a violation of this Policy, might implicate other University policies, the Title IX Coordinator may refer the matter to the appropriate University officials.

2.9.9   If, after conducting the initial review of a formal complaint, the Title IX Coordinator determines that the allegation, if true, would constitute a violation of this Policy, then a formal investigation will be initiated. The investigation will take the form of the single-investigator model recommended by the White House Task Force to Protect Students from Sexual Assault.

2.9.10  The Title IX Coordinator may enter an interim order, where warranted and/or requested by the complainant, directing that no contact shall occur between the complainant and the respondent, and may also institute any other interim measures necessary.

2.9.11  In the case where a law enforcement agency is in the process of gathering information, and at the request of law enforcement or University general counsel, the University will temporarily suspend the fact-finding aspect of the University investigation.  Investigation will proceed again upon notification of the Title IX Coordinator or Investigator by University general counsel.

## 2.10   Investigation

2.10.1  The Title IX Coordinator will meet with the respondent in order to provide written notification of the allegations, provide the respondent with a copy of the policy and its procedures, inform the respondent of his/her rights under this policy and answer any questions regarding the Policy, process and procedures that the respondent may have.

2.10.2  The Title IX Coordinator will assign an investigator to the complaint. The investigator will make findings of fact, applying a preponderance of the evidence standard (i.e., more likely than not), and determine based on those findings of fact whether a violation of this policy occurred.

2.10.3  The Respondent will have five (5) business days to submit a written response to the allegations to the Title IX Coordinator. The Respondent is not required

to submit a written statement. The investigation will continue regardless of whether the respondent chooses to participate in the process.

2.10.4 The investigator will request individual interviews with the complainant, the respondent, and other witnesses as appropriate. The initial interviews with the complainant and the respondent should be in person.

2.10.5 The purpose of the interviews is to gather and assess information about the incident(s) at issue in the complaint, not to solicit general information about either party's character.

2.10.6 This initial interview with the complainant should take place in person and within 5 business days after being assigned the case by the Title IX Coordinator. The investigator may wait to hold the initial interview with the respondent until after first meeting with the complainant.

2.10.7 The investigator will interview witnesses provided by both the complainant and respondent. Witnesses may also include those identified by a University representative, those identified by other witnesses, and any other persons the investigator considers it proper to interview.

2.10.8 After the collection of additional information is complete but prior to the conclusion of the investigation, the investigator may request individual follow-up interviews with the complainant and respondent to give each the opportunity to respond to the additional information.

2.10.9 Within one week after each party reviews the preliminary factual findings, the complainant and respondent may submit a written response to the investigator who will consider that response before finalizing the factual findings.

2.10.10 To the extent that the final report of the investigator concludes that a violation has occurred, the report will not contain any specific recommendation as to sanctions.

2.10.11 The investigator will return the final investigation report to the Title IX Coordinator. The Title IX Coordinator will notify the complainant and respondent simultaneously in writing of the final findings of the investigator.

2.10.12 Such notification shall include the process, reasons for and deadline for appealing the investigator's finding.

## 2.11   Student Sanctions

2.11.1 This section shall apply when the respondent's primary role at the University is as a student.

2.11.2 If the final report determines that a violation has occurred and there is no appeal, or a finding that the investigator's decision is upheld, the Title IX Coordinator will appoint a 3-person panel of faculty and staff to a Title IX Administrative Panel, for determination of sanctions. Students are not eligible to serve on this panel. This Panel may request clarification on the facts from the investigator, but does not have the authority to overrule the factual determinations of the investigator.

2.11.3 Concurrent to the appointment of the Title IX Administrative Panel, the Title IX Coordinator shall request a written confidential report from the Vice President of Student Affairs regarding the background of the student respondent, any prior incidents of misconduct in which the respondent has been involved, and a report of sanctions/remediation previously applied for offenses of a nature similar to the current case. Such report shall be completed within five (5) business days and returned to the Title IX Coordinator.

2.11.4 Concurrent to the appointment of the Title IX Administrative Panel, the Title IX Coordinator shall request a voluntary, written confidential impact statement from the complainant and respondent.

2.11.5 The Title IX Coordinator shall provide the Administrative Panel with 1) a full copy of the investigator's final report, including all exhibits, 2) the written confidential report from the Vice President of Student Affairs, and 3) any and all confidential impact statements received from the complainant and/or respondent.

2.11.6 The Administrative Title IX Panel shall issue a letter detailing the sanctions to be imposed within 5 days of receiving the materials from the Title IX Coordinator. The letter shall be sent to the Title IX Coordinator who will then simultaneously relay it to the complainant and respondent, along with the procedures to appeal the decisions.

2.11.7 In an investigation conducted against a student who is the alleged perpetrator of any crime of violence or non-forcible sex offense (e.g., statutory rape, incest), the results of the sanctions proceeding will be provided to the victim and in the case of a deceased victim, to the next of kin.

## 2.12   Employee Sanctions

2.12.1 This section shall apply when the respondent's primary role at the University is as a non-faculty employee.

2.12.2 If the final report determines that a violation has occurred and there is no appeal, or a finding that the investigator's decision is upheld, the case shall be referred to the Director of Human Resources for disciplinary action per the Employee Standards of Conduct Policy and Corrective Action Procedures.

## 2.13   Faculty Sanctions

2.13.1 This section shall apply when the respondent's primary role at the University is as a faculty member.

2.13.2 For individuals holding dual and equal roles at the University as both faculty member and non-faculty employee, this section shall also apply.

2.13.3 If the final report determines that a violation has occurred and there is no appeal, or a finding that the investigator's decision is upheld, the case shall proceed through the process for faculty sanctions (including termination) as outlined in the Faculty Service Information (FSI).

## 2.14   Advisors

2.14.1 The complainant and the respondent each have the opportunity to be advised by an advisor of their choice, including legal counsel, at their expense, at any stage of the process and to be accompanied by that advisor at any meeting or hearing in which the complainant or the respondent is required to be present.

2.14.2 An advisor may only consult and advise his or her advisee, but not speak for the advisee at any meeting nor may the advisor direct questions to any administrator, party or witness in the process.

2.14.3 Should the advisor become disruptive during any meeting, the Title IX Coordinator or investigator may ask them to leave. No advisor (or party) will be given the opportunity to cross-examine or to directly question a complainant/respondent.

2.14.4 A parent may serve as an advisor to the complainant or respondent, and in such case, shall be treated as set forth above.

D_00037

### 2.15  Appeal

2.15.1  An appeal may be made by either party based only on the following situations:

- A substantive violation of the procedures set forth in this policy has occurred which, in the context of the case, is likely to have the effect of changing the outcome; or
- The appellant has substantive and relevant new information that was not available at the time of the investigation that may change the outcome; or
- The appellant believes the decision regarding responsibility was in error; or
- The appellant believes the sanctions are not commensurate with the violation

2.15.2  An appeal must be made to the Title IX Coordinator in writing within five (5) business days of receiving notification of the Title IX Administrative Panel's decision from the Title IX Coordinator.

2.15.3  The Title IX Coordinator, having received the appeal, will convene a Title IX Appeals Panel, a 3-person panel of appropriately trained faculty and staff, for review of the appeal. Students are not eligible to serve on this panel.

2.15.4  The Title IX Coordinator will forward all materials reviewed by the Title IX Administrative Panel to the Appeals Panel.

2.15.5  The Appeals Panel may request clarification on the facts from the investigator,.

2.15.6  The Appeals Panel will first make a determination of merit for the Appeal. If no merit is found, the Appeals Panel will notify the Title IX Coordinator that the Appeal will not move forward.

2.15.7  If merit is found for the Appeal, the Appeals Panel will make a determination within five (5) business days of one of the following:

- Change in the finding of responsible/non-responsible for a violation of this policy;
- Change in the sanctions imposed;
- Refer the case back to the investigator to further review new information acquired; or
- Affirm the original findings and sanctions imposed

2.15.8  Upon determination by the Appeals Panel, the Title IX Coordinator will immediately be notified.

2.15.9  In the event there is a subsequent change in the result or when the result becomes final, both parties will be sent written notification of such change within two (2) business days.

2.15.10  Any change in responsibility/non-responsibility and/or change in sanctions made by the Appeals Panel is final, and not subject to further appeal. Findings and/or sanctions of this Policy cannot be grieved through the Student Grievance Policy.

### 2.16  Request to Withdraw Complaint

2.16.1  While every effort will be made to respect the complainant's wishes to withdraw a formal complaint, the University must be mindful of its overarching commitment to provide a non-discriminatory environment as set forth in this policy and pursuant to Title IX. Therefore, the Title IX Coordinator may determine that investigation is appropriate despite a complainant's request to withdraw the complaint.

**2.17   Request for Informal Resolution After a Complaint has Been Filed**

2.17.1  Once a complaint has been opened for investigation and before the final report has been provided to the parties, the complainant may request informal resolution or mediation as an alternative to formal resolution of the complaint.

2.17.2  Such informal resolution requires the agreement of the complainant and respondent and the approval of the Title IX Coordinator.

2.17.3  If such a request is approved, the timeframes will be stayed, and the investigators or a designee will take such steps as he or she deems appropriate to assist in reaching a resolution.

2.17.4  If an informal resolution cannot be reached in two weeks, then formal procedures will resume.

**2.18   Additional Confidentiality Considerations**

2.18.1  Once a complaint is filed, the complainant, third-party reporter, the respondent, personal advisors, and any witnesses will be notified of the potential for compromising the integrity of the investigation by disclosing information about the case and the importance of keeping confidential any information or documents that they receive or review.

2.18.2  If it is determined that anyone involved in a report or complaint either as a complainant, respondent or witness, colluded or shared information with another, sanctions may be imposed by USciences.  Such consequences may include suspension or dismissal from USciences, being barred from residing on campus, or being prohibited from participating in extracurricular activities, including varsity athletics.

**2.19   Multiple Charges**

2.19.1  If the report of a violation of the Sexual Misconduct and Harassment Policy also implicates other potential violations of the University's Code of Student Conduct (in the case of students) or potential violations of other University policies, the Title IX Coordinator, in consultation with other appropriate University personnel, will evaluate all reported allegations to determine whether the allegations may be appropriately investigated together without unduly delaying resolution.

2.19.2  When the Title IX Coordinator determines that a single investigation is appropriate, the determination of responsibility for the violation of the Student Code of Conduct or violation of University policy will be evaluated under the applicable policy.

2.19.3  The investigation and adjudication will be done in accordance with the Sexual Misconduct and Harassment Policy.

2.19.4  If there is found to be no violation of the Sexual Misconduct and Harassment Policy, but violations of other University policies may have occurred, a referral to the appropriate hearing body (student conduct, human resources, faculty senate) may occur for further assessment and possible action, to be undertaken and/or imposed at the discretion of that body.

**3.   APPENDICES**

**3.1**     Appendix A – List of Confidential Employees

**3.2**     Appendix B – List of Potential Sanctions

**4.  COMPANION DOCUMENTS**
   **4.1**     Annual Security and Fire Safety Report
   **4.2**     Student Handbook
   **4.3**     Employee Handbook
   **4.4**     Faculty Service Information
   **4.5**     Mandatory Training Policy/Matrix
   **4.6**     Title IX Intake Form
   **4.7**     Notification of Respondent's Rights
   **4.8**     Notification of Victim's Rights

## APPENDIX B – List of Potential Sanctions

**Student Sanctions**

*All sanctions with detailed descriptions are available in the student handbook under the Student Conduct Policy.  Depending on the circumstances of the violation, alternative sanctions beyond the below list may be imposed.*

- Written reprimand
- Completion of educational program(s)/workshop(s)
- Participation in psychological, physical, or substance abuse evaluations and/or counseling
- Conduct probation:  Loss of ability to participate in co-curricular activities
- Educational reflection paper
- Fines and restitution
- Housing Probation
- Housing Reassignment
- Housing Suspension (deferred)
- Housing Suspension
- Housing Termination
- Loss of Privileges
- Parental Notification
- Revocation of admission and/or degree
- Service requirement
- University Suspension (deferred)
- University Suspension (up to two years)
- Expulsion

**Employee Sanctions**

- Verbal warning
- Written reprimand
- Required participation in non-credit educational programs or community service
- Required participation in psychological, physical, or substance abuse evaluations
- Required counseling
- Fines and restitution
- Administrative Leave
- Suspension
- Termination

**Faculty Sanctions**

- Verbal warning
- Written reprimand
- Required participation in non-credit educational programs or community service
- Required participation in psychological, physical, or substance abuse evaluations
- Required counseling
- Fines and restitution
- Administrative Leave
- Termination

# EXHIBIT B

D_00042

Respondent – R

Complainant 1 – C1

Complainant 2 – C2

Witness 1 – W1

Witness 2 – W2

Witness 4 – W4

Student 1 – S1

Student 2 – S2

Student 3 – S3

Student 4 – S4

D_00043



**USciences**
**University of the Sciences**

Philadelphia College of Pharmacy
Misher College of Arts and Sciences
Samson College of Health Sciences
Mayes College of Healthcare Business and Policy

600 South 43rd Street, Philadelphia, PA 19104
215.596.8800 | usciences.edu

## NOTICE OF SEXUAL MISCONDUCT INVESTIGATION

**DATE:**    **8/30/18**

**TO:**    Respondent

**CC:**    C2  /  C1

**FROM:**    **Michael Stitley, Title IX Coordinator**

The University of the Sciences is conducting an investigation into allegations made by COMPLAINANT against the RESPONDENT of sexual misconduct that occurred on or about

_____Nov. 3 / 4 2017; Jan. 2018_____ at _____Respondent's Apartment_____.

The allegations include the following prohibited conduct as defined by the *University of the Sciences Sexual Misconduct Policy* (see attached):

X   Sexual Assault I – Non-Consensual Sexual Intercourse
☐   Sexual Assault II – Non-Consensual Sexual Contact
☐   Sexual Exploitation
☐   Sexual Harassment/Gender Based Harassment
☐   Unwelcome Conduct
☐   Hostile Environment
☐   Stalking
☐   Intimate Partner Violence (Dating/Domestic Violence)
☐   Retaliation

Additional conduct prohibited by the Policy that is discovered during the investigation may also be investigated; you will be informed if the allegations under investigation are expanded.

Joseph Kalin, j.kalin@usciences.edu  has been assigned to investigate this complaint.

R                                                     ૪-૩૦-૪
Respondent Printed Name                            Date

R
Signature

> **TELL YOUR PARENTS**
> Because a finding of a violation of the Policy can have serious consequences for your education, it is strongly recommended that you immediately notify and consult with your parents or guardian.

## LEGAL COUNSEL

When the allegations, if true, might constitute criminal conduct, the party against whom they are brought is hereby advised to seek legal counsel before making any written or oral statements. Those facing allegations may wish to obtain legal advice about how this process could affect any criminal case in which they are or may become involved.

## POTENTIAL SANCTIONS

Students found in violation of the Sexual Misconduct Policy are subject to discipline based on the circumstances and nature of the violation. The forms of sanctions/remediation may include expulsion, suspension for a determinate or indeterminate length of time, restrictions on contact; course-schedule or work-schedule alteration; changes in housing; leaves of absence; required counselling and/or treatment, and restitution. Expulsion precludes re-enrollment or re-admission to the University.

## ROLE OF SUPPORT PERSON AND ADVISOR

You may arrange for a Support Person and/or Advisor to accompany you to any investigative interview or related meeting.  The Investigator will communicate directly with you and not with your Advisor.

## REMINDER

The Advisor may not speak for you but may advise you in private.  All attendees are required to review the Sexual Misconduct Policy to understand the scope of their role in the administrative process.

## TIME FRAME

University of the Sciences strives to conclude its investigation within six weeks from issuance of this *Notice of Investigation.* The time frame may be extend for good cause, e.g., to ensure the integrity and completeness of the investigation, to comply with a request by external law enforcement, to accommodate the availability of witnesses, to accommodate reasonable requests for delay by the parties, account for breaks or holidays, and to account for complexities in the case or for other legitimate reasons.

## RETALIATION

The University prohibits any form of retaliation and will take steps to prevent retaliation and take strong responsive actions if retaliation occurs. No faculty, administrator or staff, applicant for employment, student, or member of the public may be subject to restraint, interference, coercion or any other form of retaliation for, in good faith, seeking advice concerning a sexual misconduct matter, filing a sexual misconduct complaint, or serving as a witness in the investigation of a sexual misconduct complaint.


**USciences**
**University of the Sciences**

600 South 43rd Street, Philadelphia, PA 19104
215.596.8800 | usciences.edu

Philadelphia College of Pharmacy
Misher College of Arts and Sciences
Samson College of Health Sciences
Mayes College of Healthcare Business and Policy

## COMPLAINANT

### NOTICE OF RIGHTS AND RESPONSIBILITIES

The purpose of this form is to ensure that persons reporting sexual misconduct, as defined under the Sexual Misconduct Policy, are aware of their rights and responsibilities. Please review the statements listed below and be sure that you understand each of them.

**I have been advised of the following:**

___Y___ I may report sexual misconduct to law enforcement at any time and, upon request, the University will assist me in doing so by contacting the Philadelphia Police Department 18th District (215) 686-3180. I understand that I also may file a complaint with Public Safety and/or Student Affairs.

___Y___ The University's investigative and adjudicative process, including informal mediation.

___Y___ Available Interim Protective Measures

- Adjustment of course schedules to ensure Complainant and Respondent do not attend same classes
- Adjustments for assignment or tests
- Change of living or working arrangements
- No-contact orders
- Public Safety escort

___Y___ Available services on campus and in the community

- Counseling services (mental health, victim advocacy)
- Medical
- Legal assistance

**I understand the following:**

___Y___ The University may need to investigate and take action even if I do not wish to proceed with the investigation and adjudicative process.

___Y___ Complaints will be reviewed in accordance with the Sexual Misconduct Policy, located in the Student Handbook, and any relevant grievance procedures.

___Y___ Both the Complainant and Respondent (Parties) are entitled to have a Support Person present during any investigative or adjudicative proceeding or related meeting.

___Y___ Parties are entitled to have a Non-Attorney Advocate or Attorney present during any investigative or adjudicative proceeding or related meeting, at their own expense.

___Y___ I understand that at all times the University will communicate with me directly, and will not engage with my Advisor; I understand that my Advisor may not speak for me but may

advise me privately; it is my responsibility to share information and communication received from the University with my Advisor.

__Ч__   Retaliation is prohibited and if any persons retaliate against me due to my participation in a sexual misconduct investigation, will be subject to disciplinary action; and that I should report any incidents of retaliation to the Title IX Coordinator (Michael Stitley 215-895-1116 or m.stitley@usciences.edu)

__Ч__   Conduct may violate the University's Sexual Misconduct Policy even if it is not violate the law.

__Ч__   Persons who commit sexual misconduct in violation of federal, state or local laws may also be subject to criminal charges

__Ч__   The University's investigation and resolution process is independent of any criminal investigation or proceeding.

__Ч__   Parties will be informed of their appeal rights under the University's investigation and complaint resolution process.

__Ч__   Parties will be informed of the outcome of any disciplinary action resulting from the University's investigation and complaint resolution process.

__Ч__   I have received a copy of the University's Sexual Misconduct Policy, which is located in the Student Handbook, and had an opportunity to ask questions and have them answered.

**C2**

Complainant Name (*Printed*)

**C2**

Signature                                                            Date     09/05/18

_Michael Stitley_                                 _Title IX Coordinator_
Title IX Coordinator or Designated Representative          Title

Signature                                                            Date     9/5/18



**USciences**
**University of the Sciences**

Philadelphia College of Pharmacy
Misher College of Arts and Sciences
Samson College of Health Sciences
Mayes College of Healthcare Business and Policy

600 South 43rd Street, Philadelphia, PA 19104
215.596.8800 | usciences.edu

### RESPONDENT

### NOTICE OF RIGHTS AND RESPONSIBILITIES

The purpose of this form is to ensure that when a complaint of sexual misconduct is filed, the accused person is aware of their rights and responsibilities. Please review the statements listed below carefully and be sure that you understand each of them.

_Y_ I understand a complaint of sexual misconduct has been filed against me and have received the Notice of Sexual Misconduct Investigation.

_Y_ I understand the University is required to investigate complaints of sexual misconduct.

_Y_ I understand the University's investigation is independent and separate from any criminal or civil legal action.

_Y_ I understand that complaints of sexual misconduct will be reviewed in accordance with the University's Sexual Misconduct Policy and any relevant grievance procedures.

_Y_ Both the Complainant and Respondent (Parties) are entitled to have a Support Person present during any investigative or adjudicative proceeding or related meeting.

_Y_ Parties are entitled to have a Non-Attorney Advocate or Attorney present during any investigative or adjudicative proceeding or related meeting, at their own expense.

_Y_ I understand that at all times the University will communicate with me directly, and will not engage with my Advisor; I understand that my Advisor may not speak for me but may advise me privately; it is my responsibility to share information and communication received from the University with my Advisor.

_Y_ Retaliation is prohibited and if any person retaliates against anyone who participates in a sexual misconduct investigation, they will be subject to disciplinary action; and that I should report any incidents of retaliation to the Title IX Coordinator (Michael Stitley 215-895-1116 or m.stitley@usciences.edu)

_Y_ Conduct may violate the University's Sexual Misconduct Policy even if it does not violate the law.

_Y_ Persons who commit sexual misconduct in violation of federal, state or local laws may also be subject to criminal charges

_Y_ I have been informed of available services on campus and in the community for counseling, health, mental health, and legal assistance.

_Y_ Parties will be informed of their appeal rights under the University's investigation and complaint resolution process.

_Y_ Parties will be informed separately and simultaneously of the outcome of any disciplinary action resulting from the University's investigation and complaint resolution process.

D_00048

 Y  I have received a copy of the University's Sexual Misconduct Policy and had an
opportunity to ask questions and have them answered.

████████ R ████████       ████████████
Respondent Name (*Printed*)          Student ID#

████████ R ████████        9.3~18
Signature              Date


  Michael Stitley      Interim Title IX Coordinator
Title IX Coordinator or Designated Representative    Title

*M. Stitley*         9-30-18
Signature              Date



**USciences**
**University of the Sciences**

600 South 43rd Street, Philadelphia, PA 19104
215.596.8800 | usciences.edu

Philadelphia College of Pharmacy
Misher College of Arts and Sciences
Samson College of Health Sciences
Mayes College of Healthcare Business and Policy

**C1**
SID: 621119

August 30, 2018

### ORDER OF NO CONTACT

This letter is to serve as notice that an ORDER OF NO CONTACT has been issued wherein you are to cease all communication and contact with ███ R ███.

This no contact order includes, but is not limited to all communications whether in-person, oral, or via electronic means (eg. text messaging, e-mail, social media, etc.). Further there should be no physical contact. **Please note that this request extends to all action(s) which may occur as a result of third parties (eg. friends, roommates) acting on your behalf.**

Failure to obey this notice may result in disciplinary actions. I trust that you understand the seriousness of this matter and that you will comply with the terms of this order. This no contact order is effectively immediately and until further notice from my office. If you have any questions please contact me at 215-596-8950 or via email at r.radish@usciences.edu.

Ross W. Radish
Vice President of Student Affairs & Dean of Students
Title IX Student Administrator

PC:    Michael Stitley, Director of Public Safety & Title IX Coordinator
      File

**Where healthcare and science converge.**
Founded in 1821 as the Philadelphia College of Pharmacy



D_00050



**USciences**
**University of the Sciences**

Philadelphia College of Pharmacy
Misher College of Arts and Sciences
Samson College of Health Sciences
Mayes College of Healthcare Business and Policy

600 South 43rd Street, Philadelphia, PA 19104
215.596.8800  |  usciences.edu

**C2**
SID:  635622

August 30, 2018

---

### ORDER OF NO CONTACT

---

This letter is to serve as notice that an ORDER OF NO CONTACT has been issued wherein you are to cease all communication and contact with ███ R ███ .

This no contact order includes, but is not limited to all communications whether in-person, oral, or via electronic means (eg. text messaging, e-mail, social media, etc.).  Further there should be no physical contact. **Please note that this request extends to all action(s) which may occur as a result of third parties (eg. friends, roommates) acting on your behalf.**

Failure to obey this notice may result in disciplinary actions.  I trust that you understand the seriousness of this matter and that you will comply with the terms of this order.  This no contact order is effectively immediately and until further notice from my office.  If you have any questions please contact me at 215-596-8950 or via email at r.radish@usciences.edu.

Ross W. Radish
Vice President of Student Affairs & Dean of Students
Title IX Student Administrator

PC:      Michael Stitley, Director of Public Safety & Title IX Coordinator
         File

**Where healthcare and science converge.**
Founded in 1821 as the Philadelphia College of Pharmacy





**USciences**
**University of the Sciences**

600 South 43rd Street, Philadelphia, PA 19104
215.596.8800 | usciences.edu

Philadelphia College of Pharmacy
Misher College of Arts and Sciences
Samson College of Health Sciences
Mayes College of Healthcare Business and Policy

R
SID: 616331

August 30, 2018

## ORDER OF NO CONTACT

This letter is to serve as notice that an ORDER OF NO CONTACT has been issued wherein you are to cease all communication and contact with ████ C1 ████.

This no contact order includes, but is not limited to all communications whether in-person, oral, or via electronic means (eg. text messaging, e-mail, social media, etc.).  Further there should be no physical contact. **Please note that this request extends to all action(s) which may occur as a result of third parties (eg. friends, roommates) acting on your behalf.**

Failure to obey this notice may result in disciplinary actions.  I trust that you understand the seriousness of this matter and that you will comply with the terms of this order.  This no contact order is effectively immediately and until further notice from my office.  If you have any questions please contact me at 215-596-8950 or via email at r.radish@usciences.edu.

Ross W. Radish
Vice President of Student Affairs & Dean of Students
Title IX Student Administrator

PC:   Michael Stitley, Director of Public Safety & Title IX Coordinator
      File

**Where healthcare and science converge.**

Founded in 1821 as the Philadelphia College of Pharmacy





**University of the Sciences**

600 South 43rd Street, Philadelphia, PA 19104
215.596.8800  |  usciences.edu

Philadelphia College of Pharmacy
Misher College of Arts and Sciences
Samson College of Health Sciences
Mayes College of Healthcare Business and Policy

**R**

SID:  616331

August 30, 2018

## ORDER OF NO CONTACT

This letter is to serve as notice that an ORDER OF NO CONTACT has been issued wherein you are to cease all communication and contact with **C2**.

This no contact order includes, but is not limited to all communications whether in-person, oral, or via electronic means (eg. text messaging, e-mail, social media, etc.).  Further there should be no physical contact. **Please note that this request extends to all action(s) which may occur as a result of third parties (eg. friends, roommates) acting on your behalf.**

Failure to obey this notice may result in disciplinary actions.  I trust that you understand the seriousness of this matter and that you will comply with the terms of this order.  This no contact order is effectively immediately and until further notice from my office.  If you have any questions please contact me at 215-596-8950 or via email at r.radish@usciences.edu.

Ross W. Radish
Vice President of Student Affairs & Dean of Students
Title IX Student Administrator

PC:     Michael Stitley, Director of Public Safety & Title IX Coordinator
        File

**Where healthcare and science converge.**
Founded in 1821 as the Philadelphia College of Pharmacy



D_00053

On August 30, 2018 at approximately 1430 hours, Dean Radish and I met with ███ R ███ to provide Notice of Investigation. I explained to ██ R ██ our conversation was confidential but not private and he acknowledged understanding the difference. I read him the Notice of Rights and Responsibilities and he acknowledged he understood each. He signed both the Notice of Investigation and Notice of Rights and Responsibilities acknowledging he understood both documents. I provided him with resource information and asked if he would like to speak with anyone from the SHAC. He declined immediate resources and acknowledged he could contact me 24 hours a day if he felt he needed resources. I also explained to him that I would be contacting him in the immediate future regarding the investigative process and that he did not need to contact Investigator Kalin at this time. Prior to leaving, ██ R ██ was provided a copy of the University Sexual Misconduct Policy.

On September 5, 2018 at 1000 hours, I met with ███ C2 ███ for the purpose of conducting a Title IX intake. ██ C2 ██ had previously spoken to Investigator Kalin and provided preliminary information supporting the need for a formal Title IX investigation. I advised ██ C2 ██ that our conversation was private but not confidential and she acknowledged understanding the difference. I then reviewed with her the Complainant Notice of Rights and Investigation. She signed the document acknowledging she understood the process. I told her that an investigation would be conducted and reviewed available resources with her. I provided her a copy of the University's Sexual Misconduct Policy and advised her the investigation would seek to determine if there was a policy violation. I offered her resource information if she chose to seek law enforcement involvement and she declined to pursue that option at this time.

On September 5, 2018, at 1100 hours, I contacted Anne Kane, of Schnader Harrison Segal & Lewis LLP., an outside legal firm retained to investigate this matter. Copies of all documents sent to Ms. Kane, via email on September 5, 2018.

Michael J. Stitley

*[signature]*   9-5-18

Interview of ███ C1 ███

On Friday, Aug 24, 2018, I met with USc student ███ C1 ███. ██ C1 ██ related she is a member of the ████████████ sorority.

██ C1 ██ then provided details regarding an incident that occurred between her and USc student ██ R ██ ██.

██ C1 ██ stated that on or about Nov 3, 2017, she and ██ R ██ were 'snapchatting' that she referred to as a "streak."

During the snapchat exchange, ██ R ██ asked ██ C1 ██ if she "wanted to come over" and ██ C1 ██ replied that she would come over. ██ C1 ██ then left her room at Osol Hall and walked to ██ R ██'s residence on 42nd Street (exact address unknown). She stated that it took her approximately five minutes to walk to ██ R ██'s residence. ██ C1 ██ was unsure of the exact time that she left Osol Hall, but approximated between 2100 and 2300 hours.

Upon arriving at ██ R ██'s residence, ██ R ██ greeted ██ C1 ██ at the door and they walked inside.

██ C1 ██ stated they "went up to his room (██ R ██'s) and were talking and kissing.

██ C1 ██ stated that she and ██ R ██ had consensual sexual intercourse and ██ R ██ was wearing a condom. ██ C1 ██ stated that she and ██ R ██ stayed in bed and fell asleep. Several hours later (██ C1 ██ estimated the time at approximately 0100 hours), ██ R ██ woke up ██ C1 ██ and they engaged in consensual sexual intercourse. ██ C1 ██ noted that ██ R ██ was wearing a condom.

Several hours after the second act of sexual intercourse occurred, ██ R ██ woke up ██ C1 ██ with the intention of engaging in sexual intercourse. During foreplay, ██ R ██ related that he did not have a condom. ██ C1 ██ then stated. "Let's stop this," and ██ R ██ responded "okay."

At this point ██ C1 ██ believed that ██ R ██ was agreeing with her not to have intercourse because he did not have a condom.

██ C1 ██ stated that ██ R ██ "got on top of me anyway" and was "trying to push his penis in." ██ C1 ██ stated that she was trying to move into a position that would prevent ██ R ██ from inserting his penis into her vagina. ██ C1 ██ described her actions as "I didn't want it to seem like I was pushing him off" because they were "friends," but was hoping ██ R ██ would understand she did not want to have sex.

██ C1 ██ stated that she knew ██ R ██ was a 'wrestler' and "knew how to hold me down."

██ R ██ was able to insert his penis into ██ C1 ██'s vagina and ██ C1 ██ stated, "I kind of froze up and zoned out while he did it. I didn't enjoy it."

██ C1 ██ stated intercourse lasted about one to two minutes and that ██ R ██ stopped when ██ C1 ██ exclaimed, "Didn't I tell you not to fucking do that!"

██ C1 ██ believed ██ R ██ would have continued intercourse had she not made the above exclamation.

Upon inquiry, ██ C1 ██ stated ██ R ██ did not ejaculate.

I asked ██C1██ if she had consumed any alcohol or drugs before this incident and she replied that she had not. I then asked her if ██R██ had consumed any alcohol or drugs before this incident and

██C1██ stated at some point they both fell asleep. ██C1██ stated that she woke up around 6 am, got dressed, and ██R██ walked her downstairs. They both said "good bye" to each other and ██C1██ walked alone to Osol Hall.

██C1██ stated the next morning, she "believes' she told ██████W1██████ what occurred between her and ██R██. ██C1██ stated that she knew ██W1██ was sexually assaulted (no nexus to USC) and sought her guidance on how to proceed.

██W1██ related that she "wanted to feel out the situation" and further sought the advice of another sorority sister. ██C1██ was then advised that she "shouldn't say anything."

██C1██ stated on Thursday, Aug 23, 2018, she and friends went to the 'Copa Restaurant.' After leaving the restaurant ██C1██ walked home with "██W2██." Note – ██C1██ did not feel comfortable disclosing ██W2██'s last name.

██C1██, who admitted that she did not have a clear recollection of the conversation with ██W2██ due to alcohol consumption, recalled ██W2██ saying that ██R██ "had also done something to her" at a party during Christmas, 2017.

██C1██ stated that she received clarifying details regarding the incident on Friday, Aug 24, 2018.

At this point, ██C1██ related she felt compelled to report her incident from Nov 2017, because another sorority sister had also suffered consequences as a result of ██R██'s actions.

Near the conclusion of the interview, I advised ██C1██ of her option to notify law enforcement.

**Interview of**  W1

On Friday, Aug 24, 2018, I met with USc student ▮W1▮ at Whitecar Hall. Note – This interview occurred immediately upon concluding my interview with ▮C1▮.

▮W1▮ related that she is the "Big" to ▮C1▮ as her role in the sorority.

▮W1▮ related that ▮C1▮ disclosed the incident between her ▮C1▮ and ▮R▮ in November 2017.

▮W1▮ stated that she went to pick up ▮C1▮ at Osol Hall in her vehicle the day after this incident occurred. As ▮W1▮ was driving the vehicle, ▮C1▮ related the details of what occurred the night prior between her and ▮R▮.

▮W1▮ recalled ▮C1▮ stating that ▮R▮ advised that he did not have another condom and ▮C1▮ told ▮R▮ "no," because she did not want to engage in sexual intercourse.

▮C1▮ told ▮W1▮ that ▮R▮ held her down and "did it (intercourse) anyway."

▮C1▮ stated that she asked ▮R▮, "Why did you do that?" but she ▮W1▮ was unable to recall ▮C1▮'s response.

At this point, ▮W1▮ asked ▮C1▮ if she was going to tell anyone what happened and ▮C1▮ related she was unsure because reporting the incident could be "social suicide." ▮W1▮ explained that "social suicide" meant that ▮C1▮ would be "shunned" among her friends.

On Thursday, Aug 23, 2018, ▮W1▮ went to ▮C1▮'s residence at approximately 9:30 pm – 10:00 pm. Upon observing ▮C1▮ in the residence, ▮C1▮ was crying.

As ▮W1▮ attempted to calm ▮C1▮ down, one of ▮C1▮'s roommates told ▮W1▮ why ▮C1▮ was crying.

▮W1▮ then spoke to ▮C1▮ about a course of action and collectively decided on notifying Randi Miller of the sexual assault occurring in November 2017. ▮W1▮ sent a text to Miller advising same of the sexual assault allegations. Upon receiving the text, Miller scheduled to meet with ▮W1▮ and ▮C1▮ on Friday, Aug 24, 2018.

▮W1▮ related that on Friday, Aug 24, 2018, she was talking to ▮W2▮ at ▮W2▮'s residence.

▮W1▮ asked ▮W2▮ if she had ever been sexually assaulted by ▮R▮ and ▮W2▮ stated "No."

▮W1▮ then told ▮W2▮ that "one of the girls last night" said you had been sexually assaulted by ▮R▮ ▮. ▮W2▮ replied that "He ▮R▮ did try something, but ▮S1▮ saved me from the situation."

▮S1▮ is identified as USc student ▮S1▮, who is fraternity brother of ▮R▮.

▮W2▮ stated the above incident between her and ▮R▮ occurred at a 2017 Christmas party where she ▮W2▮ was ▮R▮'s date.

`W2` told `W1` that she was not surprised upon learning about the incident between `C1` and `R` and related that she "knows other girls assaulted by him `R` .

`W1` then asked `W2` if she was "okay" with her name situation being disclosed to Randi Miller and `W2` replied "yes."

### Supplemental Interview of `W1`

On Monday, Aug, 27, 2018, `W1` arrived at Public Safety and advised she wanted to "update" me on a recent incident involving `C1` .

`W1` related `C1` called her on Sunday, Aug 26, 2018, at approximately 1806 hours. During the ensuing conversation, `C1` related that `R` had contacted her `C1` via Snapchat to "talk."

`W1` advised `C1` to "ignore" any communication from `R` , but if she did communicate via Snapchat to screenshot the messages.

`W1` stated `R` "heard rumors" about a potential investigation regarding him and `C1` and "wanted to talk about it." `W1` was unaware of how `R` found out about the "investigation."

On this date, at my request, `W1` sent a screen shot of the aforementioned messages.

Refer to Attachment ……………

### Statement from Randi Miller

On Friday, Aug 24, 2018, I had a brief meeting with Randi Miller, Associate Director of Student Life, regarding this incident.

At my request, Miller provided the following statement via email. The salient portion of the statement is as follows:

*Hi Joe,*

*████ W1 ████, President of ████, texted me at 12:41pm today asking if she could talk to me about some sexual assault allegations. At 12:50pm, I met with her, ████ S2 ████, and ████ C1 ████ in the Whitecar Hall Conference Room.*

*████ C1 ████ explained that on November 3rd, the night before she crossed/officially joined into her sorority, an incident happened. She hadn't said anything before today because she didn't think it was real. Through her sorority's Women's Week in April, she began to think about it more. She said that she was raped. Last night she was hanging with some students in Greek Life (████ S2 ████, ████ S1 ████, ████ , ████ W2 ████) at Copabanana and then they all went back to her house.*

*████ C1 ████ said that last night, ████ W2 ████ made a comment about being put in an uncomfortable situation at a Christmas party and ██ R ██ had tried things on her, but ████ S1 ████ (a friend) had stepped in at the time (potentially accidentally, maybe just by knocking on the door and causing an interruption). Hearing ████ W2 ████ say this made ████ C1 ████ hysterical. ████ W2 ████ said that she isn't surprised it has happened to multiple people.*

*████ C1 ████ said that on the night of, her and ████ R ████ had sex twice at his house. They were both sober, and used a condom both times. However, he wanted to have sex a third time, and she didn't want to so she told him that. He pinned her down and didn't use a condom. She said "didn't I just tell you not to fucking do that."*

*That is all the information I have.*

The complete email is contained in this report. Refer to Attachment 'A'



Interview of ████ W2 ████

On Tuesday, Aug 28, 2018, I met with USc student ████ W2 ████ at the Investigators Office.

██ W2 ██ related that on or about the first week of September 2017, she and a few of her friends went to ██ R ██'s residence on 42nd Street (exact street address unknown).

██ W2 ██ related when she arrived at ██ R ██'s residence, she observed a group of people sitting at a table and playing cards. ██ W2 ██, who is a member of ██████ also observed USc student ██ C2 ██ ████, as well as ██ R ██ at the table.

██ W2 ██ stated that upon immediate observation it was immediately apparent to her that ██ C2 ██ was intoxicated as evidenced by slurred speech and stumbling gait. Upon inquiry, ██ W2 ██ stated she observed ██ C2 ██ "drinking from a water bottle," but was unaware if the content.

██ W2 ██ stated that ██ R ██ was also drinking in a "casual" manner.

At some point while at the gathering, ██ W2 ██ heard ██ R ██'s roommates telling ██ R ██ he should "hook up" with ██ C2 ██. ██ R ██, upon hearing this suggestion agreed with his friends regarding the "hook up."

Several minutes later, ██ W2 ██, who is a friend of ██ R ██, pulled ██ R ██ aside and told him "it wasn't a good idea" and that he ██ R ██ was a good kid and she did not want to see hi, get in any trouble.

██ R ██ agreed with ██ W2 ██'s assessment and apologized for his action. ██ W2 ██ then offered to ensure ██ C2 ██ got home safely and ██ R ██ stated that he would ensure ██ C2 ██ arrived home safely.

██ W2 ██ then spoke with one of her friends regarding ██ C2 ██s condition and was reassured that ██ C2 ██ "was fine." Upon hearing this, ██ W2 ██ stated she "relaxed" her concern. As ██ W2 ██ was preparing to leave the gathering (approximately 0030 hours) with her friends, she again told ██ R ██ to take care of ██ C2 ██ and ██ R ██ responded he would call her ██ W2 ██ if he needed any help.

██ C2 ██ told ██ W2 ██ that she really didn't remember the events of that evening, but told ██ W2 ██ that she ██ C2 ██ did wake up at ██ R ██'s residence.

██ W2 ██ related that on or about Aug 24, 2018, she was approached by ████ W1 ████ and asked if she knew about the "situation" that occurred between ██ R ██ and ██ C2 ██. ██ W2 ██ told ██ W1 ██ about the evening in September 2017, when ██ C2 ██ was with ██ R ██ while playing cards.

██ W2 ██, seeking internal clarification, approached ██ C2 ██ at a later time (one on one) and asked her if the incident in September 2017, was the incident that ██ W1 ██ was alluding to.

██ C2 ██ then advised ██ W2 ██ she was "raped by ████ R ████" in January 2018. ██ C2w█ stated that she was afraid to tell anyone about being raped.

██ C2 ██ stated that she was at ██ R ██s apartment ██ R ██ and they were both "really intoxicated." ██ C2 ██ remembers "it," referring to sexual activity occurring, but that she was "in and out of consciousness."

**Interview of** ███ C2 ███

On Thursday, August 30, 2018, at 0930 hours, I met with USc student ███ C2 ███ in the Investigators Office.

███ C2 ███ related she first met ██ R ██ during the Fall 2017 semester. ███ C2 ███ stated that on "the Saturday before the start of last semester," ██ R ██ and his roommates had a party at their residence. ███ C2 ███ described the residence as being located on 42nd Street, and was the "white house, between the brick houses."

███ C2 ███ stated she "hooked up" (referring to sexual activity) with ██ R ██ while at the party and the sex was consensual. ██ C2 ██ advised this occasion was the first time she met ██ R ██.

I asked ██ C2 ██ to relate her account of the events as described by ███ W2 ███ (Refer to paragraphs # 2 and # 3) regarding ██ W2 ██'s interview.

███ C2 ███ stated she had "pre-arranged" with ██ R ██ to go to his residence to "drink and spend the night." ███ C2 ███ stated there were approximately 10 – 12 individuals present and everyone was just "hanging out."

███ C2 ███ stated that consensual sex with ██ R ██ did occur and it was "okay" with her.

███ C2 ███, at my request, then described an incident that occurred between her and ██ R ██ in January 2018.

███ C2 ███ related that on the day this incident occurred, she wanted to have a "girl's night out" as she was dealing with a few problems. ██ C2 ██ also stated that on the day prior to the party at ██ R ██'s, she received a text from ███ R ███ advising her of the party and that she ██ C2 ██ could invite her friends.

███ C2 ███, ███ S3 ███ and ███ S4 ███, possibly accompanied by other students walked to ██ R ██'s residence from Goodman Hall.

███ C2 ███ stated she was unsure of the exact time she arrived at ██ R ██'s, but estimated the time between 10:00 pm and 11:00 pm.

███ C2 ███ stated that prior to arriving at the party, she did not drink or use any drugs. Upon arriving at the party, ██ C2 ██ stated that "guys on the steps" were handing drinks (beer from a keg and "juice") to the attendees.

███ C2 ███ stated her first drink was a cup of beer that she did not finish due to the taste. ██ C2 ██ then had "three or four" cups of juice. ██ C2 ██ described the cups as not being full.

███ C2 ███ stated she "hung out" and was dancing while at the party.

While dancing on the floor (possibly tile), ██ C2 ██ was "bumped" causing her to lose her balance and impact the floor with her face. ██ C2 ██ stated the force of the impact broke her glasses and caused her nose to bleed. ██ C2 ██ stated upon observing the blood, she started to cry.

███ C2 ███ "was helped" to the bathroom in the kitchen for first aid by ███ W4 ███. Additionally, an unknown individual contacted ██ R ██ to make him aware of the situation. ██ R ██ then arrived on scene

and **R** and **W4** assisted **C2** for a few minutes in the kitchen bathroom, but due to the crowded conditions, decided to utilize the upstairs bathroom.

**C2** stated she walked up the steps, passing the "guys" dispensing the drinks. **C2** stated that **R** was with her but was unsure if **W4** also walked up the steps.

While in the upstairs bathroom, **R** assisted **C2** with washing her face. At some point **R** asked **C2** if she wanted to lie down in his room (adjacent to the bathroom) and **C2** accepted the offer.

**C2** states that she fell asleep and believed that **R** may have left the room and returned.

**C2** then stated her next recollection is, "he **R** is on top of me (referring to sexual intercourse)." **C2** stated she was "really tired" and "really drunk" and was hoping "he **R** would get done and finish."

**C2** stated that she did not recall any conversation occurring during the act of intercourse. She also stated that on previous consensual encounters when she engaged in sexual intercourse, **R** did not wear a condom.

**C2** believes she fell back asleep and upon awakening was "panicking and freaking out" because she was confused as to where she was.

**C2** stated that **R** was present in the room when she woke up. At this time, **C2** hurriedly got dressed, leaving behind her underwear and flannel shirt. **R** believed that **C2** should stay in the room and suggested same, however, **C2** wanted to return to her residence (Goodman Hall).

**R** walked **C2** "most of the way" to Goodman Hall.

**C2** stated that went to sleep upon returning to her room and woke up between 9:00 am and 10:00 am.

**C2** sated later in the day she sent **R** a text where she apologized for "being a mess" at the party. **C2** stated that at some point in the text exchange with **R**, **R** agreed with **C2** about her being drunk.

Several days after this exchange, **C2** sent a text message to **R** advising they "shouldn't see each other." **R** agreed and stated, "It was for the best."

Near the conclusion of the interview I informed **C2** of internal and external resources for assistance as well as the option to report this incident to law enforcement.

# EXHIBIT C

Complainant 1 Interview Notes

I met with Complainant 1 at the USciences Human Resources Office (4100 Chester Avenue) at noon on September 11, 2018.  We spoke for two hours.

Complainant 1 confirmed that she had previously given a statement to Joe Kalin on Friday, August 24, 2018 and that she had received a copy of Complainant's Notice of Rights and Investigation on Friday, September 7, 2018.

At the outset, I explained my role as investigator and the investigation process.  I also reminded her that the information provides would be confidential not private and she confirmed that she understood the difference.

Complainant 1 is currently a junior and lives off campus.  She is a member of the ██████████ ██ sorority.  During her sophomore year, she lived in Osol Hall.

Complainant 1 told me that she met Respondent her freshman year (Fall 2016) through a friend (a student who is no longer at USciences).  Respondent was a sophomore.  She saw Respondent periodically on campus (two to three times a month) and they talked and became friendly.  At some point towards the end of her freshman year (Spring 2017), they started snapchatting and exchanging photos. These exchanges were friendly and non-sexual (for example, he would send her photos of his cat and a stuffed "minon" that he had in his room).  Sometimes they would "streak" on snapchat (i.e., exchange snapchat messages at least once a day).  However, they did not make plans to do things together.  On one occasion, she went to a lunch arranged by the friend who had introduced her to Respondent that Respondent and two other friends also attended.  These friendly, casual, non-flirtatious interactions continued in the fall semester of her sophomore year (Fall 2017).

On Friday, November 3, 2017, Complainant 1 was in her room at Osol Hall, texting/snapchatting with friends.  She was having a rough night due to "guy issues."  Respondent snapchatted her (they were on a "streak") and asked how she was doing.  She told him that she was having "a rough night." He suggested that she come over to his house and talk about it.  Complainant 1 agreed.  This occurred between 10 and 11 pm.  Although there was no mention of sex in the snapchat exchange, Complainant 1 understood that sex was a possibility if she went and she was "okay" with that.

She arrived at Respondent's house around 11 pm (Respondent lives off campus at 626 S 42th Street—a house he shares with several members of his fraternity ██████████).  This was the first time she had gone to Respondent's house.  He met her at the door and they went up to his room.  They hung out and talked casually for about 20 minutes.  She recalls that they talked about some of the paintings he had in his room.  He then kissed her and she kissed him back. They made out for a while and she gave him oral sex.  They ended up having consensual sexual intercourse.  He used a condom. The foreplay and intercourse lasted 15 to 20 minutes. Afterwards they talked briefly before falling asleep.  They did not talk about the sex although he commented that "my bed was shaking a lot."  She understood this to mean that he thought she had enjoyed the sex.  She told him that she had to get up early to be ready for her "crossing" with

2

████████████ the next day. Crossing is when a student officially becomes a member of the sorority and gets her "letters."  By midnight, they were falling asleep.

An hour or so later (between 1 and 2 am), Respondent woke her up by initiating foreplay.  She was half asleep but recalls he was touching her "butt or her boobs."  When she woke up, she turned towards him and responded to his overtures.  Although she was tired, she was willing to have sexual intercourse with him.  Her mindset was "ok—let's get it done" so she could go back to sleep.  He again used a condom.  She does not recall any conversation.  Afterwards, they both fell back asleep.

An hour or so later (between 3 and 4 am), Respondent again woke her up by initiating foreplay and rubbing his penis against her.  She was half-asleep but recalls that he disengaged and then told her "I don't have a condom."  She responded "If you don't have a condom, let's not do this."  She recalls that he said "okay."  She understood this to mean that he understood that she did not want to have unprotected sex. During this brief conversation, she was lying down in the bed and he was sitting up in the bed next to her.  She does not recall whether he moved away to search for a condom (either before or after their exchange).

Respondent then got on top of her and rubbed his penis against the outside of her vagina.  She was unsure whether he just wanted to make out or engage in some form of sexual contact short of sexual intercourse.  She thought it would be better to avoid such close contact between his penis and her vagina.  She didn't want to just push him off but changed the angle of her hips and arched her back to put some distance between his penis and her vagina.  He pressed back and maintained the contact of his penis with her vagina. He then placed his legs over hers in a manner that prevented her from closing her legs or moving away from him.  It was approximately 5 minutes from when he initially rubbed against her to when he restricted her movement with his legs.  He then achieved penetration.  Complainant 1 did not know what to do and was in shock.  She felt paralyzed and lay there immobile, staring at the wall.  As she lay there, she thought: "I am being raped."  He had his head over her shoulder as he was lying on top of her and was not looking at her.  This was different from the two prior times when he had looked her in the eye during intercourse.  One or two minutes after he had entered her, he stopped and withdrew (he did not ejaculate).  Complainant 1 then said: "Didn't I tell you not to fucking do that."  She thinks he responded: "sorry."  They said nothing else and fell back asleep.

Complainant 1 woke up at 6 am the following morning (Saturday, November 4, 2017) when her phone alarm went off.  She got dressed and woke up Respondent so he could let her out of the house.  They did not talk about the sex.  She said goodbye and walked back to Osol Hall alone (it is a block away from Respondent's house).

Complainant 1 had not consumed any alcohol or drugs on November 4--either before she arrived at Respondent's house or when she was there.  She did not observe Respondent consume any alcohol or drugs and his behavior did not indicate to her that he had done so before her arrival.

When she returned to her room, she got ready for the morning's crossing activities.  She was still in shock about what had happened and did not know what she should do.  She thought further about what had happened.  She knew she had said "no" to sexual intercourse without a condom and that Respondent had acknowledged her refusal but had penetrated her anyway.  She worried

D_00065

that she would not be believed because she had engaged in consensual sexual intercourse with him earlier in the same night.  She did not say anything to anyone about what had happened that morning.

In the afternoon, she went to Linvilla Orchard with her sorority sisters.  She drove with her "Big" (Witness 1).  While they were alone, Complainant 1 told Witness 1 that something had happened the night before with Respondent and that she thought it was rape.  She told Witness 1 the details of what had happened.  Witness 1 told her when Respondent had done was rape and not okay.  They talked about what they should do.  Witness 1 decided to talk to one of her friends who was also a good friend of Respondent's to get her perspective.  Complainant 1 recalls that Witness 1 then told her that this friend was shocked and said that this was "not like him."  After talking further with Witness 1, Complainant 1 and Witness 1 decided not to say anything.

Complainant 1 believes she told another student about what had happened a week or so later but that she was trying to "explain it away" in her mind.  She had been willing to have sex with Respondent because she considered him a friend.  She felt that it just "didn't seem real" that he had held her down and penetrated her without a condom after she had said no.  She just wanted things to go back to normal.  She initially tried to continue her snapchat interactions with Respondent but said it didn't feel right and these contacts eventually stopped.  She no longer talked to him on campus as they had in the past and they did not interact.

Several months later, in April 2018, Complainant 1 attended a presentation by Women Against Rape during her sorority's Women's Week.  She began thinking about what had happened again and that it was rape ("I said no" but "he did it anyway") but she was still questioning herself and felt that she would not be believed.

On August 23, 2018, the day before the start of the fall semester, Complainant 1 attended an InterGreek Council and Respondent was there.  Complainant 1 stated that she would feel stressed when she saw him.  Later she went out to a restaurant ("Copa") to have drinks with two guy friends and Witness 2.  They met at Complainant 1's house around 4:30 and went to the restaurant.  According to Complainant 1, both she and Witness 2 had margaritas and drank too much.  They walked home together afterwards around 7 or 8 pm.  The two guys were no longer with them.  During the walk, Witness 2 said something about Respondent, and Complainant 1 started sobbing and told her she had been assaulted by Respondent.  Witness 2 told her that something had happened with her and Respondent and mentioned a party where Complainant 2 had been very drunk and she (Witness 2) thought Respondent was trying to hook up with Complainant 2.  By the time they arrived back at Complainant 1's apartment, they both were very upset.

A number of people were at the house: (1) Complainant 1's two roommates; (2) a female friend; and (3) a male friend.  Complainant 1 and Witness 2 were both crying.  Complainant 1 told the group that they had both been previously assaulted.  Complainant 1 felt horrible because she thought if she had said something about Respondent, others would not have been hurt by him.  Both she and Witness 2 were hysterical and lying on the floor.  The male friend also started sobbing and said "that is so fucked up" (this person is a friend of both Complainant 1 and Respondent).  Because Witness 2 was so upset (and getting sick), someone called her boyfriend and he came and picked her up.  After Witness 2 left, Witness 1 and another girl arrived at the

house.  Witness 1 put Complainant 1 to bed and left her a note to call her (Witness 1) when Complainant 1 woke up.

The next day, August 24, 2018, Complainant 1 texted Witness 1 when she woke up and they talked about what to do ("now what").  They decided to report what had had happened to Complainant 1 to Randi Miller.  Witness 1 went with Complainant 1 and they met with Randi Miller and then later spoke separately to Joe Kalin.

Complainant 1 has since learned about the January 2018 incident reported by Complainant 2.

Complainant 1 disclosed that Respondent had reached out to her on snapchat when he heard rumors about a report being made.  She moved the exchange to text so there would be record and told him that she did not want to discuss it.  It is Complainant 1's understanding that Respondent heard about her report from a comment Witness 1 made to one of Respondent's fraternity brothers ("One of your brothers raped one of my sisters").

When asked if there was anything else Complainant 1 wanted to share with me about what had happened, Complainant 1 said that she had heard from a friend (the president of another fraternity) that when that fraternity took over a house that had been the old ███████ house, they had found a basement room filled with mattresses and it is her understanding that fraternity brothers had gotten girls drunk and taken them into this room to have sex.  She also stated that she believes that they use Everclear and Absinthe in the juice mixes they use at parties and that is one of the reasons why her sorority (███████████) does not have mixers with them anymore.  She described a 2017 mixer around Halloween where guys were groping girls inappropriately (Respondent was not present at this mixer).  Complainant 1 also disclosed that the fraternity guys always seem to go after freshman.  She also commented, however, that many fraternity guys are good guys.

When asked if there was anyone I should talk to, Complainant 1 suggested Witness 3.  Witness 3 transferred from UScience to another school but had an experience with Respondent that made her uncomfortable at a formal fraternity event.  Complainant 1 says that Witness 3 told her that Respondent kept trying to get her away from the group and then tried to hook up with her.  Complainant 1 says that Witness 3 spoke to her afterwards and then sent a text to Respondent saying that she was not comfortable with what had happened.

Complainant 1 had already provided the text Respondent sent her after he heard rumors that she was making a report.

<u>Follow Up Interview</u>

On October 23, 2018, I met with Complainant 1 a second time.  I provided her with a copy of my summary of our interview and asked her to make any corrections or additions.  She corrected the spellings of several names but made no other edits or additions.

I reviewed with Complainant 1 what Respondent had said about their encounter.  She strongly reiterated that she had said no to having sex without a condom but that he had penetrated her any way.  She also disagreed with his statement that they had sex four times and that they got up immediately after the last time after he stopped.  Complainant 1 is confident that they only had

sex three times (unless she was asleep during a fourth time), that they fell back asleep after the last time (when he did not have a condom), and that she left in the morning after her alarm went off.

6

# EXHIBIT D

D_00069

Complainant 2 Interview Notes

I met with Complainant 2 at the USciences Human Resources Office (4100 Chester Avenue) at 8 am on September 13, 2018.  We spoke for an hour and 40 minutes.

Complainant 2 confirmed that she had previously given a statement to Joe Kalin on Friday, August 30, 2018 and that she had received a copy of Complainant's Notice of Rights and Investigation on Friday, September 5, 2018.

At the outset, I explained my role as investigator and the investigation process.  I also reminded her that the information provides would be confidential not private and she confirmed that she understood the difference.

Complainant 2 is currently a sophomore and lives on campus in Osol Hall.  She is a member of the ████████████ sorority.  During her freshman year, she lived in Goodman Hall.

Complainant 2 met Respondent a week before the 2017 fall semester started at the end of August.  They met at a party at his house.  She was a freshman and this was her first college party.  There was a keg, "jungle juice" and fruit juices to drink.  The drinks were handed out by guys at the staircase inside the house (the stairs were blocked off so no one could go upstairs).  She had been warned by her brothers about drinking mixed drinks like "jungle juice" and only drank beer.  She did not drink much in high school and this party was one of her first experiences drinking alcohol.  She has since learned that the "jungle juice" at the parties she attended was typically made with Vladimir vodka and/or Everclear.

At the party, she was talking to someone she had just met (Witness 4) and Respondent came up and joined them.  She and Respondent hung out with a group.  Later in the night (around 1 or 2 am) the party was winding down but she and Respondent were both still there and continued to talk.  They talked about school and their families.  After a while he asked her "Do you want to stay" or "Do you want to go upstairs" and she agreed.  She understood when she agreed that they were going to have sex and she was okay with that.  She was tipsy but not drunk.  She does not know how much Respondent had been drinking but did not think he had drunk too much because he had been "running the party."

When they got to Respondent's room they briefly talked about what was in his room (they talked about the paintings that were there) and then started making out.  They did not talk about having sex but she actively participated in the foreplay and sex.  She believes that they had sexual intercourse multiple times.  In the morning, she got up and got dressed and returned to Goodman Hall.  Respondent was awake and their interactions were relaxed and casual.

A few days later she went to a party at the unofficial house of the fraternity that Respondent was in (████████████).  This party was during the first week of classes (known as syllabus week) when there are a lot of parties.  She did not go there specifically to meet Respondent but she knew that he was likely to be there.  She drank a little more at this party but still felt in control.  Later in the evening, as Respondent was leaving, he asked her if she wanted to come over to his house (his house a few houses away) and she agreed.  They went back to his house and had sexual intercourse. She again spent the night.

2

Later that same week, Respondent texted her and asked if she wanted to come over.  She agreed.  They again had sexual intercourse and she slept over.

Sometime around this time, they had a conversation about what they were doing.  They agreed that their relationship would be casual and less frequent and that they would not always spend the night together after sex.  This conversation was initiated by Respondent but they mutually agreed on being "friends with benefits" to relieve stress.

Over the following semester (Fall 2017), they saw each other for sexual intercourse every week or so.  Sometimes one of them would initiate meeting up by text.  Sometimes they would meet at a party and go back to Respondent's house together.  Sometimes they hooked up during the day/early evening.  They did not spend the night together unless they met at a party and Complainant 2 had been drinking.  However they did not always hook up when they they saw each other at parties.  Their relationship was not exclusive and both were seeing other people.

When asked about a September 2017 card party, Complainant 2 recalled that she attended a small gathering at Respondent's house to play "Kings" in mid-September 2017.  Respondent had texted to invite her and told her she could bring friends.  She expected that they would hook up at the party.  Approximately ten to twelve persons attended this party, including Witness 2, one or two of Respondent's roommates and two girls from Goodman Hall.  Complainant 2 drank a fair amount at this party but does not believe that she was incapacitated.  Complainant 2 has since learned that Witness 2 confronted Respondent about her at the party and that Witness 2 expressed concern that Complainant 2 was very drunk.  Complainant 2 denies that she was impaired and states she freely chose to have sexual intercourse with Respondent that night.

At the end of the Fall 2017 semester, Complainant 2 and Respondent were still casually hooking up.  When Complainant 2 returned to school in January 2018 after the Christmas break, she got a text from Respondent on Saturday about a party at his house the next day.  She says that there are usually a lot of parties at the beginning of the semester.  She decided to go to the party with her girlfriends to have a "girls night out."  She knew that Respondent would be there but she was not planning to hook up with him or spend the night with him.  She does not know whether Respondent was expecting her to stay over.

Complainant 2 and her friends arrived at the party between 10 and 11 pm. She was with two friends and two other girls from Goodman Hall.  They started drinking and dancing. One friend left fairly quickly because she did not drink and it was not "her scene."  Complainant 2 started out drinking beer but stopped because it tasted bad.  Although she had been warned by her brothers not to drinks mixed by someone else, she felt it would be okay to do so at this party because she knew Respondent and his friends.  She recalls drinking 3 or 4 cups of the "jungle juice" (although they were not full cups) and became intoxicated.  She does not recall drinking more but she could have.  She continued to dance in the living room/front area with the group of girls she was with.

Complainant 2's memory of much of the remaining night is limited.  While she was dancing (she is unsure of the time) she was bumped and fell down, her face hitting the floor.  She recalls that the floor was made out of tile and very slippery (because of spilled drinks) and that her reactions were slowed because of the amount of alcohol she had consumed.  She hit the floor hard enough

to scratch one of the lenses of her glasses (she did not realize this until the next day) and her nose immediately started to bleed. In addition to being hurt, she was very embarrassed by her fall and started crying. Witness 4 (a friend of both her and Respondent) came over to help her. He took her into the kitchen to help her clean up in the sink. Complainant 2 thinks Witness 4 asked someone to get Respondent (Witness 4 was a mutual friend). Respondent came and Respondent and one of his roommates (Complainant 2 does not recall who), took her upstairs to the bathroom where it was less crowded. Respondent helped her wash her face and check to make sure her nose was not broken. Complainant 2 was crying, upset, disoriented, in shock, and very embarrassed. Respondent asked her if she wanted to lie down in his room and she recalls him saying that she was in no condition to go home. Respondent took her to his room and she took off her shoes and lay down. Respondent returned to the party and she fell asleep. Complainant 2 has no idea how much alcohol Respondent had consumed but does not think he would have been drinking heavily because he was hosting the party.

The next thing Complainant 2 remembers is waking up to find that Respondent was on top of her and inside her engaging in sexual intercourse. Her memory is episodic and she was in and out of consciousness. She was too drunk and too exhausted to say or do anything. She does not recall him finishing or having an orgasm. She next recalls waking up disoriented some time later. Her pants and underwear were off but she was still in her tee-shirt and bra. Respondent was asleep beside her. She immediately jumped up and put on her pants and shoes in the dark. She was crying, confused and upset because she couldn't remember anything but pieces of the prior evening after her accident and she had had no intention of staying over. Respondent woke up and asked "What are you doing." Complainant 2 responded that she wanted to go home. Respondent then asked her "Are you okay to go home?" Complainant 2 understood him to be asking whether she was sober enough. Respondent got up and walked her most of the way to Goodman Hall (he stopped where the red bricks stopped approximately 100 yards from the door). They did not talk and simply said good bye.

She does not know the time she woke up and got back to Goodman Hall only that it was dark. Complainant 2 went to her room and crashed. When she woke up the next morning, she was still very confused and she had only limited recall of the prior night. Her memory was good until her fall but then episodic and disconnected. After her fall, she only recalled Witness 4 and Respondent helping her clean up, laying down in Respondent's room, waking up when he was on top of her, and waking up without her pants in the dark.

Complainant 2 was very embarrassed about her fall and making a disturbance at the party. She texted Respondent later that day and apologized to him for "being a mess" the night before. He texted back that she had been very drunk. Complainant 2 was still confused and upset about what had happened with Respondent but did not talk to anyone.

Later that same day, Respondent texted her that she had forgotten clothes at his house when she left (Complainant 2 recalls that she had left her underwear and her flannel). She went to pick them up after practice around 6:30/7:00 pm. She went to his house and he took her up to his room and closed the door. She thought this meant that he wanted to have sex and she immediately said that she was not staying. She got her stuff and then immediately left. They did

4

not talk about the evening of the party, the end of the friends with benefits arrangement, or anything else of substance.

A few days later, she decided that she wanted to break off her "friends with benefits" arrangement with Respondent and texted him that she wanted to end their arrangement. She has not texted him since except once. She wished him Happy Birthday, to which he responded "Thanks." This was few weeks after the January 2017 party. At some point in February 2018, Respondent texted her to see if she wanted to "reevaluate" and start hooking up again. She responded no and told Respondent that she was seeing someone.

Complainant 2 regularly saw Respondent around campus after January 2017. She did not interact with him much but felt uncomfortable around him. She saw him more frequently after she joined the ███████████ sorority because they are both active in Greek life. She never went back to Respondent's house (except for when she picked up her clothes). She also stopped going to as many parties because she started dating someone (a member of the Pi Lambda Phi fraternity).

Complainant 2 never told anyone the details about what had happened until she reported it to Joe Kalin on August 30, 2018. She decided to report what happened at the January 2017 party after she found out at the beginning of the 2018 fall semester that another sorority sister had had a problem with Respondent. On August 24, 2018 (move in day for the fall semester), one of her sorority sisters, asked if Complainant 2 had hooked up with Respondent. Complainant 2 was confused as to why she was asking and this sorority sister told her that another sister was reporting him for assault. Complainant 2 did not want to talk about it with this sorority sister because she knew that she was close friends with Respondent. Complainant 2 told her that "he never forced himself on me" but that things had happened that she was not happy with. It is her understanding that the sorority sister relayed this information to Witness 1, the president of the sorority. She later exchanged texts with Witness 1 and also spoke with her in person about what had happened with Respondent (although not in great detail). Witness 1 told her that there were resources at school if she needed anything. It was through these texts that Complainant 2 learned it was Complainant 1 who was reporting Respondent for assault. A couple days later, Witness 1 referred to Joe Kalin when Complainant 2 decided to report what had happened to her. Complainant 2 also subsequently had a brief conversation with Complainant 1 about what had happened to her with Respondent.

When asked if there was anything else Complainant 2 wanted to share with me about what had happened or Respondent generally, Complainant 2 said that one of her sorority sisters knew Respondent from back home and told her that Respondent had dated her cousin in high school and that Respondent had done things that had made her cousin uncomfortable. This conversation occurred about mid-way in the 2017 Fall semester when Complainant 2 and Respondent were engaged in the "friends with benefits" arrangement. Complainant 2 stated that this information did not cause her to consider putting an end to their arrangement. Complainant 2 says she also asked around about Respondent when they started hooking up and was told that he didn't date girls and kept things casual but that he was a nice guy.

5

Complainant 2 also shared that Respondent's fraternity was called the "creepy" fraternity because of incidents that had occurred with women at their parties.  Complainant 2 did not know any specifics regarding these incidents but said that she went to a 2017 Halloween party at Respondent's fraternity and saw a guy (not a fraternity member) acting inappropriately by touching and grinding on girls who were not into it while dancing.  According to Complainant 2, the fraternity brothers running the party simply laughed when they were asked to make the guy leave the party.  She said she had also heard that the members of this fraternity sometimes used Everclear in the juice mix at their parties and that a guy ended up in the hospital after drinking the "jungle juice" at one of the fraternity's parties.

Complainant 2 identified Witness 4 as someone who could describe events at the party.  She also agreed to provide text messages she had exchanged with Respondent.

Update to Complainant 2 Interview Notes

Complainant 2 provided a series of texts between her and Respondent which are listed below.

1.   August 27, 2017 texts exchanged the day after Respondent and Complainant 2 first met.

2.   August 28, 2017 texts, in which Respondent invites Complainant 2 and her friends to a party.

3.   September 2, 2017 texts, in which Respondent invites Complainant 2 and her friends to come over and hang out.

4.   September 13, 2017 texts, in which Respondent suggests keeping the relationship causal.

5.   October 9, 2017 texts, in which Respondent invites Complainant 2 over.

6.   October 28, 2017 texts, discussing friend who collapsed after drinking

7.   January 12, 2018 texts, in which Respondent invites Complainant 2 and her friends to a party on Sunday

8.   January 15, 2018 texts, exchanged the day after the Sunday (January 14, 2018) party

   a.   Exchange in the morning/early afternoon.

      In response to Complainant 2's statement:

      "Thanks for last night.  I'm sorry about that.  Also used to knocking back beers like it's nothing.  Didn't think break would fuck over my tolerance as much as it did."

      Respondent responded:

D_00074

"Hey no prob.  And yea you were pretty drunk."

    b. Exchange in the evening regarding clothes left behind after Complainant 2 left.

9. January 17, 2018 texts in which Complainant 2 breaks off their arrangement: "I think it is best we don't hook up anymore.  Nothing against you, just a personal decision I wanted to make you aware of."

10. February 3, 2018 texts in which Respondent asks Complainant 2 to reconsider and Complainant 2 responds "I just needed to take a step back and reevaluate some stuff going on in my life. But I'm actually seeking someone now.  Sorry."

<u>Follow Up Interview</u>

On October 23, 2018, I met with Complainant 2 to review my summary of the September 13, 2018 interview.  She reviewed the summary and made two corrections:

(1) she corrected the spelling of several names; and

(2) she corrected a statement in the next to last paragraph of the summary, clarifying that the student acting inappropriately at the ███████ party was not a member of the fraternity but that the fraternity brothers had simply laughed when told about it and did not ask the student to leave the party.  (I made this change to the above summary).

I reviewed with Complainant 2 what Respondent had said about the January 14, 2018 party.  She reiterated that she had not intended to spend the night with Respondent and denied saying anything that would have indicated to Respondent she wanted to spend the night/have sex with him.

When asked if she was able to walk up the stairs on her own, Complainant 2 said that she probably did (although her memory is fuzzy) and commented that immediately following her accident she was feeling disorientated and confused more than physically impaired.

When asked if it was possible Respondent could have misinterpreted anything she had said, she said it is possible that he misunderstood why she accepted his offer to lie down in his room.  She again emphasized that she only accepted this offer because she wanted to lie down and collect herself.  She further stated that she does not recall any conversation with Respondent in his room, that he left the room, and the next thing she remembers is waking up to find him on top of her engaging in sexual intercourse.  She stated that she does not recall anyone banging on the door when she was in Respondent's room.  Finally, she stated that she does not recall anyone walking out of the house behind her and the Respondent when they left the house.

Finally, Complainant 2 disclosed that she started a casual, sexual relationship with Witness 4 towards the end of the spring semester (April 2018).  She stated that she has not discussed her report with him except to tell him that she was very drunk the night of the party.

# EXHIBIT E

D_00076

 **C2**                    Text Messages

August 27, 2017 → Morning after first meeting



August 28, 2017





Text Messages

September 2, 2017



 **C2**    Text Messages

September 13, 2017



Oct. 9, 2017                    Oct. 26, 2017

 **C2**                         Text Messages



January 12, 2018 → Invitation to party



January 15, 2018

**C2**                     Text Messages



January 17, 2018                          February 3, 2018



EXHIBIT F

Witness 1 Interview Notes

I met with Witness 1 at the USciences Pharmacology & Toxicology Center (Room 233) at 3 pm on September 20, 2018.  We spoke for 45 minutes.

Witness 1 confirmed that she had previously given a statement to Joe Kalin on Friday, August 24, 2018, and another brief statement on Monday, August 26, 2018.

At the outset, I explained my role as investigator and the investigation process.  I also reminded her that the information provides would be confidential not private and she confirmed that she understood the difference.

Witness 1 is a junior and lives off campus.  She is the president of the ████████████ sorority.

In November 2017, Witness 1 stated that Complainant 1 told her about an incident with Respondent.  Complainant 1 told her that she (Complainant 1) had been hooking up with Respondent the night before and he ran out of condoms.  Although Complainant 1 told him she didn't want to have sex without a condom, he went ahead anyway.  Complainant 1 told Witness 1 that she didn't know what to do and asked Witness 1: "What should I do?"  Witness 1 described Complainant 1 as upset but not crying.

Witness 1 says that her initial reaction was that the girl always becomes "the enemy" in such situations and gets "shunned" because people think the girl is lying.  They discussed whether reporting what had happened would be "social suicide."  Witness 1 asked Complainant 1 if she could talk to one of her friends to get her perspectives and Complainant 1 agreed.  The conversation between Witness 1 and Complainant 1 lasted around 15 minutes or so.

The next day, Witness 1 talked to her friend.  This girl was also a friend of Respondent's (they had had several classes together).  The friend's reaction was shock and surprise: "She didn't know what to think."  The friend also thought that reporting it would be "social suicide" for Complainant 1.  Witness 1 asked the friend to keep what she had told her confidential and she agreed to do so.

Witness 1 shared this discussion with Complainant 1 and told her "whatever you decide I will stand behind you."  Complainant 1 told her that she was not going to report it at that time.

Witness 1 did not discuss this incident again until August 23, 2018.  Witness 1 was at Copa with friends that evening when one of them got a call and asked Witness 1: "What is going on with Complainant 1?"  Witness 1 then got a text from Complainant 1 which did not make much sense (Complainant 1 had started typing but stopped).  Witness 1 then texted another friend and tried to find out what was going on. When she was told by others that "Complainant 1 is going through shit" and was very upset, Witness 1 and another friend left the restaurant to go to Complainant 1's house.  When Witness 1 got there, one of their male friends answered the door "bawling his eyes out."  She then saw Complainant 1 in the hall, crying.  Witness 1 hugged her and Complainant 1 kept saying "sorry."  Complainant 1's roommates were cleaning up vomit (Witness 2 had gotten sick but had left with her boyfriend).  Witness 1 stayed with Complainant 1, hugging her.  Complainant 1 told her: "it was not just me that he did it to, it was Witness 2

2

too." One of Complainant 1's housemates then told Witness 1 that there was also another girl (Complainant 2). Witness 1's reaction was: "this is crazy."

Witness 1 stayed with Complainant 1 and tried to comfort her. Complainant 1 kept asking "what are we going to do" and apologizing. This was very unusual behavior for Complainant 1. Witness 1 had only seen Complainant 1 cry on one prior occasion (about her dad) and had never seen her lose control like this. According to Witness 1, Complainant 1 "knows how to handle herself." After Complainant 1 fell asleep, Witness 1 left her a note asking to text her when she woke up.

Witness 1 then went back to her house. There were a few Delta brothers hanging out in the living room but her friend came out and pulled her into the bedroom. The male friend who had been at Complainant 1's house earlier was also there. They talked about what had happened and what they were going to do. From Witness 1's perspective, now that there were three girls, it would not be "social suicide" to report. After talking for a while, the three of them went out to get something to eat around 11 or 12 at night.

The next day (it was move in day), Complainant 1 texted Witness 1 to say that she didn't feel well. Although Complainant 1 came to move in day, she left early. Complainant 2 was also at the move in day and Witness 1's friend talked to Complainant 2 about Respondent.

Witness 1 went to see Complainant 1 and sat with her on her porch. After talking, she texted Randi Miller who told them to "come now." She and Complainant 1 then met with him and made the initial report.

When asked if there was anything else I should know, Witness 1 said that she told one of Respondent's fraternity brothers that "one of your brothers had raped one of my sisters" at a party when she was drunk. She didn't remember saying this but the fraternity brother later texted her and told her what she had said. Although the fraternity brother appeared to want to talk about it, Witness 1 told him that "we can't talk about it." Witness 1 thinks that Respondent had given him questions to ask. She also said that the fraternity brother told her: "This is going to ruin his future."

Witness 1 also shared that her sorority (███████████) had a mixer with Respondent's fraternity her sophomore year (2017-2018) and the sorority decided to not have any further mixers with that fraternity because they were "creepy." (Witness 1 said the theme of the event was "risky business" and the guys were all wearing tight briefs and showing off their stuff). She also shared that she had heard that the old fraternity house had had mattresses in the basement where they used to take girls. However, she did not have any direct knowledge of this.

# EXHIBIT G

Hey I got your message. I'd just prefer we move it here for both of our sakes

Okay. The reason I reached out to you is that I heard a rumor from someone that involved you and I and it completely threw me off guard.

I'm going to be honest I really don't want to have his conversation right now

Delivered

Alright, but we need to have this conversation soon because it involves something serious.

# EXHIBIT H

D_00087

Witness 2 Interview Notes

I met with Witness 2 at the USciences Pharmacology & Toxicology Center (Room 233) at 1 pm on September 20, 2018.  We spoke for one hour.

Witness 2 confirmed that she had previously given a statement to Joe Kalin on August 28, 2018.

At the outset, I explained my role as investigator and the investigation process.

Witness 1 is a junior and lives off campus.  She is a member of the ██████████ sorority.

Just before classes started this semester (2018 fall semester), Witness 2 went out for dinner and drinks with two guy friends and Complainant 1 at the "Copa" restaurant.  They met up outside Complainant 1's house.  One of the guys said that he had invited Respondent but that Respondent was not coming. During the dinner, Complainant 1 and Witness 2 each had two shakers of margaritas and got "pretty drunk" (although they were still able to walk and talk). They left the restaurant around 8:00 pm and walked home together (they had separated from the two guys by this point).

On the way back from the restaurant, they began talking about Respondent. Complainant 1 said that she had felt uncomfortable when she heard that he had been invited to join them.  Witness 2 asked "why" and Complainant 1 told Witness 2 about an encounter she had had with Respondent the prior November.  Complainant 1 did not provide details but stated that she was sexually assaulted by Respondent ("I was raped").  Because of the amount they had been drinking, however, Witness 2 does not have a detailed recollection of what Complainant 1 said or her response.  She recalls, however, that Complainant 1 said that she had thought she and Respondent were friends and that she had been very hurt by what had happened.  By the time they arrived back at Complainant 1's house, they were both upset and crying.  Complainant 1's two housemates were at the house with some other people.  Everyone was trying to understand what had happened and to console Complainant 1 who was very upset.  According to Witness 2, Complainant 1 never got emotional which made the situation even more disturbing to her friends (this "came out of the blue").  Witness 2 had known Complainant 1 for over a year and considered her to be a "free spirit" about guys.

Witness 2 was herself upset and crying because she was concerned about Complainant 1 and because she had had an uncomfortable encounter with Respondent and believed other girls had too (there was a "pattern of behavior").  Shortly after they arrived at the house, someone called her boyfriend because she was hysterical and because she started to vomit due to the amount of alcohol she had consumed.  Her boyfriend picked her up and walked her back to his apartment where she fell asleep.  Later than night, her boyfriend asked Witness 2 to clarify that Respondent had not done anything to her because he had a hard time understanding what she had been saying when he picked her up.  She later explained to him why she had gotten so upset: (1) Complainant 1 was her friend and she gets angry and upset when her friends are hurt, and (2) in addition to her own uncomfortable encounter with Respondent at a fraternity Christmas party, she had observed Respondent talking about hooking up with Complainant 2 at a party in September 2017 when Complainant 2 was drunk.  Witness 2 felt guilty because she had not taken any action.

2

The next day, Witness 1 asked her what had happened with Complainant 1 that night and whether she (Witness 2) had ever been assaulted by Respondent.  Witness 2 told her that Respondent had not assaulted her but that he had made her feel very uncomfortable.  Witness 2 also told Witness 1 about what she had seen at the September 2017 card party with Respondent and Complainant 2.  Witness 2 has since had a brief conversation with Complainant 2 about Respondent in which Complainant 2 told her that she had had a "friends with benefits" relationship with Respondent in the 2017 fall semester.

Witness 1 later asked her if she would be willing to talk to the University Title IX investigator Joseph Kalen and she agreed to do so.

September 2017 "Kings" card party

According to Witness 2, she attended a September 2017 "Kings" card party at Respondent's house.  There were approximately 10 to 15 people at the card party.  Witness 2 went with her housemate and another friend.  During the evening, Witness 2 states that she observed Complainant 2 visually intoxicated (slurring her words; slouching; talking loudly) sitting close to Respondent.  Later one of Respondent's roommates made a joke to Respondent about sleeping with Complainant 2 that night.  Witness 2 states that she pulled Respondent aside, told him that sleeping with Complainant 2 was not a good idea, that Complainant 2 was drunk, and that she (Witness 2) did not want Respondent to get into trouble.  According to Witness 2, Respondent told her that he would never take advantage of a girl while drunk.  Witness 2 says she kept an eye on Complainant until she left (around 12:30).  When leaving, Witness 2 says that she told Respondent to call her if he needed help with Complainant 2.

Very recently Witness 2 learned that Complainant 2 stayed with Respondent that night.  Complainant 2 told her that they had previously met and Respondent had invited her to stay over.

Christmas party incident

Respondent invited Witness 2 to a fraternity formal Christmas dinner (Witness 2 was not certain of the year).  She did not know Respondent well at the time (they had friends in common and one of her closest guy friends from one of his fraternity brothers) but he texted her and asked if she wanted to go with him.  This was the first and only invitation she received from him. She agreed to go as "friends."  She also checked with one of Respondent's fraternity brothers (her close friend) to make sure that Respondent understood.

Initially the evening went well.  It was at the fraternity house.  They took pictures, ate dinner and participated in various activities.  They ended up in the basement watching a slideshow.  She was sitting next to Respondent on one of the couches.  Her friend was sitting next to Justin with his date on the same couch.  Respondent had had a fair amount to drink and was "buzzed" (although he did not show any signs of extreme intoxication).  Witness 2 had consumed several drinks but was not impaired.According to Witness 2, he started to put his arm around her.  She leaned away to avoid him.  He then put his hand on her thigh and she moved away.  This continued until she told him: "I am not into this; I am not interested."  To which he responded: "ok."  He then started touching her again and asked her if she wanted to go back to his place."  She said "no."  This cycle continued.  Eventually, frustrated by his persistence, Witness 2 turned to her male friend

3

and asked "do you mind if we go home."  All four of them then left.  They stopped off at Respondent's house where Respondent again asked her if she wanted to stay over.  According to Witness 2, his persistence and refusal to "take no for an answer" made her very uncomfortable. She states that she has avoided him ever since.

When asked if there was anyone else she thought I should talk to about these issues, Witness 2 mentioned Witness 8 (who she thinks had an experience similar to her own at a fraternity event although she does not know for sure).  Witness 2 then commented that Respondent has never had a girlfriend and hooks up casually with lots of different girls.

D_00090

# EXHIBIT I

Witness 3 Interview Notes

I interviewed Witness 3 by telephone on September 25, 2018 at 6:00 pm.  We spoke for approximately 40 minutes.

Witness 3 was a USciences student for the 2016-2017 academic year.  She transferred to another school at the end of the 2017 spring semester.  Complainant 1 identified Witness 3 as someone I should talk to because Witness 3 had had an issue with Respondent as a freshman.  Complainant 1 then reached out to Witness 3 and Witness 3 contacted the Title IX coordinator to say that she (Witness 3) was willing to share her experience.

According to Witness 3, Respondent asked her to attend a formal fraternity event (the ███████ ████ with him in March/February 2017.  At the time, she was "talking" to one of his fraternity brothers (according to Witness 3, "talking" means semi-dating) and she agreed to attend with Respondent only as "friends."  She says that she didn't know Respondent well at the time (only well enough to say "hi" to) and says that she was "very clear" with him that she was not interested in anything more.  In fact, she insisted on paying her own share of the event costs.

At the time she agreed to go to the event with Respondent, she was not aware that the event was being held at a hotel in the suburbs and she did not learn that everyone would be staying overnight at the hotel until the day before the event.  She was uneasy when she learned that they would be spending the night but told herself it would be fine because Respondent knew that she was "talking" to someone else.  She also did not realize until she arrived at the hotel that she would be sharing a double room with Respondent and one of his fraternity brothers.

Approximately 20 to 30 people attended the event at a Marriott hotel.  It started with a dinner. She and Respondent hung out with other people and were not acting as a couple in any way. There was drinking and dancing.  Witness 3 had 3 or 4 mixed drinks.  She was not drunk but was "feeling good."  Witness 3 does not know how much Respondent was drinking but commented that most people were drinking heavily.

As the evening progressed, Witness 3 began to get an uneasy feeling.  Respondent kept asking her if she wanted to go up to the room on various pretexts (I forgot something or let's go chill out) and she kept saying no.  Eventually, she, Respondent and several others went to one of the hotel rooms and continued to hang out.  Respondent continued to ask her if she wanted to go back to their room (which was nearby on the same floor).  She stated that she was very clear that she was not interested in being alone with him: "how many times have I told you I'm not going off with you."

Eventually, she did go back to the room with Respondent.  She thinks it was probably around midnight.  There was a couch area in the room separate from the bed area.  Witness 3 stated that she sat on the couch but then Respondent called her over to the bed.  She sat on the bed next to him, playing with her phone (texting, snapchating) but after a few minutes he pushed aside her phone and started to make a move on her.  He pushed her down and started to kiss and grope her. She pushed him off and said: "what are you doing?" and "no".  At this point, the other guy who was sharing the room with them walked in.  Respondent then said: "oh okay.  I respect that."

2

She then left the room and rejoined the group in the other room.  She believes that she was alone with Respondent in the room for approximately 10 to 15 minutes.

Later she ended up watching television with Respondent and the other fraternity brother in the room together.  Witness 3 believes that the fraternity brother had seen her reaction to what had been happening with Respondent when he (the fraternity brother) walked in on them and that he kept an eye on her after that.  She believes he understood that she was "not cool" with Respondent.

When they went to bed she shared a bed with Respondent but she built a pillow barrier between them.  Nothing further happened with Respondent and he appeared to have accepted that she was not interested in hooking up with him.

The next morning, everyone gathered for breakfast and then drove back to Philadelphia.  She was in a car with Respondent and several others.

On her return, she told Complainant 1 what had happened and that she had felt uncomfortable.  Complainant 1 encouraged her to say something to Respondent about how she felt and she (Witness 3) sent him a text.

Overall, Witness 3 stated that she felt Respondent had manipulated the situation and had repeatedly ignored her efforts to show him she was not interested in hooking up with him.  She describes him as pushy and says that he only backed off after she physically pushed him off of her and told him to stop.

Witness 3 states that she did not view what happened to have anything to do with Respondent's fraternity.  She commented that there is a culture of older boys hooking up with freshman at USciences but she does not view this as a fraternity issue.  She thinks it is a product of USciences being a small school with a small dating pool.

Follow Up Note:

On September 25, 2018, Witness 3 sent me screenshots of her text message exchange with Respondent the day after the event, in which she stated:

> "Hey so I really thought it was clear that we were going as friends.  I was not okay with what happened and pretty put off by it."

Respondent responded:

> "Hey [Witness 3].  I'd like give my full apologies as to what happened last night.  To be brutally honest, I was attracted to you beforehand but was convinced that nothing would happen.  The alcohol brought it out of me.  Again [Witness 3] Im genuinely sorry and I hope that this won't mess with our friendship."

Copy attached.

3

# EXHIBIT J

Hey so I really thought it was clear that we were going as friends. I was not okay with what happened and pretty put off by it.

Hey **W3** . I'd like give my full apologies as to what happened last night. To be brutally honest, I was attracted to you beforehand but was convinced that nothing would happen. The alcohol brought it out of me. Again **W3** Im genuinely sorry and I hope that this won't mess with our friendship

I knew it was something to be worried about because of the nature of the event. And the reason I went was because I thought we were good enough friends that you wouldn't try

D_00095

# EXHIBIT K

Respondent Interview Notes

I met with Respondent at the USciences Pharmacology/Toxicology Center (Room 233) at 2 pm on October 2, 2018.  He was accompanied by his attorney Zak T. Goldstein.  We spoke for an hour and 45 minutes.

Respondent confirmed that he had previously received a copy of the Notice of Sexual Misconduct Investigation and the Notice of his Rights and Responsibilities.

At the outset, I explained my role as investigator and the investigation process.

<u>Complainant 1</u>

We first discussed the allegations made by Complainant 1.  I asked him if he was aware of an incident with Complainant 1 occurring on or about November 3, 2017.  He responded that he was not sure of the date but that he knew the night she was referring to.

When asked to describe what happened that night, Respondent stated that last year Complainant 1 had been in an open relationship with her boyfriend (who does not attend USciences).  Respondent and Complainant 1 were snapchatting that evening (Respondent does not recall the time) and in the course of that exchange she told him that her boyfriend was not there for her, that she needed physical affection and, that she was "looking to be satisfied sexually."  As a result of this disclosure (Respondent had previously known she had a boyfriend but not that it was an open relationship), Respondent asked her if she wanted to come over.  He also asked her whether her boyfriend would be okay with that.  Complainant 1 said "yes" to both questions and then came over to Respondent's house, arriving there between 11 pm and 12 am.  According to Respondent, based on their snapchat exchange, it was clear that they were going to have sex.  They went almost immediately to his room.  After talking for a while (he does not recall about what), they had sexual intercourse.  Over the course of the night, he believes they had sex three more times.  The last time was in the morning.  This time, as they were having sex, she told him to stop and he immediately stopped. He does not recall the words she used when she told him to stop but said that it was "awkward" in the moment.  They talked a little after that and then she went home.  According to Respondent, after that night they remained friends, continued to talk and snapchat and everything "was fine."

When asked to elaborate on his relationship with Complainant 1 before that night, Respondent described them as "close friends" and as "supportive friends."  He does not recall how they met but thinks it might have been at a party or through mutual friends.  He said that they would share personal issues with each other (Respondent declined to say what she shared with him because it was private).  Typically they connected through snapchat (they would often streak) and texts (once a week or so).  He would also see her on campus and they would sometimes talk in person (this was less frequent).  He did not arrange meetings with her, except to sometimes invite her to parties or smaller gatherings with friends.  Respondent did not characterize these interactions as romantic or flirtatious.  He thought she was attractive but also knew she had a boyfriend.  Respondent was also not looking for a relationship.  According to Respondent, he invited her over because he was offering to give her the affection she was looking for (he told her "I can be that person").

2

We then discussed the night in question in more detail.  When she arrived at his house, they went to his room right away.  After talking for 15-20 minutes, he turned off the light.  They then started kissing and removing each other's clothes.  They were in his bed and had sexual intercourse.  Although they did not discuss having sex at that point, Respondent reiterated he was confident that she wanted to have sex because (1) they had discussed it before she came over and (2) she was responding to and actively participating in the sex.  Afterward, he thinks they may have talked but he does not recall the conversation.  They then went to sleep but Respondent says they did not sleep well (he said that he has problems sleeping due to hip problems).  He said they woke up and had sex two more times before the last time when she told him to stop.  During both the second and third times, Respondent states that she was an active and willing participant and Respondent had no doubt that she had wanted to have sex.  According to Respondent, she was also an active and willing participant the last time until she told him to stop.

When asked, he said he used a condom.  He then volunteered that she had asked him to use a condom the first time they had intercourse but that he ran out of condoms and didn't have one the last time they had sex.  When asked what happened when he ran out, he said he must have told her he was out of condoms but said that he did not recall the conversation (he kept condoms in his nightstand next to the bed).  He said she did not indicate that this was a problem and they proceeded to have sex.  He recalls that she was responding to him exactly the same way she had before but then told him to "stop" which he did. Again he does not recall the words she used but does not believe it had anything to do with condoms.

When asked if she positioned her body in a way that would keep his penis away from her vagina before he achieved penetration, he said no.  When asked what sexual position they were in, he said that he was on top.  He further stated that he was leaning on his arms and his legs were between her legs.  When asked if his legs or arms were positioned in a way that would restrict her movement, he said no. When asked how long they were engaging in intercourse before she said "stop," he said no more than a minute or so.

He says that Complainant 1 did not do or say anything that would suggest that she didn't want to have sex without a condom.  When asked if the following exchange occurred (he: "I don't have a condom"; she: "If you don't have a condom, let's not do this"; he: "ok"), he said that he did not have this conversation with Complainant 1.  He does not recall having a conversation with her prior to engaging in intercourse the last time, where he was sitting up in the bed and she was lying down next to him. When asked if Complainant 1 said: "Didn't I tell you not to fucking do that" after he stopped, he said no and that he would remember it if she had.  As noted above, Respondent does not recall what Complainant 1 said when she told him to stop.  Respondent said that he did not have any concerns that had misread Complainant 1's signals and does not know why she asked him to stop.

When asked, Respondent said that he has had a girl ask him to stop during intercourse on a few prior occasions (because the girl was uncomfortable) and he has always stopped immediately.

After Complainant 1 stopped the sex, he said they talked briefly (but not about her request that he stop) and she got dressed and left.  When asked if they could have fallen asleep again, he said no.  He also did not recall Complainant 1 setting an alarm or hearing an alarm go off at any point during the night.

3

Respondent states that he had consumed no drugs or alcohol that evening and that Complainant 1 also did not appear to be under the influence of anything.

According to Respondent, his interactions with Complainant 1 became less frequent after November 2017 but it was a gradual change and he did not perceive that it was connected in any way to the night at issue. He says that her manner and attitude towards him did not change. He still sees her around campus. According to Respondent, streaks end for lots of reasons because people get busy. He does not recall when he stopped but says he hasn't snapchatted with her for at least several months.

Respondent says he does not have any texts from Complainant 1 or saved snapchats. He also doesn't think that there is any person who would have any information regarding what happened with Complainant 1.

When asked if there was anything else he thought I should know, Respondent volunteered that he had a conversation with Complainant 1 at a party sometime after that night (he does not recall the date) where she told him that she was going to spend the night at another guy's house. He understood this to mean she was going to get the physical contact and affection she needed from someone else.

Respondent also explained how he found out that she had made a complaint. A friend of his heard about it second hand from one of Complainant 1's sorority sisters who said "One of your brothers raped one of my sisters." His friend thought it might involve Respondent and told Respondent about it. (During our follow-up interview, Respondent explained that the reason his friend figured out that he (Respondent) might be the person who had been accused by Complainant 1 was because his friend knew that he had had sex with Complainant 1 and knew that no other fraternity brother had hooked up with a girl from the ████████████ sorority). Respondent did not want to disclose his friend's name. He has also heard that Complainant 1 was drinking with friends, got very drunk, and started telling people that Respondent had "raped" her. Respondent said he reached out to talk to Complainant 1 about this but she refused to talk to him. This occurred before there was a no contact order.

Respondent says he was shocked by Complainant 1's statements and complaint and does not understand why she would make a complaint like this.

<u>Complainant 2</u>

We then talked about Complainant 2. Respondent stated that the January 2018 incident referred to in Complainant 2's complaint was the last time they had sex together. This occurred at a party at Respondent's house in early to mid January 2018.

Respondent stated that he and Complainant 2 had been hooking up casually through the fall 2017 semester when she was a freshman and he was a junior. One of them would reach out to the other (typically by text), suggest getting together, and she would come over to his house and they would have sex. Sometimes they would also meet at parties and one of them would ask "do you want to hang out later" or "are you free" and then they would go back to his house and have sex. Respondent said that they had sex that semester more than ten times but is not sure of the exact number.

D_00099

Respondent described what happened at the January 2018 party as follows: When she arrived, he asked her if she wanted to stay over that night and she said "yes." He then saw her periodically during the party but they were not hanging out together.  He had hosting responsibilities and was often either at the stairs or at the front door.  At some point in the evening, she got elbowed while dancing and got a bloody nose.  Respondent did not see it happen but saw his friend Witness 4 helping her clean up.  Respondent met her on the second floor and asked her if she still wanted to stay over.  She said yes.  They went to his room and talked for a while (she was "shaken up" over being elbowed and Respondent was trying calm her down).  After a while, she seemed fine and they started to have sex.  She seemed fine and engaged in what they were doing.  Afterwards, she decided she wanted to go home.  This was about the time the party was breaking up and he walked Complainant 2 back to her dorm.  Four of his friends (including Witness 4) also left the party at this time and were walking behind them for part of the way.  At her dorm, he hugged her and said good bye.

We then went through the night in more detail.  Respondent estimated that there were approximately 80 people at the party. There was beer and "juice" to drink.  The juice was made of ice tea or lemon aide mix and vodka (he said they did not use anything like Everclear).   He believes that the party started around 10 and that Complainant 2 got there relatively early.  He does not know what she was drinking or how much she drank but he says she was "buzzed" not "drunk."  He said that he was also "buzzed" (he thinks he had 3-4 cups of beer and a cup of juice but is not sure).  To Respondent, being "buzzed" means being more talkative and social.  He does not believe that Complainant 2 drank more than she normally did and he stated several times that she was not acting in a way that would indicate that she was really intoxicated (stumbling or slurring her words).  According to Respondent, he had seen her on other occasions much more drunk than she was that night.

They encountered each other periodically throughout the party and Respondent states that, at one point, he asked her again whether she wanted to stay over and she again said yes.

Respondent says that he then saw her on the second floor with Witness 4 after she got hurt.  She had tissues for her bloody nose and Witness 4 was helping her.  Respondent was standing below on the stairs.  He said she seemed shaken and shocked about getting hurt (he said that she told him she was elbowed and he does not recall her saying anything about being knocked to the floor).  She was outside the second floor bathroom when he joined her on the second floor.  Witness 4 had left but there were a few people there waiting for the bathroom (he does not know who).  He spoke to her briefly and they went into his bedroom.  Respondent recalling asking her again if she wanted to stay the night and that she said yes.  Respondent believes that they went into his bedroom around midnight but is not sure of the exact time.

When asked why he had asked her if she wanted to stay over so many times, Respondent said that he had a feeling that she might have changed her mind because of what had happened (getting a bloody nose).  (During our follow-up interview, Respondent clarified that the reason that he asked her again whether she wanted to stay over after her accident was because he wanted to make sure she still wanted to stay and had not changed her mind).

According to Respondent, they talked for a while after going into his room.  He was trying to calm her down because she was still upset about being elbowed and he told her "someone may

D_00100

have accidently hit you while dancing without knowing it." After about 15 or 20 minutes of talking, he states that they then had sex. He believes that the sex lasted around 30 minutes or so. Respondent states that she fully participated in the sex and he had no doubt of her consent. He again reiterated that she fully aware of what they were doing, actively participating in the sex, and was "buzzed" not "drunk."

When asked if he returned to the party at any time after he went into his room with Complainant 2, Respondent then recalled that he left her briefly before they had sex to go make sure someone was taking over his hosting responsibilities. When asked if she was awake when he came back into the room, he said that she was and that they talked on his return before having sex. According to Respondent, at no point did Complainant 2 fall asleep or pass out. They had sex only once and he did not use a condom. He believes that, during the sex, sometimes he was on top; sometimes she was on top.

Although Respondent cannot recall specific times, he thinks he and Complainant 2 went to his room around midnight or so and that he remained with her for the duration of the party except when he left his bedroom to check on the party before they had sex.

After the sex, although he wanted her to stay over, Complainant 2 told him she wanted to leave. Respondent then walked her back to her dorm. He recalls it being really late (between 1am and 3 am) but cannot pinpoint the exact time. He does not recall her being upset.

When asked if it was possible that he later either said or texted that Complainant 2 had been really drunk that night, he said he did not and that she had not been really drunk.

A few weeks later, he texted her to see if she wanted to come over and she responded that she was seeing someone else. After this, he stopped asking her to come over because she was dating someone. From his perspective, their casual hook ups ended because she started seeing someone else not because of anything that had happened at the party.

When asked if he recalled a card party at the beginning of the 2017 fall semester that Complainant 2 attended, he said he did and that it was one of the first times he and Complainant 2 had hooked up. When asked if he recalled a conversation that evening in which someone told him that they had overheard him talking about hooking up with Complainant 2, that Complainant 2 was really drunk, and that hooking up with her was a bad idea, he said he recalled no such conversation. When asked whether he recalled such a conversation with Witness 2 that evening, he said that he did not and commented that she was a member of Complainant 1's sorority.

Respondent acknowledged that he had asked Witness 2 to be his date "as friends" to a fraternity Christmas party. This party was at the fraternity house. When asked whether he had tried to initiate sex with Witness 2, he responded that he had asked her to stay longer at his house (when she and two others had stopped there after the party) and she said no. (During our follow-up interview, Respondent clarified that, at this point, he asked her to stay to talk and not for sex. Things could still have developed but he didn't think they would). When asked whether he had made any moves on Witness 2 at the party, he said he put his arm around her but that was it. He does not recall her saying or doing anything that suggested she was uncomfortable and, to the contrary, recalls that she "leaned into his arm."

6

Respondent also acknowledged that he took Witness 3 to a fraternity event.  When asked if he had tried to initiate sex with Witness 3, he recalled that they were hooking up and kissing but then she wanted to stop because she "had a thing" with one of Respondent's fraternity brothers. According to Respondent, as soon as she told him she wanted to stop, he stopped.  He does not recall her being resistant to his advances before that point.

When asked if he would sometimes try to get girls like Witness 2 and Witness 3 to be alone with him (by saying I forgot something in my room or I want to show you something), he says that it something he might do but emphasized that he would never do anything that would make any one uncomfortable.

Respondent says he does not have any texts from Complainant 2 because his phone deletes them after 30 days.  He identified Witness 4 as someone who could provide information about what happened at the party.  His roommates were also there but he doesn't want to get them involved.

When asked if there was anything else he thought I should know, Respondent said he did not have anything to add at this time.

At the close of the interview, I reminded Respondent of the university policy prohibiting retaliation.  We also revisited the importance of keeping our discussions and the investigation confidential.

<u>Update to Respondent Notes</u>

On October 9, 2018, Jessica Rickmond, the acting Title IX coordinator, forwarded to me a communication from Respondent, identifying seven additional witnesses with information relevant to the investigation.

<u>Follow Up Interview</u>

On October 25, 2018, I met with Respondent to review my summary of the October 2, 2018 interview.  He reviewed the summary and made the following corrections:

(1) He changed the word "thought" to "knew" in the following sentence: "He thought she was attractive but also <u>knew</u> she had a boyfriend."  (I made this change in the above summary).

(2) He explained that the reason his friend figured out that he (Respondent) might be the person who had been accused by Complainant 1 was because his friend knew that he had had sex with Complainant 1 and knew that no other fraternity brother had hooked up with a girl from the ███████████ sorority.  (I added this comment in a parenthetical to the above summary).

(3) He clarified that the reason that he asked her again whether she wanted to stay over after her accident was because he wanted to make sure she still wanted to stay and had not changed her mind.  (I added this clarification in a parenthetical to the above summary).

7

(4) He changed the quote "accidents happen" to the phrase "someone may have accidently hit you while dancing without knowing it."  (I made this change in the above summary).  The sentence now reads:  "He was trying to calm her down because she was still upset about being elbowed and he told her "someone may have accidently hit you while dancing without knowing it."

(5) He changed the phrase "may have left her" to "left her" because he now recalls leaving Complainant 2 briefly after she lay down in his room from a conversation with one of his roommates (Witness 5).  The sentence now reads: "When asked if he returned to the party at any time after he went into his room with Complainant 2, Respondent then recalled that he left her briefly before they had sex to go make sure someone was taking over his hosting responsibilities.  "

(6) He added the following clarification regarding why he asked Witness 2 to stay later at his house after the Christmas party: "At this point, he asked her to stay to talk and not for sex.  Things could still have developed but he didn't think they would."

I asked Respondent whether he had anything to add to his account of what had happened with Complainant 1.  He stated that he still did not recall precisely what Complainant 1 had said that caused him to stop intercourse but thinks it might have been:  "That's not for you."  When asked what he understood this to mean, he said he thought it meant "that" was only for her boyfriend. When asked why he did not ask her why she wanted him to stop, he said that he was caught up with feeling awkward.

With regard to Complainant 2, I asked Respondent whether he recalled spending time in the bathroom at some point during the evening.  He said he did (and hadn't mentioned it before because he didn't think it was relevant).  He further stated that this was before Witness 4 and Complainant 2 came upstairs after her accident.

When asked whether he recalled anyone banging on his bedroom door that evening, he recalled that some of his friends did so when he was in the room with Complainant 2.  They knocked on his door and asked for a charger.  According to Respondent, this occurred while he was engaged in intercourse with Complainant 2.  Respondent says that he got up, closed the door and put a case of water in front of the door to prevent further disturbances.  According to Respondent, Complainant 2 did not care about the interruption and they continued to have sex.  He stated that he knew she wanted to continue because she was actively engaged in the sex but does not recall any conversation.

When asked what he did after dropping off Complainant 2, Respondent states that he joined Witness 4 and other friends at another house "to destress" for a while.

We then reviewed the texts Complainant 2 had provided.  When asked if the January 15, 2018 text in which he stated that Complainant 2 had been "pretty drunk" the night before, changed his recollection as to how drunk Complainant 2 had been that night, Respondent stated "no" and commented that he made that statement in a joking way and did not mean it literally.

8

EXHIBIT L

D_00104

Witness 4 Interview Notes

I interviewed Witness 4 on October 9, 2018 at 9:00 am in Rosenberger Room 100.  We spoke for approximately 45 minutes.

Witness 4 is a senior.  He is friends with both Respondent and Complainant 2.

Respondent identified Witness 4 as someone who would have information regarding the January 14, 2018 party.  Witness 4 stated that Respondent asked him what he remembered about the evening but did not discuss the allegations with him.  Witness 4 also stated that Complainant 2 told him that he might be contacted for the investigation.

On the day of the party, Witness 4 helped Respondent and his roommates get the house set up in the afternoon/early evening.  He went home for about an hour to get ready (between 8:00 pm and 9:00 pm) but was back before the party got started around 10:00/10:30 pm.

By 11:00/11:30 pm the party was in full swing.  Witness 4 estimates that approximately 50 to 60 people were at the party when it was most crowded.  Witness 4 was helping manage the party and kept an eye on things to make sure there were no problems.  He did not drink much during the party (approximately 3 to 4 beers).  There was beer and juice to drink at the party.  The juice was made with vodka and lemon-aide mix.  Witness 4 helped make it and did not think it was particularly strong.

During the evening, Witness 4 saw Complainant 2 at the party off and on.  He does not know what she was drinking or how much she was drinking.

Later in the evening, Witness 4 saw Complainant 2 holding her face on the ground floor near the stairs.  Witness 4 is not sure of the time but thinks it was around midnight.  She said that she had been hit by mistake and had a bloody nose.  Witness 4 stated that she seemed "flustered," "embarrassed," "upset," "worried," but was not crying.  He did not think she was "super drunk" but thinks alcohol could have been a factor in the accident.

Witness 4 took her upstairs and got some paper towels to help clean her up.  Complainant 2 walked up the stairs ahead of him without assistance.  Witness 4 could not tell how much she had been drinking and noted that she showed no obvious signs of intoxication (she was not stumbling or slurring her words).  He reiterated that she was "flustered" and "upset," and that she kept saying "I'm sorry."  Witness 4 does not recall whether they went into the bathroom to clean up.  Once she was cleaned up and her nose stopped bleeding, Witness 4 thought she was "fine" and went back downstairs.  He estimates that he was helping her for about five minutes or so.

When he left her, she was either sitting on a folding chair or standing at the top of the stairs on the second floor where people were waiting for the bathroom.  When Witness 4 left, Respondent was also there and Witness 4 thought that Respondent would take care of her (Witness 4 knew they were friends and had hooked up in the past).  Witness 4 does not recall having any conversation with Respondent before he (Witness 4) went downstairs.

2

After Witness 4 returned to the party, he does not recall seeing either Respondent or Complainant 2 downstairs and he thinks they both stayed upstairs for the rest of the party.

Witness 4 left the party between 1:30 am and 2:00 am with a group of friends (not USciences students).  Respondent and Complainant 2 left the house around the same time.  Witness 4 did not talk to Complainant 2 but spoke to Respondent about meeting up after he dropped off Complainant 2.  When they left the house, Respondent and Complainant 2 were walking together side by side and Complainant 2 appeared to be walking fine.  They were walking ahead of Witness 4 for about 2 minutes or so until their paths diverged and Respondent took Complainant 2 back to Goodman Hall.  Witness 4 and the group he was with went to another house and hung out until approximately 3:00 am.  Respondent joined them after he left Complainant 2.  The group talked about the party but Witness 4 does not recall any conversation about Complainant 2 or her accident.

When asked whether he had an opinion as to how intoxicated Complainant 2 was at the party, Witness 4  said that he knew that she had been drinking but that he could not tell how drunk she was.  He stated that he had seen her drunk before and it was hard to gage from her behavior how much she had been drinking.  Complainant 2 has since told him that she was really drunk at the party and Witness 4 saw nothing that night that would either confirm or disprove that she was really drunk.

D_00106

# EXHIBIT M

Witness 5 Interview Notes

I interviewed Witness 5 on October 12, 2018 at 1:00 pm in Whitecar Hall (Women's Club Room).  We spoke for approximately 50 minutes.

Witness 5 is a fourth year P2 student.  He is currently one of Respondent's roommates at the house located at 626 S 42nd Street.  He has known Respondent since their freshman year.

Respondent identified Witness 5 as someone who would have information regarding the January 14, 2018 party and the September 2017 card party.  He also identified Witness 5 as seeing Complainant 1 the morning after he (Respondent) and Complainant 1 hooked up in November 2017.

Witness 5 stated that Respondent had told him very little about the issues being investigated. Witness 5 knows generally that he (Respondent) had been accused of sexual assault by two different girls: Complainant 1 and Complainant 2.

<u>January 14, 2018 party</u>

According to Witness 5, the January 14, 2018 party started around 10:30 to 11:00pm.  He was there from the beginning mingling with friends.  He had hosting responsibilities and was walking around throughout the evening checking on things to make sure there were no problems.  Once the party got underway, there were approximately 100 people in attendance.  He believes that the party started to wind down around 12:30 am, when people started leaving.

He saw Complainant 2 arrive at the party with some friends but did not talk to her.  He recalls that she got there fairly early.  He does not know Complainant 2 well (she is an acquaintance to whom he says "hi").

He recalls seeing Complainant 2 again later, talking to Witness 4 near the kitchen area.  He is not sure of the time but believes it was between 11:30 pm and 12:00 am.  He could not tell whether she had been drinking but assumed that she was.

He saw her a third time a short time later (approximately 15 minutes or so) walking up the stairs with a bloody nose.  Witness 4 was still with her.  She was holding tissues to her nose with both hands and was walking up the stairs unassisted.  Witness 5 was upstairs waiting in line for the bathroom. As soon as the bathroom was free, Witness 4 and Complainant 2 cut in line and went in.  Witness 5 asked Witness 4 if he needed anything but Witness 4 told him he had it under control.  Witness 4 told him that Complainant 2 had been "elbowed."  He does not recall talking to Complainant 2 but she might have said "my nose is bleeding."  Witness 5 does not recall if anyone else went into the bathroom with them.  Witness 5 did not see Complainant 2 again for the remainder of the night.  Based on his observations of Complainant 2, Witness 5 could not tell how much she had been drinking (although she was able to go up the stairs on her own).

Witness 5 then went back downstairs.  He saw Respondent as he returned downstairs. Respondent was "handling the juice" at the stairs.  Witness 5 did not talk to him or say anything about Complainant 2.  He thinks that Respondent's friend from out-of-town came down to get

2

him shortly after that, and that Respondent then went upstairs.  He recalls that Respondent then called down to his friend from out-of-town and thinks that Respondent was making sure someone was going to cover his hosting duties.

When the out-of-town friend returned downstairs, Witness 5 asked him where Respondent was and the friend told him he was in his room.  Witness 5 assumed that he was probably with Complainant 2 because they had been hooking up the prior semester.  He, the out-of-town friend and a couple other people then went upstairs and bothered Respondent by knocking at his door to ask him for a charger.  Witness 5 believes this was 10 to 20 minutes after Respondent had spoken to his out-of-town friend about covering for him.  Witness 5 recalls that Respondent cracked opened the door (the lights were off) and told them to go away.  Witness 5 could not see into the room and did not see or hear anyone in the room.  They then returned downstairs and continued to hang out.

The party started to wind down and Witness 5, his girlfriend and a smaller group (approximately 20 people) were still hanging out.  Witness 5 does not recall seeing Respondent or Complainant 2.  Witness 4 was there but Witness 5 does not recall when he left.

The next morning, Witness 5, Witness 10, Respondent, Respondent's out-of-town friend and possibly another guy had breakfast around 9 am.  Although there was conversation about the party, Witness 5 does not recall anyone talking about Complainant 2.  He does not believe that she spent the night because she wasn't there in the morning.

Witness 5 does not know when/why Respondent's relationship with Complainant 2 came to an end.

September 2017 "Kings" card party

Witness 5 was at the September 2017 card party at their house.  Kings is a drinking game but Witness 5 does not believe it would be possible to really get drunk playing the game (although he acknowledges someone who doesn't drink regularly could get drunk playing).  There were 15 to 20 people at this gathering, including Complainant 2, two of Complainant 2's friends, Witness 10, Witness 7, and Witness 8.  Witness 5 does not recall whether Witness 2 was there.  Witness 5 recalls that Complainant 2 and Respondent sat together and believes that this was one of the first times they hooked up.  Witness 5 does not recall Complainant 2 being drunk at this gathering.

November 2017

Witness 5 was texting with Respondent the evening Respondent and Complainant 1 hooked up in November 2017.  According to Witness 5, Respondent first texted him that Complainant 1 and he were snapchatting and she appeared to indicate that she wanted to hook up, then texted him that he wasn't sure it was going to happen, and then texted him that she was coming over.

Witness 5 spent the night with his girlfriend and was not home.  Witness 5 came home early (he thinks around 7:00 or 8:00 am) because he had to work that morning.  He was in his room and heard the steps of two people walking and going down the stairs together.  Respondent later told

3

him that it was Complainant 1 and that she left early because she was going to a "crossing thing."  Respondent did not say anything else about his night with Complainant 1.

# EXHIBIT N

Witness 6 Interview Notes

I interviewed Witness 6 on October 12, 2018 at 2:00 pm in Whitecar Hall (Room 114).  We spoke for approximately 40 minutes.

Witness 6 is a fourth year P2 student.  He is currently one of Respondent's roommates at the house located at 626 S 42nd Street.

Respondent identified Witness 6 as someone who would have information regarding the January 14, 2018 party.  Witness 6 stated that Respondent had told him very little about the issues being investigated.  Witness 6 knows generally that he (Respondent) had been accused of sexual assault by two different girls and that one of the girls was Complainant 2.

Witness 6 did not participate in the January 14, 2018 party (he did not want "anything to do with it") and was not at home for much of the night.  He returned to the house around 11:30 pm to 12:00 am.  The party was still ongoing and Witness 6 estimates that there were around 100 people in attendance.  He went straight upstairs.

Witness 6 saw Respondent on the stairs when he got home.  He did not see Complainant 2.  He stayed in his room for a while.  He could hear people outside in the hall.  He heard people yelling at Respondent to get out of the bathroom because he had been in there for a long time.

Witness 6 later heard people in the hall heckling Respondent (who was in his room) because he was in there with a girl.  Although his room is next to Respondent's, he could not hear anything from Respondent's room due to the loud music.

Around 12:45 to 1:00 am, Witness 6 left his room to go downstairs briefly.  Respondent's door was shut and he thinks that Respondent was in his room.  He could not tell whether anyone was with him.  Witness 6 said hi to his two other roommates downstairs (Witness 5 and Witness 10) and then returned to his room.  He was downstairs for approximately 10 minutes.  One of his roommates (Witness 10) told him that Respondent was upstairs with Complainant 2.  Witness 6 thought nothing of this because Respondent and Complainant 2 had hooked up in the past.  When he returned upstairs, Respondent's door was still shut.

Witness 6 did not leave his room again until the morning and does not recall hearing anything unusual.  He did not see or hear Complainant 2 at any point during the party or later that night.

At a much later point in time, he heard that Respondent and Complainant 2 had stopped hooking up.  It is his understanding that she no longer wanted to see him after that night.  He believes he learned this from either Witness 10 or Witness 5 but is not sure who told him.

Witness 6 has known Respondent since they were freshman living in Goodman Hall.  He does not know Complainant 2 beyond saying hello.

# EXHIBIT O

D_00113

Witness 7 Interview Notes

I interviewed Witness 7 on October 12, 2018 at 3:00 pm in Whitecar Hall (Women's Club Room). We spoke for approximately 40 minutes.

Witness 7 is a fourth year P2 student. She is the girlfriend of one of Respondent's roommates (Witness 5).

Respondent identified Witness 7 as someone who would have information regarding the January 14, 2018 party and the September 2017 "Kings" card party. Witness 7 stated that Respondent had told her very little about the issues being investigated. Witness 7 knows generally that he (Respondent) had been accused of sexual assault by two different girls.

The day of the January 14, 2018 party, Witness 7 was at the house during the day with her boyfriend cleaning and moving furniture. Respondent and others were helping as well.

The party got underway around 10:00/11:00 pm. Witness 7 walked around mingled. Within an hour or so, the party was crowded. Witness 7 estimates there were 80 to 90 people in attendance. The party started winding down around 1:00/1:30 and Witness 7 left around 2:30.

Witness 7 saw Respondent periodically during the evening. Sometimes he was handing out drinks at the stairs; other times he was just mingling. She did not see him drinking and does not know whether he was drunk.

Witness 7 also saw Complainant 2 at the party. She did not speak to her and does not know whether she was drunk.

At some point in the evening, Witness 7 went upstairs and saw Complainant 2 upstairs outside the bathroom with Witness 4. Witness 7 thinks this was around midnight. Witness 4 was taking care of Complainant 2 who was bleeding and Witness 7 was told that Complainant 2 had gotten hurt downstairs. Just before Witness 7 had come upstairs, she had noticed blood on the ground and had cleaned it up with a napkin. She now realized that this had been Complainant 2's blood.

At some point in the evening, Witness 7 also recalls waiting for the bathroom for a long time (approximately 20 minutes). It is unclear whether this was before or after Witness 7 saw Complainant 2 upstairs. Eventually, the door opened and Witness 7 realized that Respondent was the one in the bathroom. He asked for toilet paper. She thinks Respondent then returned downstairs and she later saw him handing out drinks again.

Although Witness 7 did not see Respondent with Complainant 2, she recalls joking with other people about the fact that Respondent was upstairs with a girl towards the end of the night (she estimates this occurred sometime between 1:00 and 2:30). Witness 7 understood that the girl in Respondent's room was Complainant 2. The group (including Witness 7 and Witness 5) went upstairs to give Respondent a hard time and Respondent's friend from out of town knocked on Respondent's door, saying that he needed to get his stuff out of Respondent's room. The room was dark and Respondent got up and shut the door in their faces. They could not see into the room and neither saw or heard anyone else in the room. Witness 7 says Respondent was annoyed and "being Respondent."

2

She does not recall seeing Respondent, Complainant 2 or Witness 4 leaving the party. Witness 7 went to her boyfriend's room for a while but decided not to stay the night because the people who were cleaning up were too loud. She believes she left the house around 2:30 or 3:00 am.

Witness 7 has known Respondent since they were freshman and considers him to be a close friend.

She does not really know Complainant 2 but is aware that Complainant 2 had been hanging out with/hooking up with Respondent. Witness 7 was at a card party in September 2017 when Respondent and Complainant 2 first started hooking up but does not recall anything specific about that gathering. Complainant 2 did not hang out with their group or Respondent's friends during the period they were hooking up. She does not know why/when their relationship ended but thinks that Complainant 2 had a boyfriend at another school. Although she noticed Complainant 2 was not coming around anymore, she never discussed this with Respondent.

Witness 7 volunteered that she was at the house one day when Complainant 2 came over and picked up "a bunch of her stuff." Complainant 2 was only there for about 15 to 20 minutes. She does not know exactly when this occurred. When asked, she said it could have been shortly after the January 14, 2018 party, but is not sure.

When asked if there was anything else Witness 7 wanted me to know about Respondent and/or Complainant 2, Witness 7 shared that Respondent was always respectful, that she trusted him, and that he was "a good guy." She said it was very hard for her to believe that Respondent would assault anyone and that she just "didn't expect anything like this from Respondent."

D_00115

EXHIBIT P

Witness 8 Interview Notes

I interviewed Witness 8 on October 12, 2018 at 4:00 pm in Whitecar Hall (Room 114).  We spoke for approximately 40 minutes.

Witness 8 is a fourth year student.  She has known Respondent since they were freshman.

Respondent identified Witness 8 as someone who would have information regarding the January 14, 2018 party and the September 2017 "Kings" card party.  Witness 8 stated that Respondent had told her little about the allegations and that she knows only generally that he (Respondent) had been accused of sexual assault by two different girls.

Witness 8 arrived at the January 14, 2018 party around 10:00 pm with Witness 9 and her boyfriend.  She did not see either Respondent or Complainant 2 when she arrived.  She mingled and got a drink.  She saw Respondent around 10:30 or so and had a five minute conversation with him.  Based on this interaction, Witness 8 thought he was a little "buzzed" but did not think he was drunk.

At some point later, she saw Complainant 2 in the kitchen/living room area and said "hi." According to Witness 8, Complainant 2 did not appear to be intoxicated based on this limited interaction because she was standing and talking normally.

Witness 8 does not recall seeing either Respondent or Complainant 2 again before she left around midnight.  Witness 8 stated that the punch or "juice" being served was not particularly strong.

Witness 8 recalls the September 2017 "Kings" card party and thinks there were approximately 10 people there.  She doesn't think anyone got drunk (including Complainant 2) and does not recall Witness 2 being present.

Witness 8 states that she was aware of Complainant 2 and Respondent's relationship during the 2017 fall semester.  It was her understanding that it was a casual, non-exclusive relationship.

Witness 8 states that she also had a sexual relationship with Respondent that year (the 2017-2018 academic year).  They had sex three times.  It was casual and not romantic.  During their second sexual encounter, the condom came off or broke during intercourse.  She stated that Respondent was very considerate and caring when this happened and immediately stopped intercourse to help her.  She also stated that he did not attempt to resume intercourse or pressure her to do so. She volunteered, based on her experience, that Respondent was not the kind of guy that would engage in non-consensual sex or be forceful or aggressive during sex.  Witness 8 also stated that she did not feel pressured on any of the three occasions they had sex.  Witness 8 further volunteered that one of her friends, Witness 9, had had an experience with Respondent where he could have taken advantage of her (because Witness 9 was drunk) but instead took care of her.

D_00117

# EXHIBIT Q

Witness 9 Interview Notes

I interviewed Witness 9 on October 17, 2018 at 2:00 pm in Whitecar Hall (Women's Club Room).  We spoke for approximately 40 minutes.

Witness 9 is a senior and lives off campus.  She is a member of the Delta Phi Epsilon sorority.

Respondent identified Witness 9 as someone who would have information regarding the January 14, 2018 party and the September 2017 "Kings" card party.  Witness 9 stated that Respondent had told her very little about the issues being investigated.  Witness 9 knows generally that he (Respondent) had been accused of sexual assault by two different girls.

<u>January 14, 2018 party</u>

Witness 9 arrived at the party around 9:00 or 10:00 pm. The party was not yet crowded.  Witness 9's recollection of the party is limited because she drank a lot that night.  She left the party around midnight or so.

Witness 9 saw Respondent when she first arrived.  He was at the door collecting money.  She also recalls seeing Complainant 2 and said "hi" to her.

She later saw Complainant 2 upstairs after she got injured and remembers thinking "that really sucks."  She does not recall talking to Complainant 2 but remembers seeing her being taken care of by Witness 4 outside the bathroom.  She recalls that Complainant 2 was standing on her own. She recalls Complainant 2 and Witness 4 were next to the bathroom (either inside with the door open or just outside the door) and the area outside the bathroom was really crowded.  Witness 9 believes she was in the group at the top of the stairs for about 15 minutes and then went back downstairs.

<u>September 2017 "Kings" card party</u>

Witness 9 met Complainant 2 for the first time at the September 2017 "Kings" card party.  She had heard that Respondent was "talking" to a girl named Complainant 2 and was excited to meet her.  Complainant 2 had brought a bag with clothes, toothbrush etc. and was planning to spend the night with Respondent.  They played Kings (a casual drinking game) but no one got drunk. Witness 9 does not recall Witness 2 being at this party but she might have been (Witness 2 is not one of her group of friends).  Witness 9 commented that she does not think Witness 2 was there because she recalls talking about sorority stuff and they wouldn't have talked about this with Witness 2 present because she is a member of a different sorority.  Witness 9 does not believe that Complainant 2 was drunk on this evening and states that she seemed perfectly fine when she and Respondent went upstairs for the night.

When asked if there was anything else she wanted to share regarding Respondent and/or Complainant 2, Witness 9 volunteered that she had gotten extremely drunk after a snow-day drinking game as a sophomore and had to be carried to her room.  She says that she threw herself at Respondent and did everything she could to get him to sleep with her.  He did not take advantage of the situation and tucked her into bed.  A day or so later, she apologized to him and

D_00119

he told her that he almost reciprocated but did not because "he knew it was wrong."  Based on this experience, Witness 9 feels strongly that Respondent would never take advantage of a girl who was incapacitated.

Witness 9 considers Respondent to be a close friend.  She does not know Complainant 2 that well but they used to talk when they would see each other.  They do not talk anymore because they are not in the same social circle.  Witness 9 says that she was shocked that assault allegations were made against Respondent.  She thinks of him as a "good guy" and does not believe he is the type of guy who would force or take advantage of a girl.

3

# EXHIBIT R

D_00121

Witness 10 Interview Notes

I interviewed Witness 10 on October 17, 2018 at 3:00 pm in Whitecar Hall (Women's Club Room).  We spoke for approximately 30 minutes.

Witness 10 is currently one of Respondent's roommates at the house located at 626 S 42nd Street).  He is a fourth year student and has known Respondent since their freshman year.

Respondent identified Witness 10 as someone who would have information regarding the January 14, 2018 party.  Witness 10 stated that Respondent had told him very little about the issues being investigated.  Witness 10 knows generally that he (Respondent) had been accused of sexual assault by two different girls.

Witness 10 was stationed outside the house from approximately 11:00 pm to 1:30 am.  His job was to make sure people did not disturb the neighbors.

He did not see Complainant 2 at any point during the party and believes she must have arrived before 11:00 when he took up his post.  At some point in the evening, he heard that she had slipped and gotten a bloody nose from someone (maybe Witness 4).  He did not see her leave the party and concludes that she must have left after 1:30 am if she left that night.  Witness 10 also did not see either Respondent or Witness 4 leave the party.  If they left together, it was after 1:30 am.

Respondent was inside during the party.  He had various duties but was also mingling.  Witness 10 says he wouldn't be surprised if Respondent left his duties and went to his room to be with Complainant 2.

Witness 10 does not know Complainant 2 except to say "hi."  Witness 10 was aware that Respondent had been hooking up with Complainant 2 since the 2017 fall semester.  At one point during the fall, Witness 10 believes they stopped seeing each other briefly and he thinks this break had something to do with a long-distance boyfriend of Complainant 2's.  He knows Respondent and Complainant 2 stopped seeing each other at some point in the 2018 spring semester but does not know when or why (he speculated that it could have been because Respondent started seeing another girl who had been a friend of Complainant 2's).

Witness 10 has known Respondent since they were freshman.  They were in the same residence hall as freshman (Goodman Hall) and shared a suite as sophomores (Osol Hall).  They have been roommates since the 2017 fall semester.  Witness 10 volunteered that he doesn't think that Respondent is the kind of guy to take advantage of a girl.

D_00122