UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, | Case Number: 2:19-cv-00358 |
| Plaintiff-, | Judge: SANCHEZ |
| v. | MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| UNIVERSITY OF THE SCIENCES. | |
| Defendants-Appellees | (EMERGENCY ORAL ARGUMENT REQUESTED) |

Plaintiff John Doe respectfully submits this Motion for a Preliminary Injunction. Plaintiff seeks an Order prohibiting Defendant from imposing any disciplinary sanctions against Plaintiff related to the alleged sexual misconduct described in the Amended Complaint and restoring him as a student in good standing. *See* Proposed Order. This Motion is accompanied by the Affidavit of John Doe.

## FACTS

**A.     The Parties**

USciences is a private higher educational institution founded in 1821. The University is located in Philadelphia, Pennsylvania and has approximately 1200 undergraduate students. (Amended Complaint (Doc#19) ¶4.) The University receives federal funding. (Amended Complaint ¶83.)

Doe is a North Carolina resident who was an undergraduate student at the University. He paid his tuition, attended classes, and had a more than respectable 3.29 GPA. Doe had completed 3½ semesters towards a degree in Biomedical Sciences before he was expelled.

1

B.     The University's Disciplinary Process

This case is one of many amidst a growing national controversy about the responses of colleges and universities to alleged sexual assaults on campuses. After years of criticism for being too lax on campus sexual assault, on April 11, 2011, the U.S. Education Department's Office of Civil Rights ("OCR") sent a "Dear Colleague Letter" to colleges and universities. Letter from Office for Civil Rights, U.S. Dep't of Educ. (April 11, 2011). (*See* Amended Complaint ¶¶9-12.) The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. Observers on both the left and the right noted that this led colleges to eliminate due process protections for accused students in order to create the appearance of being tough on the problem of sexual assault on campuses. *See e.g.* Caroline Kitchens, *Overreaching on Campus Rape,* National Review, May 13, 2014 ("Because of the inadequacy of campus courts and lack of procedural safeguards in place to protect students, this has grave consequences for due process"); Emily Yoffe, *The College Rape Overreaction*, Slate, Dec. 7, 2014 ("Colleges, encouraged by federal officials, are instituting solutions to sexual violence against women that abrogate the civil rights" of accused students). The procedures adopted by schools have received substantial criticism from federal courts in recent years. For example, one federal court observed:

> Sexual assault is a deplorable act of violence… Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D. Ohio 2018).

On September 22, 2017, OCR withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from

Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017).  In withdrawing the Dear Colleague Letter, OCR observed that prior actions

> may have been well-intentioned, but… led to the deprivation of rights for many students — both accused students denied fair process and victims denied an adequate resolution of their complaints.

*Id.* at 1-2.  OCR further acknowledged:

> Legal commentators have criticized the [Dear Colleague Letter]…  for placing 'improper pressure upon universities to adopt procedures that do not afford fundamental fairness.' [As a result, many schools have established procedures for resolving allegations that] lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.

*Id.*, *quoting* Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; Members of the Harvard Law School Faculty, *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

Against this background, the University adopted a Sexual Misconduct Policy (the "Policy"). (Sexual Misconduct Policy Definitions, Process and Procedures, Amended Complaint Ex. A.)  The Policy provides that a "person who wants to engage in a specific sexual activity is responsible for obtaining consent for that activity." (Amended Complaint Ex. A §2.1.1.)

The obligations of the University are triggered by a Report, which is defined as "notifying the Title IX Coordinator or other Responsible Employee of" possible misconduct.  (Amended Complaint Ex. A §2.3.1, JA133.)  Following a Report, the University's Title IX Coordinator is required to meet with the accused student in order to provide "written notification of the allegations," as well as information about the Policy.  (Amended Complaint Ex. A §2.10.1, JA138.) The accused student may have an "advisor" present during all meetings, but the advisor may "not speak… at any meeting" or "direct questions to any administrator, party or witness in the process. (Amended Complaint Ex. A §2.14.2.)

3

The Title IX Coordinator assigns an investigator; this investigator makes "findings of fact, applying a preponderance of the evidence standard (i.e., more likely than not), and determine[s] based on those findings of fact whether a violation of this policy occurred. (Amended Complaint Ex. A §2.10.2.) The investigator may conduct interviews of the alleged victim, the accused student, and "witnesses provided by both the complainant and respondent." (Amended Complaint Ex. A §§2.10.4-2.10.7.) The purpose of the interviews is to "gather and assess information about the incident(s) at issue" and is "not to solicit general information about either party's character." (Amended Complaint Ex. A §2.10.5.) The accused student is never given an opportunity to question his accuser. Instead, a draft investigative report is provided to the parties. The alleged victim and the accused student may review "preliminary factual findings" and "submit a written response to the investigator."

The Student Handbook (which sets forth the University's rules and is a contract, *see infra*.) guarantees certain rights to students accused of sexual misconduct. The Student Handbook provides that the Policy "serves to demonstrate the University's commitment to… engaging in investigative inquiry and resolution of reports that are adequate, reliable, impartial, prompt, fair and equitable." (Amended Complaint Ex. B at 37.) The Handbook summarizes the University's obligations to provide a fair hearing process even if the formal rules of courts are not utilized:

> Students should be aware that the student conduct process is quite different from criminal and civil court proceedings. *Procedures and rights in student conduct procedures are conducted with fairness to all*, but do not include all of the same protections afforded by the courts. Due process, as defined within these procedures, assures written notice and the opportunity for a hearing before an objective decision-maker. No student will be found in violation of a University policy without information showing that it is more likely than not that, a policy violation occurred. Any sanctions will be proportionate to the severity of the violation and to the cumulative conduct history of the student.

(Amended Complaint Ex. B at 49 (emphasis supplied).)

If the investigator determines that a violation has occurred, sanctions are determined by a 3-person panel of faculty and staff. (Amended Complaint Ex. A §2.11.2.) An appeal is available, but is limited to certain situations, such as a "substantive violation of the procedures" which "is likely to have the effect of changing the outcome," new evidence, "the decision regarding responsibility was in error," or "the sanctions are not commensurate with the violation." (Amended Complaint Ex. A §2.15.1.)

C.   **The Allegations Against Doe**

Doe had sexual encounters with two female students at the University, identified as Jane Roe 1 ("Roe 1") and Jane Roe 2 ("Roe 2").

In November, 2017, Doe and Roe 1 had an exchange on Snapchat, described as follows in the investigation:

> [Roe 1] and [Doe] had a snapchat exchange the evening of November 3, 2017, in which [Roe 1] complained about "guy issues." Respondent invited Complainant 1 to his house to talk.
>
> Both [Doe] and [Roe 1] understood that sex was a possibility if [Roe 1] accepted this invitation. [Doe] and [Roe 1] had known each other for over a year and had a casual, non-sexual friendship.

(Investigation at 5.) Roe 1 then came over to Doe's residence where the two engaged in sexual activity, including oral sex and intercourse. (Amended Complaint ¶¶22-28.) In the morning, the two again had sexual intercourse and Doe walked Roe 1 back to her residence. The two continued to interact over the following days. (Amended Complaint ¶¶32-33.) More than nine months later, in August 2017, Roe 1 reported to the University that Doe had engaged in sexual misconduct by engaging in sexual activity with her in the morning without her consent. (Amended Complaint ¶¶35-36.)

In late 2107 through early 2018, Doe and Roe 2 had an ongoing sexual relationship. The relationship was a casual, "friends with benefits" type of relationship; the two would often arrange

5

to meet for sex via text messages or after meeting at parties. (Amended Complaint ¶39.) In January 2018, Roe 2 attended a party of Doe's residence. Both Doe and Roe 2 consumed alcohol. (Amended Complaint ¶¶40, 42.) Roe 2 agreed to spend the night in Doe's room and the two engaged in sexual activity. (Amended Complaint ¶¶41, 43-44.) Roe 2 left approximately 2:00 am. (Amended Complaint ¶45.)

More than seven months later, in August 2018, Roe 1 and Roe 1's sorority sister encouraged Roe 2 (who was also a member of the same sorority) to file a report of sexual misconduct against Doe. (Amended Complaint ¶¶37, ¶47.) The Amended Complaint alleges that, in order to do this, Roe 1 and Roe 1's sorority sister violated the confidentiality provisions of the Policy. The Amended Complaint states:

> Despite policies and regulations prohibiting students from disclosing information about a report or a complaint of sexual misconduct, [Roe 1]… and others were permitted and encouraged by the University to disclose information about [Roe 1's] complaint to others in an effort to find other women willing to make a complaint against [Doe].

(Amended Complain ¶37. *Compare* Amended Complaint Ex. A §1.23.3(Policy provision prohibiting the disclosure on information).)

The University retained an attorney to conduct a single inquiry into both of the allegations against Doe. (Amended Complaint ¶59.) Doe was provided with notice of an investigation, but was not provided details of the allegations against him. (Amended Complaint ¶50.) As a result, Doe was unprepared to answer some of the questions from the investigator due to the passage of time between the sexual encounters and the filing of the complaints. (Amended Complaint ¶63(g.)

The investigator sought and received impermissible character evidence about Doe, declined to interview witnesses with information helpful to Doe, and disregarded witness statements that tended to exonerate Doe. (Amended Complaint ¶¶63(a)-63(c), JA103.) For example, the investigator considered character evidence from other female students that Doe "was pushy and

6

would not take no for an answer," but did not consider other witnesses who stated that Doe "would never have sex with someone without their consent." (Amended Complaint ¶65(b).) The investigator also demonstrated bias against Doe. For example, the investigator refused to confront Roe 1 and Roe 2 about inconsistencies in their statements despite conducting multiple interviews with each alleged victim. In contrast, the investigator "always cross-examined [Doe] on any discrepancy in his version of events." (Amended Complaint ¶¶63(e)-63(f).) The investigator also disregarded the testimony of several witnesses who provided evidence contrary to the statements of Roe 1 and Roe 2. (*See e.g.* Amended Complaint ¶¶63(c), 65(d).)

The investigation was completed on November 13, 2018. (Amended Complaint ¶66.) The investigator concluded that Doe had engaged in sexual misconduct with Roe 1 by engaging in sexual intercourse without affirmative consent. (Amended Complaint ¶68.) The investigator concluded that Doe had engaged in sexual misconduct with Roe 2 by engaging in sexual intercourse when Roe 2 was incapacitated due to alcohol consumption. (Amended Complaint ¶69.) Doe was subsequently expelled from the University. (Amended Complaint ¶75.) His appeals were denied. (Amended Complaint ¶78.)

This litigation shortly followed.

D.    **Procedural History**

On January 24, 2019, Doe filed a Complaint and Motion for a Temporary Restraining Order and Preliminary Injunction. After a two-day hearing, the District Court denied the Motion for a Temporary Restraining Order and Preliminary Injunction. (Feb. 14, 2019 Order (Doc#14).) Doe filed an Amended Complaint on April 15, 2019. The University filed a Motion to Dismiss. (Doc#23) The Court held oral argument on July 10, 2019. (July 10, 2019 Hrg.) On June 29, 2019, the District Court granted Defendant's Motion to Dismiss. (Doc#37.) The Third Circuit reversed

and remanded the case for further proceedings. *Doe v. Univ. of the Sciences*, 961 F.3d 203 (3d Cir. 2020).

## ARGUMENT

**A.    The Standard For Resolution Of This Motion**

The standard employed to determine whether Plaintiff is entitled to a temporary restraining order is the same as that used for a preliminary injunction: Plaintiff must demonstrate "(1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Bimbo Bakers USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010); *see also Pileggi v. Aichele*, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012) ("The standard for granting a temporary restraining order . . . is the same as that for issuing a preliminary injunction."), *citing Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994)).

**B.    Cases Granting Preliminary Injunctions To Students**

Federal courts have granted preliminary injunctive relief prohibiting private universities from implementing discipline against students accused of sexual misconduct where the student raised significant breach of contract claims. *See e.g. Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017) (court concluded that a student facing discipline for an allegation of sexual misconduct has demonstrated "at least some likelihood of success on the merits of his breach of contract claim and of irreparable harm"); *Doe v. Middlebury College,* D.Vt. No. 1:15-cv-192-jgm, 2015 U.S. Dist. LEXIS 124540 (Sep. 16, 2015) (court found that a student accused of sexual misconduct had "demonstrated a sufficiently serious question regarding whether [the school] violated its policies"); *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014) (court found that a student accused of sexual misconduct had demonstrated likely success on breach of contract claims against the school).

Courts have similarly granted injunctive relief against public colleges and universities, finding that students faced irreparable harm from the imposition of school discipline. *See e.g. Doe v. Rector & Visitors*, W.D.Va. Civil Action No. 3:19CV00038, 2019 U.S. Dist. LEXIS 108990 (June 28, 2019) (granting a preliminary injunction prohibiting a public university from proceeding with a disciplinary hearing after concluding that the student had demonstrated a likelihood of success on the merits of his procedural due process claim); *Doe v. Univ. of Michigan*, 325 F. Supp. 3d 821, 826 (E.D.Mich. 2018) (granting preliminary injunction prohibiting a public university from continuing with an unconstitutional disciplinary process); *Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017) (granting preliminary injunction prohibiting a public university from suspending a student); *Ritter v. Oklahoma*, W.D.Okla. No. CIV-16-043 8-HE, 2016 U.S. Dist. LEXIS 60193 (May 6, 2016) (ordering school to stay any discipline and permitting student to complete all remaining graduation requirements); *Doe v. Pennsylvania State Univ.*, M.D.Pa. No. 17-CV-01315, 2017 U.S. Dist. LEXIS 132186 (Aug. 18, 2017) (granting preliminary injunction to student who had alleged that a school acted in violation of his due process right to confrontation in disciplinary proceedings); *Doe v. University of Cincinnati,* 223 F. Supp. 3d 704 (S.D. Ohio 2016), *aff'd* 872 F.3d 393 (6th Cir. 2017) (same); *Roe v. Adams-Gaston*, S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697 (Apr. 17, 2018) (same).

**C.    The Plaintiff Has A Substantial Likelihood of Success On His Breach Of Contract Claim[1]**

   **1.    Standard**

Under Pennsylvania law, a student and a private university have a contractual relationship. *Powell v. Saint Joseph's Univ.*, E.D.Pa. No. 17-4438, 2018 U.S. Dist. LEXIS 27145, at *10-11 (Feb. 16, 2018), *quoting Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999). The contract between an educational institution and a student includes any "agreement between the parties concerning disciplinary procedures, contained within a portion of the student handbook." *Doe v. Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 810 (E.D.Pa. 2017), quoting Reardon v. Allegheny Coll., 926 A.2d 477, 480 (Pa. Super. Ct. 2007) (citation omitted).

A number of contractual provisions require the University to provide a fundamentally fair system. The University's Student Handbook, provides: "Procedures and rights in student conduct procedures are conducted with fairness to all…" (Amended Complaint Ex. B. at 49.) A policy statement attached to the Handbook, states that the University is committed to "engaging in investigative inquiry and resolution of reports that are adequate, reliable, impartial, prompt, fair and equitable." (Amended Complaint Ex. B. at 37.)

   **2.    The Single Investigator Model Does Not Provide A "Hearing" As Required By Pennsylvania Law**

The contractual promise by a school to provide "fundamental fairness" has a very specific meaning under Pennsylvania law. Under Pennsylvania law "fundamental fairness" requires some form of a hearing, and the failure of the University to provide any such hearing is a violation of this

---

[1] Plaintiff also has a viable Title IX selective enforcement claim; Plaintiff alleges that the decision to initiate proceedings or the penalty imposed was affected by plaintiff's gender. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). However, given the decision of the Third Circuit on the breach of contract claim, Plaintiff does not believe it necessary to address the selective enforcement claim in this Motion.

10

contractual guarantee.  The decision of the Third Circuit on this point in this case was clear and unambiguous:

> Pennsylvania courts have similarly determined that fairness includes the chance to cross-examine witnesses and the ability to participate in a live, adversarial hearing during which the accused may present evidence and a defense.

961 F.3d at 214.  The Third Circuit added:

> In short, notions of fairness in Pennsylvania law include providing the accused with a chance to test witness credibility through some form of cross-examination and a live, adversarial hearing during which he or she can put on a defense and challenge evidence against him or her.

961 F.3d 203 at 214.

Other courts have, prior to the Third Circuit's decision, held that fundamental fairness requires a hearing.  In *Trustees of the Univ. of Pennsylvania*, a district court in this Circuit concluded that a promise of fairness by a private institution includes the standard of fundamental fairness for disciplinary proceedings at state universities. 270 F. Supp. 3d at 812 n. 6.  That court then observed that a university's obligation to provide "fundamental fairness" requires a university to provide "notice of the charges *and some opportunity for hearing.*" 270 F. Supp. 3d at 812 (emphasis supplied), *quoting Ruane v. Shippensburg Univ.*, 871 A.2d 859, 862 (Pa. Commw. Ct. 2005).  In *Ruane, supra*, a Pennsylvania court observed that a private university was not "obligated to provide a 'full-dress judicial hearing,' subject to the rules of evidence or representation by counsel."  871 A.2d at 862. However, the court held that a student who is promised fundamental fairness is promised "[a]t a minimum… some opportunity for a hearing." *Id. citing Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.*, 573 A.2d 575, 578-79 (Pa. Super. 1990).  Finally, in *Boehm,* a Pennsylvania court observed that a disciplinary proceeding was "fundamentally fair" because the accused students "were present at and participated in a hearing" where they could "cross-examine witnesses who testified against them and call witnesses to testify on their behalf."  573 A.2d at 579.

The University breached its contractual obligation for fundamental fairness because it did not provide Doe with the opportunity for a hearing. The Handbook, itself, suggests that fundamental fairness requires a hearing: "Due process, as defined within these procedures, assures written notice *and the opportunity for a hearing before an objective decision-maker.*" (Amended Complaint Ex. B at 49.) The Third Circuit's decision made clear that use of a single investigator by USciences was not a hearing and, thus, was a breach of both the "fundamental fairness" requirement in Pennsylvania law and the due process guarantee on page 49 of the Handbook. The court said:

> We hold that USciences's contractual promises of "fair" and "equitable" treatment to those accused of sexual misconduct require at least a real, live, and adversarial hearing and the opportunity for the accused student or his or her representative to cross-examine witnesses—including his or her accusers.

961 F.3d at 215. The court added:

> USciences did not provide Doe a real, live, and adversarial hearing. Nor did USciences permit Doe to cross-examine witnesses—including his accusers, Roe 1 and Roe 2. As we explained above, basic fairness in the context of sexual-assault investigations requires that students accused of sexual assault receive these procedural protections.

961 F.3d at 216. Thus, following the decision of the Third Circuit, Doe has a substantial likelihood of success on his breach of contract claim that the single-investigator model used by USciences violated the fairness that the University promises students accused of sexual misconduct.

**D.     Irreparable Harm**

The accompanying Affidavit of John Doe describes the irreparable harm Plaintiff will suffer if a temporary restraining order and preliminary injunction are not granted. The imposition of discipline by USciences would deny Plaintiff the benefits of education at his chosen school, would damage his academic and professional reputation, would prevent him from competing athletically, and would result in the loss of a scholarship. The discipline will also affect his ability to enroll at other institutions of higher education and to pursue a career. This has been found to constitute irreparable harm. In *Doe v. Univ. of Cincinnati,* the Sixth Circuit observed that a suspended student

12

would "suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing." 872 F.3d 393 at *29. The Fifth Circuit in *Plummer* observed that sanctions imposed by a university could have a "substantial lasting impact on [students'] personal lives, educational and employment opportunities, and reputations in the community." 860 F.3d at 773, *citing Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016). Another court observes that this satisfies the irreparable harm prong of the preliminary injunction inquiry:

> The court concludes plaintiff has also demonstrated that he will suffer irreparable harm if the injunction is denied. The loss of educational and career opportunities he will encounter if not reinstated and allowed to graduate is not readily compensable in money damages.

*Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8.

In the event Defendant attempts to argue that Plaintiff's claims can be fully compensated with money damages, this clam has been rejected by other courts. *See Doe v. Univ. of Michigan*, 325 F. Supp. 3d at 829 ("Money damages cannot compensate Plaintiff for the reputational harm he has already suffered and will continue to suffer as a consequence of sexual assault allegations."); *Haney v. W. Chester Univ.*, E.D.Pa. No. 18-02456, 2018 U.S. Dist. LEXIS 138639, at *28 (Aug. 16, 2018) ("Expulsion also is likely to affect Plaintiff's ability to enroll at other institutions of higher education and to pursue a career. Neither money damages nor any other legal remedy can compensate for these injuries.").

E.     **Harm to Third Parties and Public Interest**

An injunction will not cause any harm to third parties or Defendant. Defendant remains able to enforce its rules and regulations in a manner consistent with its policies and student handbook. On the other hand, the failure to grant an injunction would harm the public because it would permit Defendant to ignore Pennsylvania law with respect to all current and future students on an ongoing basis while this case is resolved, which necessarily would cause substantial, irreparable harm to those students.

Plaintiff has a substantial likelihood of success on his breach of contract claim. *See supra*. Enforcement of contracts is in the public interest, generally – but more so when there is a disparity in power and resources between students and an educational institution. *See Newlife Homecare Inc. v. Express Scripts, Inc.,* M.D.Pa. No. 3:07cv761, 2007 U.S. Dist. LEXIS 33031, at *26 (May 4, 2007) ("a public interest exists in the enforcement of contracts"); *Siemens Building Technologies, Inc. v. Camacho*, 168 F. Supp. 2d 425 (E.D. Pa. 2001) (noting that it is in the public interest to enforce valid contracts).

### F.     Nominal Bond Should Be Imposed

Federal R. Civ. P. 65(C) provides that "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Defendant is an educational institution. Accordingly, because money is not an issue for Defendant and the school is not likely to suffer any potential losses if an injunction is granted, this Court should set surety in the nominal amount of $1. *See Doe v. Cincinnati*, 223 F. Supp. 3d 704 ("The Court sets a bond in the nominal amount of $1."); *Ponce v. Socorro Indep. Sch. Dist.,* 432 F. Supp. 2d 682, 707 (W.D. Tex. 2006) (setting a nominal bond of one hundred dollars because the evidence indicates that Defendant will suffer little, if any, damage by the issuance of the preliminary injunction), *rev'd on other grounds* 508 F.3d 765 (5th Cir. 2007).

## CONCLUSION

This Court should issue a Preliminary Injunction prohibiting Defendant from imposing any disciplinary sanctions against Plaintiff related to the alleged sexual misconduct described in this Amended Complaint pending the completion of trial and the consideration of permanent injunctive relief and issue an Order restoring him as a student in good standing. *See* Proposed Order.

Respectfully submitted,

/s/ Riley H. Ross III
Riley H. Ross III
MINCEY FITZPATRICK ROSS, LLC
Two Penn Center
1500 JFK Blvd., Suite 1525
Philadelphia, PA 19102

Joshua Adam Engel (OH 0075769)
*Pro hac vice*
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the ECF System this August 18, 2020 upon all counsel of record.

/s/ Riley Ross
Riley H. Ross III